UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 11-03216 |
| | ) | |
| The Merit Group, Inc., *et al.,* | ) | (Joint Administration) |
| | ) | |
| | ) | NOTICE AND MOTION PURSUANT TO |
| Debtors.[1] | ) | FEDERAL RULE OF BANKRUPTCY |
| | ) | PROCEDURE 4001(d) |

**TO:    All Creditors and parties in Interest Entitled to Notice under Federal Rule of Bankruptcy Procedure 4001(d)**

The debtor/trustee and Regions Bank hereby move the Court for an order approving the agreement between them which is described below and attached to this notice.

TAKE FURTHER NOTICE that any response, return and/or objection to the interim relief provided in this application, should be filed with the Court no later than [_____] and a copy simultaneously served on all parties in interest.

TAKE FURTHER NOTICE that an emergency hearing on the interim relief requested in this application will be held on _____, ____, at _____m., at _____, _____, South Carolina. No further notice of this hearing will be given.

TAKE FURTHER NOTICE that any response, return and/or objection to the final relief requested in this application, should be filed with the Court no later than [_____] and a copy simultaneously served on all parties in interest.

TAKE FURTHER NOTICE that a hearing will be held on the final relief requested in this application on _____, ____, at _____m., at _____, _____, South Carolina.  No further notice of this hearing will be given.


(A)    TYPE OF AGREEMENT:  **Debtor-In-Possession Credit Facility secured by administrative claim and superpriority lien.**

(B)    The DIP Loan Agreement and proposed order are attached.

(C)    PROVISIONS OF THE AGREEMENT:  **The provisions of the DIP Facility are summarized in the Motion.**

---

[1] The Debtors and the last four digits of their respective tax identification numbers are: The Merit Group, Inc., f/k/a Lancaster Distributing Company, f/k/a Lancaster Paint Sundries, Inc. (4224); Merit Transportation, Inc. (9048); Merit Paint Sundries, LLC d/b/a Lancaster (8882); Merit Supply Company, LLC d/b/a Merit Supply (5878); Merit Pro Finishing Tools, LLC d/b/a Merit Trade Source (8544); Five Star Products, Inc. (9186); and Five Star Group, Inc., d/b/a Lancaster/Five Star, d/b/a Rightway (3506).

(I)    USE OF CASH COLLATERAL:  **The Interim Order and DIP Loan Agreement contemplate the limited use of cash collateral.  The Pre-Petition Lender and others holding a subordinate lien on the Debtors' assets are granted adequate protection by a replacement lien.**

(II)    OBTAINING CREDIT (IF APPLICABLE):  **The DIP Facility is a revolving line of credit up to the maximum amount of $55,000,000, less the amount of the Pre-Petition Revolving Loans and Letters of Credit.  The DIP Facility will mature on or about August 20, 2011.  The DIP Facility will accrue interest at the rate of LIBOR plus 5.25%; provided that Overadvances in excess of the amounts available under the borrowing base will be accrue interest at the rate of LIBOR plus 7.25%.   The Interim Order provides for the subordination of the secured lenders' claims, if necessary, to pay certain unpaid Professional Expenses, to the extent incurred prior to the termination of the DIP Facility, if such expenses are approved by the Court, and the total does not exceed $800,000, or such expenses incurred after the termination of the DIP Facility, if approved by the Court and such total does not exceed $200,000.00.**

1.    If the credit agreement or proposed order includes any provisions listed below, a statement must follow that briefly lists or identifies the applicable provision(s), identifies its specific location in the agreement and proposed order, and identifies any such provision that is proposed to remain in effect if interim approval is granted, but final relief is denied, as provided under Rule 4001(c)(2).   **The references herein relate to the Interim Order and the disclosures are substantially similar in the DIP Loan Agreement; the disclosures may be supplemented prior to any Final Hearing.**

a.    A grant of priority or a lien on property of the estate under § 364(c) or (d);  **See Interim Order at Sections 5 and 6.  The DIP Lender is granted a superpriority lien over all assets of the Debtors.**

b.    The providing of adequate protection or priority for a claim that arose before the commencement of the case, including granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim;  **See Interim Order at Section 8(a), (f), & (g. The Pre-Petition Lenders, including Stonehenge, and Valspar, are granted replacement liens on all assets of the Debtors, which lien is junior and subordinate to the lien of the DIP Lender securing the DIP Facility.**

c.    A determination of the validity, enforceability, priority or amount of a claim that arose before the commencement of the case, or of any lien securing the claim;  **See Interim Order at C(v) & Section 21.  Any claims challenging the Pre-Petition Lender's liens and security interest in the Collateral must be filed no later than the soonest to occur of (a) 75 days after the Petition Date; (b) 65 days after the appointment of a Official Committee of Unsecured Creditors; or (c) the date of an auction under § 363 of the Bankruptcy Code for a sale of all or substantially all the Debtors' assets.**

d.    A waiver or modification of Code provisions or applicable rules relating to the automatic stay;  **See Interim Order at 19.  The stay shall be modified and lifted as needed to implement the DIP, including among other things allowing the Senior Lenders to receive collections of Collateral for**

2

application to Pre-Petition Obligations and DIP Obligations, file lien and perfection documents, and to enforce any of the Senior Lender Liens to the extent authorized in the Interim Order.

e.      A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364;  See Interim Order at 13.  Providing protection to the Senior Lenders against other financing orders; see also Benchmark deadlines below by which Debtor must take certain steps in the Chapter 11 Cases to effectuate a § 363 sale of its assets to avoid an event of default under the DIP Facility (which timetable might affect the Debtor's ordinary timing available to formulate a plan).  The Benchmark deadline provides that the order for a § 363 sale and the closing of such sale must occur prior to the date which is 90 days after the Petition Date.

f.      The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order;  Not Applicable.

g.      A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien;  See Interim Order at Section 14.  Providing for automatic perfection of the DIP Liens and Pre-Petition Lender Replacement Liens upon entry of the Interim Order.

h.      A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action;  See Interim Order at C(v) and Section 21.  Providing a deadline for third parties other than the Debtors to object to the validity of the Pre-Petition Lender's liens and claims; Release of any claim of the Debtors' against the Pre-Petition Lenders.

i.      The indemnification of any entity;  See Interim Order at Section 9. Debtors will indemnify DIP Lender for all costs and expenses related to the DIP Facility or the Pre-Petition Obligations and all other costs and expenses incurred by the DIP Lender.

j.      A release, waiver, or limitation of any right under § 506(c);   See Interim Order at Section 11.  Providing that no costs or expenses of administration may be surcharged against the lenders, their claims or Collateral pursuant to §§ 105 or 506(c).

k.      The granting of a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a).  See Interim Order at Section 5 (b).  Providing no encumbrance of avoidance actions except that if the Debtors grant an interest in avoidance actions to any other parties, the Senior Lenders shall be entitled to a parity lien on such avoidance actions.

