UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| The Merit Group, Inc., *et al.,* | ) | Case No. 11 - _____ |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

**AFFIDAVIT OF MITCHELL T. JOLLEY IN SUPPORT OF THE DEBTORS'
CHAPTER 11 FILINGS AND FIRST DAY MOTIONS**

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | |
| | ) | ss: |
| COUNTY OF SPARTANBURG | ) | |

Mitchell T. Jolley, being duly sworn, deposes and states:

1.     I am the Chief Executive Officer and President of The Merit Group, Inc., a corporation organized under the laws of the State of South Carolina and one of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"). In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, books and records.

2.     On the date hereof (the "Petition Date"), the Debtors filed their voluntary petitions for relief (the "Chapter 11 Cases") under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.[2]

3.     To enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses, the Debtors have requested various types of relief in

---

[1] The Debtors and the last four digits of their respective tax identification numbers are The Merit Group, Inc., f/k/a Lancaster Distributing Company, f/k/a Lancaster Paint Sundries, Inc. (4224); Merit Transportation, Inc. (9048); Merit Paint Sundries, LLC d/b/a Lancaster (8882); Merit Supply Company, LLC d/b/a Merit Supply (5878); Merit Pro Finishing Tools, LLC d/b/a Merit Trade Source (8544); Five Star Products, Inc. (9186); and Five Star Group, Inc., d/b/a Lancaster/Five Star, d/b/a Rightway (3506).
[2] Further references to the Bankruptcy Code (11 U.S.C. § 101 et seq.) will be by section number only.

their "first day" motions and applications (each, a "First Day Motion" or "Motion"). The First Day Motions seek relief intended to allow the Debtors to: (a) perform and meet those obligations necessary to fulfill their duties as debtors-in-possession in these Chapter 11 Cases and (b) retain the professionals needed to guide them through their Chapter 11 Cases.

4.      I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate within the confines of Chapter 11 with minimal disruption or loss of productivity or value, (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) is in the best interests of the Debtors' estates and creditors.

5.      I submit this Affidavit in Support of the First Day Motion and the filing of the Chapter 11 Cases. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant books and records, documents, or information supplied to me by other members of the Debtors' management and its professionals. I am authorized to submit this Affidavit on behalf of the Debtors, and if called upon to testify, I could and would testify to the facts set forth herein.

## BACKGROUND

6.      The Merit Group, Inc. is a South Carolina corporation headquartered in Spartanburg, South Carolina. The Merit Group, Inc. is the parent company of five wholly-owned subsidiaries. Four of the subsidiaries, including Merit Transportation, Inc., Merit Paint Sundries, LLC d/b/a Lancaster ("Sundries"), Merit Supply Company, LLC d/b/a Merit Supply ("Supply"), and Merit Pro Finishing Tools, LLC d/b/a Merit Trade Source ("Pro Finishing"), are South Carolina corporations or companies. The remaining wholly-owned subsidiary is Five Star Products, Inc. ("Five Star Products") which has its own wholly-owned subsidiary, Five Star

Group, Inc., d/b/a Lancaster/Five Star, d/b/a Rightway ("Five Star Group"). Five Star Products and Five Star Group are both Delaware corporations.

7.    As of the Petition Date, Merit Group has approximately 320 employees and serves as one of the leading paint sundries distributors in the United States. It also serves markets in Mexico, the Caribbean Islands, Central America and South America.

8.    The Debtors' inventory is supplied by over 750 manufacturers and the Debtors maintain distribution centers in South Carolina, Florida, Kentucky, New Jersey, New York, Texas, California and Utah. The Debtors' customer base consists of more than 10,000 independent, regional and national paint store chains as well as "big box" retailers, hardware stores, lumber yards, home centers, drywall yards and auto trim shop distributors.

9.    The Debtors' 2010 annual revenues were approximately $200 million.

10.    The Company has approximately 1,160 creditors excluding its employees and approximately $100 million of total debt, of which $37 million is unsecured trade debt.

