**UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| The Merit Group, Inc., *et al.* | ) Case No: 11-03216-hb |
| | ) |
| Debtors.[1] | ) (Joint Administration) |
| | ) |

**<u>ORDER</u>**

     **The relief set forth on the following pages, for a total of <u>19</u> pages including this page, is hereby ORDERED.**

---

[1] The Debtors and the last four digits of their respective tax identification numbers are: The Merit Group, Inc., f/k/a Lancaster Distributing Company, f/k/a Lancaster Paint Sundries, Inc. (4224); Merit Transportation, Inc. (9048); Merit Paint Sundries, LLC d/b/a Lancaster (8882); Merit Supply Company, LLC d/b/a Merit Supply (5878); Merit Pro Finishing Tools, LLC d/b/a Merit Trade Source (8544); Five Star Products, Inc. (9186); and Five Star Group, Inc., d/b/a Lancaster/Five Star, d/b/a Rightway (3506).

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| The Merit Group, Inc., *et al.* | ) Case No: 11-03216-hb |
| | ) |
| Debtors.[2] | ) (Joint Administration) |
| | ) |

### ORDER CONDITIONING RIGHT OF STONEHENGE OPPORTUNITY FUND II, L.P. TO CREDIT BID AT AUCTION RELATING TO SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

**THIS MATTER** came before the Court on June 28, 2011, as a result of the Motion of the Debtors for Entry of an Order (I) Approving Auction and Bidding Procedures in Connection With the Sale of Substantially All of the Debtors' Assets, (II) Authorizing, But Not Requiring Entry Into a Stalking Horse Agreement and Approving Stalking Horse Protections, (III) Approving Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling Auction and Sale Approval Hearing and (V) Approving the Form and Manner of Sale Notice [Docket No. 169] (the "Bid Procedures Motion").

The Official Committee of Unsecured Creditors (the "Committee") filed a Limited Objection to the Bidding Procedures Motion [Docket No. 226] ("the Objection"), challenging, *inter alia*, the right of Stonehenge Opportunity Fund II, L.P. ("Stonehenge") to credit bid at the auction that the Debtors sought permission to schedule for July 20, 2011.[3] In its Objection, the Committee argued that Stonehenge should not be permitted to credit bid at the Auction because:

---

[2] The Debtors and the last four digits of their respective tax identification numbers are: The Merit Group, Inc., f/k/a Lancaster Distributing Company, f/k/a Lancaster Paint Sundries, Inc. (4224); Merit Transportation, Inc. (9048); Merit Paint Sundries, LLC d/b/a Lancaster (8882); Merit Supply Company, LLC d/b/a Merit Supply (5878); Merit Pro Finishing Tools, LLC d/b/a Merit Trade Source (8544); Five Star Products, Inc. (9186); and Five Star Group, Inc., d/b/a Lancaster/Five Star, d/b/a Rightway (3506).

[3] Objections to the Bid Procedures Motion were also filed by Regions Bank and the Office of the United States Trustee. Neither of these objections related to Stonehenge's right to credit bid and are not relevant to this Order.

(i) "cause" exists under 363(k) of the United States Bankruptcy Code (the "Bankruptcy Code") to deny Stonehenge's credit bid right, because a bona fide dispute exists regarding whether Stonehenge's claim should be recharacterized due to the nature of the transaction between Stonehenge and the Debtors; and (ii) Stonehenge is an insider, whose representative is currently sitting on The Merit Group, Inc.'s ("Merit's") board of directors (the "Board"), with access to privileged and confidential information about the Debtors' sale efforts.

On June 26, 2011, in response to the Committee's Objection, the above-captioned debtors and debtors in possession (together, the "Debtors") revised their auction and bid procedures to require, *inter alia*, that the full amount of the credit bid portion of any Stonehenge credit bid be secured by immediately available funds to be deposited in an escrow account. The Debtors' revised bid procedures further provided that such posted collateral shall be held in an escrow account pending a determination by the Court as to the validity and enforceability of Stonehenge's claims against the estates.

