## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **11-03216-hb**

## ORDER

The relief set forth on the following pages, for a total of 27 pages including this page, is
hereby ORDERED.

---

**FILED BY THE COURT**
**07/12/2011**



US Bankruptcy Judge
District of South Carolina

Entered: 07/12/2011

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

IN RE:

The Merit Group, Inc.,

               Debtor(s). [1]

C/A No. 11-03216-HB

Chapter 11

**ORDER**

This is a dispute between the official Committee of Unsecured Creditors ("Committee") and creditor Stonehenge Opportunity Fund II, L.P. ("Stonehenge") over credit bidding rights under 11 U.S.C. § 363(k).[2]  The dispute was initiated in the *Limited Objection of the Official Committee of Unsecured Creditors to Motion of the Debtors for Entry of an Order (I) Approving Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing, but not Requiring, Entry into a Stalking Horse Agreement and Approving Stalking Horse Protections, (III) Approving Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling Auction and Sale Approval Hearing an (V) Approving the Form and Manner of Sale* Notice ("Objection") (Doc. No. 226).  In its objection, the Committee seeks to prohibit or limit Stonehenge's credit bidding rights at the auction proposed in the Debtors' Motion.[3]  On June 27, 2011, Stonehenge filed its

---

[1] An Order Directing Joint Administration of the Debtors' Related Chapter 11 Cases was entered on May 17, 2011 (Docket No. 16). The Debtors and the last four digits of their respective tax identification numbers are:  The Merit Group, Inc., f/k/a Lancaster Distributing Company, f/k/a Lancaster Paint Sundries, Inc. (4224); Merit Transportation, Inc. (9048); Merit Paint Sundries, LLC d/b/a Lancaster (8882); Merit Supply Company, LLC d/b/a Merit Supply (5878); Merit Pro Finishing Tools, LLC d/b/a Merit Trade Source (8544); Five Star Products, Inc. (9186); and Five Star Group, Inc. d/b/a Rightway (3506).

[2] Further reference to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, will be by section number only.

[3] *Debtors' Motion for Entry of an Order (I) Approving Auction and Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets, (II) Authorizing, but not Requiring, Entry into a Stalking*

1

*Statement in Support of its Right to Credit Bid under 11 U.S.C. § 363(k) and Response to the Official Committee of Unsecured Creditors' Limited Objection to the Debtors' Motion to Approve Bidding Procedures and Related Relief* ("Response") (Doc. No. 245). In its response, Stonehenge contends that it has a right to credit bid under § 363(k) and that any determination of whether a credit bid should be accepted and approved by the Court is premature.[4]

This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b) and 1334 and Local Civil Rule 83.XI.01, DSC. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND & FINDINGS OF FACT

These Chapter 11 cases were filed on May 17, 2011, by The Merit Group, Inc. ("Debtors"). From the first day of the bankruptcy cases, the Debtors have advised the Court and creditors of their intent to sell substantially all of their assets at a sale pursuant to § 363. On June 10, 2011, this intent resulted in the filing of *Debtors' Motion for Entry of an Order (I) Approving Auction and Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets, (II) Authorizing, but not Requiring, Entry into a Stalking Horse Agreement and Approving Stalking Horse Protections, (III) Approving Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling Auction and Sale Approval Hearing, and (V)*

---

*Horse Agreement and Approving Stalking Horse Protections, (III) Approving Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling Auction and Sale Approval Hearing, and (V) Approving the Form and Manner of the Sale Notice* (Docket No. 169).

[4] At the hearing, the Court took this matter under advisement and the parties submitted competing proposed orders (Doc. Nos. 278 & 282), further clarifying and asserting their positions. However, after a review of both proposed orders, the Court prepared this order with the assistance of the parties' submissions.

2

*Approving the Form and Manner of the Sale Notice* ("Bidding Procedures Motion")
(Docket No. 169) along with the *Motion of Debtors for Entry of an Order Approving (A)
the Proposed Sale of Substantially All Assets of the Debtors Free and Clear of All Liens,
Claims, Encumbrances and Other Interests and (B) Assumption, Assignment and Sale of
Certain Executory Contracts and Unexpired Leases* ("Sale Motion") (Docket No. 170).
A hearing on the Bidding Procedures Motion was held on June 28, 2011.

Debtor Merit Group, Inc., is a South Carolina corporation headquartered in
Spartanburg. It is the parent company of five wholly-owned subsidiaries. Four of those
are also South Carolina corporations. Its other subsidiary, Five Star Products, Inc., has its
own wholly-owned subsidiary, Five Star Group, Inc., both of which are Delaware
corporations. As of the petition date, the Debtors have 320 employees and serve
collectively as one of the leading paint sundries distributors in the United States, also
serving Mexico, the Caribbean Islands, Central America and South America. The
Debtors' inventory is supplied by over 750 manufacturers and the Debtors maintain
distribution centers in South Carolina, Florida, Kentucky, New Jersey, New York, Texas,
California and Utah. The Debtors' customer base consists of more than 10,000
independent, regional and national paint store chains as well as large retailers, hardware
stores, lumber yards, home centers, drywall yards and auto trim shop distributors.
Debtors' 2010 annual revenues were approximately $200 million and as of the filing date,
Debtors anticipated that they have approximately 1,160 creditors (excluding current and
former employees) and approximately $100 million in debt.

The Debtors have represented to the Court that the bankruptcy results from The
Merit Group, Inc.'s, acquisition of Five Star Products, Inc., in January 2010. The

acquisition resulted in the companies spending far more than anticipated for the consolidation of warehouses and the integration of the organizations. Consequently, there was substantial stress on the Debtors' liquidity.

After significant first day Motion activity, on May 19, 2011, the Court entered an *Interim Order Pursuant to 11 U.S.C Sec 105, 361, 362, 363, 364, and 507 (I) Approving Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling A Final Hearing* ("Interim Order") (Doc. No. 30), with financing funded by the Debtors' pre-petition lender, Regions Bank ("Regions" or "DIP Lender"). The Committee was appointed on May 23, 2011, and its counsel became active in the case shortly thereafter.