Additional Disclosures Required under Local Rule 4001-4(b):

COLUMBIA 1040719v1

A. <u>Provisions or findings of fact that bind the estate or parties in interest with respect to the validity, perfection, or amount of the secured party's lien or debt;</u>  **See disclosure c. above. No other party, including the Official Committee of Unsecured Creditors is bound by such provisions. The Debtors believe this provision is warranted under the circumstances because they know of no basis to avoid the liens or dispute the amount of the debt to Pre-Petition Lender and the Pre-Petition Lender will not enter into the DIP Facility without these protections.**

B. <u>Provisions or finds of fact that bind the estate or parties in interest with respect to the relative priorities of the secured party's lien and liens held by persons who are not parties to the stipulation. (This would include, for example, an order approving a stipulation providing that the secured party's lien is a "first priority" lien);</u> **See disclosure above**.

C. <u>Waiver of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds;</u>  **See disclosure j. above. The Debtors believe this provision is appropriate because the Pre-Petition Lender will not enter into the DIP Facility without these protections.**

D. <u>Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or limit access to the Court to seek any relief under other applicable provisions of law;</u> **Not Applicable.**

E. <u>Cross-collateralization clauses, i.e., clauses that secure pre-petition assets in which the secured party would not otherwise have a security interest by virtue of its pre-petition security agreement;</u> **See Interim Order at Section 8. The only cross cross-collateralization securing prepetition debt with postpetition assets is for adequate protection in the event of a diminution in value as a result of Debtor's use of Prepetition Lender's collateral.**

F. <u>"Rollup" clauses, i.e., clauses that include the application of proceeds of post-petition financing to pay, in whole or in part, pre-petition debt;</u>  **See Interim Order a B, C, and Section 8 (b) & (c). The DIP Facility is not being used to "rollup" the Pre-Petition Loan. The Pre-Petition Loan will be paid from the proceeds of the Pre-Petition Lenders Collateral. However, when pre-petition inventory is sold the DIP Lender may advance funds in an amount equal to the value of that inventory to the Debtor which is then applied to the Pre-Petition Loan. This is done to account for the Debtor's use of the Pre-Petition Lenders Collateral and also to simplify the application of proceeds when prepetition inventory and postpetition inventory are sold and one invoice is generated.**

G. <u>Releases of liability for the creditor's alleged pre-petition torts or breaches of contract;</u> **See i. and j. above.**

H. <u>Waivers, assignment, transfer or encumbrance of avoidance actions arising under the Bankruptcy Code;</u> **See k. above.**

I. <u>Immediate entitlement to relief from the automatic stay upon default, conversion of the case, or appointment of a trustee, absent further order;</u>  **See Interim Order at Section 17. DIP Lender is entitled to immediately cease funding of the DIP Facility and after five (5) business days written notice to applicable parties, the DIP Lender may exercise all of its rights and remedies under the DIP Facility Documents and the Pre-Petition Loan Documents, unless the Court enters an order prior to the end of the notice period finding that an event of default has not occurred.**

4

J.  Waivers of the procedural requirements for foreclosure mandated under applicable non-bankruptcy law;  **Not Applicable.**

K.  Adequate protection provisions that create liens on claims for relief arising under the Bankruptcy Code; **See Interim Order at Section 5(b) & 6.**

L.  Findings of fact on matters extraneous to the approval process.  (For example, in connection with an application to borrow on a secured basis, a finding that the debtor cannot obtain unsecured credit would be acceptable, whereas a "finding" that the lender acted in good faith in declaring the pre-petition loan in default would not be acceptable.  Do not include long histories of the relationship between the parties or a lengthy recitation or detailing of documents. A finding that notice is proper should be replaced by a provision which states that notice has been given according to the certificate of service filed by the movant);  **Not Applicable.**

M.  Provisions which merely recite the Bankruptcy Code. (For example, a provision that in the event the adequate protection provided by the debtor is insufficient that the creditor is entitled to an administrative priority claim is unnecessary since that is the effect of § 507(b));  **Not Applicable**.

N.  Any provision which purports to bind a later appointed trustee to the agreement of the debtor;  **See Interim Order at Sections 13 and 23.  The Debtors believe these provisions are appropriate because the DIP Lender will not enter into the DIP Facility with the protections granted in these sections.**

O.  Provisions which prohibit or restrict the Court's ability to vacate, modify, or stay the effect of a consent order or which provide for conditional approval by the Court before notice and an opportunity for hearing or provisions in which the Court independently finds "all of the terms of the agreement to be fair and reasonable," for such provisions presume a detailed determination which may not have been undertaken;  **Not Applicable.**

P.  Waivers that divest the Court of its power or discretion in a material way, or interfere with the exercise of the fiduciary duties of the debtor or unsecured creditors' committee in connection with the operation of the business, administration of the estate, or the formulation of a reorganization plan, such as provision that deprive the debtor or unsecured creditors' committee of the ability to file a request for relief with the Court, to grant a junior post-petition lien, or to obtain future use of cash collateral.  **See Interim Order at Section 13a.  The Debtors believe these provisions are appropriate because the DIP Lender will not enter into the DIP Facility with the protections granted in these sections.**


(D)    IMPACT ON PRE-PETITION CLAIMS:  The DIP Facility represents the best opportunity for the Debtors to continue to operate their businesses while pursuing a § 363 sale, which will ultimately benefit the unsecured creditors in terms of the value of their claims and the opportunity for the continued viability of the businesses.

(E)    DEFAULT:  **Events of Default under the Interim Order and the DIP Facility include but are not limited to (1) failure to achieve the sales goals or exceeding the expenses or other deviations from the Budget; (2) failure to make any payments set forth in the DIP Loan Agreement; (3) failure to meet the Benchmarks related to a potential § 363 sale; (4) failure to cure any Overadvance; (5) other terms and conditions set forth in the DIP Loan Agreement.**

(F)    RESULT OF DEFAULT:  **See I above.**

COLUMBIA 1040719v1

(G)    DESCRIPTION OF PROPERTY SUBJECT TO LIEN: **All assets of the Debtors.**

(H)    APPRAISED VALUE OF PROPERTY SUBJECT TO LIEN:    **To be Determined.    The Debtors do not believe all of the parties holding liens on its pre-petition assets are fully secured.**

(I)    LIEN AMOUNT (IF APPLICABLE):  **The prepetition secured debt obligations of Debtors is estimated at $64,000,000.**

(J)    MOVING PARTIES:

> Michael M. Beal, Esquire
> 1221 Main Street, 18th Floor
> Post Office Box 11390
> Columbia, South Carolina 29211
> Tel: (803) 799-9800
> Proposed Counsel to the Debtors and
> Debtors-in-Possession
>
> AND
>
>
> Julio E. Mendoza Jr. Esq
> Nexsen Pruet Jacobs & Pollard
> 1441 Main Street, 15th Floor (29201)
> Post Office Drawer 2426
> Columbia, SC 29202-2426
>
> C. Edward Dobbs, Esquire
> Parker, Hudson, Rainer & Dobbs LLP
> 285 Peachtree Center Avenue, N.E.
> 1500 Marquis II Tower
> Atlanta, Georgia 30303
> Direct: 404.420.5529
>
> Counsel for Regions Bank

(K)    LOCAL RULE DISCLOSURE: See above.

Date: May 17, 2011

McNAIR LAW FIRM, P.A.