11.    The Debtors' primary secured lending relationship is with Regions Bank, a relationship that dates back to 2008, and was most recently amended in 2010. The Debtors' presently have four different debt obligations outstanding to Regions Bank totaling approximately $51,200,000 (the "Regions Debt"). The Regions Debt consist of three term loans totaling an estimated $2,200,000, a hedge agreement in an estimated amount of $1,500,000, and a revolving line of credit with a balance in the approximate amount of $47,500,000 which includes the amount of outstanding but undrawn letters of credit. The Regions Debt is secured by a first priority lien and security interest in all of the Debtors' real and personal property, including inventory and accounts receivable, including the assets acquired in 2010 in the Five Star Acquisition (as defined below).

12.    The Debtors obtained additional financing to assist in its stock purchase acquisition of Five Star Products Inc., and its subsidiary, Five Star Group, Inc. and other capital needs.    Stonehenge Opportunity Fund, II, L.P. loaned the Debtors $11,956,565 (which includes PIKed interest of $456,565), pursuant to a Senior Subordinated Note and Option Purchase Agreement (the "Stonehenge Debt").    The Stonehenge Debt is secured by second priority lien and security interest in all of the Debtors real and personal property, including inventory and accounts.

13.    The shareholders of the Debtors have together loaned the Debtors in excess of $2,500,000 in cash and pledged personal assets as collateral for the Regions Debt valued at slightly less than $5,000,000.    These  loans are subordinated to both the Regions Debt and the Stonehenge Debt.

## EVENTS LEADING UP TO BANKRUPTCY FILING

14.    After The Merit Group, Inc. acquired Five Star Products, Inc. in January 2010, the companies spent far more than anticipated for the consolidation of warehouses and the integration of the organizations, which put substantial stress on the Debtors' liquidity.    As a result of these liquidity problems the Debtors have been unable to purchase goods at normal levels and the lower inventory levels have resulted in declining sales, which only exacerbated the liquidity problems.

15.    The Debtors have evaluated numerous strategies for resolution of their liquidity difficulties, including potential financial restructuring, cost containment programs and a sale of the company.    Notwithstanding these efforts, the Debtors have been unable to resolve their liquidity problems to date.    In view of these circumstances, the Debtors have determined that commencement of these Chapter 11 cases is necessary and appropriate at this time to stabilize

operations, allow the Debtors to borrow under the proposed debtor in possession loan, purchase inventory and otherwise operate their business.

## FIRST DAY MOTIONS

16.    To enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their ongoing business operations and to promote and facilitate a smooth transition to Chapter 11, the Debtors have requested various relief in their First Day Motions. The First Day Motions seeks authority to, among other things, designate the Chapter 11 Cases as Complex Chapter 11 cases, have the Chapter 11 Cases jointly administered, obtain debtor-in-possession financing on an interim basis, preserve customer relationships, maintain employee morale, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. Receiving Court approval of the relief sought in the First Day Motions is essential to giving the Debtors an opportunity to work towards a successful restructuring that will benefit all of the Debtors' constituents.

17.    Several of the First Day Motions request authority to pay certain prepetition claims. As set forth below, the Debtors have narrowly tailored their requests for authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

### A. *Motion for Order Designating the Debtors' Chapter 11 Cases as Complex Chapter 11 Cases Pursuant to Local Rule 2081-2*

18.    In light of the size and complexity of the Debtors' business operations, it is my opinion that it is necessary to have streamlined notice and hearing procedures for the Chapter 11 Cases. I anticipate that the number of filings in the Chapter 11 Cases by both the Debtors and

other parties in interest will be voluminous and, and to be handled expeditiously and efficiently, will need to be governed by global notice and hearing procedures.

19.    Further, I believe that it is critical that a hearing on the First Day Motions filed concurrently with the Debtors' Chapter 11 petitions occur on an expedited or emergency basis. In the absence of such a hearing, the Debtors will be unable to, among other things, (a) pay critical prepetition claims of employees, taxing authorities, insurance providers and other essential parties, (b) utilize their existing bank accounts to make such payments and (c) utilize cash collateral to operate their business in the ordinary course.  The potential disruption and damage to the Debtors' business as a going concern as a result of any delay in hearing the first day motions cannot be overstated.