On June 27, 2011, Stonehenge filed a Statement in Support of its Right to Credit Bid under 11 U.S.C. § 363(k) and Response to the Official Committee of Unsecured Creditors' Limited Objection to the Debtors' Motion to Approve Bidding Procedures and Related Relief [Docket No. 245] (the "Stonehenge Statement"). In the Stonehenge Statement, Stonehenge argued that it should be given the unequivocal right to credit bid, without restrictions, because no cause under Section 363(k) of the Bankruptcy Code existed to deny its credit bid right. In support of its position, Stonehenge asserted that it has a valid second lien on all of the Debtors' personal and real property, and that Stonehenge was not an equity interest holder or insider with control. Although the Stonehenge Statement did not directly address the Debtors' revised bid procedures which sought to require the credit bid portion of any Stonehenge credit bid to be

collateralized, at the hearing Stonehenge opposed any conditions being imposed on its right to credit bid.

On June 28, 2011, the Court held a hearing on approval of the Bid Procedures Motion. At the hearing, the Court heard evidence and argument on several aspects of the Bid Procedures, including certain stalking horse protections and Stonehenge's right to credit bid. At the conclusion of the hearing, the Court approved the Bid Procedures as modified by the Debtors, including a breakup fee of $500,000 and expense reimbursement of up to $750,000 to the stalking horse bidder, subject to a review of such expenses for reasonableness.  The Court instructed the Debtors to include a provision in the final bid procedures order finding that Stonehenge's right to credit bid would be subject to further order of the Court.  The Court took the issue with respect to Stonehenge's right to credit bid under advisement and instructed the parties to submit competing orders by Friday, July 1, 2011.

On June 29, 2011, the Court entered an Order approving the Bid Procedures [Docket No. 270] (the "Bid Procedures Order"), consistent with its ruling at the hearing.  As it relates to Stonehenge, paragraph 11 of the Bid Procedures Order provides that, "[t]he right of Stonehenge to credit bid at the Auction shall be subject to and determined by further order of this Court, which is presently under advisement."  This Order constitutes the Court's ruling on Stonehenge's right to credit bid at the Debtors' auction, which is currently scheduled for July 20, 2011.

Upon review of the pleadings, the arguments of counsel, and the evidence presented at the hearing, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

I. **The Stonehenge Transactions.**

1. Prior to these bankruptcy filings on May 17, 2011 (the "Petition Date"), Merit entered into a Stock Purchase Agreement dated as of November 24, 2009 with National Patent

Development Corporation (the "Stock Purchase Agreement").  Committee Ex. 1 at ¶ 2, ¶ A. Pursuant to the Stock Purchase Agreement, Merit agreed to acquire the stock of Debtor Five Star Products, Inc., and its subsidiary, Debtor Five Star Group, Inc.  See Declaration of Mitch Jolley in Support of First Day Motions [Docket No. 18], at ¶ 12.

2. As part of closing on the Stock Purchase Agreement in January 2010, Regions Bank ("Regions") restructured its loan with Merit and became the senior lender for all of the Debtors, including the Five Star entities whose stock was acquired under the Stock Purchase Agreement.  See Committee Ex. 1 at 2, ¶ B.  Pursuant to an Amended and Restated Loan Agreement dated as of January 15, 2010, by and between Regions and the Debtors, Regions agreed to provide the Debtors, on a revolving credit basis, up to a maximum aggregate principal amount of $65,000,000 at any one time outstanding, and a term A loan to Merit in the original principal amount of $1,000,000, a term B loan to Merit in the principal amount of $3,000,000 (collectively, the "Regions Loan").  Id.  The Regions Loan is secured by a first priority security interest on the Debtors' assets.  Id.

3. Contemporaneously upon closing on the Regions Loan, the Debtors and Stonehenge entered into a Senior Subordinated Note and Option Agreement (the "Purchase Agreement").  Id.  The Debtors executed certain other documents in connection with closing on the Purchase Agreement, including but not limited to (i) a Senior Subordinated Note due January 15, 2010 in the original principal amount of $7,500,000 (the "Alleged Note") (Committee Ex. 2), (ii) an Option agreement dated January 15, 2010 (the "Option") (Committee Ex. 3), and (iii) a Voting Agreement dated January 15, 2010 (the "Voting Agreement") (Committee Ex. 5).