The *Final Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364, and 507(I) Approving Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, and (V) Modifying the Automatic Stay* ("Final Order") (Doc. No. 163) recites the following regarding Regions' outstanding debt, secured by a lien on substantially all of the Debtors' assets:

> *Pre-Petition Obligations.* As of the Petition Date, there was outstanding under the Pre-Petition Loan Facility or was otherwise owed to the Pre-Petition Lender (a) revolving credit loans in the approximate principal amount of $47,286,000 (the "*Pre-Petition Revolver Loans*"), (b) term loans in the approximate principal amounts of $916,679, $794,428 and $455,113 (the "*Pre-Petition Term Loans*"), (c) reimbursement obligations for any draws made upon letters of credit issued by the Pre-Petition Lender, for the account of the Debtors, in the aggregate face amount of approximately $590,000 (collectively, the "*Pre-Petition LCs*"), (d) interest rate hedging obligations having an aggregate exposure to the Debtors of approximately $120,000, $413,000, and $987,700, and (e) corporate credit card debt in amounts that fluctuate daily (the "*Pre-*

*Petition Credit Card Debt*" and, together with the Pre-Petition Revolver Loans, Pre-Petition Term Loans, Pre-Petition LCs, and all other obligations of any Debtor to the Pre- Petition Lender on the Petition Date, including, without limitation, all indebtedness associated with cash management system services or products and all interest, fees, legal expenses and other amounts heretofore or hereafter accruing on any of the foregoing or at any time  chargeable to any of the Debtors in connection therewith, referred to as the "*Pre-Petition Obligations*").

*Id.* at 5, § (C)(ii).  The Final Order also recognized certain other secured obligations owed to Stonehenge and The Valspar Corporation ("Valspar").   Neither Stonehenge nor Valspar objected to any provisions of the Interim or Final Order and are parties to Intercreditor Agreements that, among other things, subordinate all of their respective liens to those of Regions.

The Final Order provided the Debtors with financing of up to $55 million from Regions.  Prior to entry of that Final Order, the Committee renegotiated certain terms of Debtors' interim financing arrangement, and the Final Order included a provision stating that the objections were overruled subject to certain concessions therein (including but not limited to): (1) the exclusion of certain assets and claims from the DIP Lender's collateral; (2) reservation of certain rights by the Committee; (3) a carve-out for an initial plan funding commitment for unpaid professional expenses, certain fees and expenses (not to exceed $800,000 for fees and $200,000 for expenses) and United States Trustee fees[5]; (4) the DIP Lender agreed to make a loan of $500,000 to the Debtors if an Acceptable Sale[6] closes, to be used by the Debtors in connection with confirmation of a

---

[5] A complete statement of carve-out terms is set forth in the Final Order. *See* Doc. No. 163 at 26, ¶ 10.

[6] "Acceptable Sale" is defined in the Final Order to mean:
> a sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code (i) to which DIP Lender affirmatively consents, (ii) that is made pursuant to bid procedures (if any), an asset purchase agreement, sale approval order and other documentation that is in form and substance satisfactory to DIP Lender in its sole discretion, and (iii) that actually closes.

Chapter 11 plan.  This amount was referred to as the "Initial Plan Funding Commitment."

The Final Order expressly reserved Regions' right to credit bid at any sale pursuant to

§ 363(k), and the Committee expressly reserved its right to object to any proposed sale of

the Debtors' assets, evidencing the parties' anticipation of further negotiation.

<u>COMMITTEE'S BIDDING PROCEDURES OBJECTION & STONEHENGE'S RESPONSE</u>

After the June 28, 2011, hearing, the Court entered an Order approving the

Bidding Procedures Motion ("Bidding Procedures Order") (Doc. No. 270), with some

modifications to alleviate most of the objections.  The Bidding Procedures Order also

scheduled an auction for July 20, 2011, and a final sale hearing for July 21, 2011, to

determine whether any resulting bidder and sale should be approved.  In the Bidding

Procedures Order, with the agreement of the objecting parties and other parties in

interest, the Court reserved for future determination the issue that is the subject of this

Order: Whether Stonehenge may credit bid pursuant to § 363(k) at the auction over the

objection of the Committee, and if so, on what terms.  In their objection, the Committee

asks, *inter alia*, that the Court require the full amount of the credit bid portion of any

Stonehenge credit bid be secured by immediately available funds to be deposited in an

escrow account.  The Committee further requests that such posted collateral be held in an

escrow account pending a determination by the Court as to the validity and enforceability

of Stonehenge's claims against the estates. (Doc. No. 226).

The approved Auction and Bidding Procedures in the Bidding Procedures Order

provide the following bid requirements:

> 1.  Only bids for the Assets that constitute "Qualified Bids" will be
> considered by the Debtors. A <u>"Qualified Bid"</u> is an offer to purchase the

---

*Id.* at 18, ¶ 6(b).

Assets that: (i) identifies the Assets to be purchased and any Excluded Assets; (ii) identifies the price to be paid for the Assets to be purchased, an amount at least equal to (x) the price identified in the Stalking Horse Agreement (if applicable) *plus* (y) any Break-Up Fee ($500,000) and Expense Reimbursement ($750,000) *plus* (z) $500,000 (such amount shall be referred to as the "Initial Overbid Amount"), provided however, that all Qualified Bids, including **any credit bids** by Regions Bank, as pre-petition and post-petition lender to the Debtors (in such capacities, the "Lender") or **Stonehenge**, shall include sufficient cash to fund payment of amounts owed to Morgan Joseph as a "Sale Transaction Fee" and the Break-Up Fee and Expense Reimbursement if the Successful Bid is not the Stalking Horse Bid . . .