/s/ Michael M. Beal
Michael M. Beal (S.C. Dist. Ct. ID# 1253)
Robin C. Stanton (S.C. Dist. Ct. ID# 7438)
Elizabeth (Lisa) J. Philp (S.C. Dist. Ct. ID# 8033)
Michael H. Weaver (S.C. Dist. Ct. ID# 9847)
1221 Main Street, 18th Floor
Post Office Box 11390
Columbia, South Carolina 29211
Tel: (803) 799-9800
Fax: (803) 753-3277
mbeal@mcnair.net
rstanton@mcnair.net
lphilp@mcnair.net
mweaver@mcnair.net

PROPOSED COUNSEL TO THE DEBTORS AND
DEBTORS-IN-POSSESSION


/s/ Julio E. Mendoza, Jr.
Julio E. Mendoza, Jr. Fed ID No. 3365
NEXSEN PRUET, LLC
1230    Main    Street,    Suite    700    (29201)
Post        Office        Drawer        2426
Columbia, South Carolina 29202
PHONE: 803-771-8900
FACSIMILE: 803-253-8277
RMendoza@nexsenpruet.com

And

C. Edward Dobbs, Esquire
Elizabeth C. Arnett, Esquire
PARKER, HUDSON, RAINER &
   DOBBS LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303
PHONE: 404-420-5542
FACSIMILE: 678-533-7733
EDobbs@phrd.com
ECA@phrd.com

ATTORNEYS FOR REGIONS BANK

UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Merit Group, Inc., *et al.,* | ) | Case No. 11 - _____ |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| _____ | ) | |

## MOTION FOR AN INTERIM AND FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING

The Merit Group, Inc. and its affiliates ("Merit Group" or the "Debtors"), the above-caption debtors and debtors-in-possession, hereby move this Court pursuant to Sections 105(a), 361, 362, 363, 364(c), 364(d), and 507 of Title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule") 2002, 4001, and 9014 for the entry of (a) an interim order, substantially in the form of the proposed interim order attached hereto as **Exhibit "A"** (the "Interim Order"), (i) authorizing the Debtors to obtain secured post-petition financing and other extensions of credit on a super priority basis (the "DIP Facility") pursuant to the terms and conditions of that certain Post-Petition Loan and Security Agreement (together with all schedules, exhibits, and annexes thereto, and as at any time amended, supplemented, restated, or otherwise modified from time to time, the "DIP Loan Agreement") between the Debtors and Regions Bank (in its capacity as post-petition lender, the

---

[1] The Debtors and the last four digits of their respective tax identification numbers are: The Merit Group, Inc., f/k/a Lancaster Distributing Company, f/k/a Lancaster Paint Sundries, Inc. (4224); Merit Transportation, Inc. (9048); Merit Paint Sundries, LLC d/b/a Lancaster (8882); Merit Supply Company, LLC d/b/a Merit Supply (5878); Merit Pro Finishing Tools, LLC d/b/a Merit Trade Source (8544); Five Star Products, Inc. (9186); and Five Star Group, Inc., d/b/a Lancaster/Five Star, d/b/a Rightway (3506).

"DIP Lender"), substantially in the form annexed as **Exhibit B**[2] hereto; (ii) authorizing the

Debtors to execute and deliver the DIP Loan Agreement and related instruments, security

agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to

therein or requested by the DIP Lender to give effect to the terms thereof among the Debtors and

the DIP Lender (the DIP Loan Agreement and such related instruments, security agreements,

pledges, assignments, control agreements and other documents, as at any time amended,

being collectively called the "DIP Financing Documents"), and to perform such other acts as may

be necessary or desirable in connection with the DIP Financing Documents; (iii) granting the DIP

Facility and the DIP Obligations (as defined below) allowed super priority administrative

expense claim status in each of the Chapter 11 Cases, and in any case under chapter 7 of the

Bankruptcy Code upon the conversion of any such case or any of the Chapter 11 Cases, or in any

other proceedings superseding or related to any of the foregoing (collectively, the "Successor

Cases"); (iv) granting to the DIP Lender automatically perfected security interests in and liens

upon all of the Collateral (as defined below), including, without limitation, all property

constituting Cash Collateral (as defined below), which liens shall have the priorities set forth

herein; (v) authorizing the use of Cash Collateral under the Pre-Petition Loan Documents (as

defined below) and providing adequate protection to the Pre-Petition Lender for any diminution

in value of its interest in the Pre-Petition Collateral (as defined below), including, without

limitation, the Cash Collateral; (vi) vacating and modifying the automatic stay imposed by

section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the

terms and provisions of the DIP Financing Documents, as limited pursuant hereto; and (vii)

---

[2] Defined Terms not defined in this Motion shall have the meanings assigned to them in the Interim Order or DIP
Loan Agreement.

scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing.

The facts and circumstances supporting the Motion are set forth below and in the Affidavit of Mitchell T. Jolley in Support of First Day Motions filed concurrently herewith (the "Affidavit"). In support of the Motion, the Debtors respectfully represents as follows:

## **INTRODUCTION**

1.      On the date hereof, (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the District of South Carolina (the "Court"). The Debtors are operating their businesses and managing their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.[3]

2.      No statutory committee has yet been appointed in these Chapter 11 cases.

3.      The Debtors have requested that the Court designate these cases as Complex Chapter 11 Cases pursuant to Local Rule 2081-2 and have requested that these Chapter 11 Cases be jointly administered.

4.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §1334. Venue of this proceeding and this Motion are proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought in the Motion are Sections 105(a), 361, 362, 363, 364(c), 364(d), and 507 of the United States Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

---

[3]  Further reference to the Bankruptcy Code (11 U.S.C. § 101 et.seq.) will be by section number only.

## BACKGROUND

### A.    Organizational Structure

5.    The Merit Group, Inc. is a South Carolina corporation headquartered in Spartanburg, South Carolina. The Merit Group, Inc. is the parent company of five wholly-owned subsidiaries. Four of the subsidiaries, including Merit Transportation, Inc., Merit Paint Sundries, LLC d/b/a Lancaster ("Sundries"), Merit Supply Company, LLC d/b/a Merit Supply ("Supply"), and Merit Pro Finishing Tools, LLC d/b/a Merit Trade Source ("Pro Finishing"), are South Carolina corporations or companies. The remaining wholly-owned subsidiary is Five Star Products, Inc. ("Five Star Products") which has its own wholly-owned subsidiary, Five Star Group, Inc., d/b/a Lancaster/Five Star, d/b/a Rightway ("Five Star Group"). Five Star Products and Five Star Group are both Delaware corporations.

### B.    Overview of Business Operations

6.    As of the Petition Date, Merit Group has approximately 320 employees and serves as one of the leading paint sundries distributors in the United States. It also serves markets in Mexico, the Caribbean Islands, Central America and South America.

7. The Debtors' inventory is supplied by over 750 manufacturers and the Debtors maintain distribution centers in South Carolina, Florida, Kentucky, New Jersey, New York, Texas, California and Utah. The Debtors' customer base consists of more than 10,000 independent, regional and national paint store chains as well as "big box" retailers, hardware stores, lumber yards, home centers, drywall yards and auto trim shop distributors.

8.    The Debtors' 2010 annual revenues were approximately $200 million.

4

9.      The Company has approximately 1,160 creditors excluding its current and former employees and approximately $100 million of total debt.