20.    I believe that the size and complexity of the Debtors' business, the number of their creditors and other parties in interest and the anticipated number of filings the Debtors expect in the Chapter 11 Cases all support the entry of an order designating the Chapter 11 Cases as "Complex Chapter 11 Cases" pursuant to SC LBR 2081-2.

21.    In accordance with SC LBR 2081-2, I disclose the Debtors' existing senior management and information regarding such parties:

- **Mitch Jolley – CEO:** Mr. Jolley was hired in 1990 to manage day-to-day activities throughout The Merit Group, Inc.'s organization including strategic planning.  Prior to joining The Merit Group, Inc., Mr. Jolley was Vice President of Finance of Community Newspaper Inc., where he was in charge of acquisitions and divestitures of community newspaper companies, as well as, day-to-day financial performance.  Mr. Jolley is also a CPA.   He left the organization in October of 2009 and then rejoined the company in April 2011.

- **Jon Heard – CFO:** Mr. Heard joined the company as Chief Financial Officer on October 12, 2010.  Prior to joining The Merit Group, Mr. Heard was the Senior Vice President and CFO of Exopack Holding Corporation, a $700 million manufacturer of paper and plastic flexible packaging products. Prior to assuming the CFO role, Mr. Heard was the Corporate Controller of the company. Prior to

6

Exopack, he was the Vice President of Business Development at Sandbox.com. Mr. Heard started his career at KPMG and Deloitte and Touche. He is a graduate of Furman University with a B.S. in business administration, and also is a CPA.

- **Geff Lynch – Senior VP of Sales & Marketing:**  Mr. Lynch joined the Merit Group in 2007 with the acquisition of GMG Distributors where he held the positions of VP of Sales, VP of Sales & Marketing and General Manager over an 18 year period. Mr. Lynch currently oversees all Field Sales and Marketing functions. Mr. Lynch has 28 years of Sales & Marketing experience in the wholesale and retail paint sundry industry, along with 3 years of experience as the Retail Marketing Director for Gaco Western, a coatings manufacturer.

22.     The documents filed in connection with the commencement of the Chapter 11 Cases contain information regarding the holders of the Debtors' thirty (30) largest unsecured claims (on a consolidated basis), excluding insiders, and the holders of the Debtors' five (5) largest secured claims.

**B.   *Motion for Order Directing Joint Administration of the Related Chapter 11 Cases***

23.     The seven (7) Debtors in these Chapter 11 Cases are affiliates.  The Debtors request that, in light of the fact that The Merit Group, Inc. and its affiliates have each filed petitions for relief under the Bankruptcy Code in this Court, the Court can and should jointly administer the Chapter 11 Cases.  I believe that joint administration of these Chapter 11 Cases will be more cost efficient and less burdensome for the Debtors' estates, for the Court and is in the best interest of creditors.

**C.   *Motion for Order (A) Authorizing (But Not Requiring) Payment of Prepetition Wages, Salaries, Employee Expenses, Disability Insurance And Other Employee Benefits and Payment Of Related Taxes and Withholdings, (B) Authorizing (But Not Requiring) Continuation of Employee Benefit Programs, and (C)***

*Authorizing Financial Institutions to Honor All Checks Presented for Payment*

*Related to the Foregoing*

24.     Prior to the Petition Date, the Debtors employed approximately 320 full time and part time employees.  As of the Petition Date there are approximately 120 salaried employees (the "Salaried Employees") and approximately 200 full time hourly employees (the "Hourly Employees").  Included in the Salaried Employees are approximately 54 sales representatives (the "Sales Representatives").  The Sales Representatives are full time employees with benefits.

25.     The employees participate in various benefit programs in addition to their wages and salaries, including health and dental insurance, life and accident insurance, disability, medical care spending account, a 401K plan, and vacation and holiday pay.  Some benefits are employer paid, some are employee paid based on group discount rates negotiated by the employer.