4. Section 2 of the Purchase Agreement (entitled "Purchase and Sale of the Securities") provides that after the Debtors execute and deliver the Note and Option, Stonehenge

shall purchase the Note for $7,500,000 (the face amount of the Note) and shall purchase the Option for $100.

5.  Pursuant to the Option Agreement, Stonehenge was given the right to require the Debtors to pay Stonehenge an option price based, in part, on the enterprise value of the Debtors. Committee Ex. 3 at 5, § 2.1.  If the Debtors failed to pay the option price when required under the Option, the Option imposed certain additional obligations on the Debtors, including the obligation to execute an option note for the outstanding amount of the option price.  Id. at 8 (¶3.4(e)).  The Option further required that, if such an option note remained outstanding, or within 12 months after the option price were paid in full, Stonehenge could be entitled to a higher option price upon a change in control or a sale of the Debtors' business.  See id. at 9 (§ 3.4(e)).

6.  Pursuant to the Voting Agreement, for so long as Stonehenge holds the Option or is owed any amounts under the Option, Merit was required to (i) elect a Stonehenge representative to the board of directors (the "Board"); (ii) fix and maintain the number of directors on the Board at three (3); and (iii) nominate and appoint the Stonehenge director to each committee on the Board.  Committee Ex. 5 at 1-2 (§1.1).  Mr. Thomas R. Utgard was appointed as the initial representative for Stonehenge on the Board.  Id. at 2 (§1.1(c)).

7.  The Voting Agreement further required that each certificate representing shares of Merit's capital stock bear the following legend:

> THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A VOTING AGREEMENT BY AND AMONG THE COMPANY AND STONEHENGE OPPORTUNITY FUND II, L.P. (A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL PROVISIONS OF THE VOTING AGREEMENT.

Id. at 2-3 (§2.2).

8. As part of closing on the Stock Purchase Agreement, Stonehenge also entered into an Intercreditor and Subordination Agreement (the "Intercreditor Agreement") with Regions. Committee Ex. 4. Pursuant to the Intercreditor Agreement, Stonehenge subordinated to Regions' first priority interest. See id.

9. On or about February 18, 2011, Stonehenge agreed to advance another approximately $4.5 million to Merit, and the Purchase Agreement and related documents were amended to account for this new money. See Committee Ex. 6. Like the initial $7.5 million, Stonehenge again agreed to advance this money on a subordinate basis to Regions. See id. Stonehenge acknowledged in the Stonehenge Statement, and again during argument at the hearing, that the $4.5 million was used to pay down the Regions Loan. Stonehenge Statement at ¶7. While sitting on the Board, Mr. Utgard executed the amended Stonehenge documents on behalf of Stonehenge as its Principal. Committee Ex. 5 at 19 (Amendment No. 1 to Senior Subordinated Note and Option Agreement).

**II. The Debtors' Bankruptcy Filings and Stonehenge's Continued Role on the Board.**

10. On May 17, 2011 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. See Docket No. 1. The Board, including Stonehenge's designee, Mr. Utgard, unanimously consented to and authorized the filing of the voluntary petitions for relief. See Docket No. 1, at 19-21.

11. On June 21, 2011, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules"), which identified Stonehenge as a secured creditor on Schedule D thereto. See Docket No. 212. On June 21, 2011, the Debtors also filed their Statements of Financial Affairs (the "SOFA"). See Docket No. 213. In response to question 19(c) of the SOFA, however, the Debtors identified Stonehenge as an "investor."

12. It was acknowledged by counsel for Stonehenge at the hearing that Mr. Utgard continues to serve on the Board pursuant to the terms of the Voting Agreement.