(Doc. No. 270, Ex. 1 at § C) (emphasis added).    The Auction and Bidding Procedures

also include the following provision regarding credit bids:

Notwithstanding anything else herein, the right of Stonehenge to credit bid at the Action shall be subject to and determined by further order of this Court, which is presently under advisement. At or before the conclusion of the Auction, Lender (or Stonehenge, subject to further order of the Court) may submit a credit bid for some or all of such Assets to the fullest extent permitted under section 363(k) of the Bankruptcy Code. The Lender shall be deemed a Qualified Bidder upon its submission of a credit bid pursuant to and in compliance with the terms hereof and may assign any credit bid at any time prior to the closing, to a third party who thereupon will be entitled to close, and any such assignment shall relieve the Lender of any continued responsibility or duties with respect to any such assigned credit bid (but not under the DIP Order). Any credit bid by Lender or Stonehenge must include at least enough cash to pay any fees owed to Morgan Joseph [Morgan Joseph Triartisan LLC, the sales broker] and pay any Break-up Fee and Expense Reimbursement. The failure of the Creditors' Committee to object to a bid put forth by Lender shall not (a) impair the rights any interested party may have under paragraph 21 of the DIP Order; or (b) release Lender from any causes of action which can be brought on behalf of the Debtors' estates pursuant to said paragraph 21. If Stonehenge is permitted to credit bid by subsequent order of the Court, Stonehenge's right to credit shall not (a) prejudice or impair the rights of the Creditors' Committee to challenge the nature, extent, priority, validity, perfection or amount of Stonehenge's alleged liens, security interest and claims, in accordance with its existing challenge deadline; or (b) release Stonehenge from any causes of action which can be brought by or on behalf of the Debtors' estates relating to any of the foregoing.

*Id.* at § F.

The sale in question is proposed as a sale of substantially all of the Debtor's assets pursuant to § 363 free and clear of all liens, outside of a Chapter 11 plan, and without a disclosure statement on file.  The Sale Motion contemplates a sale price to a Stalking Horse Bidder, MG Distribution, LLC, in the amount of $46 million plus other assumed liabilities, cure amounts, etc., with an auction on July 20 to entertain higher and better offers.  The sale contemplates a transaction fee to Morgan Joseph of $750,000[7] and recites secured liens on assets to be sold as follows:

> **LIENSIMORTGAGES/SECURITY INTEREST ENCUMBERING PROPERTY:** (A) Regions Bank, in the approximate amount of $53,500,000 secured by a first priority lien on all of the Assets, including prepetition and post-petition Assets; (B) Stonehenge, in the approximate principal amount of $12,000,000, secured by a lien on all of the Assets, including pre-petition and post-petition Assets, which lien is subordinate to the lien of Regions Bank pursuant to an intercreditor and subordination agreement; (C) The Valspar Corporation, in the approximate amount of $350,000, secured by a lien on certain inventory, which lien is subordinate to the lien of Regions Bank and Stonehenge, pursuant to an intercreditor and subordination agreement; (D) Utah State Tax Lien filed in Salt Lake County against Strategic1 d/b/a The Merit Group, Inc. on 12/6/10 for $1,223.19, which amount is disputed; (E) Utah State Tax Lien filed in Salt Lake County against Merit Paint Sundries, LLC d/b/a Lancaster on 2/7/11 for $41,732.93, which amount is disputed; (F) Spartanburg County, South Carolina Tax Assessor, for outstanding real and personal property taxes in the amount of $59,239.84; (G) Mesquite Tax Fund payable to Mesquite, Texas for outstanding taxes in the amount of $94,554.62; and (H) Dallas County Tax Office for outstanding taxes in the amount of $31,186.02.

(Doc. No. 271 at 4).  The first lien listed clearly exceeds the proposed sale price, although the Debtors are hopeful that holding an auction will increase the price.

---

[7] Exact terms of the sale are set forth in the *Notice of (A) the Proposed Sale of Substantially All Assets of Debtors Free and Clear of All Liens, Claims, Encumbrances and Other Interests; (B) Bidding Procedures, Auction, and Hearing on the Sale; (C) Deadline to Object to Sale; (D) Deadline to Object to Assumption of Executory Contracts and Unexpired Leases and Establishment of Cure Amounts and Extension of Time to Assume or Reject Certain Unexpired Leases; and (E) Hearing on Assumption of Executory Contracts and Unexpired Leases and Cure Amounts and Extension of Time to Assume or Reject Certain Unexpired Leases* (Doc. No. 271).

The benefit to the bankruptcy estate from the sale of the property is set out in the

Notice as follows:

> **PROCEEDS ESTIMATED TO BE PAID TO THE ESTATE:** The
> Debtors and the Unsecured Creditors' Committee will request permission
> to set aside an undetermined amount of funds from the Sale Proceeds for
> payment of administrative expense claims and unsecured creditors,
> including both priority and non-priority unsecured claims, to be paid
> before the payment of the secured creditors set forth above. Although the
> ultimate resolution of this request is uncertain and no agreement has yet
> been reached, the Debtors, the Unsecured Creditors' Committee and the
> Lender could negotiate such an amount and other terms and conditions at
> the Auction and seek approval of such terms and conditions at the Sale
> Hearing. Any such resolution could involve release of claims or payment
> of funds by the parties involved. Without a consensual resolution, the
> Debtors may seek approval of the sale, from which all sale proceeds will
> be paid first to the secured creditors. Based on the present purchase price,
> absent an agreement, there will be little or no proceeds available to pay
> unsecured creditors out of this sale, which, if approved by the Court,
> involves substantially all of the Debtors' assets.

*Id.*

The Auction and Bidding Procedures proposed by the Debtors and approved by

the Court give considerable discretion to the Debtors, in consultation with Regions and

the Committee, to alter the procedures as necessary and to determine the successful bid

and back-up bid. (Doc. No. 270, Ex. 1 at § K).  Further, despite approval of the Auction

and Bidding Procedures—and even after the Debtors, in consultation with others, select

their choice bid—the sale of the Debtors' assets to any bidder on any terms is not

approved until the Court approves the same, applying applicable law to the facts as they

develop. *Id.* at § N.

Stonehenge argues that it has a right to credit bid at the auction under § 363(k) as

provided in and subject to the limitations of Sections C and F of the approved procedures.

*See supra* at 6-7.  In addition, Stonehenge contends that any determination of whether

any credit bid should be accepted and approved by the Court is premature until Stonehenge actually utilizes § 363(k) at any sale. (Doc. No. 245). The Committee argues that cause exists, prior to any auction, to deny or limit Stonehenge's right to credit bid because, *inter alia*, a bona fide dispute exists as to whether Stonehenge's loans should be recharacterized as equity, making a credit bid inappropriate.