**C.      Events Leading Up to Bankruptcy Filing**

10.      After The Merit Group, Inc. acquired Five Star Products, Inc. in January 2010, the companies spent far more than anticipated for the consolidation of warehouses and the integration of the organizations, which put substantial stress on the Debtors' liquidity. As a result of these liquidity problems, the Debtors have been unable to purchase goods at normal levels and the lower inventory levels have resulted in declining sales, which has only exacerbated the liquidity problems.

11.      The Debtors have evaluated numerous strategies for resolution of their liquidity difficulties, including potential financial restructuring, cost containment programs and a sale of the company. Notwithstanding these efforts, the Debtors have been unable to resolve their liquidity problems to date. In view of these circumstances, the Debtors have determined that commencement of these Chapter 11 cases is necessary and appropriate at this time to stabilize operations, allow the Debtors to borrow under the proposed debtor in possession loan, purchase inventory and otherwise operate their businesses.

**The Debtors' Prepetition Financing Arrangements and Other Significant Prepetition Liabilities**

12. The Debtors are parties with Regions Bank ("Regions" or the "Pre-Petition Lender") to that certain Amended and Restated Loan and Security Agreement dated January 15, 2010 (hereinafter, together with all amendments thereto and modifications thereof, the "Pre-Petition Loan Agreement"), pursuant to which the Pre-Petition Lender provided the Debtors with a $65

million secured revolving credit facility that was later reduced to $60 million (the "Pre-Petition Loan Facility") under which the Debtors could obtain revolving credit loans and letters of credit (with a sublimit for letters of credit of $3,000,000).

13. As of the Petition Date, there was outstanding under the Pre-Petition Loan Facility or was otherwise owed to the Pre-Petition Lender (a) revolving credit loans in the approximate principal amount of $47,286,000 (the "Pre-Petition Revolver Loans"), (b) term loans in the approximate principal amounts of $916,679, $794,428 and $455,113, (c) reimbursement obligations for any draws made upon letters of credit issued by the Pre-Petition Lender, for the account of the Debtors, in the aggregate face amount of approximately $590,000 (collectively, the "Pre-Petition LCs"), (d) interest rate hedging obligations in the aggregate amount of approximately $1,532,645[4] and (e) corporate credit card debt of a relatively de minimis amount which fluctuates daily (the "Pre-Petition Credit Card Debt" and, together with the Pre-Petition Revolver Loans, Pre-Petition Term Loans, Pre-Petition LCs, and all other obligations of any Debtor to the Pre-Petition Lender on the Petition Date, including, without limitation, all indebtedness associated with cash management system services or products and all interest, fees, legal expenses and other amounts heretofore or hereafter accruing on any of the foregoing or at any time chargeable to any of the Debtors in connection therewith, referred to as the "Pre-Petition Obligations").

14. To secure the Pre-Petition Obligations, each Debtor granted to the Pre-Petition Lender, pursuant to the Pre-Petition Loan Agreement and various mortgages and related security documents (collectively with the Pre-Petition Loan Agreement, as at any time amended, the "Pre-

---

[4] This may reflect estimated termination value and not actual value.

Petition Loan Documents"), security interests in and liens upon (the "Pre-Petition Lender Liens") (a) all or substantially all of such Debtor's personal property, including, without limitation, all accounts, inventory, contract rights, chattel paper, documents, instruments, supporting obligations, general intangibles, equipment, money, securities, deposit accounts, and books and records, and (b) a certain parcel of real property of certain Debtors, and improvements thereto, which parcel is located in Pauline, South Carolina,  (all such real and personal property, as the same existed on the Petition Date, together with all cash and non-cash proceeds thereof, being collectively called the "Pre-Petition Collateral").

15. All of the Debtors' customers mail or wire payments to the Debtors for payment on account to a lockbox account maintained by Regions, which account is in the name of both Regions and the Debtors.  However, Regions withdraws all funds from the Lockbox Account each night and applies the full amount received to the outstanding balance under the Pre-Petition Revolver Loans.  In addition, the Debtors deposit funds received from Five Star Products, Inc.'s Rightway Cash N Carry into a Bank of America Account and these funds are swept directly by Regions and applied to the Pre-Petition Revolver Loans.  (These accounts shall be referred to collectively as the "Lockbox Account".)

16. Regions transfers to the Debtors' zero balance account on a daily basis the lesser of the (i) total amount of checks presented or (ii) monies available to be advanced to the Debtors under the Pre-Petition Revolver Loans based on the availability pursuant to the daily borrowing base calculation.

17. The Debtors have prepared a 13-week pro forma cash budget (attached hereto as **Exhibit C** the "Budget") which itemizes and forecasts the Debtors' cash flow and sources and

uses of cash over the next 13 weeks. The Debtors believe and will show the Court at the preliminary hearing on this matter that the expenses forecast for the first two weeks (in the approximate amount of $7,000,000 and the weeks following in the approximate amount of $4,000,000) must be paid to avoid immediate and irreparable harm to the Debtors and their estates.

## The Stonehenge Loan

19. The Debtors obtained additional financing to assist in its stock purchase acquisition of Five Star Products Inc., and its subsidiary, Five Star Group, Inc. and other capital needs. Stonehenge Opportunity Fund, II, L.P. loaned the Debtors $11,956,565 (which includes paid in kind "PIKed" interest of $456,565), pursuant to a Senior Subordinated Note and Option Purchase Agreement (the "Stonehenge Debt"). The Stonehenge Debt is secured by a second priority lien and security interest in all of the Debtors' real and personal property, including inventory and accounts.

## The Intercreditor Subordination Agreement

20. Pursuant to a certain Amended and Restated Intercreditor and Subordination Agreement dated as of February 18, 2011, among Pre-Petition Lender, Stonehenge and Debtors (as at any time amended, the "Stonehenge Intercreditor Agreement"), Stonehenge agreed, among other things, to subordinate all of its liens upon any assets of Debtors to all of the Pre-Petition Lender Liens and other liens that may be granted from time to time to Pre-Petition Lender; to subordinate the payment of all liabilities and obligations owing at any time or times (collectively, the "Stonehenge Claims") to Stonehenge to the full and final payment of all of the Pre-Petition Obligations (subject to certain limitations); to subordinate its liens to any loans made or credit

8

extended by DIP Lender during the pendency of the Chapter 11 Cases; and, subject to certain

limitations set forth in the Stonehenge Intercreditor Agreement that are not pertinent to the DIP

Facility, agreed to consent to the DIP Facility and use of Cash Collateral as provided herein.

### The Valspar Security Agreement

19. The Debtors purchased from The Valspar Corporation ("Valspar") certain inventory

on credit.  As security for repayment of the amounts due to Valspar (the "Valspar Debt"), the

Debtors  made and entered into the Security Agreement dated as of January 20, 2011, granting a

security interest in the inventory sold by Valspar to the Debtors.   Pursuant to the Intercreditor

and Subordination Agreement between Valspar, the Debtors, and Pre-Petition Lender, dated

January 20, 2011, Valspar agreed, among other things, to subordinate its lien on certain inventory

of the Debtors to all of the Prepetition Lender Liens; to subordinate payment of all liabilities

owing at any time to Valspar to the full and final payment of the Pre-Petition Obligations and to

subordinate its liens to any loans made by DIP Lender during the pendency of the Chapter 11

Cases and to consent to the DIP Facility and use of Cash Collateral as provided herein.