26.     There are approximately 57 Hourly Employees (the "Union Employees") whose employment and benefits are governed and controlled by the Agreement between Five Star Group and Local No. 11, affiliated with the International Brotherhood of Teamsters, dated December 20, 2008 and expiring December 16, 2011 (the "Union Agreement").

27.     There are a small number of  individuals who are no longer employed by the Debtors as result of retirement, layoffs, or voluntary or involuntary termination, who may be participating in severance payments and other post-employment benefit programs (the "Former Employees").

28.     The Debtors are requesting permission to pay any prepetition wages, salaries, commissions, and benefits, directly or by payment of premiums or other fees or expenses outstanding on the Petition Date to all presently employed Salary Employees, Hourly

Employees, and Sales Representatives (together, the "Employees"), and to continue their prepetition wages, salaries, commissions, and benefits to its Employees without interruption. The Debtors also seek permission to authorize financial institutions to honor all checks presented for payment of prepetition wages, salaries, commissions, and benefits. The detailed information regarding the wages, salaries, and benefits and the cost and benefit to the estate are set forth below.

29.    The Debtors also seek approval to pay any prepetition payroll taxes, employee withholdings for taxes, garnishments, insurance premiums, and savings fund contributions that are property of the employees and due and payable on behalf of the employees to third parties.

30.    The Debtors also seek approval (but not the obligation) to pay all prepetition benefits due to Former Employees.

31.    I believe that the relief requested in this motion is critical to the Debtors' ability to retain its skilled workforce, maintain employee morale and will assist the Debtors in connection with their reorganization efforts..

**D.    *Debtors' Precautionary Motion for Approval of Field Sales Force Compensation Restructuring Program***

13.    To service its customers, the Debtors currently employ a field sales force of almost 50 members (hereinafter, the "Field Sales Representatives" or "Field Sales Force") whose efforts and expertise largely drive the Debtors' revenue. Field Sales Representatives currently receive a compensation package that combines a weekly salary draw plus monthly sales commissions (if those commissions exceed the net monthly draw). Historically, a substantial portion of each Field Sales Representatives' total compensation has been derived from sales commissions.

14.    In 2010, largely because of integration issues resulting from Debtors' acquisition of Five Star (e.g., shipping problems, system integration problems, improper inventory levels, dealer pricing issues), the Field Sales Force's ability to earn sales commissions was substantially impaired. Recognizing that its Field Sales Force relied on sales commissions as an integral part of their compensation package, and further recognizing that lagging sales revenues were largely beyond the Field Sales Representatives' control, Merit Group paid an additional two percent in sales commissions as additional compensation, totaling $486,033, to certain Field Sales Representatives in May, June and July 2010.

15.    Because of Debtors' current financial condition and inability to maintain consistent inventory levels in their various distribution centers, Field Sales Force total compensation has continued to suffer significantly (i.e., Debtors' sales representatives cannot meet clients' purchasing demands because Debtors do not have sufficient inventory and cannot replenish inventory because of their current financial distress).

16.    I believe that maintaining an intact sales force is absolutely essential to the future success and reorganization of Merit Group.  Many members of the Debtors' sales force have developed valuable highly specialized, industry-specific institutional knowledge regarding the Debtors' commercial operations and the product lines from the hundreds of manufacturers whose products are sold and distributed by Debtors.  Additionally, the Debtors' sales representatives have cultivated strong relationships with the thousands of retailers who rely on the skill of the Debtors' sales representatives in retail merchandising and marketing operations. I believe the skill of the Debtors' sales force and the relationships they have cultivated with clients are absolutely critical to the Debtors' successful operations and reorganization.

17.     In the weeks leading up to the filing of Debtors' petitions for bankruptcy relief, a significant number of the Debtors' key sales representatives have been poached by competing companies because of the financial uncertainty that faces Merit Group and because of declining compensation due to Debtors' tenuous inventory situation.  The Debtors have been informed and believe that many other members of its Field Sales Force have been contacted and offered employment by competitors.