## CONCLUSIONS OF LAW

**I.  Right to Credit Bid under Section 363(k)**

The right of a secured creditor to credit bid is governed by Section 363(k) of the Bankruptcy Code. To be afforded the benefit of credit bidding, a secured creditor must hold an allowed secured claim, unless the Court "for cause" orders otherwise. 11 U.S.C. § 363(k). The opportunity to credit bid, therefore, is a right that is within the discretion of the Court and is not absolute. See, e.g., In re NJ Affordable Homes Corp., No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006). See also In re Theroux, 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994) ("[T]here is no absolute entitlement to credit bid.").

"Cause" is not defined by section 363(k) of the Bankruptcy Code, but is "intended to be a flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis." In re NJ Affordable Homes Corp., No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006). Furthermore, the intent of the statute is to permit only those persons with a valid security interest in property to be sold to claim a setoff. Bank of Nova Scotia v. St. Croix Hotel Corp. (In re St. Croix Hotel Corp.), 44 B.R. 277, 279 (Bankr. D.V.I. 1984). The purpose of requiring a valid security interest is to avoid the property from being transferred to a putative secured creditor based on a credit bid only to have that creditor's lien subsequently deemed invalid.

Recognizing this purpose, courts have denied the opportunity to credit bid when a bona fide dispute exists regarding the validity of the lien forming the basis for a credit bid. See In re Daufuskie Island Properties, LLC, 441 B.R. 60 (Bankr. D.S.C. 2010) (holding that a secured creditor was not entitled to credit bid when its mortgage was in dispute); Nat'l Bank of Comm. v.

McMullan (In re McMullan), 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that a secured creditor could not credit bid "because the validity of its liens and security interests are unresolved"); Morgan Stanley Dean Witter Mortgage Capital, Inc. v. Alon USA L.P. (In re Akard St. Fuels, L.P.), No. 3:01-CV-1927-D, 2001 WL 1568332, at *3 (N.D. Tex. Dec. 4, 2001) (refusing a request to credit bid where the secured creditor's lien was subject to a bona fide dispute that could not be resolved before the sale).

A dispute is bona fide if "there is an objective basis for either a factual or legal dispute as to the validity of the debt." In re Octagon Roofing, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991) (citing In re Busick, 831 F.2d 745, 750 (7th Cir. 1987)).

## II.     Burden of Proof in a Section 363(k) Dispute.

In deciding whether to deny a credit bid right, "a court need not determine the probable outcome of the dispute, but merely whether one exists." See Octagon Roofing, 123 B.R. at 590. Accordingly, the Court does not need to find that it is more likely than not that the Committee will ultimately prevail in recharacterizing Stonehenge's claims. Instead, the task of the Court at this stage of the proceeding is simply to determine whether there is an objective factual or legal basis regarding the nature of Stonehenge's claim. See In re Atlas, 986 F.2d 709 (4th Cir. 1993); In re Collins, 100 B.R. 447 (Bankr. E.D. Va. 1995); In re Taylor, 198 B.R. 142 (Bankr. D.S.C. 1996).

## III.    Current Procedural Posture.

The Committee is requesting that the Court deny or condition Stonehenge's credit bid rights as part of the hearing on bidding procedures, as opposed to waiting until the conclusion of the auction. Stonehenge, on the other hand, believes that it is more appropriate to address Stonehenge's credit bid rights at the sale hearing currently scheduled for July 21, 2011, the day after the scheduled auction.

Although the Court understands that credit bid disputes sometimes arise during an auction and are later addressed at a subsequent final sale hearing, when the dispute is known and raised at the bidding procedures hearing, it is more than appropriate (and in fact advisable in this case) to address it in advance of the auction.  See In re Aloha Airlines, Inc., 2009 WL 1371950 (Bankr. D. Hawaii Mary 14, 2009) (denying right to credit bid at bid procedures hearing); In re Antaeus Technical Servs., Inc., 345 B.R. 556 (Bankr. W.D. Va. 2005) (same).  The Court believes that Stonehenge's right to credit bid at the auction should be addressed prior to the auction, given that the failure to do so could cause confusion as to the ground rules of the auction and delays following the auction.  In the current situation, the Court finds that any delay in the sale process could be detrimental to the Debtors' ability to operate and their ultimate sale value, as reflected by the testimony at the hearing of the Debtors' Chief Executive Officer, Mitch Jolley.