In its proposed order[8] submitted after the hearing, the Committee alleges the following in support of its position:

1.     Prior to these bankruptcy filings on May 17, 2011 (the "Petition Date"), Merit entered into a Stock Purchase Agreement dated as of November 24, 2009 with National Patent Development Corporation (the "Stock Purchase Agreement"). Committee Ex. 1 at ¶ 2, ¶ A. Pursuant to the Stock Purchase Agreement, Merit agreed to acquire the stock of Debtor Five Star Products, Inc., and its subsidiary, Debtor Five Star Group, Inc. See Declaration of Mitch Jolley in Support of First Day Motions [Docket No. 18], at ¶ 12.

2.     As part of closing on the Stock Purchase Agreement in January 2010, Regions Bank ("Regions") restructured its loan with Merit and became the senior lender for all of the Debtors, including the Five Star entities whose stock was acquired under the Stock Purchase Agreement. See Committee Ex. 1 at 2, ¶ B. Pursuant to an Amended and Restated Loan Agreement dated as of January 15, 2010, by and between Regions and the Debtors, Regions agreed to provide the Debtors, on a revolving credit basis, up to a maximum aggregate principal amount of $65,000,000 at any one time outstanding, and a term A loan to Merit in the original principal amount of $1,000,000, a term B loan to Merit in the principal amount of $3,000,000 (collectively, the "Regions Loan"). Id. The Regions Loan is secured by a first priority security interest on the Debtors' assets. Id.

3.     Contemporaneously upon closing on the Regions Loan, the Debtors and Stonehenge entered into a Senior Subordinated Note and Option Agreement (the "Purchase Agreement"). Id. The Debtors executed certain other documents in connection with closing on the Purchase Agreement, including but not limited to (i) a Senior Subordinated Note due January 15, 2010 in the original principal amount

---

[8] The Court required competing proposed orders from Stonehenge and the Committee. *See* Doc. Nos. 278 & 282.

of $7,500,000 (the "Alleged Note") (Committee Ex. 2), (ii) an Option agreement dated January 15, 2010 (the "Option") (Committee Ex. 3), and (iii) a Voting Agreement dated January 15, 2010 (the "Voting Agreement") (Committee Ex. 5).

4.      Section 2 of the Purchase Agreement (entitled "Purchase and Sale of the Securities") provides that after the Debtors execute and deliver the Note and Option, Stonehenge shall purchase the Note for $7,500,000 (the face amount of the Note) and shall purchase the Option for $100.

5.      Pursuant to the Option Agreement, Stonehenge was given the right to require the Debtors to pay Stonehenge an option price based, in part, on the enterprise value of the Debtors.  Committee Ex. 3 at 5, § 2.1.  If the Debtors failed to pay the option price when required under the Option, the Option imposed certain additional obligations on the Debtors, including the obligation to execute an option note for the outstanding amount of the option price.  Id. at 8 (¶ 3.4(e)).  The Option further required that, if such an option note remained outstanding, or within 12 months after the option price were paid in full, Stonehenge could be entitled to a higher option price upon a change in control or a sale of the Debtors' business.  See id. at 9 (§ 3.4(e)).

6.      Pursuant to the Voting Agreement, for so long as Stonehenge holds the Option or is owed any amounts under the Option, Merit was required to (i) elect a Stonehenge representative to the board of directors (the "Board"); (ii) fix and maintain the number of directors on the Board at three (3); and (iii) nominate and appoint the Stonehenge director to each committee on the Board.  Committee Ex. 5 at 1-2 (§1.1).  Mr. Thomas R. Utgard was appointed as the initial representative for Stonehenge on the Board.  Id. at 2 (§1.1(c)).

7.      The Voting Agreement further required that each certificate representing shares of Merit's capital stock bear the following legend:

> THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A VOTING AGREEMENT BY AND AMONG THE COMPANY AND STONEHENGE OPPORTUNITY FUND II, L.P. (A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL PROVISIONS OF THE VOTING AGREEMENT.

Id. at 2-3 (§2.2).

8.      As part of closing on the Stock Purchase Agreement, Stonehenge also entered into an Intercreditor and Subordination Agreement (the

"Intercreditor Agreement") with Regions.  Committee Ex. 4.  Pursuant to the Intercreditor Agreement, Stonehenge subordinated to Regions' first priority interest.  See id.

9.      On or about February 18, 2011, Stonehenge agreed to advance another approximately $4.5 million to Merit, and the Purchase Agreement and related documents were amended to account for this new money.  See Committee Ex. 6.  Like the initial $7.5 million, Stonehenge again agreed to advance this money on a subordinate basis to Regions.  See id.  Stonehenge acknowledged in the Stonehenge Statement, and again during argument at the hearing, that the $4.5 million was used to pay down the Regions Loan.  Stonehenge Statement at ¶7.  While sitting on the Board, Mr. Utgard executed the amended Stonehenge documents on behalf of Stonehenge as its Principal.  Committee Ex. 5 at 19 (Amendment No. 1 to Senior Subordinated Note and Option Agreement).

. . . .

10.     On May 17, 2011 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  See Docket No. 1.  The Board, including Stonehenge's designee, Mr. Utgard, unanimously consented to and authorized the filing of the voluntary petitions for relief.  See Docket No. 1, at 19-21.

11.     On June 21, 2011, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules"), which identified Stonehenge as a secured creditor on Schedule D thereto.  See Docket No. 212.  On June 21, 2011, the Debtors also filed their Statements of Financial Affairs (the "SOFA").  See Docket No. 213.  In response to question 19(c) of the SOFA, however, the Debtors identified Stonehenge as an "investor."

12.     It was acknowledged by counsel for Stonehenge at the hearing that Mr. Utgard continues to serve on the Board pursuant to the terms of the Voting Agreement.

(Doc. No. 282 at 4-8).  The Committee's proposed order suggests that the Court should

find that Stonehenge:

shall only be permitted to credit bid pursuant to Section 363(k) of the Bankruptcy Code if (a) it posts an irrevocable letter of credit in the amount of Stonehenge's credit bid, pending a final determination by the Court as to the nature of Stonehenge's claim; (b) it submits a Qualified Bid as part of a joint venture or other arrangement with a third party acceptable to the Debtors and the Committee; and (c) Mr. Utgard resigns from the Board prior to submitting a Qualified Bid involving Stonehenge.