20. Pursuant to the Intercreditor and Subordination Agreement between Valspar, the

Debtors, and Stonehenge, dated March 16, 2011, Valspar agreed, among other things, to

subordinate its lien on certain inventory of the Debtors to all of the Stonehenge liens; to

subordinate payment of all liabilities owing at any time to Valspar to the full and final payment

of the Stonehenge Debt and to subordinate its liens to any loans made by Stonehenge during the

pendency of the Chapter 11 Cases and to consent to a DIP Facility and use of Cash Collateral as

provided herein.

## Summary of Capital Structure

21. In addition to Regions' debt in the total approximate amount of $52,000,000 and Stonehenge's debt in the total approximate amount of $12,000,000, the Debtors owe insiders approximately $2,500,000 and trade and other unsecured creditors approximately $37,000,000.

## The Debtors' Immediate Need for Postpetition Financing

22. In order to continue to operate their businesses and safeguard the assets for reorganization or potential sale of the assets, and to avoid immediate and irreparable harm, it is necessary for the Debtors to obtain the financing provided by the DIP Facility. Absent the immediate availability of new credit, the Debtors' ability to pay their employees, purchase inventory, sell and ship goods, collect accounts receivable, and otherwise operate their businesses would be severely disrupted. Such a result would eliminate the possible return to creditors under any plan of reorganization or sale.

23. The availability under the DIP Facility will accomplish more than merely providing the necessary working capital for the Debtors' businesses. The financing will instill confidence in the employees, suppliers and customers of the Debtors and make it clear that the Debtors have support from their primary secured lender. Without this financing, the Debtors believe that there will be a severe negative impact that would diminish the value of the businesses and which the Debtors believe can easily be avoided.

24. In order to continue their distribution businesses, pursue a reorganization or sale of the businesses, and preserve the maximum value for the estates, the Debtors have determined, in the exercise of their sound business judgment, that a postpetition credit facility which permits the Debtors to obtain new credit is critical and is being requested on an interim or emergency basis

10

pursuant to Bankruptcy Rule 4001(c)(2), as evidenced by the Budget.  The Debtors' ability to reorganize is dependent upon their ability to obtain postpetition credit for these purposes, and the DIP Facility is the best alternative and, as a practical matter, the only alternative available.

## Negotiation of the DIP Facility

25. Prior to the Petition Date, the Debtors surveyed various sources of postpetition financing in an effort to obtain the most favorable credit terms.  Unfortunately, few financial institutions are willing to consider a loan to an entity such as the Debtors in their present economic condition, as set forth in the Affidavit.  Traditional institutional lenders will not loan the amounts needed by the Debtors on an unsecured or priority basis.  Lenders willing to consider lending on a secured basis would only do so if they obtained a priming lien senior to Regions, Stonehenge, and Valspar.  The Debtor received one proposal to prime all secured creditors but the amount offered was substantially less than the Regions debt and therefore, it was rejected by Regions.  No lender offered a loan in an amount sufficient to take out Regions, much less Regions, Stonehenge and Valspar.  Therefore, in order to avoid a protracted and very risky contested debtor in possession financing hearing in court, and in light of the fact that Regions was the Debtors' prepetition lender and therefore familiar with the Debtors' operations, management and assets, the Debtors determined to seek postpetition financing from Regions.

26. Prior to the Petition Date, the Debtors negotiated the terms of the DIP Facility with the Pre-Petition Lender at arm's length and in good faith (as that term is defined in Section 364(e) of the Bankruptcy Code), with all parties represented by experienced counsel.  Pursuant to these negotiations, the Pre-Petition Lender presented the Debtors with the most attractive economic package available, and the only package that as a whole would provide the Debtors with the

11

ability to meet their various financing needs. These negotiations culminated in an agreement by Regions to provide postpetition financing to the Debtors on the terms and conditions set forth in the DIP Loan Agreement.

27. The Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arms' length. Accordingly, the DIP Lender should be accorded the benefits of Section 364(e) of the Bankruptcy Code with respect to such agreement.

### Overview of the DIP Facility and Related Relief

28. Pursuant to the DIP Facility, the Debtors will receive new credit to meet their working capital and stablization needs. The Debtors' obligation under the DIP Facility will be secured by perfected first priority liens on and security interests in all of the Collateral, including all such Collateral acquired after the Chapter 11 filing, subject only to a carve out for professional and statutory fees.

29. The Debtors request the Court authorize and approve:

    a.  the Debtors' execution and delivery of the DIP Loan Agreement in substantially the form annexed hereto (with such changes, if any, as may be addressed to the Court at the Interim Hearing or are otherwise authorized to be made as amendments to the DIP Loan Agreement in accordance with this Order) and all of the other DIP Financing Documents;

    b.  the Debtors' obtaining revolver loans (the "DIP Loans") and letters of credit pursuant to the DIP Loan Agreement (collectively, the "Senior Credit Extensions") from time to time up to an aggregate principal amount outstanding at

any time of $55 million (with a sublimit of up to $590,000 for letters of credit) in accordance with the DIP Loan Agreement plus interest, fees, and other charges payable in connection therewith, and to incur any and all liabilities and obligations thereunder and to pay all principal, interest, fees, expenses and other obligations provided for under the DIP Financing Documents; and

c.   that, during the period from the date of entry of this Order through the date on which the Final Hearing is concluded (the "Interim Period") and subject to all of the terms and conditions in the DIP Loan Agreement, the Debtors may obtain Senior Credit Extensions in the amounts for such period as set forth in the Budget to the extent necessary to avoid immediate and irreparable harm to the Debtors.

### Summary of the Terms of the DIP Facility

30. The DIP Loan Agreement is attached hereto as **Exhibit B** and its terms and the terms of the Interim Order will control. However, a summary of significant elements of the DIP Loan Agreement are as follows:

(a)    Debtors:   Merit Group, Inc.; Five Star Group, Inc.; Five Star Products, Inc.; Merit Paint Sundries, LLC; Merit Pro Finishing Tools, LLC; Merit Supply Company, LLC; and Merit Transportation, Inc.

(b)    Commitment Amount.   The DIP Facility provides for a total commitment of $55 million, with $7,000,000 to be provided on an interim basis the first two weeks and an additional $4,000,000 to be provided the following week.

(c)    Use of Proceeds.   Proceeds of DIP Loans may be used by Debtors in their Chapter 11 Cases solely to pay (i) the Pre-Petition Obligations to the extent authorized by the Bankruptcy Court; (ii) expenses described in the Budget (as defined below); (iii) adequate protection claims, but only to the extent authorized by the Bankruptcy Court; (iv) fees required to be paid to the office of the U.S. Trustee; (v) fees and expenses of Bankruptcy Court approved professional persons subject to certain limitations to be included in the Financing Orders (as defined below), allowance by the Bankruptcy Court and the Debtors' and DIP Lender's receipt of an itemized billing and expense statement

13

from such professional persons; (vi) any of the DIP Loans, other indebtedness and obligations of Obligors at any time or times outstanding under any DIP Loan Documents or obligations arising from letters of credit, hedge agreements, cash management or bank products (collectively, the "DIP Obligations"); (vii) property taxes with respect to any Collateral (as defined below) to the extent nonpayment thereof is secured by a lien senior to the liens of the DIP Lender thereon; and (viii) other expenses authorized by the Bankruptcy Court in orders entered in the Chapter 11 Cases that are acceptable to the DIP Lender.