18.     Prior to filing its petitions, in an effort to stabilize Field Sales Force compensation, and in the ordinary course of its business, the Debtors instituted a temporary compensation restructuring program (the "Restructuring Program") that will guarantee each eligible Field Sales Representative compensation commensurate with his or her historical average compensation, provided that the representative meets certain eligibility thresholds until such time as the internal factors impairing the representatives' ability to earn sales commission are mitigated.

19.     The Restructuring Program is effective through pay periods ending July 31, 2011. The Debtors anticipate that their inventory levels will have normalized by this date, allowing for a phase-out of the Restructuring Program.  The Debtors' intent in filing the motion is to normalize compensation during this period of lower inventory levels.  In the event inventory levels have not reached normal levels by July 31, 2011 the Debtors reserve the right to extend this program until such time as inventory levels are normal, in Debtors' sole discretion.

32.     I believe that the Restructuring Program is a critical component of the Debtors' reorganization effort and its ability to retain its skilled and experienced Field Sales Force.

**E. *Motion for an Interim and Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (I) Approving Postpetition Financing, (II) Authorizing Use of***

*Cash Collateral, (III) Granting Liens Granting Liens and Providing Superpriority*

*Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying*

*the Automatic Stay, and (VI) Scheduling a Final Hearing*

33.    In order to continue to operate their business and safeguard the assets for reorganization or potential sale of the assets, and to avoid immediate and irreparable harm, it is necessary for the Debtors to obtain the financing provided by the DIP Financing Agreement. Absent the immediate availability of new credit, the Debtors' ability to pay their employees, purchase inventory, sell and ship goods, collect accounts receivable, and otherwise operate their business would be severely disrupted.  Such a result would eliminate the possible return to creditors under any plan of reorganization or sale.

34.    The availability under the DIP Financing Agreement will accomplish more than merely providing the necessary working capital for the Debtors' business.  The financing will instill confidence in the employees and suppliers of the Debtors and make it clear that the Debtors have the support for their reorganization from their primary secured lender.  Without this financing, I believe that there will be a severe negative impact that would diminish the value of the business which the Debtors believe can easily be avoided.

35.    In order to continue the distribution business, pursue a reorganization or sale of the business, and to preserve the maximum value for the estates, the Debtors have determined, in the exercise of their sound business judgment, that a postpetition credit facility which permits the Debtors to obtain new credit is critical and is being requested on an interim or emergency basis pursuant to Bankruptcy Rule 4001(c)(2).

36.    I believe that the Debtors' ability to reorganize is dependent upon their ability to obtain postpetition credit for these purposes, and the DIP Financing Agreement is the best alternative and, as a practical matter, the only alternative available.

**F.    *Motion for Order Authorizing the Debtors to (I) Maintain Existing Corporate Bank Accounts and Cash Management System (II) Use Existing Business Forms and Records and (III) Waiver of § 345 Investment Requirements***

37.    Prior to the Petition Date, the Debtors utilized a centralized cash management system through their existing bank accounts at Regions Bank and Bank of America (the "Cash Management System").    The Cash Management System involves an integrated network of separate accounts to manage and control receipts and disbursements.    The cash management system is centralized at the Debtors' corporate offices in Spartanburg and allows the Debtors, through the use of accounting software, to track their cash situation on a daily basis.

38.    I believe that any disruption of the Cash Management System would be detrimental to the Debtors' operations and reorganization efforts.

39.    I also believe that only through the continuation of the Cash Management System in the ordinary course of business may the Chapter 11 reorganization process be achieved in an efficient and cost-effective manner.    I do not believe any party in interest will be prejudiced by the Debtors' continuation of their existing Cash Management System.    The Debtors will maintain records of all pre- and postpetition transfers within the Cash Management System so that all transfers and transactions will be documented in its books and records to the same extent such information was maintained prior to the Petition Date.