Another procedural issue that requires consideration is the fact that no adversary proceeding is on file challenging Stonehenge's liens and claims.  Stonehenge argued that because no adversary proceeding was pending, there is no "bona fide dispute" as to the nature of its claim.  The Court rejects this technical argument.

As a threshold matter, it is unclear whether an adversary proceeding must be filed to recharacterize a claim.  Although Bankruptcy Rule 7001 requires an adversary proceeding to subordinate a claim under Section 510 of the Bankruptcy Code, an adversary proceeding may not necessarily be required solely to recharacterize a claim.  See In re Micro-Precision Technologies, Inc., 303 B.R. 238, 243 (Bankr. D.N.H. 2003) (an adversary proceeding need not be commenced to recharacterize a claim); see also In re Official Comm. of Unsecured Creditors for Dornier Aviation (North America), Inc. (In re Fairchild), 453 F.3d 225,(4th Cir. 2006) (a bankruptcy

court may recharcterize a claim and exercise its equitable powers separate and apart from disallowing and equitably subordinating a claim under Sections 502(b) and 510(c) of the Bankruptcy Code, respectively).

Even if an adversary proceeding is required to achieve a recharacterization of a secured creditor's claim and resulting avoidance of its lien, however, the adversary proceeding does not need to be pending at the time the Court denies or conditions the alleged secured creditor's right to credit bid under Section 363(k).  See In re NJ Affordable Homes Corp., No. 05-60442 (DHS), 2006 WL 2128624, at *11(Bankr. D.N.J. June 29, 2006) ("The dispute need not even be the subject of an immediate or concurrent adversary proceeding") (quoting Union Planters Bank, N.A. v. Burns (In re Gaylord Grain, L.L.C.), 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004)).  Because the Court finds that the pendency of an adversary proceeding is not required to deny or condition an alleged secured creditor's credit bid right, the Court need not opine on whether an adversary proceeding would be required to recharacterize Stonehenge's claim and avoid its lien resulting from a finding of recharacterization.

In finding that an adversary proceeding need not be pending to decide Stonehenge's credit bid rights in this case, the Court observes the practicality that the Committee could not reasonably have been expected to commence an adversary proceeding against Stonehenge at this junction.  The parties acknowledged at the hearing that the Committee received the Stonehenge documents in the past two weeks, and it is undisputed that the Committee has not received all of the information it has requested to date.  The Committee cannot control the timing of the bidding procedures hearing or the Debtors' original request to give Stonehenge the unconditional right to credit bid in the Bid Procedures Motion.  The Court further considered the fact that, if an adversary proceeding were required to challenge Stonehenge's claims and liens, the right to

bring this challenge would belong to the estates, and the Committee could not commence such a proceeding without further order of the Court granting the Committee standing to do so.

The Court also rejects Stonehenge's argument that the Debtors' Schedules, which do not dispute Stonehenge's status as a secured creditor, are an impediment to the Court's ability to deny or condition Stonehenge's credit bid rights, The Court finds that, like the fact that no adversary proceeding is pending, the Debtors' Schedules do not impact the Court's ability to disallow or condition Stonehenge's credit bid right. Although Stonehenge's claim is technically "deemed" allowed at this very moment, as a result of the filing of the Schedules, the Schedules represent only the Debtors' position with respect to the claim, not the position of the Committee or any other creditor who could file an objection to Stonehenge's claim. Moreover, Stonehenge has not filed a proof of claim, so the Committee could not possibly have objected to a claim that has not yet been filed prior to the hearing.