*Id.* at 19.  The Committee believes these measures are necessary "to protect the estates and to minimize the risk of Mr. Utgard using his position on the Board to influence the outcome of the auction." *Id.*

Conversely, Stonehenge's proposed order focuses the Court's attention on, *inter alia*, the fact that Schedule D of each of the Debtors' Schedules of Assets and Liabilities indicates that: (i) Stonehenge has a secured claim; (ii) the date of Stonehenge's lien is January 15, 2010; (iii) Stonehenge's lien is "secured by all property of the Debtor"; (iv) the amount of Stonehenge's claim is $12,276,642.00; and (v) Stonehenge's claim is not contingent, unliquidated or disputed. (Doc. No. 278 at 6, ¶ 11) (citing Stonehenge, Ex. A).  Stonehenge also mentions that, in their Bidding Procedures Motion, the Debtors contemplated that Stonehenge would have the right to credit bid at the Auction. Furthermore, Stonehenge points out that there are no pending objections to the claims of Stonehenge and no adversary proceedings or formal challenges have been initiated that call into question the validity, priority, or extent of the Stonehenge's liens. *Id.* at 7. Stonehenge also presented documentary evidence to further support the existence of its liens. (Stonehenge, Ex. B, C).

### DISCUSSION AND CONCLUSIONS OF LAW

At the time the auction is scheduled to be conducted (July 20, 2011), this case will be barely two months old, with the Committee formed for an even shorter period.  In addition, the Debtors' schedules were only filed a few weeks ago.  Despite the fact that the sale as proposed contemplates a sale of the assets of the jointly administered cases together, one must consult the individual cases for the schedules of assets and liabilities of each Debtor to attempt to gather details of the sale package of substantially all of the

13

assets of the various Debtors.[9]  The Bidding Procedures Motion was filed approximately twenty (20) days after the case was commenced.  Furthermore, the Debtors, the Committee, Regions, Stonehenge and other parties are still in the early stages of sharing and reviewing documentation to assess the rights and positions of all parties.

The Debtors (without great opposition from other parties in interest) have demonstrated that moving with great speed is a priority in this case to increase the likelihood that asset values will be maximized and creditor distibutions will result.  Similar matters often move very quickly in bankruptcy proceedings to the advantage of all those involved.  However, as in this case, urgency can raise significant challenges for the Court and the parties involved.  These challenges can be problematic when the case involves a sale of substantially all of the Debtors' assets without the formality of a plan and a disclosure statement.  In addition, there has not been sufficient time for the parties to conduct adequate discovery, to review and analyze their positions, to present their cases to the Court, and for the Court to leisurely deliberate over, and finally determine, significant controversies essential to a just resolution of the case, preserving the bargained for and statutory rights of all parties.  As observed at the hearing on the Bidding Procedures Motion, thus far, the Court has only had evidence of and time to determine that the Debtors have met their burden of showing that it is more likely than not that continuing on the proposed path will preserve the chance of some distribution to creditors, other than Regions.  As the case moves forward, greater evidence, certainty,

---

[9] The Court acknowledges that the evidence and arguments indicate that significant amounts of information are available to and shared with potential buyers, creditors, the Committee and parties in interest outside of the Court's docket as this case develops.  The public record, however, does not contain this information and it is not found in any easily accessible and digestible form available to the Court, the average creditor, or a party in interest.  A clearer form of such information is typically provided in a Chapter 11 disclosure statement.

and persuasion will likely be required.  Whether any sale will ultimately be approved on

any terms remains to be seen, as the complete proposed sales terms and benefit to the

estate are not yet known.

South Carolina courts have "formally adopt[ed] the sound business purpose test as

the standard to be used in determining the appropriateness of pre-confirmation sales of

substantially all of a debtor[']s assets in a Chapter 11 case." *In re Taylor*, 198 B.R. 142,

157 (Bankr. D.S.C. 1996).  Pursuant to the sound business judgment rule, the Court must

find that: "(1) a sound business reason or emergency justifies a pre-confirmation sale; (2)

the sale has been proposed in good faith; (3) adequate and reasonable notice of the sale

has been provided to interested parties; and (4) the purchase price is fair and reasonable."

*In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

> Historically, bankruptcy courts do not view themselves as an alternative to
> a state court foreclosure process.  That is to say if the DIP or Trustee is
> proposing a sale where the only parties to benefit are the secured creditors
> and the professionals, the court will generally disapprove the sale.  To that
> end, sellers should propose a "carve out" for priority or unsecured
> creditors.  This carve out can range from 1% (*See In re Renaissance Park
> Hotel, LLC*, Case No. 06-04893 (Bankr. D.S.C. Nov. 19, 2007) to over
> 20% (*See In re Pulliam Motor Company d/b/a Pulliam Ford*, Case No. 07-
> 01555-dd (Bankr. D.S.C. Apr. 17, 2007) . . . One can also reasonably
> anticipate that in sales where there are significant issues about employee
> retention, courts may be sympathetic to a reduction in the proposed carve
> out (*See In re StarTrans Inc.,* Case No. 09-07468 (Bankr. D.S.C. Nov. 5,
> 2009)).

G. William McCarthy, Jr. & William H. Short, Jr., South Carolina Bankruptcy Law

Association Annual Convention, *What You Need to Know Before Your Next 363 Sale*,

Seminar Materials at 7-8 (May 8, 2010).[10]  In addition, this Court has indicated that

---

[10] In the instant case, Mr. McCarthy, McCarthy Law Firm, LLC currently serves as local counsel for the
Committee and Mr. Short, Haynsworth Sinkler Boyd, P.A., currently serves as local counsel for
Stonehenge.

"filing [a disclosure statement and plan] before a sale better informs all creditors of what to expect in the case, including the details of their treatment and anticipated distribution." *In re Bellwright Indus., Inc.,* C/A No. 08-01597-JW, slip op. at 2 (Bankr. D.S.C. June 18, 2008).

In this case, thus far, only the Bidding Procedures have been approved and there are many unknown terms of sale that must be established before this Court could consider approval, and before creditors will have sufficient information to decide whether to support or oppose any sale.  Within this environment, and with great haste, the Court must decide whether to deny or condition Stonehenge's right to credit bid.