(d)    Collateral.  All of the DIP Obligations will be secured by Liens in favor of DIP Lender upon (a) all of the real and personal assets (including tangible and intangible assets) of the Debtors and (b) all personal assets of the Pre-Petition Guarantors that are currently pledged to the Pre-Petition Lender as security for the Pre-Petition Obligations, including, without limitation, (x) all of the types and items of property of each Debtor and each Pre-Petition Guarantor that constitute Collateral under the Pre-Petition Loan Agreement and the other Pre-Petition Loan Documents, wherever such Collateral may be located and whether such Collateral arises, is acquired or exists prior to, on or after the date of commencement of the Chapter 11 Cases, (y) all real estate of each Debtor and (z) all intellectual property of each Debtor, including, without limitation, all rights with respect to trademarks, patents and copyrights (collectively, the "Collateral").

(e)    Priority.  All DIP Obligations will be entitled to administrative priority under Section 364(c)(1) and 503(b) of the Bankruptcy Code.  The foregoing Liens in favor of DIP Lender will be duly perfected Liens and will have priority over all other Liens (whether granted or obtained prior to, on or after the Petition Date) with respect to the Collateral including (x) the pre-petition Liens in favor of Pre-Petition Lender with respect to items of Collateral in existence on the Petition Date and proceeds thereof (collectively, the "Pre-Petition Collateral") and all adequate protection Liens and security interests in favor of Pre-Petition Lender with respect to the Collateral and (y) Liens with respect to any Pre-Petition Collateral securing the Stonehenge Debt and the Valspar Debt; provided that the foregoing Liens in favor of DIP Lender, as well as all Liens in favor of Pre-Petition Lender, will be subject to the Carve-Out.  The Financing Orders will provide that the Liens securing the DIP Credit Extensions and any other post-petition indebtedness owing to DIP Lender will not be subordinated, avoided or otherwise affected by virtue of any avoidance, subordination or invalidity of any Liens in favor of Pre-Petition Lender.

(f)    Interest.  DIP Loans will bear interest at a variable rate per annum equal to the Base Rate or the LIBOR Index Rate (as applicable) in effect from time to time plus 5.25%; provided that Overadvances will bear interest at a variable rate per annum equal to the Base Rate or the LIBOR Index Rate (as applicable) plus 7.25%.  All interest and per annum fees will be calculated on the basis of the number of days elapsed in a year of 360 days.  If an Event of Default (as defined below) exists, all DIP Obligations will bear

interest at a default rate that is 2.00% per annum in excess of the otherwise applicable rate.

(g)    <u>Conditions Precedent</u>.  The DIP Lenders' obligation to provide the initial extension of credit under the DIP Facility is conditioned on, among other things, the following:

1. the Interim Financing Order is entered by the Bankruptcy Court after proper notice and a hearing and sufficient presentation of evidence, in DIP Lender's view, to support all findings of fact and conclusions of law set forth in DIP Lender's approved form of interim financing order, and such order is not stayed pending appeal;

2. the DIP Loan Documents are executed by each Debtor party thereto and the Debtors have performed and complied with all covenants, agreements and conditions contained therein which are required to be performed or complied with by the Debtors before or on such Closing Date;

3. The following will be conditions precedent with respect to each DIP Credit Extension under the DIP Facility after the Closing Date:

   a. DIP Lender has received a notice of borrowing and such other information as DIP Lender may request;

   b. no event has occurred and is continuing, or would result from such extension of credit, which constitutes a Default or an Event of Default;

   c. the requested amount of any such DIP Credit Extension does not exceed

   d. the amount of availability under the DIP Facility (including, when applicable, Permitted Overadvances); and

   e. the DIP Lender has received all collateral information, including Borrowing Base Certificates, on a timely basis in accordance with the terms of the DIP Loan Documents.

(h)    <u>Term</u>.  The Commitment will terminate on the earliest of (i) three months from the Closing Date (the Closing Date is no later than three days after the Petition Date) or the closing of a § 363 sale.

(i)    <u>Fees</u>.  Debtors, jointly and severally, agree to pay the following fees to the DIP Lender: (a)  upon the entry of the Interim Financing Order (as defined below), a

15

non-refundable closing fee of $175,000; (b) on the first day of each calendar month, for each day in the preceding calendar month and on the Maturity Date, a fee for each day equal to 0.375% divided by 360 times (ii) the amount by which the Pre-Petition Revolver Loans Commitment exceeded the sum of (A) Working Capital Obligations plus (B) the Pre-Petition Obligations on such day; (c) at the time of issuance, renewal or extension of each letter of credit, a fee determined on a per annum basis equal to the Applicable Margin for Pre-Petition Revolver Loans that are LIR Loans times the face amount of the letter of credit for the period of time the letter of credit will be outstanding; and (d) upon demand, all customary charges associated with the issuance, amending, negotiating, payment, processing, transfer and administration of letters of credit.

(j)     <u>Professional Carveout.</u>  The Liens and priority claims in favor of Pre-Petition Lender, DIP Lender, Stonehenge, and Valspar will be subject to the payment of the following (to the extent that there are insufficient, unencumbered funds in Debtors' estates to pay such amounts at the time that payment is required to be made): (a) accrued and unpaid fees and expenses of professionals (other than "Transaction Fees" of Morgan Joseph TriArtisan LLC as that term is defined in its engagement letter which fees shall be paid from the proceeds of such transaction), to the extent that such fees and expenses are for services rendered or expenses incurred by such professionals prior to the occurrence of a Carve-Out Event (as defined below), are approved for payment by the Bankruptcy Court and do not exceed $800,000 in the aggregate; (b) fees and expenses of professionals, to the extent that such fees and expenses are incurred after the occurrence of a Carve-Out Event, are approved for payment by the Bankruptcy Court and do not exceed $200,000 in the aggregate; and (c) quarterly fees required to be paid pursuant to Bankruptcy Rule 2015(a) and 28 U.S.C. §1930(a)(6) that are accrued and unpaid as of a Carve-Out Event (collectively, the "Carve-Out").

(k)     <u>Adequate Protection.</u>  As adequate protection for Debtors' use, sale, or consumption of any Pre-Petition Collateral securing the Pre-Petition Obligations, Debtors will agree in the Financing Orders to the following:

1. Debtors will grant to Pre-Petition Lender a replacement lien upon all Collateral acquired at any time after the Petition Date, to the extent that any such use, sale or consumption of Collateral existing on the Petition Date results in any diminution in the value of Pre-Petition Lender's Liens, and such replacement liens will secure all Pre-Petition Obligations.

2. Proceeds from the sale of all Pre-Petition Collateral (including pre-Petition Date accounts, inventory, equipment and payment intangibles) will be applied first to pay the Pre-Petition Obligations (other than the Term Loans unless and until there is an Event of Default under the DIP Facility) and thereafter to the DIP Obligations; <u>provided</u> that DIP Lender and Pre-Petition Lender may agree, without prior notice, to apply or re-apply any proceeds of the Collateral (whether existing on, or acquired or arising

16

after, the Petition Date) first to the payment of the DIP Obligations and then to the Pre-Petition Obligations in their sole discretion.