**G.    *Motion of the Debtors for an Order Authorizing Payment of Prepetition Claims and Obligations to Critical Foreign Vendors and Payment to Customs Brokers***

13

*of Duties, Brokers Fees, Transportation Charges and Other Advances Related*

*to Delivery of Foreign Goods*

40.    By this Motion, the Debtors request authority to pay the prepetition Foreign Claims of their Critical Foreign Vendors and Customs Claims of Customs Brokers in the ordinary course of business.  I believe that payment of these Foreign Claims are necessary and essential to ensure uninterrupted provision of goods and services the Debtors need and to maximize the Debtors' efforts to successfully reorganize in these Chapter 11 cases.  I believe that the relief sought in this motion is critical to maximizing the potential return on the Debtors' assets for all parties.  The Debtors seek this relief as to the Customs Brokers because without Customs Brokers, I believe the Debtors may lose millions of dollars of inventory that will remain in ports, warehouses, and with the U.S. Customs due to the failure of the Debtors to pay the Customs Brokers amounts due and amounts advanced by the Customs Brokers on behalf of the Debtors.  I believe this breakdown in the foreign inventory, delivery and supply chain of the Debtors would be catastrophic to its customer delivery programs, future sales, and ultimate ability to reorganize.

41.    I believe that the Critical Foreign Vendors are unaffiliated with the Debtors and cannot, as a practical matter and for various reasons, be timely replaced with other sources of the goods or services they supply to the Debtors.  Most Critical Foreign Vendors are a sole source or unique supplier, with whom the Debtors have negotiated specific prices and manufacturing specifications previously approved by their customers.

42.    I believe that the Customs Brokers are critical to delivery of inventory from Critical Foreign Vendors.  Without the Customs Brokers to coordinate the transportation, duties, and U.S. Customs regulations, the goods from the Critical Vendors could not be timely brought

into the United States for sale by the Debtors.  Without these Critical Foreign Vendors and

Customs Brokers, I believe that the Debtors' ability to preserve and protect their assets and to

generate future revenues would suffer.  Therefore, I believe that it is in all parties' best interests

for the Debtors to have the authority to pay the Foreign Claims of Critical Foreign Vendors, to

pay the Customs Claims of Customs Brokers, and honor any other Critical Foreign Vendor and

Customs Brokers obligations.

43.    I believe that the preservation of working capital resulting from the retention or

reinstatement of historic trade credit terms for the Debtors, ensured through payment of these

creditors, and which the Debtors will confirm as needed, will enable the Debtors to maintain

their competitiveness and service levels before and after their reorganization efforts and

ultimately aid the Debtors in exiting from the Chapter 11 cases.  Conversely, I believe that the

cessation or reduction by Critical Foreign Vendors of credit terms and deliveries of goods and

services would severely undermine the Debtors' ability to reorganize successfully.

### H.  *Motion for Entry of an Order Granting Authority for the Debtors to Honor Certain Prepetition Customer Programs*

44.    I believe that the success and viability of the Debtors' businesses depend upon the

loyalty of their customers.  To maximize customer loyalty, in the ordinary course of business and

consistent with industry practice, the Debtors have maintained and followed practices and

programs for the benefit of its customers (the "Customer Incentive Programs").

45.    The Debtors use the Customer Incentive Programs to, among other things, reward

customer loyalty and provide incentives for customers to buy select products from the Debtors,

ensure customer satisfaction, ensure the Debtors' competitiveness in the marketplace, attract and

maintain relationships with customers, improve revenue and profitability and generate goodwill.

Without the ability to continue the Debtors' Customer Incentive Programs and honor its pre-petition obligations with respect thereto, the Debtors risk surrendering their market share to competitors. Such a result could adversely affect the Debtors' reorganization efforts.