The Court finds that the current status of Stonehenge's claim has no relevance to a Section 363(k) determination, based on the plain language of the statute itself. Section 363(k) requires that the claim be "allowed" as a condition precedent to permitting credit bidding. The section contains an exception, however, which is that, even if "allowed," the Court can still disallow or condition the credit bid right for "cause," including the existence of a bonda fide dispute regarding the claim. The language of Section 363(k), therefore, permits on its face the Court to deny or condition Stonehenge's credit bid rights, even if the claim at this moment in time is deemed allowed. The critical issue the Court must decide, therefore, is not whether an adversary proceeding or claim objection *has been* filed. Rather, the Court needs to decide whether there is an objective factual or legal basis to bring such an adversary proceeding or claim objection at the appropriate time.

IV. **Stonehenge's Right to Credit Bid Must be Conditioned.**

After reviewing the evidence and pleadings, and hearing argument from counsel at the hearing, the Court finds that cause exists under Section 363(k) of the Bankruptcy Code to condition Stonehenge's right to credit bid in two ways.  First, the Court will require Stonehenge to post collateral representing the amount of any credit bid portion of Stonehenge's claim, to protect the estates from the possibility of Stonehenge's claim being recharacterized later.  Second, to address Stonehenge's status as an insider, the Court will require Stonehenge to submit a qualified bid by the July 15, 2011 bidding deadline, either by itself or as part of a joint venture that is fully disclosed, and will further require Mr. Utgard to resign from the Board prior to submitting such a credit bid.

A. **A Bona Fide Dispute Exists as to Stonehenge's Claim.**

The Court is conditioning Stonehenge's right to credit bid on posting collateral in the in the amount of any Stonehenge credit bid.  This remedy is consistent with remedies imposed by other Courts when the secured credit's claim is the subject of a dispute.  See, e.g., Octagon Roofing, 123 B.R. at 592; Bank of Nova Scotia v. St. Croix Hotel Corp. (In re St. Croix Hotel Corp.), 44 B.R. 277, 278-79 (Bankr. D.V.I. 1984); In re Diebart Bancroft, 1993 WL 21423 (E.D. La. 1993).

In making this ruling, the Court need not rule on the ultimate issue of recharacterization.  Indeed, the Court does not opine on the likelihood of success of the Committee's claim, as the Court is not required to go that far in determining a party's right to credit bid under Section 363(i).  After considering the factual record and the law on recharacterization, the Court finds that the Committee has shown that an objective basis to dispute the nature of Stonehenge's claim exists.

The parties do not dispute that, in assessing a recharacterization issue in the Fourth Circuit, the Court must consider the eleven (11) factors set forth in the Fairchild case. These factors are as follows:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

In re Fairchild, 453 F.3d at 233 (citing Bayer Corp. v. Masco Tech, Inc. (In re AutoStyle Plastics, Inc.), 269 F.3d 726, 749-50 (6th Cir. 2001)).

Based on the record before the Court, some factors appear on their face to favor Stonehenge's position. Specifically, factors (1), (2) and (3) appear to suggest that the Stonehenge advances are in the nature of a loan. These factors address the situation in which the agreement was not properly document, or was documented after the investment was made.

After considering the remaining Fairchild factors, however, the Court finds that they appear to weigh in favor recharacterization:

Factor 4: The source of repayments: When Stonehenge agreed to make a second advance to Merit of approximately $4.5 million close to the Petition Date, Mr. Utgard sat on the Merit Board and knew or should have known that the Debtors were facing a liquidity crisis and that bankruptcy was a strong possibility. Notwithstanding being privy to privileged and confidential information about the Debtors' dire situation, Stonehenge decided to make this advance, on a subordinate basis. In addition to the unlikely possibility of being paid back on this advance as a

result of its subordination to Regions, Stonehenge also had expectations that the source of repayment would come in part from the value of the Debtors' stock, under the Option Agreement, as opposed to the Debtors' working capital.

As such, the repayment of Stonehenge's investment was directly tied to the Debtors' success, and where repayment is tied to a company's success, this indicates that the advance is actually an equitable contribution, rather than a loan. In re Tiger Aircraft, LLC, No. 3:07-bk-0047, 2010 WL 3120041, at*3 (Bankr. N.D.W.Va. Aug. 6, 2010).