In its relevant part, Bankruptcy Rule 3003(b)(1) provides that "[t]he schedule of liabilities filed pursuant to § 521(l) of the Code shall constitute prima facie evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated." Fed. R. Bankr. P. 3003(b)(1).  Therefore, in Chapter 11 cases, "only unscheduled creditors and those listed as disputed, contingent, or unliquidated are required to file a proof of claim in order to participate in voting and distribution." *In re Webb Mtn, LLC*, 414 B.R. 308, 356 (Bankr. E.D. Tenn. 2009). Currently Stonehenge holds an allowed claim because Debtors have scheduled the claim without condition or challenge and have not objected to the claim.

Section 363(k) provides that:

At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

The intent of § 363(k) is to permit only those with valid security interests in property to be sold to claim a setoff. *See Bank of Nova Scotia v. St. Croix Hotel Corp. (In re St. Croix Hotel Corp.)*, 44 B.R. 277, 279 (Bankr. D.V.I. 1984).   Without a valid interest, the property would be transferred to a putative secured creditor using a credit bid as part of the consideration, only to have that creditor's lien subsequently deemed invalid. Recognizing this purpose, some courts have found "cause" to deny the opportunity to credit bid when a sufficient dispute exists regarding the validity of the lien forming the basis for a credit bid.   *See In re Daufuskie Island Properties, LLC*, 441 B.R. 60, 63 (Bankr. D.S.C. 2010) (holding that a creditor was not entitled to credit bid when its mortgage was in dispute. Both the Trustee and another creditor filed adversary proceedings, which included actions to invalidate and/or subordinate the asserted mortgage and claim, challenges pursuant to §§ 547(b) and 550, and claims for equitable subordination of the claim and mortgage); *see also Nat'l Bank of Comm. v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (involving individual debtors who filed bankruptcy after a foreclosure was filed in state court, removed the foreclosure to bankruptcy court, and formally disputed the lien on various grounds.  One year later, after trial on a portion of the issues, the court found that a secured creditor's lien was disputed, but the proceedings not yet concluded.   Therefore, the court found that the secured creditor could not credit bit should there be any sale by the estate's trustee).

"Cause" to deny or condition credit bid rights under § 363(k) is not a defined term in the Bankruptcy Code.  Instead, courts decide on a case-by-case basis if "cause" exists. *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, slip op. at *16 (Bankr. D.N.J. June 29, 2006).  The Committee argues that there is cause in this case

if the Court finds that there is an objective basis for either a factual or legal dispute as to

the validity of the debt. *See In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr. N.D. Ill.

1991) (describing "bona fide dispute" under § 363(f)(4)[11] as requiring "some factual

grounds to show that there is 'an objective basis' for the dispute" and rejecting the

argument that "merely alleging a dispute is enough"); *see also Taylor*, 198 B.R. at 162

("The phrase 'bona fide dispute' is not defined in the Bankruptcy Code. Courts applying

§ 363(f)(4) have developed a standard for determining whether a 'bona fide dispute'

exists; that is whether there is an objective basis for either a factual or legal dispute as to

the validity of the asserted interest.  This standard does not require that the Court resolve

the underlying dispute or determine the probable outcome of the dispute, but merely

whether one exists.")[12]

The Committee argues that the evidence in the record, together with its assertion

that it may be appropriate to recharacterize Stonehenge's claim from debt to equity,

demonstrate sufficient cause. *See* Doc. No. 282 at 8-9 (citing *In re Atlas*, 986 F.2d 709,

716 (4th Cir. 1993) (discussing the objective test for an involuntary bankruptcy petition,

"[t]o determine bad faith [in filing an involuntary petition], a court examines whether a

reasonable person would have filed the petition (objective test) as well as the motivations

of the petitioner (subjective test)."); *In re Taylor*, 198 B.R. 142; *In re Collins*, 100 B.R.

447 (Bankr. E.D. Va. 1995)).   "Recharacterization is a theory, adopted by the

overwhelming majority of courts to have considered the question, that bankruptcy courts

---

[11] Section 363(f) provides that "[t]he trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if … such interest is in bona fide dispute…" 11 U.S.C. § 363(f)(4).

[12] Section § 363(k) does not use the term "bona fide dispute."

may place the proper label of 'claim' (generally, debt) or 'interest' (equity) on an

advance of funds, regardless of what the parties call it." *In re Airadigm Commc'ns, Inc.*,

616 F.3d 642, 653 (7th Cir. 2010).[13]

> In the Bankruptcy Code, the distinction between creditors (who hold
> "claims" against the estate) and equity investors (who hold "interests" in
> the estate) is important, for holders of claims receive much more favorable
> treatment than holders of interests. Equity investment brings not a right to
> payment, but a share of ownership in the debtor's assets—a share that is
> subject to all of the debtor's payment obligations. Thus, if a filed claim is
> rejected on the ground that it is not a claim at all, but an interest, then the
> holder of that interest is relegated to the end of the line, where any
> recovery is unlikely.

*In re Insilco Tech., Inc.*, 480 F.3d 212, 217-18 (3d Cir. 2007) (footnotes omitted). "In a

case in which a creditor has contributed capital to a debtor in the form of a loan, but the

loan has the substance and character of an equity contribution, the court may

recharacterize the debt as equity regardless of whether other requirements of equitable

subordination have been satisfied." *In re Kids Creek Partners, L.P.*, 212 B.R. 898, 931

(Bankr. N.D. Ill 1997) (citing *Diasonics, Inc. v. Ingalls,* 121 B.R. 626, 630 (Bankr. N.D.

Fla. 1990)).

In the Fourth Circuit, a party challenging the claim would have to convince the

Court that recharacterization is appropriate by considering the eleven (11) factors set

forth in *In re Fairchild*, 453 F.3d 225 (4th Cir. 2006):

> (1) the names given to the instruments, if any, evidencing
> the indebtedness; (2) the presence or absence of a fixed
> maturity date and schedule of payments; (3) the presence or

---

[13] In bankruptcy cases:

> [i]t is common practice . . . for parties-in-interest to attack the validity and priority of the
> claims of creditors higher in the pecking order than they. Two of the most common
> attacks are 'recharacterization' (seeking to treat an asserted debt as an equity interest) and
> 'equitable subordination' (seeking to subordinate a claim's priority because of inequitable
> conduct)."

*In re Insilco Tech., Inc.*, 480 F.3d 212, 214 (3d Cir. 2007).