3.  Upon the sale in the ordinary course of business of any Inventory that constitutes Pre-Petition Collateral, DIP Lender will be authorized to advance a DIP Loan in an amount equal to the cost of such Inventory, and the proceeds of such DIP Loan will be applied to the Pre-Petition Obligations.

4.  Debtors will pay all interest accrued on the Term Loans during the pendency of the Chapter 11 Cases at the non-default rate but without prejudice to the Pre-Petition Lender's right to assert its entitlement to interest at the default rate.

(l)    Benchmarks.  The Debtors shall satisfy the following Benchmarks:

| Date | Action |
|---|---|
| On or before the date that is 20 days after the Petition Date | The Debtors will have filed a motion to sell all or substantially all of their assets pursuant to Section 363 of the Bankruptcy Code (such sale, a "363 Sale" and such motion, a "363 Sale Motion"). |
| On or before the date that is 40 days after the Petition Date | The Bankruptcy Court will have entered an order approving bidding procedures for the 363 Sale. |
| On or before the date that is 72 days after the Petition Date | The 363 Sale auction will have been held. |
| On or before the date that is 75 days after the Petition Date | The Bankruptcy Court will have entered an order approving the 363 Sale auction. |
| On or before the date that is 90 days after the Petition Date | The closing of the 363 Sale will have occurred. |

(m)    Remedies.  Upon the occurrence of an Event of Default, Regions may immediately take any of the following actions, as more fully described in the DIP Facility and subject to the notice provisions set forth therein, to:

1.  Declare the principal of and accrued interest on the outstanding borrowings under the DIP Facility immediately due and payable;

2.  Terminate any further commitment to lend to the Debtors;

17

3. Take any other action or exercise any other right or remedy
permitted under the DIP Facility or by applicable law.

31. The foregoing only summarizes some of the material terms of the DIP Loan
Agreement; it does not include all material terms.

## Legal Authority

32. As described above, it is essential to the success of the Debtors' Chapter 11 case that
they immediately obtain access to sufficient postpetition financing for their working capital
needs. Without such financing -- on an interim and final basis -- the Debtors will be unable to
ensure payment to their employees, purchase inventory needed for distribution, and continue to
operate as a going concern. Consequently, the Debtors will be unable to preserve the value of
their assets and, absent such financing, the Debtors' cases would convert to Chapter 7.
Accordingly, the Debtors' continuing viability and their ability to reorganize successfully depend
heavily upon the expeditious approval of the DIP Facility, and the related actions requested
herein.

33. Section 364(c) of the Bankruptcy Code authorizes a debtor-in-possession to obtain
postpetition credit:

(c)    If the trustee is unable to obtain unsecured credit allowable under
section 503(b)(1) of this title as an administrative expense, the court, after notice
and a hearing, may authorize the obtaining of credit or the incurring of debt --

(1)    with priority over any or all administrative expenses of the
kind specified in section 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not
otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is
subject to a lien.

18

11 U.S.C. § 364(c)

34. Courts have articulated a three-part test to determine whether a debtor- in-possession is entitled to financing under Section 364(c) of the Bankruptcy Code: whether (a) the debtor is unable to obtain unsecured credit under Section 364(b), i.e., by allowing a lender only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed Pre-Petition Lender. See, e.g., In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).

35. If a debtor is unable to obtain credit under the provisions of Section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by a senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(a)     the trustee is unable to obtain credit otherwise; and

(b)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

### The Debtor is unable to obtain other financing

36. As noted above, the Debtor could not obtain the requisite financing on an unsecured basis, and could not obtain other financing under §364(c) and (d) of the Bankruptcy Code on

19

equal or more favorable terms than the DIP Facility, including on a junior lien basis.

37. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c) and (d) of the Bankruptcy Code. Bray v. Shenandoah Federal Sav. and Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

38. As noted previously, the Debtors approached various institutions specifically to obtain postpetition financing without success. One such proposal was made to Regions and Regions rejected this proposal. The Debtors and their professionals quickly concluded that no lender would loan on a subordinate basis to Regions and Stonehenge, and Regions and Stonehenge would not consent to being primed.

39. Even if the Debtors could have obtained financing from one of these potential lenders, the Debtors have concluded that they could not have obtained a postpetition credit facility to meet their working capital needs on terms more favorable than those contained in the DIP Facility. Accordingly, the Debtors turned their attention to Regions.

40. The Debtors' management reasonably concluded that Pre-Petition Lenders' proposal was the best and frankly the only, alternative available to it. Consequently, the Debtors have

20

satisfied the first statutory prong of Sections 364(c) and (d) of the Bankruptcy Code.  See, e.g.,
Snowshoe, 789 F.2d at 1088 (the fact that the trustee contacted other financial institutions in the
immediate geographic area and was unsuccessful satisfied the requirements of Section 364 of the
Bankruptcy Code); In re 495 Central Park Ave. Corp., 136 B.R. 626, 630-631 (Bankr. S.D.N.Y.
1992) (unsuccessful attempts to secure financing from other sources justified senior priority loan
under section 364); Ames Dep't Stores, 115 B.R. at 40 (debtors' discussions with four lenders
satisfied the requirement of Section 364 that the debtors were unable to obtain comparable
financing on an unsecured basis); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981)
(bankruptcy court's finding that two national banks refused to grant unsecured loans was
sufficient to support the conclusion that Section 364(d)(1) requirements were met).

41. Similar relief has been granted in other cases in this district.  See, e.g., In re BI-LO,
LLC, c/a 09-02140 (Bankr. D.S.C. April 16, 2009); In re Polymer Group, Inc., c/a 02-05773
(Bankr. D.S.C. May 29, 2002).

**The DIP Facility is Necessary to Continue Operations and Preserve Assets of the Debtors'
Estates**

42. The Debtors need immediate access to a substantial working capital facility to
preserve their continued operation.  Access to substantial credit is necessary to meet the Debtors'
day-to-day operating costs.

43. The success of these cases depends on the confidence of Debtors' employees,
suppliers and customers.  If that confidence is destroyed then so too would be the Debtors' ability
to reorganize.  In contrast, once the DIP Facility is approved, the Debtors are confident that they
will preserve, and indeed maximize, the value of their assets.

44. For these reasons, access to credit under the DIP Facility is critical to provide the

21

Debtors with sufficient working capital to continue operations and pay employees, suppliers and others.

### The Terms of the DIP Facility Are Fair, Reasonable and Appropriate

45. As set forth above, the Debtors are unable to obtain unsecured credit allowable solely as an administrative expense. In the Debtors' considered business judgment, the DIP Facility is the best financing option available in the circumstances of this case.

46. The proposed DIP Facility provides generally that the security interests in the assets of the Debtors and administrative expense claims in the cases granted to Regions are subject to the Carve Out as discussed above. In Ames Dep't Stores, the bankruptcy court found that such "carve-outs" are not only reasonable, but are necessary to insure that official committees and the debtors' estates will be assured of the assistance of counsel. Ames Dep't Stores, 115 B.R. at 40.