46.     Through the Debtors' Customer Incentive Programs, the Debtors provide certain customers incentives in the form of rebates to purchase product. These rebate programs vary in form and substance based on the customer's historical purchasing and pricing practices  The rebate programs range from fixed percentages based on the total amount of product purchased to variable rebate percentages based on different levels or thresholds of purchases. In some cases, there are minimum purchase thresholds that have to be met to qualify for any rebates. There also might be different rebate percentages depending on the product the customer purchases in an effort to provide incentives for the customer to buy a particular product.

47.     Through the Customer Incentives Program, rebates typically are earned on a quarterly or annual basis based on purchases made during such quarterly or annual period.

48.     Once a creditor becomes entitled to a rebate through the Debtors' Customer Incentive Programs, the Debtors typically credit the customers' accounts for any rebates that are earned. In certain cases, the Debtors may make a separate payment to the customers on account of rebates, as opposed to crediting the customers' accounts. As of the Petition Date, the Debtors anticipate that approximately $300,000 is owed to customers on account of rebates earned but not yet paid.

49.     I believe that if the Customer Incentive Programs are not maintained, and if the Debtors are not authorized to pay any prepetition obligations owed to customers in connection with them, the Debtors risk surrendering their market share to competitors and will likely lose additional sales and earnings.

50.    Due to the highly competitive nature of the Debtors' businesses, information relating to the Customer Incentive Programs is highly confidential. Consequently, and contemporaneously with the filing of the customer programs motion, the Debtors will file a motion to seal portions of the testimony and record. The Debtors' list of Customer Incentive Programs involved an analysis of private commercial information. The public disclosure of the various customers with whom the Debtors have a Customer Incentive Program and the amounts owed to each customer thereunder could harm the Debtors and their efforts to reorganize or effectuate a sale. Additionally, the revelation of how the Debtors' decided which customers to provide incentives to may subject the Debtors to negative repercussions from those customers not provided similar incentives, and may result in decreased sales and further pressure from the Debtors' customers regarding incentives. I believe that such information, if made public, may damage the Debtors' reputation with its customers and place the Debtors at a further competitive disadvantage.

### J.    *Motion of the Debtors for Order Establishing and Implementing Exclusive and Global Procedures for the Treatment of Reclamation Claims*

51.    The Debtors seek entry of an order establishing procedures for the processing of reclamation claims filed against the Debtors and prohibiting vendors from reclaiming goods or otherwise interfering with the delivery of goods to the Debtors, as more particularly described below.

52.    As of the Petition Date, the Debtors were in possession of certain goods that had been delivered to them, but for which they had not yet been invoiced, or made payment to the vendors. As a result of the commencement of these cases, Debtors may receive reclamation demands ("Reclamation Claims") from various vendors, suppliers, or other parties (collectively,

the "Vendors") with respect to the Goods. The Debtors estimate that they may have received as much as seven million dollars in the aggregate[1] of Goods from Vendors within the forty-five (45) days prior to the Petition Date.

53.    Maintaining normal business operations and avoiding costly and distracting litigation relating to Reclamation Claims is critical at this stage of the Debtors' reorganization. I believe that if the Debtors are unable to establish and implement uniform reclamation procedures to resolve Reclamation Claims, they could be faced with the prospect of simultaneously defending multiple reclamation adversary proceedings at a time when they need to focus on critical aspects of the reorganization process.

**K.  *Motion for an Order (1) Prohibiting Utilities From Altering, Refusing Or Discontinuing Service On Account Of Prepetition Invoices, (2) Deeming Utilities Adequately Assured of Future Performance, and (3) Establishing Procedures For Requests for Additional Adequate Assurance of Payment***

54.    In the ordinary course of the their businesses, the Debtors incur utility expenses for water, electricity, natural gas, telephone service, internet service, waste management and other services. Approximately 27 utility providers (as such term is used in section 366 of the Bankruptcy Code, and collectively referred to hereinafter as the "Utility Providers") provide these services through approximately 48 accounts.

55.    On average, the Debtors spend approximately $63,000 each month on utility costs. As of the Petition Date, the Debtors estimate that approximately $26,800 in utility costs may be outstanding; however the Debtors do not believe that they owe any past due amounts to any Utility Providers.