Factor 5: The inadequacy of capitalization: The record supports a finding that the Debtors were undercapitalized and overleveraged. The best evidence of this fact is that Regions was not willing to provide the Debtors with enough financing to close on the Stock Purchase Agreement, and the Debtors needed a mezzanine type deal to provide enough cash to close on the transaction. The Debtors' Schedules confirm that, on the Petition Date, the enterprise was severely overleveraged.

Factor 6: The identity of interest between Stonehenge and the Debtors: In determining whether or not to recharacterize a claim, courts will look beyond the language of the transaction, and to the intent of the parties, to determine how to classify a claim. In re Daufuskie Island Properties, LLC, 431 B.R. 649, 655 (Bankr. D.S.C. 2010).

In this case, Mr. Utgard became a member of the three (3) member Board pursuant to the Voting Agreement. Under that agreement, Mr. Utgard has the right to participate on all Merit Board committees. Because Stonehenge has a one-third vote on all the decisions made by the Board, including filing for bankruptcy, this factor also weighs in favor of a finding of recharacterization. Mr. Utgard is in a position in which he holds the "tie breaking" vote on any decisions made by the Debtors' Board. Moreover, while the Debtors claim that Stonehenge is a

secured creditor of the Debtors, the Debtors acknowledged in the SOFA that Stonehenge was in fact viewed by the Debtors as an "investor." The language of the Purchase Agreement also suggests that Stonehenge viewed this agreement with the Debtors as an investment. In particular, the Purchase Agreement referred to the Note and the Option collectively as the "Securities," and provides that closing on the Securities shall occur on the closing date. This is further evidence of the parties' intent of the transaction.

The Court also finds that Stonehenge is an "insider" under Section 101(a)(31)(B) of the Bankruptcy Code. Stonehenge is a member of the Board, through its representative, Mr. Utgard. At the hearing, Stonehenge argued that Stonehenge was not a member of the Board, because Mr. Utgard was the Board member, designated by Stonehenge, and not Stonehenge. The Court rejects Stonehenge's argument. The evidence is clear that Mr. Utgard is an agent for Stonehenge. In fact, while Mr. Utgard sat on the Board, he executed the amended transactional documents evidencing Stonehenge's additional $4.5 million advance to the Debtors in February 2011. Because Mr. Utgard is acting as Stonehenge's agent, as its designee on the Board, the Court holds that Stonehenge is an insider under Section 101(a)(31)(B)(i) of the Bankruptcy Code.

Stonehenge is also an insider under Section 101(a)(31)(B)(iii), because Stonehenge, through Mr. Utgard, is a "person in control" of the Debtors, due to his one-third voting right on the Board.

Factor 7: The security for advances: In looking at the substance of the transactions as a whole, instead of simply the form of the documentation supporting the transactions, the second lien granted to Stonehenge merely created an illusion of security, rather than actual security for Stonehenge's transaction with the Debtors. The Intercreditor Agreement with Regions both

subordinated Stonehenge's interest to Regions, and also gave Regions additional rights under the Intercreditor Agreement. Stonehenge should have known when it subordinated to Regions and entered into the Intercreditor Agreement, therefore, that its lien was not actual security for its investment. Additionally, the approximate $4.5 million investment made by Stonehenge near the filing date further supports the Committee's position that Stonehenge's second-lien position was not adequate to secure this investment.

Factor 8: The ability to obtain financing from outside lending institutions: Based on the Debtors' perilous financial situation, the Court finds that the evidence is unclear whether the Debtors could have obtained the first $7.5 million from an outside lending institution. There is little doubt, however, that the Debtors could not have obtained the $4.5 million advanced on a subordinate basis from any outside lending institution. This factor also supports a finding of recharacterization. See Diasonics, Inc. v. Ingalls, 121 B.R. 626, 632 (Bankr. N.D.Fla. 1990) ("The standard to determine if a loan is, in fact, a capital contribution is . . . that the loans were made when no other disinterested lender would have extended credit").