> absence of a fixed rate of interest and interest payments; (4)
> the source of repayments; (5) the adequacy or inadequacy
> of capitalization; (6) the identity of interest between the
> creditor and stockholder; (7) the security, if any, for the
> advances; (8) the corporation's ability to obtain financing
> from outside lending institutions; (9) the extent to which
> the advances were subordinated to the claims of outside
> creditors; (10) the extent to which the advances were used
> to acquire capital assets; and (11) the presence or absence
> of a sinking fund to provide repayments.

*Id.* at 233 (citing *Bayer Corp. v. Masco Tech, Inc. (In re AutoStyle Plastics, Inc.)*, 269

F.3d 726, 749-50 (6th Cir. 2001)).

The Committee asserts that Stonehenge's claim is in question. Therefore, it asks

that the Court at least condition Stonehenge's right to credit bid on posting collateral in

the amount of any Stonehenge credit bid, arguing that this remedy is consistent with

those imposed by other Courts when the secured creditor's claim is the subject of a

dispute. *Id.* at 8-9 (citing *Octagon Roofing*, 123 B.R. at 592; *In re St. Croix Hotel Corp.*,

44 B.R. at 278-79; *In re Diebart Bancroft*, Bankr. No. 92-3744, 92-3745, 1993 WL

21423 (E.D. La. 1993)). The Committee argues that the opportunity to credit bid is a

right that is within the discretion of the Court and is not absolute. *See N.J. Affordable*

*Homes Corp.*, 2006 WL 2128624, at *16; *see also In re Theroux*, 169 B.R. 498, 499 n.3

(Bankr. D.R.I. 1994) (cited by the Committee for the assertion that "there is no absolute

entitlement to credit bid.")

In the *Theroux* case:

> [t]he taxing authorities argue that the Trustee and MRA [the secured
> creditor/purchaser] are effectively engaging in a form of collusion, and
> manipulating the Bankruptcy laws to deprive them of revenue to which
> they are entitled under the law, with little if any benefit to the Bankruptcy
> Estate. They suggest that the correct procedure would be for MRA to
> obtain relief from stay and then hold a public foreclosure sale . . .

169 B.R. at 498.  The court declined to approve a sale because it found that the sale benefitted only the secured creditor, the price was inadequate as a mere fraction of the fair market value, and the "questionable alliance does not appear to be based upon any specific provision of the Bankruptcy Code." *Id.* at 499.  Furthermore, the court stated that:

> [w]e believe this is precisely the type of situation in which the Court would find that cause exists to deny MRA's right to credit bid, i.e. there is no absolute entitlement to credit bid, as MRA suggests, and that option would not be available where the sale price is so clearly inadequate.

*Id.* at 499 n.3.  The *Theroux* case is distinguishable from the matter at hand because it presents far stronger facts that justify the court's exercise of its discretion to limit a right to credit bid.  Therefore, it is not particularly helpful when applied to the facts in the instant case.

Likewise, the cases cited in support of a limitation on credit bidding seem to involve a clearly defined (both factually and procedurally) existing dispute to a claim or lien. *See supra* at 17 (citing *Daufuski Island Properties, LLC*, 441 B.R. at 63; *In re McMullan*, 196 B.R. at 835).  In addition, many of the authorities cited to persuade the Court that a more formal dispute is not necessary involve challenges to the status of a petitioning creditor's claim when an involuntary petition for relief was filed, *see supra* at 18 (citing *In re Atlas*, 986 F.2d at 716), or a determination of whether property can be sold free and clear of a lien that is in "bona fide dispute" under § 363(f)(4), *see id.* (citing *In re Octagon Roofing*, 123 B.R. at 590; *Taylor*, 198 B.R. at 162)—which are wholly different contexts.  After a review of those cases and the evidence in this matter, the Court is not convinced that there is an adequate basis for depriving Stonehenge of an

unlimited right to credit bid[14] at this time.  While the Committee may have suspicions and

has offered allegations in its Objection, at this point, these allegations, together with the

facts provided in support thereof, do not convince the Court that an adequate challenge to

Stonehenge's claim exists that rises to the level of the disputes set forth in the cited cases.

The Court notes that *In re St. Croix Hotel Corp.*, 44 B.R. 277, was helpful in

making its determination.   In that case, a limitation of credit bid rights was deemed

inappropriate.   In the bankruptcy forum, the court found that the bank purchasing the

debtor's property by auction at a sale was required to post the purchase price of $1

million in cash rather than offset the purchase price by the amount of its secured claim

pursuant to § 363(k). *Id.* at 279.   The creditor had filed a proof of claim, which the debtor

had objected to, and an adversary proceeding on the matter was pending and scheduled

for a jury trial; thus, the dispute was formal and clearly defined. *Id.* at 278.   On appeal,

the district court disagreed with the bankruptcy court's application of § 363(k) even

though the claim was clearly and formally in dispute.   The court pondered the "fair"

result and noted that:

> The Debtor did object to the bank's proof of claim.   The matter
> went to trial on one occasion and a jury verdict was entered.   However, it
> was vacated on appeal and a new trial was ordered by the Third Circuit.
> Therefore, up to this date, whether the bank had an allowed claim has not
> been finally determined.
> On the face of the statute, since at the time of the sale the bank did
> not have an "allowed claim", it should not be entitled to an offset.   But this
> ignores the fact that the bank continues to this day to assert a secured
> claim and, without the fault of the bank, that issue has not yet been
> resolved.
> The bank promptly filed its notice of a secured claim in an amount
> far in excess of the bid price of one million dollars.   Its claim of a lien is a
> public record against the hotel property.
> The intent of Section 363(k) is clearly to permit only those persons
> with a valid security interest in property to be sold to claim a setoff.   And

---

[14] Subject to the terms set forth in the approved Auction and Bidding Procedures

the issue of whether such a security interest actually existed was obviously intended to be resolved prior to the date of sale of the property. In this case that determination was not made prior to sale.

If the bank were required to pay the one million dollars in cash, notwithstanding its assertion of a secured claim, that fund would be available for other expenses of the bankrupt estate. If, in the future, that claim was validated as an "allowed claim", the bank would have the right to recoup the amount paid in cash, without any assurance that the full amount of the fund would still be in existence. The possibility of depletion of the million dollars by administrative and other expenses, while the issue of the bank's claim was still pending, was conceded by counsel for the debtor at oral argument.

This would be an elemental unfairness to the bank.