### Adequate Protection

47. The priming of both the Pre-Petition Lender Liens and pre-petition liens of the Stonehenge Debt and the Valspar Debt, under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facility, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and their creditors.

48. The Bankruptcy Code does not explicitly define "adequate protection." Section 361 of the Bankruptcy Code does, however, provide three nonexclusive examples of what may constitute "adequate protection" of an interest of an entity in property under sections 362, 363 and 364 of the Bankruptcy Code:

> (a)    requiring the trustee to make cash payment or periodic cash payments to such entity, to the extent that the. . .use. . .under section 363 of this title, or any grant of a lien under 364 of this title results in a decrease in the value of such entity's interest in such property;

22

(b)     providing to such entity an additional or replacement lien to the extent that such. . .use. . .or grant results in a decrease in the value of such entity's interest in such property; or

(c)     granting such other relief. . .as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

49. Similarly, the Bankruptcy Code does not expressly define the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under sections 361, 363 and 364 of the Bankruptcy Code. However, the Bankruptcy Code plainly contemplates that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property." See 11 U.S.C. § 361. Indeed, courts have repeatedly held that the purpose of adequate protection "is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization." In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); see also In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996); Bank of New England v. BWL, Inc., 121 B.R. 413, 418 (D.Me. 1990); In re Deker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus of adequate protection "is protection of the secured creditor from diminution in the value of its collateral during the reorganization process").

50. The Pre-Petition Lender, Stonehenge, and Valspar are entitled to receive adequate protection as set forth in this Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in value of their respective interests in the Pre-Petition Collateral (including Cash Collateral) resulting from any Debtor's use, consumption, sale, collection, or other disposition of any Pre-Petition Collateral. Pursuant to the Stonehenge Intercreditor Agreement, Stonehenge agreed, among other things, to subordinate all of its liens upon any

assets of Debtors to all of the Pre-Petition Lender Liens and other liens that may be granted from time to time to Pre-Petition Lender; to subordinate the payment of all liabilities and obligations owing at any time or times to Stonehenge to the full payment of all of the Pre-Petition Obligations as well as all loans made or credit extended by DIP Lender during the pendency of the Chapter 11 cases; and, subject to certain limitations set forth in the Stonehenge Intercreditor Agreement that are not pertinent to the DIP Facility, agreed to consent to the DIP Facility and use of Cash Collateral as provided herein.    The Pre-Petition Lender and Stonehenge will be adequately protected by the terms of the DIP Facility, including the payment of interest to the DIP Lender and Pre-Petition Lender, Debtors' operations of its businesses, insurance and maintenance of the going concern.

51. Valspar also agreed to subordinate all of its liens upon any assets of the Debtors to all of the Pre-Petition Lender Liens and to subordinate payment of the Valspar Debt to the Pre-Petition Obligations as well as any loans made by the DIP Lender during the pendency of the Chapter 11 Cases.    Valspar will be adequately protected by the terms of the DIP Facility, including Debtors' operation of its businesses and insurance and maintenance of the going concern.

### Application of the Business Judgment Standard

52. As described above, after appropriate investigation and analysis, the Debtors' management has concluded that the DIP Facility is the best alternative available in the circumstances of these cases.    Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money.    See, Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co.,

47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not

to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

"More exacting scrutiny would slow the administration of the debtor's estate and increase its

costs, interfere with the Bankruptcy Code's provision for private control of administration of the

estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v.

Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

53. In general, a bankruptcy court should defer to a debtor-in-possession's business

judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary

and capricious. In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).

Courts generally will not second-guess a debtor-in-possession's business decisions when those

decisions involve "a business judgment made in good faith, upon a reasonable basis, and within

the scope of his authority under the Code." Curlew Valley, 14 B.R. at 513-14 (footnotes

omitted).

54. The Debtors have exercised sound business judgment in determining that a

postpetition credit facility is appropriate and have satisfied the legal prerequisites to borrow

under the DIP Facility. The terms of the DIP Facility are fair and reasonable and are in the best

interests of the Debtors' estate. Accordingly, the Debtors should be granted authority to enter

into the DIP Facility and borrow funds from Regions on the secured and administrative

"superpriority" basis described above, pursuant to Section 364(c) of the Bankruptcy Code and on

a priority basis Sections 364(c)(2), (3) and 364(d), and take the other actions contemplated and

requested herein.

### Interim and Final Approval Should Be Granted

55. Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to Section 364 may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.

56. Pursuant to Bankruptcy Rules 4001(b) and 4001(c), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion (the "Preliminary Hearing") and authorize the Debtors to obtain secured credit under the DIP Facility in order to maintain ongoing operations and to avoid immediate and irreparable harm and prejudice to the estate and all parties in interest.

57. The Debtors have an urgent and immediate need for cash. The Debtors believe they need immediate availability over the next 15 to 20 days in order to operate the businesses in the ordinary course.

58. The Debtors have been unable to obtain the requisite unsecured credit or debt allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available for it to maintain ongoing operations. Absent interim and final DIP credit financing, the Debtors' objective of prosecuting the Chapter 11 cases and restructuring its businesses, will fail without a fair opportunity to achieve the purposes of Chapter 11. Without such interim and final relief the Debtors and their estate will be immediately and irreparably harmed.

59. The Debtors also requests that the Court schedule a Final Hearing on the Motion for

the same reasons set forth above.

## Notice

60. Notice of this Motion has been given to: (1) the Office of the United States Trustee for the District of South Carolina; (2) Regions Bank and its counsel (3) Stonehenge Opportunity Fund II, LP and its counsel, (4) the thirty largest unsecured creditors of the Debtors (on a consolidated basis); (5) those persons who have formally appeared in the Chapter 11 cases and requested service pursuant to Rule 2002; and (6) all applicable government agencies to the extent required by the Rules and Local Rules.  In light of the nature of the relief requested, and given the fact that no official committees have been established in this case, the Debtors respectfully submit, and request that this Court so find, that no further notice of this Motion be required.

WHEREFORE, the Debtor respectfully request that this Court (i) enter the Interim Order in the form annexed as Exhibit A authorizing the Debtors to obtain postpetition financing under the DIP Facility on an interim basis in accordance with the terms of the Budget and the Interim Order, and schedule the Final Hearing to consider the Motion, (ii) after the Final Hearing, enter the Final Order, and (iii) grant the Debtors such other and further relief as is just.

Dated: May 17, 2011
       Columbia, South Carolina

McNAIR LAW FIRM, P.A

/s/ Michael M. Beal
Michael M. Beal (S.C. Dist. Ct. ID# 1253)
Robin C. Stanton (S.C. Dist. Ct. ID# 7438)
Elizabeth (Lisa) J. Philp (S.C. Dist. Ct. ID# 8033)
Michael H. Weaver (S.C. Dist. Ct. ID# 9847)
1221 Main Street, 18th Floor
Post Office Box 11390
Columbia, South Carolina 29211
Tel: (803) 799-9800
Fax: (803) 753-3277
mbeal@mcnair.net
rstanton@mcnair.net
lphilp@mcnair.net
mweaver@mcnair.net

*Proposed Counsel to the Debtors and Debtors-in-Possession*

28