---

[1] This estimate includes Goods received within twenty (20) days of the Petition Date that constitute administrative claims pursuant to section 503(b)(9) of the Bankruptcy Code.

56.     I believe that uninterrupted utility services are essential to the Debtors' ongoing operations and reorganization efforts. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' businesses could be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts. It is essential that the services provided to the Debtors by the Utility Providers continue uninterrupted during these Debtors' Chapter 11 cases.

57.     Based upon the revenue generated from their accounts receivable and the proposed post-petition financing and/or cash collateral in this case, the Debtors expect to have ample liquidity to timely pay all postpetition obligations owed to their Utility Providers.

**L.  *Motion for Order Authorizing the Debtors to (A) Prepare a Consolidated List of Creditors in Lieu of a Mailing Matrix, (B) File a Consolidated List of the Thirty Largest Unsecured Creditors, (C) Mail Initial Notices and (D) Shorten the Mailing List***

58.     Permitting the Debtors to maintain a consolidated list of their creditors in electronic format only in lieu of filing a creditor matrix is warranted in my opinion. As stated, the Debtors have many creditors and operations in multiple states.

59.     The Debtors have filed an application seeking the appointment of Kurtzman Carson Consultants, LLC ("KCC") as their claims, noticing and balloting agent in these Chapter 11 Cases. If such application is granted, KCC will, among other things, (a) assist with the consolidation of the Debtors' computer records into a creditor database and (b) complete the mailing of notices to the parties in such database. Accordingly, I believe it is in the best interest of the Debtors' estates to avoid the cost and risks associated with preparing and filing a separate matrix for each of the Debtors' respective cases.

60. In addition, in light of the fact that many of the Debtors' customers may have relationships with more than one of the filing Debtors, and given the fact that it would require an excessive amount of the Debtors' scarce time and resources, I believe that authority to file a single, consolidated list of the thirty (30) largest unsecured creditors in these Chapter 11 cases is in the best interests of the estates and will facilitate the efficient and orderly administration of the Chapter 11 Cases.

**M.** ***Motion for Entry of an Order Granting the Debtors Additional Time Within Which to File Schedules and Statements of Financial Affairs***

61. The Debtors have requested that the Court extend by an additional thirty (30) days, for a total of forty-four (44) days, the date by which the Debtors' schedules and statements of financial affairs (collectively, the "Schedules and Statements") must be filed, pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Rules"). The Debtors have more than 1,160 creditors (excluding current and former employees). Further, the conduct and operation of the Debtors' business operations requires the Debtors to maintain voluminous books and records and complex accounting systems. Given the size and complexity of their business operations, the number of creditors and the fact that certain prepetition invoices have not yet been received or entered into the Debtors' financial accounting systems, I believe that the Debtors have begun, but have not yet finished, compiling information required to complete the Schedules and Statements.

62. Moreover, due to the complex nature of the Debtors' business and circumstances surrounding the Chapter 11 Cases, I believe that limited staff is available to perform the required internal review of the Debtors' business and affairs necessary to accurately complete the Schedules and Statements. As a result of this fact, and in conjunction with numerous other

matters incident to the commencement of these Chapter 11 Cases in the few weeks following the Petition Date, it is my opinion that the fourteen (14) day automatic extension of time to file the Schedules and Statements will not be sufficient to allow the Debtors to accurately complete them. Thus, I believe that the size, scope, and complexity of the Chapter 11 Cases and the volume of material that must be compiled and reviewed by the Debtors' staff to complete the Schedules and Statements for each Debtor during the initial days of the Chapter 11 Cases warrants the requested extension.

*******

63.     The facts stated in each of the First Day Motions are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption to the Debtors' business operations; and (b) constitutes a critical element in achieving a successful reorganization of the Debtors.

Executed this _16th_ day of May, 2011.


_____
Mitchell T. Jolley
Chief Executive Officer

Sworn to before me this
_16th_ day of May, 2011

_____
Notary Public, State of South Carolina
Commission Expires _January 27, 2019_