Factor 9: The extent to which the advances were subordinated to the claims of outside creditors: All of the Stonehenge advances were subordinated to Regions. Because Courts have held that subordination of an advancement is indicative of an equity contribution, and not debt, this factor further supports the Committee's position that Stonehenge's investment was in fact an equitable contribution. See e.g. In re Franklin Equip. Co., 416 B.R. 483, 518 (Bankr. E.D.Va. 2009); In re Tiger Aircraft, LLC, 2010 WL 3120041, at *10 (Bankr. N.D.W.Va. Aug. 6, 2010).

Factor 10: The extent to which the advances were used to acquire capital assets: Where advances are used to meet a corporation's daily operational needs, rather than to purchase capital assets, such advances are indicative of debt rather than equity. See Drake v. Franklin Equip. Co.

(In re Franklin Equip. Co.), 418 B.R. 176, 200 (E.D.Va. 2009). The initial $7,500,000 advance was unquestionably used to assist the Debtors in acquiring equity in Five Star, rather than to fund the Debtors' daily operations. Moreover, the subsequent investment made by Stonehenge was used to pay down Regions, as admitted by Stonehenge itself at the hearing and in the Stonehenge Statement.

Factor 11: The absence of a sinking fund: Finally, based on the record before the Court to date, there is no evidence of a requirement of a sinking fund for Stonehenge's transactions with the Debtors. Tiger Aircraft, 2010 WL 3120041, at *4 ("The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans.") (quoting In re Autostyle Plastics, Inc., 269 F.3d at 753).

While the Court cannot make a conclusive determination as to the nature of the transactions between Stonehenge and the Debtors at this time, the Court finds that the Committee has shown enough to establish that an objective basis exists to challenge the nature of Stonehenge's claim. As such, the Court deems it appropriate to condition Stonehenge's right to credit bid on posting collateral with the estates in the amount of any credit bid, prior to any closing on a sale that includes a Stonehenge credit bid.

**B.    Additional Conditions to Stonehenge's Right to Credit Bid are Warranted.**

Because Mr. Utgard continues to sit on the Board and have access to privileged and confidential information (including information regarding the Debtors' sale process), the Court finds that further conditions are warranted to permit Stonehenge to credit bid. Specifically, if Stonehenge wishes to credit bid, it must submit (i) a Qualified Bid as part of (a) a joint venture or (b) other arrangement with a third party acceptable to the Debtors, Regions and the Committee; and (ii) fully disclose the identity of each entity bidding for the Debtors' assets as part of the qualified bid or otherwise sponsoring or participating in connection with such bid and the

complete terms of such participation.  This condition on Stonehenge's ability to will lessen the risk of Mr. Utgard using his position on the Board, and the confidential and privileged information he has learned, to influence other potential bidders to team up with Stonehenge.

As a further condition, in the event Stonehenge does credit bid, Mr. Utgard also must resign from the Board prior to submitting any such qualifying bid.  This condition will eliminate the inherent conflict of interest that will arise if Stonehenge credit bids and Mr. Utgard is voting as a member of the Debtors' Board as to the highest and best proposed contract at the auction.

## **CONCLUSION**

The Court recognizes that Stonehenge's ability to credit bid at the auction may be limited by the restrictions placed on its right to credit bid at the auction.  Based on the record before the Court, however, the Court finds that the conditions are necessary to protect the estates and to minimize the risk of Mr. Utgard using his position on the Board to influence the outcome of the auction.

Based on the foregoing, it is hereby:

**ORDERED, ADJUDGED AND DECREED**, that Stonehenge shall only be permitted to credit bid pursuant to Section 363(k) of the Bankruptcy Code if (a) it posts an irrevocable letter of credit in the amount of Stonehenge's credit bid, pending a final determination by the Court as to the nature of Stonehenge's claim; (b) it submits a Qualified Bid as part of a joint venture or other arrangement with a third party acceptable to the Debtors and the Committee; and (c) Mr. Utgard resigns from the Board prior to submitting a Qualified Bid involving Stonehenge.

**AND IT IS SO ORDERED** on this the _____ day of _____ 2011.