*Id.* at 279. The district court thereafter found that the "fair" thing to do was to allow the bank to offset its claim on an intermediate basis despite the dispute, with the offset to become permanent or to be negated, depending on whether the bank's claim was later found to be an "allowed claim." *Id.* The Court notes that the dispute in that case was clearly defined and well underway; however, any limitation on credit bidding was found inappropriate.

Even if this Court were to find that a sufficient dispute exists to constitute "cause" to deny or limit credit bid rights, "fair" conditions on bidding would be difficult to determine on this record. The Court has no evidence as to the effect on Stonehenge if it is denied the right to credit bid or if that right is conditioned as requested. The Court **does not** view this as an evidentiary burden not met by Stonehenge because § 363(k) gives it the credit bid right *unless* cause is found. The Court also has no evidence or indication that the estate will suffer measurable harm if Stonehenge does credit bid without additional safeguards.[15] As the Committee is the party requesting that the right

---

[15] In fact, at the hearing, Committee counsel hinted that Stonehenge should have no trouble with the credit bid conditions because of its available assets. If true, this would likely mean that Stonehenge also has assets available to satisfy any subsequent liability to the estate. Also, with regard to the issue of Stonehenge's credit bid to be relevant to this sale, bidding would have to exceed the total of Regions'

be denied or conditioned "for cause," the Court **does** view the lack of evidence as a weakness in the Committee's position.

For guidance, the Court consulted *Morgan Stanley Dean Witter Mortg. Capital, Inc. v. Alon USA L.P. (In re Akard St. Fuels, L.P.)*, No. 3:01-CV-1927-D, 2001 WL 1568332, (N.D. Tex. Dec. 4, 2001), which was relied upon by the Committee to support credit bid denial; however, the Court found little help from it. In that case, the district court stated that:

> The [bankruptcy] court . . . concluded that the challenge to Morgan Stanley's alleged liens constituted a bona fide dispute, that a rapid sale of estate assets was necessary to prevent a sharp decline in the value of the estate, and that a comparatively lengthy period of time would be necessary to resolve the complex dispute surrounding the challenged liens. These findings of fact, adequately supported by record evidence, formed the basis for the bankruptcy court's legally permissible conclusion that cause existed to deny Morgan Stanley the right to credit bid. The bankruptcy court, acting within its discretion, found without clear factual error or legal error that because Morgan Stanley (who did not yet have an allowed claim) was capable of bidding cash at the auction and later recovering the cash if it proved its liens, it would not be unduly prejudiced by the sale procedure.

*Id.* at 3. The district court recognized that the bankruptcy court's decision was made "by oral on-the-record findings and conclusions, and by minute order entered . . . [that] confirmed the sale over Morgan Stanley's objections." *Id.* at *1. Furthermore, the district court characterized the precedential effect of its opinion on the appeal as follows:

> In this expedited appeal, where the need for a prompt ruling outweighs the need for a detailed one, the bankruptcy court's decision is being affirmed, and the opinion decides issues that are controlled by their specific facts and thus lacks precedential value outside the context of this case, the court need not write at length.

---

claimed liens, plus costs of sale, fees, and carve out amounts, etc., which total amount is far in excess of the $46 million price currently proposed.

*Id.* at \*2.  That court's decision is helpful because it indicates that some bankruptcy court was not in error when it denied a right to credit bid based on some sort of dispute. Unfortunately, the specific facts of that case are not readily available to the Court; therefore, the Court cannot determine whether the instant case is distinguishable or similar to the facts surrounding that case..

In *In re Diebart Bancroft*, 1993 WL 21423, the bankruptcy court required the secured creditor to pay in cash instead of allowing an offset. *Id.* at \*2.  The case involved an issue of "confusion" over the priority of liens when property was to be sold, so the bankruptcy court conditioned a lienholder's ability to bid its lien on the requirement that it pay cash. *Id.*  On appeal, the district court found only that: "[t]he Bankruptcy Court's decision to require that $270,000 be paid in cash, with a ten percent (10%) cash deposit was . . . not clearly erroneous or contrary to law.  [Section] 363(k) allows a lienholder to bid its lien, unless the court for cause orders otherwise." *Id.* at \*5.  Unfortunately, the opinion gives little guidance on when a court ***should*** impose such a requirement.

The cases cited by the Committee certainly do not impose on the Court an *obligation* to deny or condition the credit bid right at this point in time on these facts. Further, after a careful examination of the facts of each case, comparing them to the facts of this matter, the Court is not convinced that it should exercise its discretion to do so at this time.[16]

---

[16] The Committee also asserted that the Court should impose conditions to "lessen the risk of Mr. Utgard using his position on the Board, and the confidential and privileged information he has learned, to influence other potential bidders to team up with Stonehenge." (Doc. No. 282 at 19).  The Committee also urges that:

> in the event Stonehenge does credit bid, Mr. Utgard also must resign from the Board prior to submitting any such qualifying bid.  This condition will eliminate the inherent conflict of interest that will arise if Stonehenge credit bids and Mr. Utgard is voting as a member of the Debtors' Board as to the highest and best proposed contract at the auction.

*Id.*  However, any such facts, should they materialize, can be addressed at the sale hearing if appropriate.

The Committee argues that its ability to officially challenge Stonehenge's position is hampered by the speed of the case.  Conversely, Stonehenge argues that any § 363(k) limitation at this point is premature.  Both arguments have some merit; therefore, after the auction is held and the selected bidder and final sales terms are presented to the Court for approval, the Court reserves the right to revisit the appropriateness of any credit bid and to consider any conditions or safeguards requested by the Committee or any other party that may be in the best interest of the estate.

**IT IS THEREFORE, ORDERED:**

That the Committee's Objection (Doc. No. 226), which  seeks to preclude or further condition Stonehenge Opportunity Fund II, L.P. from credit bidding at the July 20, 2011 auction is **OVERRULED**.

This decision does not prejudice the rights of the Committee or any other party to bring any matter to the Court's attention or object to the Debtors' proposed sale after the auction is held and the selected bidder and final sales terms are presented to the Court for approval.  In addition, the Court reserves the right to revisit the appropriateness of any credit bid by Stonehenge and to consider any conditions or safeguards requested by the Committee or any other party that may be in the best interest of the estate at that time.