## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TMG Liquidation Company, *et al.,* | ) | Case No. 11–03216–hb |
| | ) | |
| Debtors.[1] | ) | (Joint Administration) |
| | ) | |

---

### SECOND AMENDED DISCLOSURE STATEMENT ACCOMPANYING JOINT SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

McNAIR LAW FIRM, P.A.
Michael M. Beal
Elizabeth (Lisa) J. Philp
Robin C. Stanton
Michael H. Weaver
1221 Main Street, 18th Floor (29201)
Post Office Box 11390
Columbia, South Carolina 29211
(803) 799-9800 (Telephone)
(803) 753-3277 (Facsimile)
mbeal@mcnair.net
lphilp@mcnair.net
rstanton@mcnair.net
mweaver@mcnair.net

Counsel to the Debtors and
Debtors-in-Possession

COLE, SCHOTZ, MEISEL, FORMAN
  & LEONARD, P.A.
G. David Dean
Irving E. Walker
300 E. Lombard Street, Suite 2000
Baltimore, MD 21202
(410) 528-2972 (Telephone)
(410) 230-0667 (Fax)

AND

McCARTHY LAW FIRM, LLC
G. William McCarthy, Jr.
Daniel J. Reynolds, Jr.
1517 Laurel Street (29201)
P.O. Box 11332
Columbia, SC 29211-1332
(803) 771-8836 (Telephone)
(803) 753-6960 (Fax)

Counsel to the Official Committee of
Unsecured Creditors

Dated:  November 1, 2011

---

[1]   The Debtors and the last four digits of their respective tax identification numbers are: TMG Liquidation Company (4224); MTrans Liquidation Company (9048); MP Sundries Liquidation Company, LLC (8882); MSupply Liquidation Company, LLC (5878); MPFT Liquidation Company, LLC (8544); FSP Liquidation Company (9186); and FSG Liquidation Company (3506).

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.    NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT.

ALL CREDITORS AND HOLDERS OF INTERESTS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND ALL EXHIBITS HERETO, INCLUDING THE PLAN, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN.   THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN.  RELEVANT INFORMATION MAY CHANGE AFTER THE DATE HEREOF OR OTHER INFORMATION MAY BECOME MATERIAL, AND THERE IS NO DUTY TO UPDATE THIS DISCLOSURE STATEMENT.   ANY TRANSMISSION OF THIS DISCLOSURE STATEMENT AFTER ITS "DATED" DATE SHALL NOT IMPLY OR BE CONSTRUED AS CREATING AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATED DATE OF THIS DISCLOSURE STATEMENT.  AFTER THE DATED DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE, AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, SECURITIES OF THE DEBTORS SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH SUCH DOCUMENTS WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY STATEMENT HEREIN AND THEREIN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT, RATHER, AS A STATEMENT OR STATEMENTS MADE IN THE COURSE AND CONTEXT OF SETTLEMENT OR SETTLEMENT NEGOTIATIONS.  THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY ADVERSARY OR CONTESTED BANKRUPTCY PROCEEDING (OTHER THAN THE DISCLOSURE STATEMENT HEARING AND CONFIRMATION HEARING) OR ANY NON BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY.  NOR SHALL THE DISCLOSURE STATEMENT BE CONSTRUED TO BE GIVING ADVICE TO ANY

CREDITOR OR INTEREST HOLDER OR OTHER PARTY IN INTEREST ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OF THE DEBTORS' ASSETS OR THE EFFECT OF THE PLAN, INCLUDING AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.

**PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX AND OTHER ADVISORS WITH RESPECT TO THE DISCLOSURE STATEMENT AND THE PLAN, INCLUDING THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .............................................................................................. 1

  A.  Purpose of Disclosure Statement ................................................................ 1

  B.  Overview of the Plan................................................................................... 1

  C.  Summary of Treatment of Claims and Interests under the Plan .................... 2

II.  VOTING PROCEDURES AND REQUIREMENTS ............................................ 4

  A.  Eligibility to Vote...................................................................................... 4

  B.  Ballots and Voting Deadlines...................................................................... 4

      1.   *Record Date.* ...................................................................................... 4
      2.   *Ballots.* ............................................................................................. 4

  C.  Confirmation Hearing ................................................................................ 5

  D.  Recommendations ...................................................................................... 6

III.  THE DEBTORS ............................................................................................. 6

  A.  General Information .................................................................................... 6

      1.   *Brief Description of Debtors' Pre-Petition Business.*............................... 6
      2.   *History of the Debtors.* ....................................................................... 7

  B.  Pre-Petition Capital Structure ..................................................................... 7

      1.   *Pre-Petition Secured Loans.* ............................................................... 7
      2.   *Debtors' Assets and Liabilities as of the Petition Date.* ........................ 9

  C.  Events Leading to the Bankruptcy Filing..................................................... 9

IV.  THE DEBTORS' CHAPTER 11 CASES .......................................................... 10

  A.  Significant "First Day" Bankruptcy Orders .................................................. 10

      1.   *Debtor-in-Possession Financing.* ........................................................ 10
      2.   *Pre-Petition Wages, Salaries, Employee Expenses, and other Employee Benefits.*.................................. 12
      3.   *Use of Existing Forms and Records and Existing Corporate Bank Accounts.* .......................... 12
      4.   *Consolidated List of Creditors and Shortened Mailing List.* ................. 12
      5.   *Utilities Motion.*................................................................................ 12
      6.   *Obligations to Customs Brokers and Critical Foreign Vendors.*.............. 12
      7.   *Procedure for Treatment of Valid Reclamation Claims.* ........................ 12
      8.   *Retention of Kurtzman Carson Consultants LLC as Claims Agent.* ........ 13
      9.   *Field Sales Force Compensation Restructuring Program.* ...................... 13
      10.  *Customer Incentive Programs.* ........................................................... 13
      11.  *Retention of McNair Law Firm P.A. as Counsel.* ................................ 13
      12.  *Retention of Alvarez & Marsal North America LLC as Financial Advisors*........................... 13
      13.  *Retention of Morgan Joseph Triartisan LLC as Investment Banker.* ...... 13

  B.  Significant Events During the Chapter 11 Cases ........................................... 14

      1.   *Operations During the Chapter 11 Cases.*............................................ 14
      2.   *Funding the Chapter 11 Cases.* .......................................................... 14
      3.   *The Appointment of the Committee of Unsecured Creditors.* ................. 14

i

4.      Procedures for Interim Compensation and Reimbursement of Chapter 11
        Professionals and Committee Members...................................................................15
5.      Ordinary Course Professionals. ...........................................................................15
6.      Filing of Schedules and Statement of Financial Affairs. ......................................15
7.      Executory Contracts and Leases............................................................................15
8.      Notice of Commencement and Deadline for Filing Proofs of Claim. ....................16
9.      Litigation Against Parties Receiving Avoidable Transfers. ..................................17
10.     Litigation Against Parties Relating to the Five Star Acquisition...........................17
11.     Other Litigation. ...................................................................................................18
12.     Sale of Substantially All of the Debtors' Assets. ..................................................19
13.     Change of Debtors' Corporate Names and Case Caption......................................23

V.      SUMMARY OF THE PLAN ...........................................................................................23

A.      Introduction ........................................................................................................................23

B.      Unclassified Claims ...........................................................................................................25

        1.      Administrative Claims. ..........................................................................................25
        2.      Priority Tax Claims. ..............................................................................................26

C.      Classified Claims ...............................................................................................................26

        1.      Treatment of Class 1 Claim – Secured Claims (if any): Class 1 Claims are
                Unimpaired. ...........................................................................................................27
        2.      Treatment of Class 2 Claims – Non-Tax Priority Claims: Class 2 Claims are
                Unimpaired. ...........................................................................................................27
        3.      Treatment of Class 3 Claims – Convenience Claims: Class 3 Claims are
                Impaired.................................................................................................................27
        4.      Treatment of Class 4 Claims – Senior Unsecured Claims: Class 4 Claims are
                Unimpaired. ...........................................................................................................27
        5.      Treatment of Class 5 Claims – Regions Deficiency Claim and Subordinated
                Claims: Class 5 Claims are Unimpaired. ...............................................................28
        6.      Treatment of Class 6 Interests – Interests: Class 6 Interests are Impaired. ...........28

D.      Funding of the Plan and Means for Implementation........................................................29

E.      The Plan Administrator and its Role and Duties..............................................................29

        1.      Role of the Plan Administrator Under the Plan......................................................29
        2.      Duties of Plan Administrator. ................................................................................29
        3.      Rights and Powers of Plan Administrator. .............................................................30

F.      Dissolution of the Committee and Formation of the Oversight Committee ...................30

        1.      Dissolution of the Committee. ...............................................................................30
        2.      Formation of the Oversight Committee. .................................................................31

G.      Substantive Consolidation .................................................................................................31

        1.      Substantive Consolidation Generally. ....................................................................31
        2.      Plan Substantive Consolidation..............................................................................31
        3.      Plan as Motion; Objections; Hearing.....................................................................32
        4.      Benefits of Substantive Consolidation in the Chapter 11 Cases. ...........................32
        5.      No Prejudicial Effects.............................................................................................32

H.      Vesting of Assets and Retention of Causes of Action .....................................................33

I.      Continued Existence of Debtors and Estates After the Effective Date ..........................33

        1.      Post-Confirmation Debtors and Estates. ................................................................33
        2.      Corporate Governance after the Effective Date. ....................................................33

ii

J.   Treatment of Executory Contracts and Leases and Bar Date for Rejection Claims ........................ 34

    1.   *Rejection of Executory Contracts.* ......................................................................................... 34
    2.   *Bar Date for Rejection Claims.* ............................................................................................ 34

K.   Payment and Distributions on Claims ....................................................................................... 34

    1.   *Manner of Payment.* .............................................................................................................. 34
    2.   *Funds and Accounts for Payment of Claims and Plan Implementation.* ............................... 35
    3.   *Interim and Final Distributions.* ........................................................................................... 35

L.   Effects of Confirmation ............................................................................................................ 35

    1.   *No Discharge.* ....................................................................................................................... 35
    2.   *Preservation of Causes of Action.* ........................................................................................ 36
    3.   *Limited Plan Exculpation.* .................................................................................................... 37
    4.   *Injunction.* ............................................................................................................................ 38
    5.   *Plan Terms Binding..* ............................................................................................................ 38
    6.   *Continuation of Pre-Confirmation Injunction or Stays..* ...................................................... 39

M.   Miscellaneous Plan Provisions .................................................................................................. 39

    1.   *Exemption from Transfer Taxes.* ........................................................................................... 39
    2.   *Effectuating Documents, Further Transactions and Corporate Action.* ............................... 39
    3.   *Reservation of Rights.* .......................................................................................................... 39
    4.   *Conflicts.* .............................................................................................................................. 39

VI.   FINANCIAL INFORMATION ........................................................................................................ 40

VII.   CERTAIN TAX CONSEQUENCES .................................................................................................. 40

A.   Federal Tax Consequences to the Debtors ................................................................................ 41

B.   Federal Tax Consequences to Holders of Claims or Interests .................................................. 42

C.   Backup Withholding Tax and Information Reporting Requirements ......................................... 43

VIII.   FEASIBILITY OF THE PLAN AND BEST INTERESTS OF THE
CREDITORS .................................................................................................................................. 43

A.   Acceptance of the Plan .............................................................................................................. 43

B.   Feasibility ................................................................................................................................. 44

C.   "Best Interests" Test ................................................................................................................. 44

D.   Confirmation Without Acceptance of All Impaired Classes ..................................................... 45

IX.   CERTAIN RISK FACTORS TO BE CONSIDERED ........................................................................... 45

A.   Risk of Non-Confirmation of Plan ............................................................................................ 46

B.   Risk of Non-Occurrence of Effective Date or Withdrawal or Revocation of Plan .................... 46

C.   Litigation Risks ......................................................................................................................... 46

D.   Overall Risks to Recovery by Holders of Claims in Classes 3, 4 and 5 and Holders of

Interests in Class 6 ................................................................................................................... 46

X.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ........................................................................................................................................... 46

A.   Liquidation Under Chapter 7 .................................................................................................... 47

B.   Alternative Plan of Reorganization ........................................................................................... 47

XI.   OTHER INFORMATION.................................................................................................... 47

<u>EXHIBITS</u>

Exhibit A        The Plan
Exhibit B        Disclosure Statement Order
Exhibit C-1      Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Non-Insiders
Exhibit C-2      Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Insiders
Exhibit D        Liquidation Analysis

COLUMBIA 1054928v3

I.    **INTRODUCTION**

A.    **Purpose of Disclosure Statement**

The purpose of this Second Amended Disclosure Statement (the "Disclosure Statement") is to set forth information that (i) outlines the prepetition history of the Debtors, their business, and the causes underlying the Chapter 11 Cases, (ii) summarizes the Joint Amended Plan of Liquidation of the Debtors and Official Committee of Unsecured Creditors (the "Plan"), attached hereto as **Exhibit A**, and (iii) assists each holder of any Claim against, or Interest in, the Debtors entitled to vote in making an informed decision as to whether such holder should vote to accept or reject the Plan.

This Disclosure Statement is provided in connection with the solicitation of votes for the acceptance or rejection of the Plan, as it may be amended, altered, modified or supplemented from time to time in accordance with its terms, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

The Bankruptcy Code requires that the party proposing a chapter 11 plan prepare and file with the Bankruptcy Court a document called a "disclosure statement." This Disclosure Statement summarizes the Plan's contents and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan. This Disclosure Statement also discusses the events leading to the Debtors' filing of the Chapter 11 Cases and describes the main events that have occurred in the Debtors' Chapter 11 Cases. This Disclosure Statement also describes certain applicable voting procedures and aspects of the confirmation process in a chapter 11 case, and also outlines certain risk factors associated with the Plan.

The Bankruptcy Code requires a disclosure statement to contain information of a kind, and in sufficient detail, to enable parties who are affected by the Plan to vote intelligently for or against the Plan or object to the Plan, as the case may be. The Plan was filed in the Bankruptcy Court on September 23, 2011. After a hearing held on November 1, 2011, the Bankruptcy Court entered an Order approving this Disclosure Statement (the "Disclosure Statement Order"), attached hereto as **Exhibit B**. In approving this Disclosure Statement, the Bankruptcy Court found that it contains "adequate information" to enable a hypothetical reasonable investor to make an informed decision to accept or reject the Plan.

For purposes of this Disclosure Statement, all capitalized terms not otherwise defined shall have the meaning ascribed to them in the Plan, except as expressly provided or unless the context clearly requires otherwise. Whenever the context requires, such meaning shall be equally applicable to both the singular and the plural form of such terms, and the masculine gender shall include the feminine and the feminine gender shall include the masculine. Any term used in initially capitalized form in this Disclosure Statement that is not defined herein but is used in the Bankruptcy Code shall have the same meaning ascribed to such term in the Bankruptcy Code.

All holders of Claims and Interests should carefully review both this Disclosure Statement and the Plan before voting to accept or reject the Plan.

B.    **Overview of the Plan**

A chapter 11 plan may provide for anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of a plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the Plan. In the Debtors' Chapter 11 Cases, substantially all of the assets of the Debtors were

1

sold to MG Distribution, LLC ("MG Distribution") in July 2011 pursuant to sections 363 and 365 of the Bankruptcy Code and the Bankruptcy Court's order entered as of July 25, 2011 (the "Sale Order"), as more fully described therein (the "Sale").  The proceeds from the Sale and the proceeds from the prosecution of certain Causes of Action are the sources of funding for distributions under the Plan.  As a result of the Sale and the Regions Bank Settlement discussed below, the Debtors' Estates received Settlement Payments totaling $5.75 million.  See Article IV.B.12 below for a complete discussion of the Sale and the anticipated prosecution of the Causes of Action.

As originally proposed, the sale to MG Distribution provided for a purchase price of $46 million, $2 million of which was allocated to pay Administrative Claims of the Debtors' Estates.  Due to the fact that Regions Bank held a prepetition secured claim of approximately $51 million against the Debtors, the proposed sale to MG Distribution did not contemplate that there would be any substantial proceeds for distribution to creditors holding priority unsecured claims or general unsecured claims.  After extensive negotiations among Regions Bank, the Debtors, and the Committee, the parties reached a settlement (the "Regions Bank Settlement") whereby $5.75 million would be made available to the Debtors' Estates to administer a plan and make distributions to creditors in accordance with the Bankruptcy Code.  The Bankruptcy Court approved the Regions Bank Settlement as part of the Sale Order.  See Article IV.B.12 below for a complete discussion of the Regions Bank Settlement.

The Debtors and the Committee believe that the Plan provides the best means currently available for distribution to Creditors from the proceeds of the Sale and the liquidation of the Debtors' remaining assets.  For a more detailed description of the terms and provisions of the Plan, see Article V of this Disclosure Statement, entitled, "Summary of Plan".

C.        **Summary of Treatment of Claims and Interests under the Plan**

Claims are treated generally in accordance with the priorities established under the Bankruptcy Code.  Claims that have priority status under the Bankruptcy Code are to be paid in full as provided under the Plan unless the creditor agrees to different treatment.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified under the Plan.  See Article V.B. below for a more detailed description of the treatment of such unclassified Claims.

Under the Plan, holders of Priority Tax Claims and Non-Tax Priority Claims will be paid in full.  Holders of Secured Claims will be paid in full or receive the collateral securing their claim.  Holders of Convenience Claims will receive 10% of the amount of such holder's Allowed Convenience Claim.  Under the Plan, holders of Allowed Senior Unsecured Claims (Excluding Convenience Claims) will receive pro rata distributions of the proceeds from the Sale after payment of or reserve for Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Secured Claims, Convenience Claims, and Plan Expenses.  Pursuant to the Regions Bank Settlement, Regions Bank is not entitled to receive any further distribution after Closing as a holder of an Administrative Claim or Secured Claim but, instead, will share in the Plan distributions with other general, non-priority unsecured claims.  Under the Plan and Regions Bank Settlement, Regions Bank will receive an initial distribution (on account of the Allowed Regions Deficiency Claim and the aggregate claims of the Subordinated Creditors-i.e., Stonehenge Opportunity Fund II, L.P., E. Fort Wolfe, Jr., Caleb C. Fort and Valspar Corporation) only after Distributions aggregating 10% of the principal amount of all Class 3 (Convenience Claims) and Class 4 (Senior Unsecured Claims) have been made.  Thereafter, Regions Bank will receive a true-up of its Subordinated Distribution and then may participate in future Distributions to Claims in Class 4 on a Pro Rata basis.  If Regions Bank is paid in full on account of its Regions Deficiency Claim then the Subordinated Creditors shall be authorized to participate in future Distributions to Claims in Class 4 on a Pro Rata basis based

2

upon the relative amount of all Senior Unsecured Claims in Class 4 and the Subordinated Claims at the time of each such Distribution and subsequent distributions to Subordinated Creditors shall be made directly to each Subordinated Creditor.  No distributions are anticipated to be made on account of Interests under the Plan.  See Article V.C. below for a more detailed description of the treatment of classified claims.

The following table briefly summarizes the treatment of Allowed Claims and Interests that are classified under the Plan.  The Estimated Allowed Claims assume a date of October 6, 2011  and are based upon the Debtors' books and records and certain Proofs of Claim, including a number of Claims that are contingent, disputed and/or unliquidated.  For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows.  The Debtors and the Committee are in the process of reviewing and analyzing the Proofs of Claim filed in the Chapter 11 Cases and will continue to review Proofs of Claim which are filed.  The General Claims Bar Date in the Chapter 11 Cases was October 6, 2011 for prepetition claims of Creditors other than governmental units.

The estimated recovery for Creditors has been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims in each Class.  The percentage distribution for Classes 4 and 5 cannot be determined at this time however because all Causes of Action have not been concluded, all Claims have not been filed, and the Claims objections have not been completed.

For a more detailed summary description of the terms and provisions of the Plan, see Article V below.  The Plan is attached in its entirety as Exhibit A hereto.

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Class 1: Secured Claims | Unimpaired<br><br>Holders of Class 1 Claims are deemed to accept the Plan | TBD | 100% |
| Class 2: Non-Tax Priority Claims | Unimpaired<br><br>Holders of Class 2 Claims are deemed to accept the Plan. | TBD | 100% |
| Class 3: Convenience Claims | Impaired<br><br>Holders of Class 3 Claims are entitled to vote to accept or reject the Plan. | Unknown | 10% of Allowed Convenience Claims |
| Class 4: Senior Unsecured Claims | Impaired<br><br>Holders of Class 4 Claims are entitled to vote to accept or reject the Plan. | TBD | Unknown |

3

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Class 5: Regions Deficiency Claim and Subordinated Claims | Impaired<br><br>Holders of Class 5 Claims are entitled to vote to accept or reject the Plan. | TBD | Unknown |
| Class 6: Interests | Impaired<br><br>Holders of Class 6 Interests are entitled to vote to accept or reject the Plan. | N/A | Unknown |

## II.    VOTING PROCEDURES AND REQUIREMENTS

### A.    Eligibility to Vote

The Debtors and the Committee are soliciting acceptances of the Plan from each Class of Creditors identified in the Plan as an impaired Class. Each Class of Creditors that is identified as an unimpaired Class shall be deemed to have accepted the Plan. The parties will not solicit acceptances from those Creditors. Specifically, only holders of valid Claims in Classes 3, 4 and 5 and valid Interests in Class 6 (the "Voting Classes") are eligible to vote to accept or reject the Plan. Classes 1 and 2 have either been paid in full previously or are unimpaired and therefore not entitled to vote.

### B.    Ballots and Voting Deadlines

1.    Record Date.

**THE RECORD DATE FOR VOTING ON THE PLAN IS NOVEMBER 1, 2011,** the date scheduled for the hearing on approval of this Disclosure Statement by the Bankruptcy Court. To be entitled to vote to accept or reject the Plan, a holder of a Claim against the Debtors must be the record holder of such Claim at the close of business on the Record Date. Holders who acquire Claims against the Debtors after the Record Date must arrange with its seller to receive a proxy from the holder of record of such Claim on the Record Date.

2.    Ballots.

Holders of Claims entitled to vote on the Plan shall receive a Ballot accompanying this Disclosure Statement. All votes to accept or reject the Plan must be cast by using the Ballot enclosed with this Disclosure Statement and strictly comply with the deadlines and other terms set forth in the Disclosure Statement Order to be attached hereto as Exhibit B. No other votes will be counted.

Please fill out the Ballot and return it to the Debtors' Claims Agent listed below:

**TMG Liquidation Company Ballot Processing Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue**

4

El Segundo, CA 90245

DO NOT RETURN ANY SECURITIES, NOTES OR OTHER DOCUMENTS WITH YOUR BALLOT.

If delivery is by mail, enough time should be allowed to ensure timely delivery to, and actual receipt by, the Claims Agent (before the Voting Deadline as defined below). Fax or other delivery of ballots by electronic means is not acceptable because the Claims Agent must receive an original signed ballot before the Voting Deadline, as further set forth in the Disclosure Statement Order.

**TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND ACTUALLY RECEIVED IN PROPER FORM BY THE CLAIMS AGENT REFERENCED ABOVE AT THE ABOVE ADDRESS ON OR BEFORE 5:00 P.M. (PACIFIC TIME) ON DECEMBER 6, 2011 (THE "VOTING DEADLINE"), OR SUCH LATER DATE TO WHICH THIS SOLICITATION IS EXTENDED BY THE BANKRUPTCY COURT. BALLOTS RECEIVED AFTER THIS TIME WILL NOT BE COUNTED IN THE VOTING UNLESS THE BANKRUPTCY COURT SO ORDERS. IF YOU HAVE ANY QUESTIONS ABOUT PROCEDURES FOR VOTING, OR IF YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR HAVE ANY QUESTIONS ABOUT THE PLAN OR DISCLOSURE STATEMENT, PLEASE REVIEW THE DISCLOSURE STATEMENT ORDER (ATTACHED HERETO AS <u>EXHIBIT B</u>).**

C.      **Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held at 9:30 a.m. on December 16, 2011, before the Honorable Helen E. Burris, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of South Carolina, located at the Donald Russell Federal Courthouse, 201 Magnolia Street, Spartanburg, South Carolina 29306. The Confirmation Hearing may be adjourned by the Bankruptcy Court orally at any scheduled hearing and from time to time without further notice. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite vote has been obtained for the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, and (iii) determine whether to confirm the Plan.

Attached as <u>Exhibit B</u> hereto is a copy of the Bankruptcy Court's Disclosure Statement Order scheduling the time for the distribution of the Plan and Disclosure Statement, the date by which Ballots must be returned, the date by which, and on whom, objections must be filed and served, and the date for the Confirmation Hearing. Specifically, the Bankruptcy Court has directed that all objections, if any, to confirmation of the Plan must be filed with the Bankruptcy Court and served in a manner so as to be actually received on or before December 9, 2011 by: (i) counsel to the Debtors, Michael M. Beal, McNair Law Firm, P.A., 1221 Main Street, 18th Floor (29201), Post Office Box 11390, Columbia, South Carolina 29211 (fax number 803-753-3277); (ii) counsel to the Committee, G. David Dean, Cole, Schotz, Meisel, Forman & Leonard, P.A., 300 East Lombard Street, Suite 2000, Baltimore, Maryland 21202 (fax number 410-528-9402) and G. William McCarthy, Jr., McCarthy Law Firm, LLC, PO Box 11332, Columbia, SC 29211-1332 (fax number 803-753-6930); and (iii) Office of the United States Trustee, Office of U.S. Trustee- Region 4, Attn: Linda K. Barr, Esquire, Strom Thurmond Federal Building, 1835 Assembly Street, Suite 953, Columbia, South Carolina 29201 (fax number 803-765-5260).

COLUMBIA 1054928v3

D.     **Recommendations**

THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE MOST EFFICIENT APPROACH TO THE LIQUIDATION OF THE DEBTORS' ASSETS AND MAXIMIZES THE VALUE OF THE DEBTORS' REMAINING ASSETS FOR THE BENEFIT OF THE DEBTORS' CREDITORS.  THE DEBTORS AND THE COMMITTEE URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.  REFERENCE IS MADE TO THE COMMITTEE'S LETTER IN SUPPORT OF THE PLAN ACCOMPANYING THIS DISCLOSURE STATEMENT.

III.   **THE DEBTORS**

A.     **General Information**

1.     Brief Description of Debtors' Pre-Petition Business.

TMG Liquidation Company f/k/a The Merit Group, Inc. ("TMG Liquidation" or the "Merit Group") is a South Carolina corporation headquartered in Spartanburg, South Carolina.  TMG Liquidation is owned by two individual stockholders, Caleb Fort (62.25%) and E. Fort Wolfe, Jr. (37.75%).  The stockholders have made personal loans and guarantees relating to obligations of some or all the Debtors, including with respect certain of the secured debt to Regions Bank, as further discussed below.

TMG Liquidation is the parent company of its five wholly-owned subsidiaries.  Four of the subsidiaries, including MTrans Liquidation Company f/k/a Merit Transportation, Inc. ("MTrans Liquidation"), MP Sundries Liquidation Company, LLC f/k/a Merit Paint Sundries, LLC d/b/a Lancaster ("MP Sundries Liquidation"), MSupply Liquidation Company, LLC f/k/a Merit Supply Company, LLC d/b/a Merit Supply ("MSupply Liquidation"), and MPFT Liquidation Company, LLC f/k/a Merit Pro Finishing Tools, LLC d/b/a Merit Trade Source ("MPFT Liquidation"), are South Carolina corporations or limited liability companies.  The remaining wholly-owned subsidiary is FSP Liquidation Company f/k/a Five Star Products, Inc. ("FSP Liquidation or "Five Star Products") which has its own wholly-owned subsidiary, FSG Liquidation Company f/k/a Five Star Group, Inc., d/b/a Lancaster/Five Star, d/b/a Rightway ("FSG Liquidation" or "Five Star Group").  FSP Liquidation and FSG Liquidation are both Delaware corporations which were acquired in 2010 by the Merit Group, as discussed further below.

As of the Petition Date, the Debtors served as one of the leading paint sundries distributors in the United States.  They also served markets in Mexico, the Caribbean Islands, Central America and South America.  As of the Petition Date, the Debtors offered over 23,000 different paint sundry and hardware products to their customers which consist of more than 10,000 independent, regional and national paint store chains as well as "big box" retailers, hardware stores, lumber yards, home centers, drywall yards and auto trim shop distributors.

As of the Petition Date, the Debtors had approximately 320 employees.  The Debtors' 2010 annual revenues were approximately $200 million.  As of the Petition Date, the Debtors' inventory was supplied by more than 700 of the industry's leading paint sundry and hardware product manufacturers, and the Debtors maintained distribution centers strategically located in seven (7) states.

6

2.      History of the Debtors.

The Debtors trace their origins back to 1953 when founded as a regional distributor of paint sundry items located in Spartanburg, South Carolina.   The Merit Group maintained headquarters in Spartanburg, South Carolina, and had expanded over the past two decades by opening or acquiring distribution centers in South Carolina (which the Debtors owned as of the Petition Date), Florida, Kentucky, New Jersey, Texas, California and Utah.   As of the Petition Date, the Debtors' New York location was a cash and carry store which operated under the RightWay banner.   The Merit Group's expansion through the acquisition of Five Star Products and Five Star Group in January 2010 is discussed below.   As of the Petition Date, Five Star Products was a distributor of paint supplies, hardware and related products in the Northeast and Middle-Atlantic states.   It was headquartered in East Hanover, New Jersey and distributed products to approximately 3,000 independent retailers and offered a range of private label products sold under the "Five Star" name.

**B.      Pre-Petition Capital Structure**

1.      Pre-Petition Secured Loans.

a.      Regions Bank Loans.   As of the Petition Date, the Debtors' primary secured lending relationship was with Regions Bank, and included four different debt obligations totaling approximately $51,200,000.   The Debtors were parties with Regions Bank to that certain Amended and Restated Loan and Security Agreement dated January 15, 2010 (as amended or supplemented, the "Regions Loan Agreement"), pursuant to which Regions Bank provided the Debtors with a $65,000,000 secured revolving credit facility that was later reduced to $60 million (the "Regions Revolving Loan Facility").   Under the Regions Revolving Loan Facility, the Debtors could obtain revolving credit loans and letters of credit (with a sublimit for letters of credit of $3,000,000).

As of the Petition Date, there was outstanding under the Regions Revolving Loan Facility or was otherwise owed to Regions Bank (a) revolving credit loans in the approximate principal amount of $47,286,000 (the "Regions Revolver Loans"), (b) term loans in the approximate principal amounts of $916,679, $794,428 and $455,113 (the "Regions Term Loans"), (c) reimbursement obligations for any draws made upon letters of credit issued by Regions, for the account of the Debtors, in the aggregate face amount of approximately $590,000 (collectively, the "Regions LCs"), (d) interest rate hedging obligations in the aggregate amount of approximately $1,532,645 (estimated termination value) and (e) corporate credit card debt of a relatively de minimis amount which fluctuated daily.   The foregoing including the Regions Revolver Loans, Regions Term Loans, Regions LCs, and all other obligations of any Debtor to Regions Bank on the Petition Date (including, without limitation, all indebtedness associated with cash management system services or products and all interest, fees, legal expenses and other amounts accruing on any of the foregoing or at any time chargeable to any of the Debtors in connection therewith) are referred to herein collectively as the "Regions Prepetition Obligations").

To secure the Regions Prepetition Obligations, each Debtor granted to Regions Bank, pursuant to the Regions Loan Agreement and various mortgages and related security documents, as amended, security interests in and liens upon (the "Regions Liens") (a) all or substantially all of such Debtor's personal property, including, without limitation, all accounts, inventory, contract rights, chattel paper, documents, instruments, supporting obligations, general intangibles, equipment, money, securities, deposit accounts, and books and records, and (b) a certain parcel of real property of certain Debtors, and improvements thereto, located in Pauline, South Carolina, (all such real and personal property, as the

7

same existed on the Petition Date, together with all cash and non-cash proceeds thereof, being collectively called the "Regions Collateral").

As further set forth in Article IV.A. below, Regions Bank provided the DIP Loan to the Debtors in the Chapter 11 Cases on a secured basis through the closing of the Sale.

b.    Stonehenge Loans.    The Debtors also obtained additional mezzanine style financing from Stonehenge Opportunity Fund II, L.P. ("Stonehenge") in January 2010 to assist it with financing in connection with the Five Star Acquisition.    On January 15, 2011, the Debtors and Stonehenge entered into a Senior Subordinated Note and Option Purchase Agreement (the "Note Purchase Agreement") and a Senior Subordinated Note (the "Stonehenge Note") in the principal amount of $7,500,000, which was to mature on January 15, 2015 and bore interest at 14% per annum.    The Stonehenge Note was secured by a Security Agreement (the "Stonehenge Security Agreement") and a Mortgage, Assignment of Rents and Leases and Security Agreement (the "Stonehenge Mortgage") through which Stonehenge obtained a security interest and mortgage on substantially all the Debtors' personal and real property (collectively, the "Stonehenge Liens").    The Stonehenge Liens and debts were subordinated to those of Regions Bank pursuant to an Intercreditor and Subordination Agreement (the "Intercreditor Agreement").

As further set forth herein, after the Five Star Acquisition, the Debtors spent far more than anticipated for the consolidation of warehouses and the integration of the organizations, which put substantial stress on the Debtors' liquidity and their ability to purchase goods at normal levels.    In an effort to address and correct these liquidity concerns, on February 18, 2011, the Debtors obtained an additional $4,000,000 of financing from Stonehenge.    The proceeds of this loan were used to pay down Regions Bank and free up availability to purchase more inventory for sale.

On February 18, 2011, to effectuate the additional $4,000,000 advance to the Debtors, the Debtors and Stonehenge amended the relevant loan documents, including the Note Purchase Agreement (as amended, the "Amended Note Purchase Agreement"), the Stonehenge Note (as amended, the "Amended Stonehenge Note"), which, as amended, was in the amount of $11,956,565.45 and bore interest at 12% per annum (including certain paid-in-kind or "PIK" interest).    Additionally, the parties amended the Stonehenge Mortgage (as amended, the "Amended Stonehenge Mortgage") and the Intercreditor Agreement (as amended, the "Amended Intercreditor Agreement" and together with the Amended Note Purchase Agreement, the amended Stonehenge Note, the Amended Stonehenge Mortgage, the Stonehenge Security Agreement and all other related loan documents, the "Stonehenge Loan Documents").

Pursuant to the Stonehenge Loan Documents, Stonehenge had the right to designate one representative to the Merit Group's board of directors.    Mr. Thomas Utgard, a principal of Stonehenge Partners, Inc., was selected as the Stonehenge representative.    Mr. Utgard resigned from the board of TMG Liquidation on or about September 22, 2011.    The outstanding balance to Stonehenge under the Stonehenge Loan Documents as of the Petition Date was $12,276,642 as set forth on the Debtors' Schedules.    Pursuant to the Regions Bank Settlement, the Debtors and the Committee agreed that the claims of Stonehenge, along with the other Subordinated Creditors, are valid and allowed claims and agreed not to challenge such claims provided that any party in interest otherwise having standing to do so (including, but not limited to, any Debtor or Committee) is authorized to challenge the validity, extent or priority of any lien purporting to secure any claim of a Subordinated Creditor, the entitlement of any Subordinated Creditor to receive any interest, fees or charges (including attorneys' fees) accrued after the Petition Date, or the calculation of the amount owed to a Subordinated Creditor.

8

      c.      <u>Shareholder Loans</u>.  In addition to the Regions Bank and Stonehenge loans, the shareholders of the Debtors (<u>i.e.</u>, E. Fort Wolfe, Jr. and Caleb C. Fort) together loaned the Debtors in excess of $2,500,000 in cash, including $1,500,000 loaned by Mr. Fort to the Merit Group in February 2011.  These loans are subordinated to the Debtors' obligations to both Regions Bank and Stonehenge.  Pursuant to the Regions Bank Settlement, the shareholders with respect to these loans are each a Subordinated Creditor.  In addition, Mr. Fort pledged personal assets valued on the Petition Date at $4,872,970 as collateral for the Regions Prepetition Obligations and obligations under the DIP Loan.

      2.      <u>Debtors' Assets and Liabilities as of the Petition Date</u>.

As of the Petition Date, the Debtors' consolidated assets at book value were approximately $72.2 million.  Specifically, as of the Petition Date, the Debtors' assets consisted of:  (1) real property and improvements with an aggregate book value of approximately $1.5 million; (2) machinery and equipment with an aggregate book value of approximately $3.7 million; (3) account receivables with an aggregate book value of approximately $34.8 million; (4) inventory with an aggregate book value of approximately

$25.1 million; and (5) certain other miscellaneous assets.  The Debtors believe that the fair market value of these assets was less than the book value and the liquidation value was less than the fair market value.

As of the Petition Date, the Debtors reflected the following liabilities:  (1) secured debts totaling approximately $63.8 million; (2) priority unsecured claims for wages, salaries, and benefits and taxes totaling approximately $1.1 million; and (3) pre-petition unsecured trade debt and other unliquidated liabilities related to workers' compensation and similar employee related liabilities, customer rebates, employee benefit plan contributions, and other claims totaling approximately $42.4 million.

**C.**      **Events Leading to the Bankruptcy Filing**

On or about November 24, 2009, the Merit Group, as buyer, entered into that certain Stock Purchase Agreement with National Patent Development Corporation, as seller, for the purpose of acquiring Five Star Products and its wholly-owned subsidiary, Five Star Group, for a purchase price of $33,124,000 (the "Five Star Acquisition").  The Five Star Acquisition closing date was January 15, 2010, contemporaneous with the first tranche of the Stonehenge financing.  The Five Star Acquisition enabled the Debtors to expand their growing national footprint into the Northeast.  In addition, the Debtors anticipated that the Five Star Acquisition would enable the Debtors to realize significant cost savings and synergies.

After the Five Star Acquisition, however, the Debtors experienced higher than anticipated consolidation costs due to, among other things, integration of warehouses, information technology systems, and overall corporate organization.  The higher than anticipated consolidation costs placed a strain on the Debtors' overall liquidity resulting in a decline in the Debtors' working capital.  As a result of their liquidity problems, the Debtors were unable to replenish their inventory and maintain it at normal levels.  The Debtors' lower pre-petition inventory levels resulted in declining sales, which only exacerbated the Debtors' pre-petition liquidity problems.  The foregoing were affected by the Debtors' financing arrangements prepetition including decreased availability under their pre-petition line of credit based on the methodology for their borrowing base calculations.

The Debtors actively pursued out of court solutions to the liquidity crisis that followed the Five Star Acquisition.  To assist in this effort, in November 2010, the Debtors retained Alvarez & Marsal

9

North America LLC ("A&M") to provide financial advisory services to the Debtors in connection with their liquidity, business plan and cash initiatives.  In April 2011, the Debtors also re-hired Mitchell T. Jolley as Chief Executive Officer ("CEO") and/or President of the Debtors.  Mr. Jolley served in his previous capacity as CEO and/or President of certain of the Debtors from 1990 to 2009.  In addition, in April 2011, the Debtors reengaged A&M to continue with the services of the prior engagement as well as to assist the Debtors with the overall restructuring process, the development of business and financial plans, and well as negotiations with lenders and creditors.  In addition, the Debtors engaged McNair Law Firm, P.A. ("McNair") as reorganization and bankruptcy counsel.  In May 2011, the Debtors also engaged the investment banking firm of Morgan Joseph Triartisan LLC ("Morgan Joseph") to advise the Debtors on their strategic alternatives, including a potential sale of the Debtors' business as a going concern enterprise.

The Debtors, with the assistance of their advisors including Morgan Joseph, A&M and counsel, evaluated numerous strategies for resolution of their liquidity difficulties, including potential out-of-court financial restructuring, cost containment programs, strategic and financial investors, and refinancing options.   In light of the Debtors' continuing financial challenges, the Debtors determined that commencement of the Chapter 11 Cases was necessary and appropriate to stabilize operations and to allow the Debtors to borrow under a secured debtor in possession loan obtained through Regions Bank and to thereafter operate and stabilize the Debtors' business while pursuing a sale of substantially all of their assets.

IV.    **THE DEBTORS' CHAPTER 11 CASES**

A.    **Significant "First Day" Bankruptcy Orders**

1.    Debtor-in-Possession Financing.

Because the Debtors' inventory levels were reduced from typical levels of approximately $45 million to approximately $25 million prior to the Petition Date, the Debtors needed to borrow approximately $7 million in additional funds to sustain their business to close a going concern sale.  The Debtors were unable to procure such financing from other sources, particularly in view of the existing secured debt to the Debtors' senior lender, Regions Bank, and Stonehenge, which provided subordinate mezzanine financing in connection with the Five Star Acquisition.  Fortunately, the Debtors and their professionals were able to negotiate debtor-in-possession financing (the "DIP Loan") from Regions Bank.

On May 17, 2011, the Debtors filed with the Bankruptcy Court the Debtors' Motion for Entry of Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (I) Approving Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing (the "DIP Motion").  The Debtors in the DIP Motion sought authority, *inter alia*, to obtain secured debtor in possession financing and other extensions of credit from Regions Bank on a superpriority basis, enter into a DIP loan agreement and other related DIP financing documents with Regions Bank, and utilize cash collateral consistent with weekly cash DIP budgets (the "DIP Budgets").  On May 19, 2011, the Bankruptcy Court issued an Interim Order granting the relief requested in the DIP Motion, including allowing the Debtors to borrow and use cash collateral in accordance with the DIP Budget pending a Final Hearing.

10

With Bankruptcy Court approval, the Debtors and Regions Bank entered into a Post-Petition Loan and Security Agreement dated May 19, 2011 (the "DIP Loan Agreement") and other financing documents (collectively, the "DIP Financing Documents"). In recognition of the Debtors' determination that a sale was necessary to maximize value for creditors, the DIP Financing Documents established certain benchmark dates and events to measure the Debtors' progress toward expeditiously selling the business. These were as follows: (a) deadline to file motion to sell substantially all the Debtors' assets – 20 days after the Petition Date; (b) deadline to obtain entry of an order approving the bidding procedures – 40 days after the Petition Date; (c) deadline for the 363 sale auction – 72 days after the Petition Date; and (d) deadline to enter the order approving the 363 sale - 75 days after the Petition Date.

Various objections to the debtor in possession financing were filed, including by the Committee, the United States Trustee, and Masterchem Industries LLC. After the Final Hearing on the DIP Motion, the Bankruptcy Court entered the Final DIP Order (as defined below) on June 10, 2011 approving the DIP Loan on a final basis. The Final Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364, and 507(I) Approving Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, and (V) Modifying the Automatic Stay (the "Final DIP Order") approved the Debtors' debtor in possession financing of up to $55,000,000 from Regions Bank. The Final DIP Order allowed the Debtors to continue to borrow under the DIP facility with Regions Bank on the terms set forth therein.

The Final DIP Order incorporated the provisions agreed to by the Committee to resolve the Committee's objections to the relief requested in the DIP Motion. Specifically, the Final DIP Order included a provision stating that the objections were overruled subject to certain concessions therein (including but not limited to): (1) the exclusion of certain assets and claims from Region Bank's collateral; (2) reservation of certain rights by the Committee; (3) a carve-out for an initial plan funding commitment for unpaid professional expenses, certain fees and expenses (not to exceed $1,000,000 in total, based on certain restrictions set forth in the Final Order) and United States Trustee fees[2]; and (4) Regions Bank agreed to make a loan of $500,000 to the Debtors if an Acceptable Sale[3] closes, to be used by the Debtors in connection with confirmation of a chapter 11 plan.

As of July 29, 2011, the date of the Closing of the Sale, the DIP Loan balance was $36,543,136, and the amount outstanding to Regions Bank under the Regions Revolving Loan Facility was $16,424,241, for a total of $52,967,377. In addition, the Debtors' records reflected $2,166,220 as the total outstanding balance of the Regions Term Loans (A, B, C). Pursuant to the Regions Bank Settlement, all of Regions Bank obligations under the Interim Order and Final DIP Order were released, including the Initial Plan Funding Commitment in the amount of $500,000. In addition, upon the Closing of the Sale and the effectiveness of the Regions Bank Settlement Agreement, Regions Bank ceased to be entitled to receive a share of the proceeds of the Excluded Assets as a holder of a claim under section 503(b) of the Bankruptcy Code and agreed to share in such proceeds on a pro rata basis with other general, non-priority unsecured claims as set forth in the Regions Bank Settlement.

---

[2] A complete statement of the carve-out terms is set forth in the Final DIP Order. See Doc. No. 163 at 26, ¶ 10.

[3] "Acceptable Sale" is defined in the Final DIP Order to mean: a sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code (i) to which Regions Bank affirmatively consents, (ii) that is made pursuant to bid procedures (if any), an asset purchase agreement, sale approval order and other documentation that is in form and substance satisfactory to Regions Bank in its sole discretion, and (iii) that actually closes.

11

2.     <u>Pre-Petition Wages, Salaries, Employee Expenses, and other Employee Benefits</u>.

On May 17, 2011, the Debtors filed a motion seeking Bankruptcy Court authority (a) allowing (but not requiring) payment of pre-petition wages, salaries, employee expenses, disability insurance and other employee benefits and payment of related taxes and other withholding, (b) allowing (but not requiring) continuation of employee benefit programs, and (c) honoring of all checks presented to financial institutions for payment related to the foregoing.  On May 19, 2011, the Bankruptcy Court issued an order approving the motion.

3.     <u>Use of Existing Forms and Records and Existing Corporate Bank Accounts</u>.

On May 17, 2011, the Debtors filed a motion seeking Bankruptcy Court authority to continue use of existing business forms and records and to maintain use of existing corporate bank accounts and cash management system.  On May 19, 2011, the Bankruptcy Court issued an interim order, and an amended order approving the Debtors' requested relief was entered on May 20, 2011.

4.     <u>Consolidated List of Creditors and Shortened Mailing List</u>.

On May 17, 2011, the Debtors filed a motion seeking Bankruptcy Court authority to file a consolidated list of the Debtors' 30 largest unsecured creditors and to send notices required under the Bankruptcy Code to a shortened mailing list and those creditors who file with the Clerk a request that they receive such notices.  On May 24, 2011, the Bankruptcy Court issued an order approving the motion.

5.     <u>Utilities Motion</u>.

On May 17, 2011, the Debtors filed a motion seeking Bankruptcy Court authority to prohibit utilities from altering, refusing or discontinuing service to the Debtors on account of prepetition invoices and establishing procedures with respect to adequate assurance of future performance to utility providers. On May 20, 2011, the Bankruptcy Court issued an order approving the Debtors' request.

6.     <u>Obligations to Customs Brokers and Critical Foreign Vendors</u>.

On May 17, 2011, the Debtors filed a motion seeking Bankruptcy Court approval to pay certain prepetition foreign trade claims of critical foreign vendors, along with duties, brokers, and other fees and transportation charges due to customs brokers and others for delivery of foreign goods.  On June 2, 2011, the Bankruptcy Court issued an interim order authorizing payment to the Debtors' customs brokers subject to approval from the Committee.  A final order granting the Debtors' motion as modified at the hearing and including payment to critical foreign vendors was entered on June 9, 2011.

7.     <u>Procedure for Treatment of Valid Reclamation Claims</u>.

On May 17, 2011, the Debtors filed a motion seeking Bankruptcy Court authority to establish procedures for treatment of valid reclamation claims and prohibiting third parties from reclaiming goods or otherwise interfering with delivery of goods to the Debtors.  On May 20, 2011, the Bankruptcy Court issued an interim order, and a final order granting the Debtors' requested relief in the reclamation motion was entered on June 2, 2011 (the "Reclamation Procedures Order").  Pursuant to the Reclamation Procedures Order, the Debtors filed their reclamation notice on July 28, 2011 (the "Reclamation Notice") which listed the reclamation claims that the Debtors, after review and evaluation, deemed valid.  The

COLUMBIA 1054928v3

Debtors determined that there were no valid reclamation claims, and no timely objections to the Reclamation Notice were filed.

       8.      <u>Retention of Kurtzman Carson Consultants LLC as Claims Agent</u>.

On May 17, 2011, the Debtors filed an application seeking Bankruptcy Court approval to employ Kurtzman Carson Consultants LLC ("KCC" or the "Claims Agent") and to appoint KCC as the claims, noticing and balloting agent for the benefit of the Bankruptcy Court and Debtors' Estates.  KCC serves as the noticing agent of the Bankruptcy Court and Debtors to mail notices to the Estates' creditors and parties in interest, provide computerized Claims, objection and balloting database services, and provide expertise, consultation, and assistance in Claim and ballot processing and other administrative services with respect to the Debtors' Chapter 11 Cases.  The Bankruptcy Court entered an order on May 20, 2011 approving the employment of KCC.

       9.      <u>Field Sales Force Compensation Restructuring Program</u>.

On May 17, 2011, the Debtors filed a precautionary motion seeking Bankruptcy Court authority to continue their existing prepetition field sales force compensation restructuring program as needed without further approval.  On May 19, 2011, the Bankruptcy Court entered an order consistent with the Debtors' request.

      10.      <u>Customer Incentive Programs</u>.

On May 17, 2011, the Debtors filed a motion seeking Bankruptcy Court authority to honor certain customer incentive programs and policies by the Debtors.  On May 20, 2011, the Bankruptcy Court entered an interim order granting the Debtors' motion, and a final order was entered on June 2, 2011.

      11.      <u>Retention of McNair Law Firm P.A. as Counsel</u>.

On May 17, 2011, the Debtors moved for Bankruptcy Court approval to retain McNair as general reorganization and bankruptcy counsel in accordance with McNair's hourly rates and expense disbursement policies in its retainer letter and the application.  On June 15, 2011, the Bankruptcy Court issued an order approving the Debtors' application.

      12.      <u>Retention of Alvarez & Marsal North America LLC as Financial Advisors</u>.

On May 20, 2011, the Debtors filed an application seeking Bankruptcy Court approval to employ A&M as Financial Advisors to the Debtors.  The Bankruptcy Court entered an order approving the Debtors' application on June 2, 2011.

      13.      <u>Retention of Morgan Joseph Triartisan LLC as Investment Banker</u>.

On June 8, 2011, the Debtors filed the Morgan Joseph Application, seeking approval to employ Morgan Joseph as the Debtors' investment banker.  Morgan Joseph's retention pursuant to the terms of a revised engagement letter was supported by the Committee and approved by order of the Bankruptcy Court on July 6, 2011.

13

**B.**     **Significant Events During the Chapter 11 Cases**

Certain significant events that have occurred during the Chapter 11 Cases to date and significant actions the Debtors intend to pursue are described below.

1.     Operations During the Chapter 11 Cases.

The Debtors continued to operate and conduct business during the Chapter 11 Cases while marketing their business for sale.  The Debtors filed their initial Monthly Operating Report with the Bankruptcy Court on June 21, 2011 for the period from the Petition Date to May 31, 2011, and have filed Monthly Operating Reports during the pendency of the Chapter 11 Cases in accordance with the Bankruptcy Code.

2.     Funding the Chapter 11 Cases.

The Debtors financed their operations during the Chapter 11 Cases with the DIP Loan pursuant to the Interim Order and Final DIP Order discussed above and the DIP Budgets agreed to among the parties including Regions Bank.  The Debtors continued to collect their account receivables and sold inventory in the ordinary course of business during the pendency of the Chapter 11 Cases through the closing of the Sale.

Pursuant to the Regions Bank Settlement, the Debtors' Estates received the following as a result of the Closing of the Sale: (i) $2,000,000 of cash proceeds to cover Administrative Claims; (ii) $2,750,000 advanced by Regions Bank from the DIP Loan; and (iii) $1,000,000 to cover professional fees funded by Regions Bank from the DIP Loan (collectively, the "Settlement Payments").  The Debtors' Estates were holding approximately $4.34 million from such funds as of October 28, 2011 after paying professional fees and expenses.

The Debtors anticipate that the Settlement Payments and the proceeds from the prosecution of the Causes of Action will provide the Debtors' Estates with sufficient funds to administer the Plan.

3.     The Appointment of the Committee of Unsecured Creditors.

On May 23, 2011, the United States Trustee for the District of South Carolina appointed the Committee in the Chapter 11 Cases.  The Committee is comprised of the following entities: DAP Products, Inc., Masterchem Industries, Inc., Primrose Plastics, Packaging Service Co., Rust Oleum Corporation, Homax, and Milazzo Industries, Inc.  The Committee retained Cole, Schotz, Meisel, Forman & Leonard, P.A. and McCarthy Law Firm, LLC as the Committee's counsel, which the Bankruptcy Court approved on June 22, 2011.

The Committee also engaged J.H. Cohn LLP as its financial advisors with Bankruptcy Court approval.  Subsequently, the Committee sought Bankruptcy Court approval to expand the scope of services provided by J.H. Cohn LLP in light of the fact that the Debtors and the Committee agreed to be co-proponents of a joint plan pursuant to the Regions Bank Settlement.  On September 13, 2011, the Bankruptcy Court approved J.H. Cohn LLP's amended application expanding its role to include: (a) investigating and evaluating potential Causes of Action of the Debtors' Estates, including but not limited to, Causes of Action under chapter 5 of the Bankruptcy Code; (b) assisting and advising the Committee with respect to the Plan and confirmation thereof; and (c) providing testimony, as necessary, at the

14

hearing on confirmation of the Plan.  Since its formation, the Committee has actively participated in the Chapter 11 Cases.

      4.      <u>Procedures for Interim Compensation and Reimbursement of Chapter 11 Professionals and Committee Members</u>.

On May 25, 2011, the Debtors filed a motion seeking Bankruptcy Court authority to establish procedures for compensation including interim compensation and expense reimbursement of Chapter 11 professionals and committee members consistent with the Bankruptcy Code.  On June 24, 2011, the Bankruptcy Court entered an order approving the Debtors' request.

      5.      <u>Ordinary Course Professionals</u>.

On June 17, 2011, the Debtors filed an application seeking Bankruptcy Court authorization for the Debtors to employ accountants, attorneys and other professionals whose services the Debtors use from time to time in the ordinary course of the Debtors' business (the "OCP Motion").  An Amended OCP Motion was filed by the Debtors on June 24, 2011.  The Bankruptcy Court entered an order approving the Amended OCP Motion on July 8, 2011.

      6.      <u>Filing of Schedules and Statement of Financial Affairs</u>.

On June 21, 2011, each of the Debtors filed its respective Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Schedules").  The Schedules for each of the Debtors is filed under its respective individual case numbers (not in the jointly administered Chapter 11 Case) and can be found at the Bankruptcy Court's PACER public document system (fee based; PACER subscription required) is accessible with instructions through the Bankruptcy Court's website at www.scb.uscourts.gov.  The Schedules may also be accessed on the website of the Debtors' Claims Agent, KCC at http://www.kccllc.net/MeritGroup.

The Plan provides for the substantive consolidation of the Debtors for all purposes related to the Plan as set forth in Article IV of the Plan.

      7.      <u>Executory Contracts and Leases</u>.

By the Debtors' motions filed on June 17, 2011, June 27, 2011, and August 5, 2011 and orders entered by the Bankruptcy Court on July 8, 2011 and thereafter, the Debtors have rejected certain executory contracts or unexpired leases that either had unfavorable terms, were considered unnecessary for a possible sale or reorganization, or were not assumed by the buyers under the APA (as defined below in the Section discussing the Sale).  These rejected executory contracts and unexpired leases include contracts and leases for copiers, computer equipment, an airplane, and an abandoned warehouse located in New Jersey.

In connection with the Sale of substantially all of the Debtors' assets to MG Distribution as Buyer discussed below, MG Distribution was allowed additional time after the Closing of the Sale to assume or reject ten specified executory contracts and unexpired leases (the "Post-Closing Agreements").  As further set forth in the APA and Sale Order, MG Distribution assumed all obligations under the Post-Closing Agreements from the date of the Closing of the Sale through the entry of an assumption or rejection order for each Post-Closing Agreement, including all obligations to pay rent, provide insurance, and vacate the

premises upon rejection of any unexpired lease, and including return of equipment under any executory contract or unexpired lease.

The Post-Closing Agreements are subject to pending decisions as to rejection or assignment and assumption to MG Distribution until the applicable deadline under the APA or Sale Order for assumption or rejection of such Post-Closing Agreement occurs.  Upon the occurrence of the applicable deadline for each, a Post-Closing Agreement not then already assumed and assigned to MG Distribution or rejected by the Debtors or the Plan Administrator shall be deemed rejected, with related Claims or other obligations treated as set forth in the APA and Sale Order.  As of the date hereof, MG Distribution has designated one unexpired lease and one executory contract for assumption, and the Debtors have filed a motion to assume and assign the lease and contract to the Buyer.  The majority of the Post-Closing Agreements must be assumed or rejected by December 13, 2011 pursuant to the Sale Order, although a few Post-Closing Agreements have earlier deadlines.

All other executory contracts and unexpired leases that are not Post-Closing Agreements and that have not previously assumed and assigned or rejected by the Debtors, will be assumed and/or assigned or rejected by the Debtors pursuant to the Plan or by further order of the Court.

8.    Notice of Commencement and Deadline for Filing Proofs of Claim.

Pursuant to the Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines entered on May 24, 2011, the Bankruptcy Court set the Bar Date for filing Proofs of Claim for any person or entity other than governmental units as October 6, 2011 and for any governmental unit as November 14, 2011.  Any person who is required to but fails to file a proof of claim on account of a Prepetition Claim, including but not limited to any Claim under section 503(b)(9) of the Bankruptcy Code, on or before the Bar Date is forever barred, estopped and enjoined from receiving a distribution under the Plan and is forever barred, estopped and enjoined from asserting a Prepetition Claim against the Debtors, their Estates or any successors or assigns.

As of the General Claims Bar Date (the bar date for governmental units does not expire until November 14, 2011), the Debtors' Claims Agent had received Proofs of Claims as follows[4]: (a) alleged general unsecured Claims in the aggregate amount of approximately $42 million; (b) alleged Priority Claims in the aggregate amount of  approximately $0.8 million; (c) alleged Secured Claims in the aggregate amount of approximately $19.9 million[5]; and (d) alleged administrative claims in the aggregate amount of approximately $2.8 million.  These numbers are based on the summary of Claims provided by the Claims Agent, and have not been verified as to amount, classification or otherwise as to validity.

The Debtors and the Committee are in the process of reviewing the Claims filed to date.  Based upon the Liquidation Analysis and the Schedules, it is currently anticipated that there will be a distribution to unsecured creditors in the Chapter 11 Cases.   Any potential estimated percentage

---

[4] Except as otherwise set forth in below in note 5, the following Proof of Claim amounts have not been reduced to account for duplicative claims or other claim adjustments, including any which will result from substantive consolidation under the Plan.

[5] This amount excludes duplicative secured claims filed by the same creditor against multiple Debtors.

16

distribution cannot be determined at this time, however, because all Causes of Action have not been concluded, all Claims have not been filed, and the Claims objections have not been completed.

As further set forth in the Plan and Disclosure Statement, the Plan establishes bar dates for certain Claims, including Administrative Claims and Executory Contract Rejection Claims. The Debtors will serve a Notice of Effective Date that sets forth certain information such as the Effective Date and deadlines for filing Administrative Claims and Executory Contract Rejection Claims under the Plan.

9.        Litigation Against Parties Receiving Avoidable Transfers.

After reviewing the Debtors' Schedules and Statements of Financial Affairs and the Debtors' records, the Debtors and their counsel have determined that a number of the transfers that the Debtors made prior to the Petition Date may be avoidable under chapter 5 of the Bankruptcy Code, including section 547, and recoverable under section 550(a) of the Bankruptcy Code as preferential transfers or otherwise.

The Debtors and/or the Committee sent demand letters (the "Demand Letters") to most of the transferees that received payments totaling more than $5,850 (per transferee). Attached hereto as **Exhibit C-1** is a Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Non-Insiders containing a list of transferees that received a Demand Letter along with the demand amount. Attached hereto as **Exhibit C-2** is a Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Insiders. Potential claims related to the Five Star Acquisition are not included on Exhibits C-1 and C-2. The Debtors and/or the Committee will initially attempt to resolve claims for which a Demand Letter is sent without litigation. If the matter is not settled, abandoned, or otherwise resolved, however, the Debtors and/or the Committee (prior to the Effective Date) or the Plan Administrator (after the Effective Date), as applicable, may file adversary proceedings against (i) any such transferees receiving a Demand Letter or listed on Exhibit C-1 or C-2, and (ii) any other or additional transferees and other avoidance action defendants which may be pinpointed after an investigation of the Debtors' books and records by the Plan Administrator and his advisors. The Debtors expressly reserve all Avoidance Actions and other Causes of Action regardless of whether they are listed on any exhibits hereto or to the Plan (including the Non-Exclusive Schedule of Potential Chapter 5 Causes of Action against Non-Insiders or the Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Insiders) or otherwise described in the Plan or Disclosure Statement.

10.        Litigation Against Parties Relating to the Five Star Acquisition.

The Committee has been investigating potential avoidable transfers as well as other Causes of Action of the Debtors and the Estates. In particular, the Committee conducted a preliminary investigation regarding the circumstances surrounding the Five Star Acquisition by reviewing documents produced by the Debtors through informal consensual discovery. The Committee's review of those initial documents raised questions regarding the prepetition conduct of certain shareholders and current and former officers and directors of the Debtors. In order to more fully investigate the Five Star Acquisition, the Committee sought Bankruptcy Court approval pursuant to Bankruptcy Rule 2004 to investigate: (a) whether certain acts and/or omissions of certain shareholders and current and former directors and officers of the Debtors resulted in the Debtors receiving less than a reasonably equivalent value in exchange for the Five Star Acquisition and (b) whether the acts and/or omissions by such shareholders, directors and officers in connection with the Five Star Acquisition constituted breaches of fiduciary duties to the Debtors; and (c) any other potential claims that the Debtors' Estates may have in connection with the Five Star Acquisition. On August 5, 2011, the Bankruptcy Court approved the Committee's request to conduct

17

discovery pursuant to Bankruptcy Rule 2004 and seek the production of documents and testimony of witnesses from the following parties: the Debtors, National Patent Development Corporation, M.M. Dillon & Co. (an advisor to National Patent Development Corporation) and certain current and former officer and directors of the Debtors, including Caleb C. Fort, E.F. Wolfe, Jr. and Jay Baker. The Committee, has taken the 2004 examinations of M.M. Dillon, Caleb C. Fort, E.F. Wolfe, Jr. and Jay Baker. All relevant information and findings in connection with the investigation will be provided to the Plan Administrator who will have the authority to commence and/or prosecute Causes of Action pursuant to the terms of the Plan. The Debtors and the Committee understand that Caleb C. Fort, E.F. Wolfe, Jr., and Jay Baker deny any wrongdoing in connection with the Five Star Acquisition.

On October 31, 2011, the Committee filed a motion (the "Standing Motion"), seeking the entry of an order authorizing the Committee to prosecute, on behalf of the Estates, a claim against National Patent Development Corporation to avoid an alleged constructively fraudulent transfer under Section 548 of the Bankruptcy Code, as well as claims for alleged breaches of fiduciary duty and negligence against Caleb C. Fort, E.F. Wolfe, Jr., and Jay Baker. A copy of the draft complaint the Committee is requesting permission to file was attached as an exhibit to the Standing Motion, which can be found on the Court's docket [Docket No. 563]. The Committee will seek the entry of an order granting the Standing Motion in advance of the Confirmation Hearing. If the Court grants the Standing Motion, the Committee intends to file the Complaint prior to the Confirmation Hearing.

11.    Other Litigation.

On or about April 15, 2011 the Internal Revenue Service sent a Notice of Deficiency to Five Star Products & Subsidiaries asserting deficiencies in corporate income taxes for tax years 2007 and 2008 in the total amount of $275,715 (the "Deficiency Letter"). The Deficiency Letter states that the Debtors have 90 days from the date of the Deficiency Letter to file a petition with the United States Tax Court to seek a redetermination of the purported deficiency. However, pursuant to 11 U.S.C. § 362(a)(8) and Internal Revenue Code Section 6213(f), the 90-day period for filing a petition for redetermination with the United States Tax Court is stayed until the confirmation of the Debtors' bankruptcy plan or dismissal of the Chapter 11 proceedings, plus 60 days.

Because the Deficiency Letter covers tax years which occurred prior to the Five Star Acquisition, the Debtors believe that any deficiency may constitute an indemnifiable claim against National Patent Development Corporation (i.e., the previous owner of Five Star Products). The Debtors are currently investigating the merits of the Internal Revenue Service's determination in its Deficiency Letter and the best means, if necessary, to challenge any purported deficiency and are also evaluating related indemnity claims as set forth above.

COLUMBIA 1054928v3

12.    <u>Sale of Substantially All of the Debtors' Assets</u>.

Along with Debtors' other financial restructuring efforts, the Debtors initially began seeking a buyer for the Debtors' business as a going concern prior to the Petition Date.  On June 10, 2011, the Debtors filed the Motion of Debtors For Entry Of An Order Approving (A) The Proposed Sale of Substantially All Assets of the Debtors Free and Clear of All Liens, Claims, Encumbrances and Other Interests and (B) Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases and Memorandum in Support of Motion (the "Initial Sale Motion").  The Initial Sale Motion requested authority to sell all or substantially all of the Debtors' assets (the "Acquired Assets") to the highest and best bidder.

Contemporaneously upon filing the Initial Sale Motion, the Debtors also filed the Motion of Debtors for Entry of an Order (I) Approving Auction and Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing, But Not Requiring, Entry into a Stalking Horse Agreement and Approving Stalking Horse Protections, and (III) Approving Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling Auction and Sale Approval Hearing, and (V) Approving the Form and Manner of the Sale Notice (the "Bidding Procedures Motion").  The Bidding Procedures Motion requested authorization, among other things, to sell the Debtors' business pursuant to certain auction procedures in the Bidding Procedures Motion.  The Bidding Procedures Motion provided for the sale of the Acquired Assets by the end of July, either with a stalking horse agreement in place or at an open auction (the "Auction").

The Debtors' assets were marketed extensively.  The Debtors' court-approved investment banker, Morgan Joseph, contacted over 150 potential purchasers directly and through electronic communications and other means, seeking both strategic buyers and financial buyers who might be interested in acquiring the Acquired Assets or another transaction with the Debtors.  Approximately 60 potential purchasers executed confidentiality agreements, allowing them access to the virtual data room and the confidential memorandum prepared by Morgan Joseph.  The Debtors and Morgan Joseph hosted a number of potential purchasers who made site visits at the Debtors' facilities, conducted inspections, and/or engaged in substantial discussions with Morgan Joseph and/or the Debtors' management.  The Debtors and Morgan Joseph received nine written indications of interest offering to purchase some or all of the Debtors' assets as a result.

After review by the Debtors and their advisors of the offers and an opportunity for the prospective purchasers to increase their bids to become the "stalking horse," the Debtors selected MG Distribution as the stalking horse and began negotiating an asset purchase agreement with MG Distribution.  These efforts led to negotiation of a "stalking horse" Asset Purchase Agreement dated as of June 29, 2011 between the Debtors and MG Distribution, as Buyer (the "APA").  The APA provided that, subject to Bankruptcy Court approval, MG Distribution would purchase the Debtors' Acquired Assets for $46 million, $2 million of which was allocated to pay Administrative Claims of the Estates.  The APA also provided for the assumption of certain post-closing liabilities, including certain cure costs of leases and contracts to be assumed and assigned at closing in excess of $150,000 in the aggregate, and post-filing trade payables and operating expenses incurred in the ordinary course of business.

On June 28, 2011, the Bankruptcy Court held a hearing and approved the Bidding Procedures Motion as modified, including incorporation of the stalking horse, MG Distribution, into the sale process.  On June 29, 2011, the Bankruptcy Court entered an order approving the Bidding Procedures Motion as modified.  Specifically, the Bankruptcy Court approved MG Distribution as the stalking horse buyer under the APA and approved a break-up fee of $500,000 and an expense reimbursement of up to

$750,000 payable to MG Distribution if it ultimately was not the successful bidder at the Auction. In addition, the Bankruptcy Court determined that Regions Bank was entitled to credit bid its debt at the Auction, so long as its bid included sufficient cash to pay the break-up fee, the expense reimbursement, and any fees due to Morgan Joseph. However, in response to the Committee's objections, the Bankruptcy Court took under advisement the right of Stonehenge to credit bid at the Auction. On July 12, 2011, the Bankruptcy Court entered an order finding that Stonehenge would be permitted to credit bid. The Bankruptcy Court, however, reserved its right to revisit at the final sale hearing the appropriateness of any credit bid by Stonehenge and to consider any conditions or safeguards requested by the Committee in connection with the final sales terms presented to the Court for approval.

On June 29, 2011, the Debtors filed the Amended Motion of Debtors For Entry Of An Order Approving (A) The Proposed Sale of Substantially All Assets Of the Debtors Free and Clear of All Liens, Claims, Encumbrances and Other Interests (B) Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases and (C) Extension of Time to Assume or Reject Certain Unexpired Leases and Memorandum in Support of Motion filed in the Chapter 11 Cases (as amended, the "Sale Motion"), pursuant to which the Debtors sought permission to sell substantially all of their assets and assign certain of their unexpired leases and executory contracts to MG Distribution, as the stalking horse, or other qualified bidders, if any, with higher and better offers. A copy of the APA was attached to the Sale Motion.

Prior to the Bid Deadline, Morgan Joseph continued to contact potential purchasers and to conduct its marketing process to solicit interest from potential purchasers. The Debtors provided notice of the Auction and the Sale Hearing to Morgan Joseph's broadest list of parties with a potential interest in purchasing the Acquired Assets (consisting of over 150 parties). Potential purchasers continued to visit the Debtors' headquarters in Spartanburg after the announcement of the APA and continued due diligence up to the bid deadline for the Auction. In addition, on June 30, 2011, the Debtors published a public notice of the upcoming sale of the Acquired Assets in *The Wall Street Journal*. The Debtors believe that based on the above process and the experience of Morgan Joseph and its broad range of contacts, all possible viable parties interested in purchasing the Acquired Assets were made aware of the Sale and opportunity to participate in the Auction process.

Potential purchasers continued to conduct due diligence and discuss bid packages with the Debtors and their advisors, up to and including through the Bid Deadline of July 15, 2011. However, as of 5:00 p.m. on the Bid Deadline, the Debtors did not receive any additional bids from any other potential purchasers. As a result, the Debtors, in consultation with Regions Bank and the Committee, determined that the Stalking Horse, MG Distribution, submitted the highest and best offer for the Acquired Assets (i.e., $46 million plus the assumption of certain post-closing liabilities, including certain cure costs of leases and contracts to be assumed and assigned at closing).

Regions Bank and the Committee each filed objections to the Sale Motion. In addition, on July 19, 2011, the Committee filed a motion seeking entry of an order authorizing the Committee to derivatively assert preference and surcharge claims on behalf of the Debtors' Estates against Regions Bank or compelling the Debtors to pursue the surcharge claims on behalf of the Debtors' Estates (the "Derivative Standing Motion"). After extensive arms-length negotiations, the Debtors, the Committee and Regions Bank agreed to settle all claims and causes of action, including all Avoidance Actions and any surcharge claim under section 506(c) of the Bankruptcy Code, that arise out of or relate to the debtor-creditor relationship between Regions Bank and the Debtors and that any of the Debtors, their Estates or the Committee have, ever had or claim to have against Regions Bank or any of its officers, directors,

agents, affiliates, shareholders or attorneys in consideration for the following, as provided for in the settlement term sheet dated as of July 21, 2011 (the "Settlement Term Sheet").

Under the Settlement Term Sheet: (i) Regions Bank agreed that $2,000,000 of proceeds from the Sale could be paid by the Buyer to the Debtors' Estates as the "Additional Claims Amount" under the APA; (ii) Regions Bank agreed to fund at least $1,000,000 from the DIP Loan for professional fees and expenses of professionals retained by the Debtors and the Committee; (iii) Regions Bank agreed to advance an additional $2,750,000 from the DIP Loan to the Debtors' Estates; (iv) all sums (net of costs and fees payable to Morgan Joseph) payable under the APA (exclusive of the Additional Claims Amount) would be remitted directly to Regions Bank for application to the pre-petition loans or the post-petition loans owed by the Debtors to Regions Bank; (v) the Settlement Amount (consisting of the sum of (i), (ii) and (iii) above) shall be free and clear of all the liens and administrative or priority claims of Regions Bank but Regions Bank shall retain all of its liens upon and rights with respect to all assets of each Debtor other than (a) the Excluded Assets (as defined in the Final DIP Order) and (b) the Acquired Assets (as defined under the APA); (vi) Regions Bank would subordinate its rights with respect to any distribution on account of the Regions Deficiency Claim to aggregate distributions on account of Senior Unsecured Claims of 10% of the aggregate principal amount of such Senior Unsecured Claims; and (vii) after distributions aggregating 10% of the principal amount of all Senior Unsecured Claims have been made, Regions Bank shall be authorized to receive (on account of the Regions Deficiency Claim and the aggregate claims of the Subordinated Creditors (i.e., Stonehenge, E. Fort Wolfe, Jr., Caleb C. Fort and Valspar Corporation)) distributions in an amount equal to the Subordinated Distribution before any other distributions are made on account of Senior Unsecured Claims and, thereafter, Regions Bank shall be entitled to participate in future distributions to unsecured creditors on a pro rata basis.

At the Sale Hearing held on July 21, 2011, the Debtors requested that the Bankruptcy Court authorize the sale of the Debtors' Acquired Assets to MG Distribution.  At the Sale Hearing, Jay Jacquin, a director with Morgan Joseph, testified regarding the marketing efforts of Morgan Joseph, which included over 150 initial contacts, execution of confidentiality agreements by over 60 entities, delivery of confidential offering memorandums to over 55 entities, an ad in *The Wall Street Journal*, nine indications of interest, and three stalking horse proposals.  Mr. Jacquin testified that, even with a longer marketing period, he did not believe a higher price for the Acquired Assets could be obtained because of concerns about certain segments of the business and the likely decline in value of the Acquired Assets if the sale was postponed or delayed.  Mitch Jolley, the Debtors' CEO and/or President and Jonathan Hickman, Managing Director of A&M, the Debtors' financial advisor, testified regarding the urgency of closing the sale of the Acquired Assets immediately to prevent further erosion of inventory, loss of customer base, and alienation of vendors.  In addition, Mr. Hickman testified that the Debtors' working capital would decrease by $750,000 to $1,000,000 per week if the sale was not approved and closed in the immediate future.  Mr. Jolley testified that if the sale is not approved, it would be "curtains" for the business and both Mr. Hickman and Mr. Jacquin agreed with this assessment.  Mr. Hickman, Mr. Jolley and Mr. Jacquin all testified that without the sale of the Acquired Assets, it was almost certain that the unsecured creditors would not receive any payment on their unsecured claims under any other sale or liquidation of the business.

An order approving the Sale was entered by the Bankruptcy Court on July 25, 2011 (the "Sale Order").  The Closing of the Sale occurred on July 29, 2011.  The Debtors filed a report of sale and notice of assignment and assumption of certain contracts on August 5, 2011 (the "Report").  The Report reflected that the purchase price was $46 million less the working capital adjustment of $1,520,438.25, for a Net Purchase Price of $44,479,561.75.  As set forth in the Report, Debtors' Estates received the

21

following in connection with the closing of the Sale: (i) $2,000,000 of cash proceeds covering the Additional Claims Amount; (ii) $2,750,000 to be advanced by Regions Bank pursuant to the Regions Bank Settlement (defined below); and (iii) $1,000,000 to cover professional fees to be funded by Regions Bank from the DIP Loan.  Regions Bank received $34,407,673.68 at closing (consisting of the net proceeds of the Sale after deduction for the expenses of the Sale and distribution to the Debtors' Estates of $2,000,000).  The Debtors were holding approximately $4.34 million as of October 28, 2011 representing the Settlement Payments received as a result of the Closing of the Sale, less payment of professional fees and expenses, which funds will be used, together with the proceeds from any litigation, to wind up the Debtors' Estates, fund expenses, and make distributions under the Plan.

The terms of the Settlement Term Sheet were expressly approved in the Sale Order and incorporated therein by reference.  As a result, the Committee withdrew its objection to the Sale and its Derivative Standing Motion.  The Sale Order provided that the parties were authorized to enter into a definitive settlement agreement, without further order of the Bankruptcy Court, provided that the definitive settlement agreement was consistent with the Settlement Term Sheet.  The Committee, the Debtors and Regions Bank then entered into a Settlement Agreement dated as of July 20, 2011 (the "Regions Bank Settlement") that was consistent with the terms of the Settlement Term Sheet.  A copy of the Regions Bank Settlement is attached as <u>Exhibit A</u> to the Plan and incorporated therein.

As part of the Closing of the Sale, two escrow agreements were established, each funded with $1,000,000 from the Sale proceeds.  First, a "Working Capital Escrow Agreement" provided for a $1,000,000 escrow to be established to fund any shortfall in the working capital adjustment owed to the Buyer pursuant to terms and conditions in the APA.   Any such escrowed working capital funds not delivered to the Buyer or any funds due from Buyer to the Debtors pursuant to the working capital adjustment procedure in the APA are required to be delivered to Regions Bank and applied by it to reduce its remaining Claims.  On October 21, 2011, the Debtors filed an objection to certain amounts and calculations set forth in the Buyer's closing date net working capital calculation, which the parties are working to resolve pursuant to the terms of the APA.  It is anticipated that the working capital adjustments will be finalized by November 30, 2011 or thereafter, with any funds transferred as promptly as practicable thereafter.

Second, an "Indemnity Escrow Agreement" provides for $1,000,000 to be established to fund any direct or third party claims arising out of any alleged breach of certain warranties and representations of the Debtors under the APA.  With a limited exception, such claims against the escrowed funds are subject to a $100,000 threshold and a $1,000,000 cap.  The APA sets out the procedures for making indemnification claims and payments from the Indemnity Escrow Agreement.   The Debtors' representations and warranties subject to the indemnification rights survive for 12 months after the closing of the Sale.   Any funds in the Indemnity Escrow Agreement not delivered to the Buyer or any third party in resolution of any indemnity claims are required to be delivered to Regions Bank and applied by it to reduce its remaining Claims.

At the Closing of the Sale and pursuant to the Sale Order, MG Distribution assumed the Debtors' employee benefits agreements, including the Debtors' agreements for health and dental insurance, third party administration of employee flexible spending accounts, third party administration of the 401(k) plans, disability and life insurance plans, and union related Agreement between Five Star Group and the International Brotherhood of Teamsters, Local No. 11, dated December 20, 2008 and benefit plans.  After the Closing of the Sale, the Debtors out of an abundance of caution rejected their severance policy, which was not assumed by MG Distribution as part of the Sale.

22

13.     Change of Debtors' Corporate Names and Case Caption.

In accordance with their APA commitments, after the Closing of the Sale the Debtors filed their Motion for Order Authorizing Debtors to Change Corporate Names and Case Caption (the "Name Change Motion"). The Court entered its order approving the Name Change Motion on August 17, 2011. The Debtors served the Notice of Debtors' Change of Corporate Names and Case Caption on the Debtors' entire consolidated list of creditors and parties in interest on August 18, 2011. The Order Approving the Name Change Motion authorized the Debtors to take such action and to execute, deliver and file all instruments and documents with the proper parties in South Carolina and Delaware as necessary and appropriate to change each of the Debtor's legal names.

Consequently, the Debtors caused their names to be legally changed as set forth in the following summary chart, and such new legal names are being used in the Debtors' case caption and any pleadings filed in the Chapter 11 Cases:

| Case No. | Former Debtor Name | Post-Sale Debtor Name |
|----------|--------------------|-----------------------|
| 11-03216 | The Merit Group, Inc. | TMG Liquidation Company |
| 11-03217 | Merit Transportation, Inc. | MTrans Liquidation Company |
| 11-03218 | Merit Paint Sundries, LLC | MP Sundries Liquidation Company, LLC |
| 11-03219 | Merit Supply Company, LLC | MSupply Liquidation Company, LLC |
| 11-03220 | Merit Pro Finishing Tools, LLC | MPFT Liquidation Company, LLC |
| 11-03221 | Five Star Products, Inc. | FSP Liquidation Company |
| 11-03222 | Five Star Group, Inc. | FSG Liquidation Company |

## V.      SUMMARY OF THE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN.  THE PLAN WAS DEVELOPED BY THE DEBTORS AND THE COMMITTEE.  HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO READ THE PLAN IN FULL.  HOLDERS OF CLAIMS AND INTERESTS ARE ALSO URGED TO AND SHOULD CONSULT WITH THEIR COUNSEL AND OTHER ADVISORS IN ORDER TO UNDERSTAND THE PLAN FULLY.  IF CONFIRMED, THE PLAN REPRESENTS A LEGALLY BINDING AGREEMENT.

### A.      Introduction

Through the Plan, the Debtors seek to liquidate the Debtors' remaining assets and complete the wind-up of the Debtors' business.  The Plan provides for the appointment of the Plan Administrator, who will manage the liquidation of the Debtors' assets and wind-up of the business.  The Debtors and the Committee believe that the Plan Administrator is well qualified to conclude the efficient and orderly

23

liquidation and wind up of the Debtors. The Debtors and the Committee believe that confirmation of the Plan and liquidation of the remaining assets under the Plan will be more economical and efficient than effecting such a liquidation under chapter 7 of the Bankruptcy Code in these circumstances, including because the Plan Administrator is knowledgeable about the Debtors' assets and liabilities and focused solely on the Chapter 11 Cases and maximizing the Assets for the benefit of the Estates, and no Chapter 7 trustee commission or other Chapter 7 costs will be paid under the Plan.

The Plan provides for the treatment of Allowed Claims and Interests. A Claim is generally defined by the Plan and the Bankruptcy Code to be a right to payment from the Debtors, or from the property of the Debtors, or a right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment. The Plan defines an Allowed Claim as follows: (a) a Claim that has been listed by the Debtors on their Schedules as other than disputed, contingent, or unliquidated, to the extent that it is not otherwise a Disputed Claim; (b) a Claim for which a Proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, to the extent that it is not otherwise a Disputed Claim; or (c) a Claim that is allowed: (i) by compromise, settlement or otherwise resolved with a Creditor pursuant to the authority granted to the Plan Administrator under the Plan, as applicable; (ii) in any contract, instrument, or other agreement entered into in connection with the Plan; (iii) in a Final Order; or (iv) pursuant to the terms of the Plan.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

The Plan designates five Classes of Claims and one Class of Interests. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. To the extent that the holders of any Allowed Claims or Interests object to the Debtors' classification scheme, such objections shall be considered at the Confirmation Hearing, and if sustained, the classifications outlined below shall be deemed modified in accordance with any order sustaining such objections. Generally, the Debtors' remaining assets shall be liquidated and distributed to holders of Allowed Claims in accordance with the respective priorities set forth under the Bankruptcy Code, the Confirmation Order or any other Final Order.

Any Class of Claims that, as of the date of the commencement of the Confirmation Hearing, contains no Allowed Claims shall be deemed deleted from the Plan for purposes of determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

The Plan is premised upon the substantive consolidation of the Debtors, as set forth below. Such substantive consolidation would mean that all allowed Claims against the Debtors or their Estates shall be satisfied from the combined cash and other assets of the Debtors and the Estates.

The classification of Claims against and Interests in the Debtors, and their respective voting rights, pursuant to the Plan are as follows:

COLUMBIA 1054928v3

| Class | Status | Voting Rights |
|-------|--------|---------------|
| Class 1 – Secured Claims | Unimpaired | Deemed to Accept Plan |
| Class 2 – Non-Tax Priority Claims | Unimpaired | Deemed to Accept Plan |
| Class 3 – Convenience Claims | Impaired | Entitled to Vote |
| Class 4 – Senior Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 – Regions Deficiency Claims and Subordinated Claims | Impaired | Entitled to Vote |
| Class 6 – Interests | Impaired | Entitled to Vote |

Article III of the Plan provides for the treatment of Claims and Interests, including unclassified Claims and classified Claims as further set forth below.

**B.      Unclassified Claims**

1.      <u>Administrative Claims.</u>

a.      <u>General Administrative Claims</u>.  The Plan provides that except to the extent the holder of an Allowed Administrative Claim agrees to other, lesser treatment (or is the holder of a Claim for Statutory Fees), each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Claim the full amount thereof, without interest, in Cash, as soon as practicable after the later of (i) the Effective Date, or (ii) 30 days after the date on which such Claim becomes an Allowed Claim; provided, however, with respect to any Allowed Administrative Claim held by Regions Bank, such Administrative Claim shall not be paid on the Effective Date.  As set forth in the Regions Bank Settlement Agreement at Section 2(c), and consistent with the DIP Financing Order, upon the Closing under the APA and the effectiveness of the Regions Bank Settlement Agreement, Regions Bank ceased to be entitled to receive a share of the proceeds of the Excluded Assets and the Regions Settlement Amount as a holder of a claim under section 503(b) of the Bankruptcy Code and agreed to share in such proceeds on a pro rata basis with other general, non-priority unsecured claims.

b.      <u>Statutory Fees</u>.  The Plan provides that Allowed Administrative Claims for fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 shall be paid in Cash as such fees are due in the ordinary course in an amount equal to the amount of such Statutory Fees.

c.      <u>Bar Dates for Administrative Claims and Professional Fee Claims</u>.

(1) <u>General Administrative Bar Date Provision</u>.  Under the Plan, the holder of an Administrative Claim, other than (a) a Fee Claim, (b) a liability incurred and payable in the ordinary course of business by the Debtors (and not past due), (c) an Administrative Claim that has been Allowed on or before the Effective Date, (d) Statutory Fees, or (e) a Section 503(b)(9) Claim, must File with the Bankruptcy Court and serve on the Debtors, the Plan Administrator, and the Office of the United States Trustee, a request for payment of such Administrative Claim within 30 days after the date the Notice of

25

Effective Date is served.  Such request must include at a minimum (A) the name of the holder of the Claim, (B) the amount of the Claim, and (C) the basis of the claim.  The Plan provides that failure to File and serve such request timely and properly shall result in the Administrative Claim being forever barred and discharged unless otherwise ordered by the Bankruptcy Court.

Under the Plan, the holders of the Allowed Administrative Claims enumerated in (a)–(f) of Article VII(D)(1) of the Plan shall not be required to File a request for payment of their Administrative Claims.  The Plan provides that holders of Allowed Administrative Claims for a liability incurred and payable in the ordinary course of business by the Debtors (and not past due) under (b) above shall be paid in the ordinary course of business (to the extent not assumed under the APA), and holders of other Allowed Administrative Claim set forth in (a), (c), (d), (e) and (f) shall be paid as set forth in Article III(A)(1) of the Plan.

(2) <u>Bar Dates for Fee Claims for Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date</u>.  Under the Plan, Professionals and Entities asserting Fee Claims must File and serve on the United States Trustee, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 60 days after the date the Notice of Effective Date is served.  The Plan provides that failure to File timely and serve such application shall result in the Fee Claim being forever barred and discharged unless otherwise ordered by the Bankruptcy Court.  Pursuant to the Plan, objections to any Fee Claim must be Filed and served on the parties that were served with such Fee Claim within 21 days after the Fee Claim is Filed.

2. <u>Priority Tax Claims</u>.

Under the Plan, each holder of an Allowed Priority Tax Claim will be paid in respect of such Allowed Claim (a) the full amount thereof, without postpetition interest or penalty or other charges, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) 30 days after the date on which such Claim becomes an Allowed Claim; or (b) such lesser amount or other treatment as the holder of an Allowed Priority Tax Claim and the Debtors might otherwise agree.  The Debtors and the Plan Administrator also reserve the right under the Plan to make deferred cash payments to the holders of Priority Tax Claims in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms applicable thereto under the Plan.  The Plan provides, however, that the Plan Administrator may prepay the balance of any Allowed Priority Tax Claim at any time without penalty or other charge.

Pursuant to the Plan, the Confirmation Order shall constitute and be deemed an injunction by the Bankruptcy Court as of the Effective Date against any holder of a Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer, or director that otherwise would be liable to such holder for payment of a Priority Tax Claim or any amounts related thereto so long as no default has occurred with respect to payment of the Allowed amount of such Priority Tax Claim under the Plan.

**C.** **Classified Claims**

In addition to the treatment of unclassified Claims set forth above, the following sets forth the treatment of classified Allowed Claims and Interests under the Plan.  The Plan provides that the treatment of and consideration to be received by holders of Allowed Claims and Interests pursuant to Article III of

the Plan shall be in full and complete satisfaction and settlement of such Claims and Interests.  The Debtors' obligations in respect of Claims and Interests shall be satisfied in accordance with the terms of the Plan.

1.    Treatment of Class 1 Claim – Secured Claims (if any): Class 1 Claims are Unimpaired.

Pursuant to the Regions Bank Settlement Agreement, the Regions Bank Settlement Amount was transferred to the Debtors free and clear of all of the liens and priority claims of Regions Bank, whether arising prior to or after the Petition Date, but Regions Bank retained all of its liens upon and rights with respect to all other assets of each Debtor upon which it held a lien other than Excluded Assets and the Acquired Assets (as defined in the APA).  The Debtors are not aware of any remaining collateral in the Estates securing the Claim of Regions Bank, the Subordinated Creditors, or any other Creditor.  The Plan provides that to the extent any Secured Claim exists, however, each holder of an Allowed Class 1 Claim shall receive on account of its Allowed Secured Claim one of the following treatments as the Plan Administrator may determine in its sole and absolute discretion (and except to the extent that a holder of an Allowed Class 1 Claim has been paid by the Debtors prior to the Effective Date or agrees to other, lesser treatment): (i) the payment of Cash in an amount equal to such Allowed Class 1 Claim, including any interest on such Allowed Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (ii) surrender of the collateral securing such Class 1 Claim, in full and complete satisfaction of such Allowed Class 1 Claim.  Such payment or surrender of collateral shall occur as soon as practicable after the later of (a) the Effective Date, or (b) 30 days after the date on which such claim becomes an Allowed Claim.  The Debtors believe there will be no Allowed Class 1 Claims.

Class 1 is unimpaired, and the holders of Claims in this Class are deemed to accept the Plan and thus are not entitled to vote to accept or reject the Plan.

2.    Treatment of Class 2 Claims – Non-Tax Priority Claims: Class 2 Claims are Unimpaired.

Under the Plan, except to the extent the holder of an Allowed Class 2 Claim agrees to other, lesser treatment, each holder of an Allowed Class 2 Claim shall be paid in respect of such Allowed Claim, the full amount thereof in Cash as soon as practicable after the later of (a) the Effective Date; or (b) 30 days after the date on which such claim becomes an Allowed Claim.

Class 2 is unimpaired, and the holders of Claims in this Class are deemed to accept the Plan and thus are not entitled to vote to accept or reject the Plan.

3.    Treatment of Class 3 Claims – Convenience Claims: Class 3 Claims are Impaired.

Under the Plan, each holder of an Allowed Convenience Claim shall receive, in full satisfaction of such Claim, a Distribution equal to ten percent (10%) of the Allowed Convenience Claim in Cash as soon as practicable after the later of (a) the Effective Date; or (b) 30 days after the date on which such claim becomes an Allowed Claim.

Class 3 is impaired, and the holders of Claims in this Class are entitled to vote to accept or reject the Plan.

4.    Treatment of Class 4 Claims – Senior Unsecured Claims: Class 4 Claims are Unimpaired.

27

Under the Plan, each holder of an Allowed Senior Unsecured Claim (excluding Convenience Claims) will receive in respect of such Claim its Pro Rata Distribution of the Net Distributable Proceeds, which shall be made from time to time by the Plan Administrator in its sole discretion, and in accordance with the Plan including the terms of the Regions Bank Settlement Agreement.

Class 4 is impaired, and the holders of Claims in this Class are entitled to vote to accept or reject the Plan.

5.      Treatment of Class 5 Claims – Regions Deficiency Claim and Subordinated Claims: Class 5 Claims are Unimpaired.

Under the Plan, Regions Bank, on account of its Allowed Regions Deficiency Claim, shall be treated in accordance with the Regions Bank Settlement Agreement, which is incorporated in the Plan by reference.  Specifically, in accordance with Section 2(d) of the Regions Bank Settlement Agreement, after Distributions aggregating 10% of the principal amount of all Class 3 and Class 4 Claims collectively have been made, Regions Bank shall be authorized to receive (on account of the Allowed Regions Deficiency Claim and the aggregate Allowed Subordinated Claims of the Subordinated Creditors), Distributions in an amount equal to the Subordinated Distribution before any other Distributions are made on account of Class 4 Claims; and thereafter Regions Bank shall be authorized to participate in future Distributions to Claims in Class 4 on a Pro Rata basis (adding the Subordinated Claims of the Subordinated Creditors to the Regions Deficiency Claim for purposes of determining Regions Bank's Pro Rata share) based upon the relative amount of all general unsecured claims in Class 4, the Regions Deficiency Claim and the Subordinated Claims) at the time of each such Distribution.  If monies are escrowed or otherwise set aside pending resolution of any disputed Class 3 or Class 4 Claims, all amounts returned to or retained by the Plan Administrator after resolution of the dispute shall be remitted to Regions Bank to the extent that aggregate Distributions on account of Class 3 and Class 4 Claims collectively total 10% of such claims as hereinabove provided and Regions Bank has not received Distributions in an aggregate amount equal to the Subordinated Distribution.[6]  If Regions Bank is paid in full on account of its Regions Deficiency Claim then the Subordinated Creditors shall be authorized to participate in future Distributions to Claims in Class 4 on a Pro Rata basis based upon the relative amount of all Senior Unsecured Claims in Class 4 and the Subordinated Claims at the time of each such Distribution and subsequent distributions to Subordinated Creditors shall be made directly to each Subordinated Creditor.

Class 5 is impaired, and the holders of Claims in this Class are entitled to vote to accept or reject the Plan.

6.      Treatment of Class 6 Interests – Interests: Class 6 Interests are Impaired.

---

[6]   By way of example, if Class 3 and Class 4 Claims are $40,000,000, and the aggregate of the Regions Deficiency Claim and the Subordinated Claims of Subordinated Creditors are 40% of the total of all general unsecured claims, then after a total of $4,000,000 of distributions is made on account of Class 3 and Class 4 Claims (or 10% of the total), Regions Bank would be entitled to receive Distributions totaling $1,600,000 before any further Distributions could be made on account of any Class 4 Claims.

COLUMBIA 1054928v3

Under the Plan, holders of Allowed Interests in Class 6 shall be authorized to receive a Distribution if and only if all Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Claims in Classes 1-5 have been paid in full. As set forth in the Plan, if a distribution to Holders of Allowed Interests in Class 6 is authorized, each holder of an Allowed Interest shall receive its Pro Rata share of the available Distributable Proceeds after the payment of all Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Claims in Classes 1-5.

Class 6 is impaired, and the holders of Interests in this Class are entitled to vote to accept or reject the Plan.

D.        **Funding of the Plan and Means for Implementation**

The Plan is a liquidating chapter 11 plan. The funds for implementation of the Plan are comprised of the Regions Bank Settlement Amount, which was paid over to the Debtors at Closing, as well as prospective liquidation of the Assets of the Debtors and the Estates, including recoveries from the pursuit of Causes of Action. The Liquidation Analysis attached to the Disclosure Statement provides detailed information regarding the Debtors' Property and proposed Distribution of the funds under the Plan.

E.        **The Plan Administrator and its Role and Duties**

1.        Role of the Plan Administrator Under the Plan.

The Plan will be administered by a Plan Administrator, which will be vested with all the rights and powers of the Debtors and the Estates and all the power and authority over all Assets of the Debtors and the Estates and with the obligation to make Distributions in accordance with the Plan. The initial Plan Administrator will be selected by the Committee prior to the Confirmation Hearing, subject to approval of the Bankruptcy Court at the Confirmation Hearing. If approved by the Bankruptcy Court at the Confirmation Hearing, the person or entity so designated will become the Plan Administrator as of the Effective Date of the Plan. The Plan Administrator will be vested with and have all rights, powers, and duties (a) that the Debtors had immediately prior to Confirmation under sections 1106, 1107, 1108 and otherwise, including without limitation with respect to the Causes of Action (whether or not commenced as of Confirmation), (b) that would be vested in a chapter 11 trustee appointed prior to Confirmation under Bankruptcy Code section 1104, and (c) otherwise set forth in the Plan. The Plan Administrator will have exclusive control of the Assets, including without limitation the Causes of Action and, subject to the terms and conditions of the Plan, will be subject to the jurisdiction of the Bankruptcy Court as further set forth in the Plan. Subject to the provisions of the Plan, the Plan Administrator will have authority to authorize the sale or other liquidation of all Assets. The Plan Administrator will be the representative of the Estates and will have the capacity to sue and be sued, as provided under Bankruptcy Code section 323 and section 1123(b)(3) and otherwise under the Plan and the Bankruptcy Code. The Plan Administrator will be deemed to be the authorized representative of the Debtors and Post-Confirmation Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan, and in any judicial proceeding or appeal to which the Debtors and Post-Confirmation Debtors are a party and the representative of the Estates, all consistent with, pursuant to and as authorized herein and under section 1123(b)(3)(B) of the Bankruptcy Code, and all Causes of Action, whenever arising, shall be retained by the Debtors and the Post-Confirmation Debtors and the Estates and be enforced and/or prosecuted by the Plan Administrator as the representative of the Debtors, the Post-Confirmation Debtors and the Estates as of the Effective Date, as further set forth in the Plan.

2.        Duties of Plan Administrator.

29

The Plan Administrator will: (a) collect and reduce to Cash (to the extent possible and in the best interest of the Estates) the Assets, including without limitation, pursuing and prosecuting the Causes of Action; (b) fund the administration of the Plan, including all Plan Expenses and specifically including any Litigation Costs associated with the Causes of Action; (c) make Plan Distributions as provided in the Plan; (d) close the Estates as expeditiously as is compatible with the best interests of holders of Allowed Claims; (e) perform the duties that a chapter 11 trustee would have performed under Bankruptcy Code section 1106(a); and (f) take such other action and perform all such other duties as are consistent with the Plan, the orderly administration of the Post-Confirmation Debtors and the Estates, and the interests of holders of Allowed Claims.

   3.    <u>Rights and Powers of Plan Administrator.</u>

   Subject to the rights and powers of the Oversight Committee as expressly set forth in the Plan, the Plan Administrator will be authorized and empowered to fully act as and for the Debtors and Post-Confirmation Debtors as of the Effective Date, including without limitation, to: (a) prosecute, settle or release all Causes of Action, in accordance with the best interest of and for the benefit of the Creditors entitled to receive Distributions under the Plan; (b) liquidate the Assets, including through any pending sale motions initiated by the Debtors, but not consummated as of the Effective Date or otherwise; (c) prosecute objections to Claims; (d) dispose of any Assets in an orderly manner, as the Plan Administrator deems appropriate in his or its discretion and judgment, consistent with the terms of the Plan; (e) resolve Disputed Claims; (f) make Distributions to the holders of Allowed Claims (as their respective interests may appear in accordance with the Plan) in as prompt, efficient and orderly fashion as possible in accordance with the Plan; (g) perform administrative services related to the implementation of the Plan; (h) accept custody and control of the Assets and the Estates and the Post-Confirmation Debtors as the sole representative of the Post-Confirmation Debtors and the Estates; (i) prosecute and defend all actions affecting the Plan or the Assets or the Estates or Post-Confirmation Debtors; (j) endorse the payment of notes or other obligations of any person or to make contracts with respect thereto; (k) purchase insurance with such coverage and limits as it reasonably deems necessary, including without limitation, insurance covering liabilities of the Plan Administrator incurred in connection with its service as Plan Administrator; (l) deposit any monies or securities with any one or more banks, trust companies or other banking institutions upon such terms as specified in the Plan and those that the Plan Administrator shall determine subject to the express provisions of the Plan; (m) take such other action and perform all such other duties as are consistent with the Plan, the orderly administration of the Post-Confirmation Debtors and the Estates, and the interests of holders of Allowed Claims; (n) employ attorneys and other professionals, as further set forth below, to assist in fulfilling the Plan Administrator's obligations under the Plan; (o) to take control of and liquidate the Debtors as their sole representative; (p) complete and file all tax returns as a representative of the Debtors; and (q) engage in all other acts necessary and reasonable in performing its obligations under the provisions of the Plan.

**F.    Dissolution of the Committee and Formation of the Oversight Committee**

   1.    <u>Dissolution of the Committee.</u>

   On the Effective Date, the Committee will be dissolved and the Committee's members, agents, advisors, and representatives (including its Professionals) will be deemed relieved of all of their duties and responsibilities as members or representatives of the Committee and the foregoing will be without any further duties, responsibilities and authority in connection with the Debtors, the Chapter 11 Cases or the Plan and its implementation.

COLUMBIA 1054928v3

2.      Formation of the Oversight Committee.

On the Effective Date, the Oversight Committee will be formed and constituted. The initial Oversight Committee will consist of three (3), five (5), or seven (7) Committee members who will be appointed by the Committee. Membership on the Oversight Committee will be on an institutional and not on an individual basis. If any holder of a Claim that is a member of the Oversight Committee sells, transfers, assigns, otherwise relinquishes its Claim, or such Claim is satisfied, such holder and its assignee, designee or transferee will be deemed to have immediately resigned from the Oversight Committee. In the event that a member of the Oversight Committee resigns or is deemed to have resigned from its position on the Oversight Committee, the non-resigning Oversight Committee members will have the right to designate its successor, if any. All approvals and other actions of the Oversight Committee set forth in the Plan will be obtained or made by a majority vote of the Oversight Committee. If the Plan Administrator is not able to obtain Oversight Committee approval under the Plan, as an alternative to being authorized to take an action requiring Oversight Committee approval, the Plan Administrator may seek such authorization by filing a motion with the Bankruptcy Court, upon at least 10 days' prior notice to the Special Notice Parties.

G.      **Substantive Consolidation**

1.      Substantive Consolidation Generally.

The Plan is premised upon the substantive consolidation (for purposes of distribution and other Plan purposes only) of the Debtors, the Estates, and the Chapter 11 Cases, including without limitation, Plan voting, confirmation, Distribution, and implementation and administration of the Plan, including reporting or Filings in connection with the Plan. Substantive consolidation is an equitable remedy that courts may apply in chapter 11 cases involving affiliated debtors, among other circumstances. As contrasted with joint administration, substantive consolidation may affect the substantive rights and obligations of creditors and debtors, depending upon the nature of the requested consolidation. Substantive consolidation involves the pooling of the assets and liabilities of the affected debtors. All of the debtors in the substantively consolidated group are treated as if they were a single corporate and economic entity. Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors, and issues of individual corporate ownership of property and individual corporate liability are ignored. Substantive consolidation of two or more debtors' estates generally results in (i) the deemed consolidation of the assets and liabilities of the debtors; (ii) the deemed elimination of intercompany claims, subsidiary equity or ownership interests, multiple and duplicative creditor claims, joint and several liability claims and guarantees; and (iii) the payment of allowed claims from a common fund. It is well established that section 105(a) of the Bankruptcy Code empowers a bankruptcy court to authorize substantive consolidation.

2.      Plan Substantive Consolidation.

On and after the Effective Date, (i) all assets and liabilities of the Debtors will be treated as though they were merged, including for purposes of any reporting requirements under the Plan; (ii) all intercompany Claims between and among the Debtors will be eliminated and no Distributions will be made under the Plan on account of any Claim held by a Debtor against any other Debtor; (iii) all intercompany Interests between and among the Debtors will be eliminated and no Distributions will be made under the Plan on account of any Interest held by a Debtor in any other Debtor; (iv) all guarantees of the Debtors of the obligations of any other Debtor will be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of

31

the Debtors will be deemed one obligation of the Debtors; (v) each and every Claim Filed or to be Filed against any Debtor will be deemed Filed against, and will be one Claim against and obligation of, the Debtors; and (vi) any duplicate claims (identical in both subject matter and amount) Filed against different Debtors will be deemed automatically expunged, so that only one claim survives against the consolidated Debtors.

      3.      <u>Plan as Motion; Objections; Hearing</u>.

      The Plan will serve as a motion seeking entry of an order substantively consolidating the Debtors, the Chapter 11 Cases, and the Estates, in the manner described above and in the Plan.  Any objections to substantive consolidation under the Plan must be made in writing by a Creditor or other party-in-interest affected by the Plan by the date fixed by the Bankruptcy Court as the Plan objection deadline.  In the event any such objections to substantive consolidation are timely Filed, a hearing with respect thereto will be scheduled by the Bankruptcy Court, which hearing may coincide with the Confirmation Hearing or be held at any earlier time established by the Bankruptcy Court.  Entry of the Confirmation Order will constitute the approval, pursuant to sections 1129 and 105(a) of the Bankruptcy Code, of the substantive consolidation of the Debtors, effective as of the Effective Date.

      4.      <u>Benefits of Substantive Consolidation in the Chapter 11 Cases</u>.

      The Debtors and the Committee believe that substantive consolidation will, inter alia, save the Debtors certain administrative costs by permitting them to solicit votes on the Plan as a single chapter 11 plan instead of separately soliciting votes on Plan acceptance for each of the Debtors, or presenting a more complicated plan.  If the requested substantive consolidation is not granted, the Debtors would be forced to divide each of the classes provided for by the Plan into multiple subclasses.  The Debtors and the Committee believe that such a result would confuse creditors and interest holders without adding to their ability to decide whether to accept or reject the Plan.

      The Debtors and the Committee believe that the substantive consolidation of the Debtors for Plan purposes, as further described in the Plan is necessary, will greatly benefit the administration of the Estates and distributions by the Plan Administrator, and will not prejudice the vast majority of creditors (including those looking to any Debtor individually to satisfy their claims).  The Debtors and the Committee also believe that substantive consolidation is appropriate because of the Debtors' common ownership as well as their shared senior management, employees, administrative and other services as well as certain shared financial obligations.  In addition, the Debtors historically reported financial results as a consolidated entity under the Merit Group name, and the Debtors' general ledger is not set up specifically by legal entity.  The Debtors' inventory and accounts payable also are not recorded and tracked by legal entity, but rather by warehouse.  Furthermore, it would cost the Estates a significant amount of time and resources to prepare required monthly operating reports and potentially increase the required quarterly fees absent substantive consolidation.  Consequently, the Debtors and the Committee believe that such substantive consolidation as contemplated in the Plan will greatly benefit the Estates.

      5.      <u>No Prejudicial Effects</u>.

      The substantive consolidation effected pursuant to the Plan will not be construed as an election of remedies and will not affect or prejudice: (i) the legal and organizational structure of the Debtors (other than for purposes related to funding Distributions and other purposes under the Plan as set forth above); (ii) any Claims or defenses of the Debtors existing prior to such substantive consolidation or at any time, whenever asserted, including without limitation any insider or other claims; (iii) requirements for any

32

third party to establish mutuality in order to assert a right of setoff; (iv) Distributions out of any insurance policies or proceeds of such policies; or (v) any similar or analogous rights of the Debtors or the Estates, including any which may constitute a right or asset of any Debtor or Estate. Without limiting the generality of the foregoing, all Claims held by any Debtor against any non-Debtor will be unaffected by substantive consolidation under the Plan.

###### H. Vesting of Assets and Retention of Causes of Action

Notwithstanding Bankruptcy Code section 1141(b) or any other provision of the Plan, all Assets of the Debtors and the Estates, including without limitation the Causes of Action and other Property, will be retained and remain property of the Estates or the Post-Confirmation Debtors, as applicable, and subject to enforcement by the Plan Administrator as provided in the Plan in accordance with section 1123(b)(3) following Confirmation of the Plan. Each of the Post-Confirmation Debtors and the Estates will continue in existence under the direction and control of the Plan Administrator, as the authorized representative of each of the foregoing, in accordance with and as further set forth in the Plan. On and after the Effective Date, except as specifically provided otherwise in the Plan: (1) the Assets shall be free and clear of all claims, liens, charges, interests and other encumbrances, and (2) the Plan Administrator shall liquidate the Assets and otherwise deal with the Assets in accordance with the Plan free of any restrictions of the Bankruptcy Code.

###### I. Continued Existence of Debtors and Estates After the Effective Date

1.  <u>Post-Confirmation Debtors and Estates</u>.

From and after the Effective Date, the Post-Confirmation Debtors and the Estates will continue in existence under the direction and control of the Plan Administrator as set forth in the Plan for the purpose of (a) winding up their affairs, (b) facilitating the liquidation, by conversion to Cash or other methods, of the Assets of the Debtors and the Estates, (c) enforcing and prosecuting Claims, interests, rights and privileges of the Debtors in conjunction with the marshaling of the Assets, (d) resolving Disputed Claims, (e) administering the Plan, and (f) filing appropriate tax returns. Each Debtor will continue to exist as a Post-Confirmation Debtor until dissolved, administratively or otherwise, in accordance with the Plan by the Plan Administrator.

2.  <u>Corporate Governance after the Effective Date</u>.

The Plan and the Debtors as the Post-Confirmation Debtors will be administered by the Plan Administrator, in consultation with the Oversight Committee as specified in the Plan, and all actions taken in the names of the Debtors and Post-Confirmation Debtors and the Estates will be taken through the Plan Administrator. On the Effective Date, automatically and without further action, (a) each existing member of the respective board of directors or other governing body of each of the Debtors and all of the officers of each of the Debtors and any managers or members with governing authority, to the fullest extent applicable, will be terminated and relieved of any further obligations or duties to the Debtors, and (b) the Plan Administrator will be deemed to have the sole authority to act for the Debtors, without any approval of any of the Debtors' officers and directors or members. From and after the Effective Date, all bylaws, articles or certificates of incorporation and related corporate documents are amended and deemed amended by the Plan to permit and authorize such sole appointment of the Plan Administrator. Nothing in the Plan shall constitute a waiver of any claims the Estates, the Debtors, or the Plan Administrator have against the Debtors' officers and directors.

33

The Plan Administrator will serve as the sole representative of the Post-Confirmation Debtors as set forth in the Plan through the earlier of the date that the (x) Post-Confirmation Debtors are dissolved in accordance with the Plan, or (y) the Plan Administrator resigns, is terminated or unable to serve and is replaced with a successor in accordance with the provisions of the Plan, at which time such successor will be deemed to be appointed the sole representative of the Post-Confirmation Debtors and will serve in such capacity until the Debtors are dissolved in accordance with the Plan.  As of the Effective Date, any officers or directors for any of the Debtors (other than the Plan Administrator) will be deemed to be terminated by the Bankruptcy Court pursuant to the Plan.

### J.    Treatment of Executory Contracts and Leases and Bar Date for Rejection Claims

1.    Rejection of Executory Contracts.

Except as otherwise specifically provided in the Plan, as of the Confirmation Date, all executory contracts and unexpired leases not previously assumed or rejected by the Debtors on the Confirmation Date, will be automatically rejected without further notice or order of the Bankruptcy Court.

2.    Bar Date for Rejection Claims.

a.    Contracts and Leases Rejected Prior to Confirmation Date.  Each Person or Entity who is a party to an executory contract or unexpired lease rejected by the Debtors prior to the Confirmation Date, including Post-Closing Agreements rejected prior to the Confirmation Date, must comply with the applicable Bar Date, if any, established by the motion and order rejecting such executory contract or unexpired lease for Claims arising from the rejection or, if none, by the Bar Date established in Article V(F)(2) under the Plan.

b.    Contracts and Leases Rejected under Plan.  Each other Person or Entity who is a party to an executory contract or unexpired lease rejected by the Debtors under the Plan must File a Proof of Claim for damages alleged to arise from the rejection of such executory contract or unexpired lease, or be forever barred, within 30 days after the date the Notice of Effective Date is served.

c.    Post-Closing Agreements Rejected after Confirmation Date.  Each Person or Entity who is a party to a Post-Closing Agreement that is rejected after the Confirmation Date must File a Proof of Claim for damages alleged to have arisen from the rejection of such executory contract or unexpired lease, or be forever barred, within 30 days after notice of rejection of the Post-Closing Agreement has been Filed and served on such party to the Post-Closing Agreement.  Any Proof of Claim required to be Filed under Article V(F)(2) or (3) of the Plan must be Filed with the Claims Agent and served on the Plan Administrator in accordance with the notice provisions of the Plan not later than the applicable Bar Date.

### K.    Payment and Distributions on Claims

1.    Manner of Payment.

Any payment in Cash to be made by the Debtors or the Plan Administrator will be made, at the election of the Plan Administrator or the Debtors, by check drawn on a domestic bank or by wire transfer from a domestic bank.

34

2.       Funds and Accounts for Payment of Claims and Plan Implementation.

As soon as practicable after the Effective Date, the Plan Administrator will establish and maintain the following funds and/or accounts to implement the Plan:

a.       Disputed Claims Reserve.    As of and after the Effective Date, the Plan Administrator will establish and maintain an account which will be called the Disputed Claims Reserve, into which the Plan Administrator will deposit potential Distributions to holders of Disputed Claims in accordance with the terms of the Plan.  Such Disputed Claims Reserve will be maintained by the Plan Administrator until each Disputed Claim in each respective class has been allowed or disallowed by Final Order of the Bankruptcy Court.  Thereafter, any excess funds in the Disputed Claims Reserve will be transferred to the Operating Account or other account established by the Plan Administrator to make Distributions to holders of Allowed Claims in accordance with the Plan.

b.       Operating Account.  As of and after the Effective Date, the Plan Administrator will establish and maintain an account called the Operating Account.  The Plan Administrator will pay all Plan Expenses and related costs of the Post-Confirmation Debtors and the Estates from the Operating Account.  Distributions to holders of Allowed Claims also may be made by the Plan Administrator out of the Operating Account, or a separate account may be established for this purpose in the Plan Administrator's discretion.  To the extent the Plan Administrator determines that the existing funds in the Operating Account are insufficient for such purposes, the Plan Administrator may transfer additional Cash as needed to the Operating Account to fund such Plan Expenses or Distributions, as the case may be.

c.       Other Accounts.   The Plan Administrator may, in its discretion and in a commercially reasonable manner, establish such other accounts as it deems necessary or advisable, including without limitation separate Distribution accounts, payroll accounts, tax escrow accounts, and any other accounts deemed necessary or desirable to implementation of the Plan.

3.       Interim and Final Distributions.

The Plan Administrator will be authorized (but not required) to made interim Distributions, upon obtaining approval of the Oversight Committee or the Bankruptcy Court.  The Plan Administrator will make a final Distribution ("Final Distribution") of all Net Distributable Proceeds to Creditors entitled to Distributions under the Plan only after (i) all Property and Assets of the Debtors, Post-Confirmation Debtors and the Estates have been converted to Cash or abandoned; (ii) all Disputed Claims have been finally resolved; (iii) the applicable 60-day time period regarding all Creditors' rights to claim unclaimed property in accordance with the Plan shall have passed; and (iv) the fees and expenses of the Plan Administrator and Oversight Committee will have been paid in full (including any fees and expenses reasonably anticipated to be incurred after the Final Distribution in order to close or wind up the Debtors, the Estates or the Chapter 11 Cases as applicable) in accordance with the Plan.

**L.       Effects of Confirmation**

1.       No Discharge.

Under the Plan, the effects of Confirmation will be as provided under Bankruptcy Code sections 1141(a), (b), (c), and (d)(3).  The Debtors and the Estates will continue to exist following Confirmation and until there is a Final Distribution.  Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtors will not be discharged by Confirmation or under the Plan.

2.      <u>Preservation of Causes of Action</u>.

a.      <u>Causes of Action Retained and Preserved For Enforcement</u>.  Upon the occurrence of the Effective Date, all Causes of Action of any of the Debtors or the Estates will be retained and preserved for enforcement by the Post-Confirmation Debtors and the Estates as applicable, with the Plan Administrator appointed and approved by the Bankruptcy Court as the authorized representative of each of the Debtors and the Estates under the Plan (and with respect to any judicial proceeding or appeal to which any Debtor is a party) pursuant to the Bankruptcy Code including section 1123(b)(3)(B).  The Plan Administrator will have the power and right to commence, continue, and otherwise enforce any Causes of Action of the Debtors and/or the Estates, all of which shall be retained and preserved under the Plan, notwithstanding confirmation and/or consummation of the Plan.  Potential Causes of Action currently being investigated by the Debtors and the Committee, which may but need not be pursued by the Debtors or the Committee prior to the Effective Date and by the Plan Administrator after the Effective Date as warranted but which will be retained after Confirmation regardless include, without limitation, the following:

(1)  <u>Specified Causes of Action</u>.   Causes of Action, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, including, without limitation, the following: all potential Causes of Action listed or referenced in the Debtors' Schedules, which are incorporated herein and in the Plan by reference; the Five Star Claims; claims related to the Deficiency Letter, including indemnity claims; possible claims against vendors, landlords, sublessees, assignees, customers or suppliers for warranty, indemnity, back charge/set-off issues, overpayment or duplicate payment issues and collections/account receivables matters; deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor, landlord, sublessee, assignee, or other Person or Entity; employee, management or operational matters; claims against landlords, sublessees and assignees arising from the various leases, subleases and assignment agreements relating thereto, including, without limitation, claims for overcharges relating to taxes, common area maintenance and other similar charges; financial reporting; environmental, and product liability matters; actions against insurance carriers relating to coverage, indemnity or other matters; actions against current or former officers, directors, employees, parents, subsidiaries, affiliates, or tax or pension or other control group members; counterclaims and defenses relating to notes or other obligations; contract or tort claims which may exist or subsequently arise;

(2)  <u>Avoidance or Subordination Actions</u>.  Any and all avoidance or subordination or other actions pursuant to any applicable section of the Bankruptcy Code, including, without limitation, sections 510, 544, 545, 547, 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code, and other similar state laws such as fraudulent conveyance and preference and other creditors' rights statutes or state or federal common law, which may involve lenders or insiders of the Debtors or other third parties, arising from any transaction involving or concerning the Debtors, including the Causes of Action listed on the Non-Exclusive Schedule of Potential Chapter 5 Causes of Action against Non-Insiders, annexed hereto as **<u>Exhibit C-1</u>**, and the Non-Exclusive Schedule of Potential Chapter 5 Causes of Action against Insiders, annexed hereto as **<u>Exhibit C-2</u>**; and

(3)  <u>Any and all other Claims and Causes of Action of the Debtors</u>.  In addition, there may be numerous other Causes of Action which currently exist or may subsequently arise that are not set forth herein or in the Plan including because the facts upon which such Causes of Action are based are not currently or fully known by the Debtors and, as a result, cannot be raised prior to Confirmation (collectively, the "Unknown Causes of Action").  The failure to list any such Unknown Cause of Action

36

herein, in the Plan, or in other Plan documents is not intended to limit the rights of the Plan Administrator or the Oversight Committee to pursue any Unknown Causes of Action including to the extent facts underlying such Unknown Cause of Action subsequently become known to the Debtors, the Plan Administrator, the Oversight Committee, or other parties in interest.

   b. <u>Statement of Intent to Retain all Potential Causes of Action</u>.  Unless Causes of Action against a Person or Entity are expressly waived, relinquished, released, compromised or settled in the Plan or by any Final Order, the Debtors and Post-Confirmation Debtors and Estates, on behalf of themselves and holders of Allowed Claims and in accordance with Bankruptcy Code including section 1123(b)(3)(B), expressly reserve and will retain for enforcement post-Confirmation and post-consummation all Causes of Action and Unknown Causes of Action, including, without limitation, the Causes of Action described herein and in the Plan as well as any other Causes of Action including Unknown Causes of Action, that the Debtors or the Estates had or had the power to assert immediately before Confirmation, for adjudication or later adjudication, and, therefore, no waiver or preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation or consummation of the Plan.  In addition, the Debtors and the Estates expressly reserve and retain the right to pursue or adopt or otherwise enforce (and the right of the Plan Administrator to do so) any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, including without limitation any lawsuits described in the Disclosure Statement or otherwise existing, against any Person, including without limitation the plaintiffs and co-defendants in such lawsuits.  Nothing contained in the Plan will constitute a waiver of the rights, if any, of the Debtors or Post-Confirmation Debtors or the Estates, through the Plan Administrator, to a jury trial with respect to any Cause of Action or objection to any Claim or Interest.

   c. <u>Representatives of the Estates</u>.  In accordance with the Bankruptcy Code including section 1123(b)(3), any claims, rights, and Causes of Action that the respective Debtors, Post-Confirmation Debtors, Estates, or post-Confirmation Estates may hold or have the power to commence at any time against any Person or Entity will be preserved and retained and enforced by the Plan Administrator, and the Plan Administrator will have the right to continue or commence or otherwise enforce, as the authorized representative of the Debtors and the respective Estates and Post-Confirmation Debtors, any and all such claims, rights, or Causes of Action.  The Plan Administrator may pursue any and all such claims, rights, or Causes of Action, as appropriate, in accordance with the best interests of the holders of Allowed Claims.  Subject to the provisions of the Plan, the Plan Administrator will have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Causes of Action.  Entry of the Confirmation Order will serve as express approval by the Bankruptcy Court of the appointment of the Plan Administrator under the Bankruptcy Code including section 1123(b)(3) as set forth in the Plan.  Notwithstanding any other provision of the Plan, the Bankruptcy Court or District Court, as the case may be, will retain jurisdiction over all Causes of Action both before and following Confirmation and the Effective Date of the Plan until all such Causes of Action have been finally adjudicated and all judgments arising out of such Causes of Action have been collected, settled, or discharged.

   3. **Limited Plan Exculpation**.  **The Debtors, the Post-Confirmation Debtors, the Committee, the Plan Administrator, Oversight Committee, and each of their respective members, officers, directors, advisors, agents, attorneys, and employees (including Professionals) (collectively, the "Exculpated Persons") will neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken by any Exculpated Person in connection with or related to the**

37

**formulation, negotiation, preparation, dissemination, implementation, administration, Confirmation or consummation of the Plan, this Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan (except for any obligations of the Post-Confirmation Debtors, the Estates, or the Plan Administrator arising in the ordinary course of business), or any other act taken or omitted to be taken in connection with the Chapter 11 Cases. The Exculpated Persons will have no liability to any Debtor, holder of a Claim, holder of an Interest, other party in interest in the Chapter 11 Cases or any other Person or Entity for actions taken or not taken in the Chapter 11 Cases, or under the Plan, in connection herewith or with respect hereto, or arising out of their administration of the Debtors or the Estates after the Petition Date, the Plan or the property to be distributed under the Plan, including failure to obtain Confirmation of the Plan or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects such Exculpated Persons will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or with respect to the Chapter 11 Cases. Provided, however, that the foregoing provisions of this paragraph will have no effect on the liability of any Exculpated Person that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence or other willful misconduct, and also shall have no effect on any liabilities arising from acts taken or omitted prior to the Petition Date.**

4.    **Injunction.    From and after the Effective Date, all Persons and Entities are permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, Cause of Action, Interest or remedy against the Debtors or the Estates.**

As of the Effective Date, all Persons or Entities that have held, currently hold, or may hold a Claim, Interest, or other debt or liability against the Debtors are permanently enjoined from taking any of the following actions on account of any such Claim, Interest, debt, or liability: (i) commencing or continuing in any manner any action or other proceeding against the Debtors, the Plan Administrator, the Oversight Committee, the Property, or the Assets, other than to enforce any right pursuant to the Plan to a Distribution; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtors, the Plan Administrator, the Oversight Committee, the Property, or the Assets, other than as permitted pursuant to the Plan; (iii) creating, perfecting, or enforcing any lien or encumbrance against the Debtors, Plan Administrator, the Oversight Committee, the Property, or the Assets; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or Plan Administrator, the Oversight Committee, other than as permitted pursuant to the Plan; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

Upon Confirmation of the Plan, each holder of any Claim and all Creditors and other Persons and Entities will be deemed to have specifically consented to the injunctions set forth in the Plan.

5.    Plan Terms Binding.  Upon the entry of the Confirmation Order, all provisions of the Plan, including all agreements, instruments and other documents Filed in connection with the Plan and executed by the Debtors or the Plan Administrator in connection with the Plan, shall be binding upon the Debtors, the Committee, the Post-Confirmation Debtors, the Estates, the Plan Administrator, the Oversight Committee, all Claim and Interest holders and all other Persons that are affected in any manner by the Plan. All agreements, instruments and other documents Filed in connection with the Plan shall have full force and effect, and shall bind all parties thereto as of the entry of the Confirmation Order,

38

whether or not such exhibits actually shall be executed by parties other than the Debtors or the Plan Administrator, or shall be issued, delivered or recorded on the Effective Date or thereafter.

6.      <u>Continuation of Pre-Confirmation Injunction or Stays</u>.  All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Cases pursuant to sections 105, 362, or 525 of the Bankruptcy Code or otherwise that are in effect on the Confirmation Date shall remain in full force and effect until the Final Decree.  Provided, however, that with regard to Causes of Action of any of the Debtors, the Post-Confirmation Debtors or the Estates, the scope of the injunctions and stays as provided for herein shall not preclude any party from propounding otherwise permissible discovery (written or oral) upon the Plan Administrator, the Estates, the Debtors or the Post-Confirmation Debtors.

### M.      **Miscellaneous Plan Provisions**

1.      <u>Exemption from Transfer Taxes</u>.

Pursuant to section 1146 of the Bankruptcy Code, the Confirmation Order, and any sale orders entered in the Chapter 11 Cases, the transfer or making or delivery of any instrument of transfer in furtherance of or in connection with the Plan including, without limitation, any transfers under the Plan or abandonment or Dispositions, subsequent transfers to Creditors or purchasers, or any assignments, documents, instruments and agreements and other conveyance documents executed and delivered by the Debtors or the Plan Administrator in connection with the sale of the Debtors' assets or the Assets to any purchaser or Creditor in furtherance of the wind-up of the Estates or otherwise, will not be subject to any stamp or similar taxes such as real estate transfer, personal property, recording or other similar taxes.

2.      <u>Effectuating Documents, Further Transactions and Corporate Action</u>.

The Debtors, the Committee, the Plan Administrator, the Oversight Committee, all holders of Allowed Claims receiving Distributions under the Plan, and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary to effectuate the provisions and intent of the Plan and the Plan documents.  As of or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the board of directors or managers or other governing body of the Debtors will be deemed to have occurred and will be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable general corporation law of the state in which the applicable Debtor is organized without any requirement of further action by the governing body of the applicable Debtor.

3.      <u>Reservation of Rights</u>.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Confirmation Order will continue to be in effect.  The filing of the Plan, any statement or provision contained in the Plan, or any document prepared in connection with the Plan including the Disclosure Statement, or the taking of any action by the Debtors, Plan Administrator, or the Oversight Committee, as the case may be, will not be and shall not be deemed to be an admission or waiver of any rights of the Debtors, the Estates, the Committee, the Plan Administrator or the Oversight Committee with respect to the holders of Claims or Interests or otherwise.

4.      <u>Conflicts</u>.

To the extent any provision of the Disclosure Statement, and any documents executed in connection therewith (or any exhibits, schedules, appendices, supplements or amendments to the foregoing) conflicts with or is in any way inconsistent with the terms of the Plan or Confirmation Order, the terms and provisions of the Plan or Confirmation Order as applicable shall govern and control.

AS STATED PREVIOUSLY, THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN, AND IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN, BUT TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS AND THE DEFINITIONS SET FORTH IN THE PLAN (WHICH IS INCLUDED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT).  IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND CONSULT WITH THEIR LEGAL AND OTHER ADVISORS BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

## VI.   FINANCIAL INFORMATION

The Debtors have filed their Schedules with the Bankruptcy Court as required by the Bankruptcy Code.  The Debtors will supplement and amend their Schedules as may be necessary and appropriate from time to time. The Plan Administrator will file operating reports from the Effective Date until the case is closed.  The monthly reports and Schedules have not been included in this Disclosure Statement, but may be examined at the Clerk's Office, United States Bankruptcy Court, District of South Carolina, J. Bratton Davis United States Court House, 1100 Laurel Street, Columbia, SC  29202.  A copy of the Debtors' most recent monthly report can be obtained on the Bankruptcy Court's electronic data base (Pacer) located at its web page (www.scb.uscourts.gov/webpacer/webpacer.htm) and at the web page for the Debtors' Claims Agent (www.kccllc.net/MeritGroup) or by contacting Debtors' counsel.

## VII.   CERTAIN TAX CONSEQUENCES

Subject to the limitations noted below, the following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan relevant to holders of Claims entitled to vote with respect to adoption of the Plan.  This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), in effect on the date of this Disclosure Statement, on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, and on judicial and administrative interpretations thereof available on or before such date.  All of the foregoing is subject to change, which change could apply retroactively and could affect the tax consequences described below.  There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS or opinion of counsel has been sought with respect to any issues that may arise under the Plan.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable, including to any particular holder. The tax treatment of a holder of a Claim or an Interest will vary depending upon such holder's particular situation.  The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtors or to a holder of a Claim or an Interest.  This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions,

insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold a Claim as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, and persons who are not U.S. persons (as defined in the Code).

No statement in this Disclosure Statement should be construed as legal or tax advice. The Debtors and their Professionals do not assume any responsibility or liability for tax consequences that the holder of a Claim or an Interest may incur as a result of the treatment afforded a Claim or Interest under the Plan.

EACH HOLDER OF A CLAIM OR AN INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE PLAN, INCLUDING ANY APPLICABLE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

## TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON SUCH HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE PLAN PROPONENTS; AND (C) HOLDERS OF CLAIMS OR INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **Federal Tax Consequences to the Debtors**

The Debtors are either subchapter S corporations or limited liability companies whose membership interests are held by subchapter S corporations. As a subchapter S corporation or limited liability company, each Debtor is a pass through entity for federal income tax purposes. As a result, any income tax liabilities or other attributes arising as a result of or in connection with the execution of the Plan will generally flow through to the shareholders of the applicable subchapter S corporation (the "Shareholders").

Subject to certain limitations, any losses reported on previous tax returns were passed through to the Shareholders. These losses and any refunds or tax benefits attributable thereto are personal to the Shareholders, and are not available to creditors as an asset of the Debtor. Subject to certain limitations, the same is true with respect to anticipated losses for the 2011 tax year.

The subchapter S corporation Debtors have not elected subchapter S corporation status during their entire existence. Such subchapter S corporations may be subject to corporate-level built-in gains taxes or corporate-level taxes on excessive passive investment income generated during operations or in connection with asset sales.

Some of the Debtors' debts cannot be paid in full under the Plan and will therefore likely be deemed partially discharged for tax purposes even though the Plan, as a liquidating chapter 11 plan, does

41

not provide for a bankruptcy discharge.  As a result, the Debtors would recognize cancellation of indebtedness ("COD") income in an amount equal to the effectively discharged debt, to the extent the accrual of such debt has generated a tax deductible expense for, or were capitalized and included in the tax basis of assets of, the Debtor.  This income (a) will be excluded from the Debtor's taxable income under Section 108(a)(1)(A) of the Code, (b) will not be passed through to the Shareholders, and (c) will not generate increases in the Shareholders' basis in their stock under Section 1367 of the Code.  At the close of the year in which the discharge occurs, the Debtors will be required to reduce certain tax attributes by an amount up to the COD income excluded from taxable income.  The tax attributes subject to reduction include:  (a) certain net operating losses for the taxable year of the discharge and any net operating loss carryovers to that year (i.e., the aggregate amount of shareholders losses or deductions that are disallowed under Section 1366(d)(1) of the Code); and (b) the basis in the Debtors' assets.  Holders of Interests with shares of Debtors that are subchapter S corporations should consult with their tax advisor regarding the cancellation of indebtedness and the possible reduction of the tax attributes of the Debtors under the Plan.

**B.**        **Federal Tax Consequences to Holders of Claims or Interests**

The federal income tax consequences of the implementation of the Plan to the holders of Allowed Claims or Interests will depend on, among other things, the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder receives distributions under the Plan in more than one taxable year, and whether the holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.

In general, a holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's tax basis in the Claim.  Any gain or loss recognized may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount.  If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation.  The holder's tax basis for any property received under the Plan generally will equal the amount realized.  Most Distributions contemplated by the Plan will be Cash, although the Plan also provides for other property to be Distributed in some circumstances, including if the Debtors or Plan Administrator determine that any Secured Creditor exists which should receive its collateral back under the Plan.  The holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received by the holder under the Plan on the Effective Date or a subsequent distribution date, less the amount (if any) treated as interest, as discussed below.

Because certain holders of Allowed Claims may receive Cash distributions after the Effective Date, the imputed interest provisions of the Code may apply and cause a portion of the subsequent distributions to be treated as interest.  Additionally, because holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred.  All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

Holders of Allowed Claims will recognize ordinary income to the extent that they receive Cash or property that is allocable to accrued but unpaid interest that the holder has not yet included in its income.  If an Allowed Claim includes interest, and if the holder receives less than the amount of the Allowed Claim pursuant to the Plan, the holder must allocate the Plan consideration between principal and interest.

42

Holders of Allowed Claims should consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

A holder who receives in respect of a Claim or an Interest an amount less than the holder's tax basis in the Claim or Interest may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under Section 166(a) of the Code, a loss under Section 165(a), or a worthless securities deduction under Section 165(g) of the Code. The rules governing the character, timing and amount of bad debt, loss, and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims or Interests, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

C.       **Backup Withholding Tax and Information Reporting Requirements**

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain non-corporate holders. Information reporting generally will apply to payments under the Plan, other than payments to an exempt recipient. A payor will be required to withhold backup withholding tax from any payments made under the Plan, other than payments to an exempt recipient, if such holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements.

THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR OR INTEREST HOLDER. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

VIII.  **FEASIBILITY OF THE PLAN AND BEST INTERESTS OF THE CREDITORS**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that (i) the plan is accepted by all impaired classes of Claims and Interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) the plan is feasible, and (iii) the plan is in the "best interests" of creditors and holders of Claims and Interests impaired under the plan.

A.       **Acceptance of the Plan**

In order for an Impaired Class of Claims or Interests to accept the Plan, (a) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Claims or Interests actually voting in such Class must have voted to accept the Plan and, with respect to Claims only, (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

The holders of Claims in Classes 3, 4 and 5 and holders of Interests in Class 6 are entitled to vote to accept or reject the Plan.  Classes 1 and 2 are either unimpaired or have previously been paid in full and therefore are not entitled to vote.

If any class of Claims or Interests votes to reject the Plan or is deemed to reject the Plan, the Plan shall constitute a request that the Bankruptcy Court confirm the Plan over such rejection in accordance with section 1129(b) of the Bankruptcy Code.  The Debtors and the Committee reserve the right to jointly alter, amend, modify, revoke or withdraw the Plan or the Disclosure Statement, including any exhibit or attachment, if necessary to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

**B.        Feasibility**

As a condition to confirmation, section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation of the reorganized debtor, unless such liquidation is proposed in the plan.  Since liquidation is proposed in the Plan, the Plan complies with this provision of chapter 11.

**C.        "Best Interests" Test**

Even if the Plan is accepted by the requisite holders of Claims and Interests, the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan is in the best interests of all holders of Claims and Interests that are impaired by the Plan and that have not accepted the Plan.  The "best interest" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find either (a) that all members of an impaired class of claims or interests have accepted the Plan or (b) that the Plan will provide a creditor that has not accepted the plan with a recovery of property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Although the Plan is comparable in many respects to a chapter 7 liquidation, the principal advantage of the Plan is that it vests the right to liquidate the Debtors' remaining assets and pursue Causes of Action in the Plan Administrator who is familiar with and focused exclusively on winding down the Debtors and maximizing their assets and distributions on the Claims.  This avoids the costs and expense of having a chapter 7 trustee administer the liquidation.

The Debtors and the Committee believe that the Plan Administrator will achieve better results than a chapter 7 trustee, without the incurrence of additional chapter 7 administrative expenses.  In particular, a chapter 7 trustee and his or her professionals would spend considerable time, incur substantial expense and consume significant resources as they educate themselves about the Debtors, the Estates, and the Chapter 11 Cases.  Moreover, the Debtors and Committee believe that the Plan Administrator is more likely to obtain a higher value for the remaining assets because of the Liquidating Supervisor's focused approach and knowledge base concerning the assets.  Accordingly, in their judgment, confirmation of the Plan with the Plan Administrator in place post-confirmation is preferable to a chapter 7 liquidation.  See also the Liquidation Analysis attached as **Exhibit D** (to be filed at least two days prior to the deadline established to file objections to this Disclosure Statement), which is based upon various assumptions, including that the Bankruptcy Court approves substantive consolidation.

THE LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY PURPOSE OTHER THAN  PROCEEDINGS RELATING TO CONFIRMATION OF THE

PLAN.  NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY OF THE DEBTORS OR THE COMMITTEE FOR ANY PURPOSE.  The assumptions used in developing these analyses are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors or Committee.   Accordingly, there can be no assurances that the values assumed in the Liquidation Analysis would be realized.

FOR THE FOREGOING REASONS, THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF EACH CLASS OF CREDITORS AND THAT EVERY IMPAIRED CLASS WILL RECEIVE DISTRIBUTIONS UNDER THE PLAN WHICH ARE AT LEAST EQUAL IN VALUE TO THE DISTRIBUTIONS SUCH CLASSES WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS.

> ### D.    Confirmation Without Acceptance of All Impaired Classes

If any class of Claims or Interests votes to reject the Plan, the Debtors and the Committee will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it is not accepted by all impaired classes of claims and interests, as long as at least one impaired class of claims has accepted the Plan.  A bankruptcy court may confirm a plan notwithstanding the rejection or deemed rejection of an unimpaired class of claims or interests if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has rejected, or is deemed to have rejected, the plan.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (ii) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

In the event it becomes necessary to "cramdown" the Plan over the rejection of Classes 3, 4, 5 and 6, the Debtors and the Committee will demonstrate at the Confirmation Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to such Classes.

## IX.    <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

Holders of Claims against and Interests in the Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or

reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

### A.    Risk of Non-Confirmation of Plan

Although the Debtors and the Committee believe the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate a re-solicitation of votes.

### B.    Risk of Non-Occurrence of Effective Date or Withdrawal or Revocation of Plan

Although the Debtors and the Committee believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the Confirmation Order is vacated or revoked or the Effective Date does not occur for any other reason, the Plan shall be null and void in all respects. The Plan provides that nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by, against, or Interests in, the Debtors or the Committee; (2) prejudice in any manner the rights of the Debtors or the Committee; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors or the Committee in any respect.

The Debtors and the Committee also reserve the right to jointly revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors and the Committee revoke or withdraw the Plan, then the result of this shall be the same as if the Confirmation Order had not been entered.

### C.    Litigation Risks

A portion of the property to be distributed to Creditors pursuant to the Plan includes potential recovery on litigation claims. The outcome of such litigation is impossible to predict. It is possible that the Debtors and/or the Estates may recover nothing at all on account of such litigation. The risks of such litigation include, but are not limited to, those associated with defenses and counter-claims of opposing parties to the litigation, the delay and expense associated with discovery and trial of factually intensive and complex disputes, the additional delay and expense inherent in appellate review, the unavailability or diminishing availability of the Debtors' former employees to serve as witnesses because they have moved from the geographic area or have otherwise become unavailable and the impossibility of predicting judicial outcomes and difficulty in collecting favorable judgments.

### D.    Overall Risks to Recovery by Holders of Claims in Classes 3, 4 and 5 and Holders of Interests in Class 6

In addition to the risks described above, the ultimate recovery under the Plan to holders of Claims in Classes 3, 4 and 5 and holders of Interests in Class 6 (as to which Interests any recovery is unlikely) depends upon the ability of the Plan Administrator to realize the maximum value of the Assets of the Debtors and the Estates and the ability to realize a favorable litigation outcome or settlement of litigation. It is extremely difficult to value litigation and, as described above, litigation outcomes cannot be predicted.

## X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include (a) liquidation of the Debtors under chapter 7 of the Bankruptcy Code, or (b) an alternative plan of reorganization. The

Debtors believe that if the Plan is not confirmed and the case is converted to a case under chapter 7 of the Bankruptcy Code, holders of Claims in Classes 3, 4 and 5 will receive a smaller dividend than proposed under the Plan.

A.       **Liquidation Under Chapter 7**

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code. A chapter 7 trustee would be appointed to liquidate the remaining assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. A chapter 7 trustee would need time, and would incur fees, to investigate the Debtors' pre-petition transactions, and their assets and liabilities. A chapter 7 trustee would retain and liquidate the Debtors' remaining unencumbered assets, and, if necessary, investigate and pursue Causes of Action.

The Debtors and the Committee believe that even if there is any chapter 7 distribution that the percentage distribution to unsecured creditors will be increased significantly if the Plan is confirmed in the Chapter 11 Cases. The Debtors believe that the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code and the appointment of a chapter 7 trustee would increase the costs of administration, and eliminate (or at best reduce) and postpone any distribution to holders of Claims in Classes 3, 4 and 5. A liquidation analysis is attached hereto as **Exhibit D** (to be filed at least two days prior to the deadline established to file objections to this Disclosure Statement), and it estimates and compares the amounts which would be received by creditors if the Plan is confirmed against the amounts which would likely be received if the case is converted to a chapter 7.

For all of the foregoing reasons, the Debtors and the Committee have concluded that Creditors are likely to receive an amount under the Plan that is not less than the amount such Creditors would receive under a chapter 7 liquidation.

B.       **Alternative Plan of Reorganization**

If the Plan is not confirmed, the Debtors, the Committee, or any other party-in-interest could attempt to formulate a different plan. However, the Debtors believe that timing is paramount in these Chapter 11 Cases, and the Plan described herein enables the Creditors and all parties-in-interest to realize the best payout under the circumstances.

XI.       **OTHER INFORMATION**

Inquiries regarding information about the Debtors or the Chapter 11 Cases not contained in this Disclosure Statement may be made by contacting Michael M. Beal, McNair Law Firm, P.A., 1221 Main Street, 18th Floor (29201), Post Office Box 11390, Columbia, South Carolina 29211 (803-799-9800) or David Dean, Cole Schotz, Meisel, Forman & Leonard, P.A., 300 E. Lombard Street, Suite 2000, Baltimore, MD 21202 (410) 528-2972.

COLUMBIA 1054928v3

**TMG LIQUIDATION COMPANY**

By:

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL]

**FSP LIQUIDATION COMPANY**

By:

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL

**FSG LIQUIDATION COMPANY**

By:

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL]

**MPFT LIQUIDATION COMPANY, LLC**

By:

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL]

**MP SUNDRIES LIQUIDATION COMPANY, LLC**

By:

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL]

[SIGNATURE PAGE TO DISCLOSURE STATEMENT ACCOMPANYING PLAN OF LIQUIDATION OF THE DEBTORS]

COLUMBIA 1054928v3

**MSUPPLY LIQUIDATION COMPANY, LLC**

By: _____

    Name: Patrick J. Rourke

    Title: President and Chief Executive Officer

                           [SEAL]

**MTRANS LIQUIDATION COMPANY**

By: _____

    Name: Patrick J. Rourke

    Title: President and Chief Executive Officer

                           [SEAL]


**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____

    Name:  Bob Hunter

    Title:  Committee Chair


[SIGNATURE PAGE TO DISCLOSURE STATEMENT ACCOMPANYING PLAN OF LIQUIDATION OF THE DEBTORS]

**MSUPPLY LIQUIDATION COMPANY, LLC**

By: _____
    Name: Patrick J. Rourke
    Title: President and Chief Executive Officer

                        [SEAL]

**MTRANS LIQUIDATION COMPANY**

By: _____
    Name: Patrick J. Rourke
    Title: President and Chief Executive Officer

                        [SEAL]

**OFFICIAL COMMITTEE OF UNSECURED
CREDITORS**

By: _____
    Name: Bob Hunter
    Title: Committee Chair

[SIGNATURE PAGE TO DISCLOSURE STATEMENT ACCOMPANYING PLAN OF LIQUIDATION OF THE DEBTORS]

**EXHIBIT A**

**The Plan**

A-1

49249/0001-7813086v6

COLUMBIA 1054928v3

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TMG Liquidation Company, *et al.*, | ) | Case No. 11-03216-hb |
| | ) | |
| Debtors.[1] | ) | |
| | ) | (Joint Administration) |
| _____ | ) | |

---

### JOINT SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

---

McNAIR LAW FIRM, P.A.
Michael M. Beal
Elizabeth (Lisa) J. Philp
Robin C. Stanton
Michael H. Weaver
1221 Main Street, 18th Floor (29201)
Post Office Box 11390
Columbia, South Carolina 29211
(803) 799-9800 (Telephone)
(803) 753-3277 (Facsimile)
mbeal@mcnair.net
lphilp@mcnair.net
rstanton@mcnair.net
mweaver@mcnair.net

Counsel to the Debtors and
Debtors-in-Possession

COLE, SCHOTZ, MEISEL, FORMAN
   & LEONARD, P.A.
G. David Dean
Irving E. Walker
300 E. Lombard Street, Suite 2000
Baltimore, MD 21202
(410) 528-2972 (Telephone)
(410) 230-0667 (Fax)

AND

McCARTHY LAW FIRM, LLC
G. William McCarthy, Jr.
Daniel J. Reynolds, Jr.
3924 Forest Drive, Suite 9 (29204)
P. O. Box 11332
Columbia, SC   29211-1332
(803) 771-8836 (Telephone)
(803) 753-6960 (Fax)

Counsel to the Official Committee of
Unsecured Creditors

Dated:  November 1, 2011

---

[1]   The Debtors and the last four digits of their respective tax identification numbers are: TMG Liquidation Company (4224); MTrans Liquidation Company (9048); MP Sundries Liquidation Company, LLC (8882); MSupply Liquidation Company, LLC (5878); MPFT Liquidation Company, LLC (8544); FSP Liquidation Company (9186); and FSG Liquidation Company (3506).

**Table of Contents**

                                                                                              **Page**

INTRODUCTION .................................................................................................................1

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, AND
            COMPUTATION OF TIME.................................................................................1

    A.    Defined Terms ........................................................................................................1

    B.    Rules of Interpretation .........................................................................................10

    C.    Computation of Time...........................................................................................11

ARTICLE II CLASSES OF CLAIMS AND INTERESTS....................................................11

ARTICLE III TREATMENT OF CLAIMS AND INTERESTS ...................................12

    A.    Unclassified Claims .............................................................................................12

    B.    Classified Claims .................................................................................................12

ARTICLE IV MEANS FOR IMPLEMENTATION OF PLAN ...................................14

    A.    Funding of Plan....................................................................................................14

    B.    The Plan Administrator and its Role and Duties .................................................15

    C.    Dissolution of the Committee and Formation of the Oversight
           Committee.............................................................................................................19

    D.    Plan Substantive Consolidation ...........................................................................20

    E.    Vesting of Assets and Retention of Causes of Action .........................................21

    F.    Continued Existence of Debtors and Estates After the Effective Date..........................21

    G.    Debtors' Business Records ...................................................................................22

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND
            UNEXPIRED LEASES .......................................................................................22

    A.    Rejection of Executory Contracts and Unexpired Leases....................................22

    B.    Post-Closing Agreements......................................................................................23

    C.    D&O Policy ..........................................................................................................23

    D.    Employment Related Agreements ........................................................................23

    E.    Indemnification Obligations of the Debtors .......................................................23

    F.    Bar Dates for Rejection Claims ...........................................................................24

ARTICLE VI PAYMENT AND DISTRIBUTIONS ON CLAIMS ...........................................24

    A.    Manner of Payment...............................................................................................24

    B.    Funds and Accounts for Payment of Claims and Plan Implementation .......................24

    C.    Interim and Final Distributions............................................................................25

i

D.    Rounding of Distributions; Minimum Distributions....................................................25

E.    Distributions to the Last Known Address ................................................................25

F.    Unclaimed Property .................................................................................................26

G.    Withholding or other Taxes .....................................................................................26

H.    Setoffs .....................................................................................................................26

I.    Subordination Rights ..............................................................................................26

ARTICLE VII BAR DATES, OBJECTIONS TO CLAIMS AND DISPUTED
        CLAIMS RESERVE................................................................................................27

A.    Allowance of Claims................................................................................................27

B.    Authority to Prosecute Objections ..........................................................................27

C.    Claims Objection Bar Date .....................................................................................27

D.    Bar Date and Objection Provisions for Administrative Claims................................27

E.    No Distributions to Holders of Disputed Claims .....................................................28

F.    Estimation of Claims...............................................................................................28

ARTICLE VIII CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN ....................29

A.    Conditions to Effective Date....................................................................................29

B.    Effect of Non-Occurrence of Effective Date ...........................................................29

ARTICLE IX EFFECTS OF CONFIRMATION ....................................................................29

A.    No Discharge ..........................................................................................................29

B.    Post-Confirmation Effect of Evidences of Claims or Interests................................29

C.    Preservation of Causes of Action...........................................................................29

D.    Limited Plan Exculpation ........................................................................................31

E.    Injunction ................................................................................................................32

F.    Plan Terms Binding .................................................................................................32

G.    Continuation of Pre-Confirmation Injunction or Stays.............................................33

ARTICLE X RETENTION OF JURISDICTION .....................................................................33

A.    Jurisdiction Retained by the Bankruptcy Court .......................................................33

ARTICLE XI MISCELLANEOUS PROVISIONS ..................................................................34

A.    Pre-Confirmation Modification ................................................................................34

B.    Post-Confirmation Immaterial Modification .............................................................34

C.    Post-Confirmation Material Modification .................................................................34

D.    Non-Consensual Confirmation ...............................................................................35

E.    Withdrawal or Revocation of Plan...........................................................................35

ii

F.    Exemption from Transfer Taxes ......................................................................35

G.    Final Decree .................................................................................................35

H.    Effectuating Documents, Further Transactions and Corporate Action..........................35

I.    Reservation of Rights.....................................................................................35

J.    Successors and Assigns...................................................................................36

K.    Governing Law ............................................................................................36

L.    Notices ......................................................................................................36

M.    Conflicts ....................................................................................................37

N.    Severability .................................................................................................37

O.    Counterparts ................................................................................................37

EXHIBITS

A.    Regions Bank Settlement Agreement

B.    Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Non-Insiders

C.    Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Insiders

COLUMBIA 1058668v2

# INTRODUCTION

TMG Liquidation Company and its affiliates, the above-captioned debtors and debtors-in-possession, jointly with the Official Committee of Unsecured Creditors appointed in these cases, hereby propose the following amended joint chapter 11 plan of liquidation pursuant to section 1121(a) of title 11 of the United States Code.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

**A.**    **Defined Terms**

As used in this Plan, capitalized terms have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.    "**Administrative Claim**" means a Claim entitled to payment as an administrative expense as specified in section 503(b) of the Bankruptcy Code that is entitled to priority under section 507(a) of the Bankruptcy Code, including but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the business of the Debtors; (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code; and (c) all fees and charges assessed against the Debtors' Estates under 28 U.S.C. § 1930.

2.    "**Allowed Claim**" means:

a.    a Claim that has been listed by the Debtors on their Schedules as other than disputed, contingent, or unliquidated, to the extent that it is not otherwise a Disputed Claim;

b.    a Claim for which a Proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, to the extent that it is not otherwise a Disputed Claim; or

c.    a Claim that is allowed: (i) by compromise, settlement or otherwise resolved with a Creditor pursuant to the authority granted to the Plan Administrator under this Plan, as applicable; (ii) in any contract, instrument, or other agreement entered into in connection with this Plan; (iii) in a Final Order; or (iv) pursuant to the terms of this Plan.

3.    "**Allowed . . . Claim**" means an Allowed Claim in the particular Class or category specified.  Any reference herein to a particular Allowed Claim includes both the secured and unsecured portions of such Claim.

4.    "**Amount in Controversy**" means:

a.    with respect to a Disputed Claim, the disputed portion of the Disputed Claim; and

b.    with respect to a Cause of Action, the amount of the Cause of Action.

5.    "**APA**" means that certain Asset Purchase Agreement dated as of June 29, 2011 between Buyer and the Debtors, together with all exhibits, supplements, amendments, and schedules thereto, including as set forth in any notices or pleadings Filed in the Chapter 11 Cases.

6.    "**Assets**" means all Property of the Debtors and the Estates of every kind and nature including, without limitation, the Regions Bank Settlement Amount and all Causes of Action of the Debtors and the Estates, all of which shall be deemed to be retained and preserved for enforcement and under the custody and control of the Estates and the Debtors, as applicable, through the Plan Administrator, as the authorized representative of the Debtors and the Estates, and administered by the Plan Administrator as of the Effective Date under this Plan.

7.    "**Avoidance Action**" means all claims, actions, avoiding powers, rights of recovery, subordination rights or other actions against insiders and/or any other Persons or Entities under the Bankruptcy Code, including sections 505, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or any other applicable fraudulent conveyance, fraudulent transfer, preference or creditors' rights laws, including but not limited to claims against Entities listed on "SOFA 3B" and "SOFA 3C" of the Debtors' statements of financial affairs which are part of its Schedules Filed with the Bankruptcy Court in the Chapter 11 Cases, as amended and as may be further amended from time to time, all of which Schedules are incorporated by reference in this Plan.

8.    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as now in effect or hereafter amended.

9.    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of South Carolina.

10.    "**Bankruptcy Rules**" mean, collectively, the Local Rules of the Bankruptcy Court and Federal Rules of Bankruptcy Procedure, as now in effect or hereafter amended.

11.    "**Bar Date**" means the applicable bar date by which a Proof of Claim or proof of Interest must be or must have been Filed.

12.    "**Business Day**" means any day, other than Saturday, Sunday, or a "Legal Holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

13.    "**Buyer**" means MG Distribution, LLC, an Illinois limited liability company, and which is the "Buyer" under the APA.

14.    "**Cash**" means legal tender of the United States of America and equivalents thereof.

15.    "**Cause(s) of Action**" means any or all claims, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims, or any other rights or claims whatsoever of any Debtor and/or Estate that are or may be pending on the Effective Date or instituted by the Plan Administrator after the Effective Date against any Person or Entity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, suspected or unsuspected, whenever arising, whether prior to, on or after the Effective Date, and of any character or kind whatsoever, whether based in contract, in tort, or otherwise, at law or in equity or under any other theory of law, including, but not limited to, (a) those actions set forth in the Debtors' Schedules or discussed in the Disclosure Statement or Plan, including but not limited to the Five Star

2

Claims, claims related to the Deficiency Letter, including indemnity claims, the Non-Exclusive Schedule of Potential Chapter 5 Causes of Action against Non-Insiders, annexed hereto as **Exhibit B**, and the Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Insiders annexed hereto as **Exhibit C**; (b) all claims, actions, avoiding powers, rights of recovery, subordination rights or other actions against insiders and/or any other Persons or Entities under the Bankruptcy Code, including Avoidance Actions, (c) rights of setoff, counterclaim or recoupment, and claims on contracts or for breaches of duties imposed by law, (d) commercial tort claims as defined in Article 9 of the Uniform Commercial Code; (e) the right to object to Claims or Interests, (f) claims pursuant to section 362 of the Bankruptcy Code, (g) such claims and defenses as fraud, mistake, duress, usury, and any other theory, without limitation. The foregoing definition shall also include without limitation all claims arising out of or related to any of the foregoing or discovered during or as a consequence of the pursuit of any of the foregoing. As used in this Plan, this definition of "Causes of Action" is intended to have the broadest possible meaning to ensure the maximum ability of the Debtors, the Plan Administrator, and the Oversight Committee to pursue any available action supported in fact and law, and none of the specific examples provided herein shall be construed as limiting the scope or meaning of such term.

16. "**Chapter 11 Cases**" means each and all of the Debtors' chapter 11 cases pending in the Bankruptcy Court, jointly administered under the caption first set forth above as In re TMG Liquidation Company, et al., Chapter 11, Case No. 11-03216-HB.

17. "**Claim**" means a "claim," as defined in section 101(5) of the Bankruptcy Code, against the Debtors.

18. "**Claims Agent**" means Kurtzman Carson Consultants LLC, which was appointed pursuant to an order of the Bankruptcy Court entered May 20, 2011 at Docket No. 51 to serve, *inter alia*, as the Bankruptcy Court's agent for the receipt and docketing of all proofs of claim for Claims Filed in the Chapter 11 Cases.

19. "**Claims Objection Bar Date**" means the last day for filing objections to Claims, which shall be the latest of: (a) 180 days after the Effective Date; (b) 180 days after the Filing of a Proof of Claim for such Claim; (c) such other period of limitation as may be specifically fixed by this Plan, the Confirmation Order, the Bankruptcy Rules, or a Final Order for objecting to such Claims; and (d) such later date as provided for by order of the Bankruptcy Court, which order may be entered without further notice.

20. "**Class**" means a class of Claims or Interests, as described in **Article II** of this Plan.

21. "**Closing**" means the closing of the transaction with the Buyer under and as defined in the APA, which occurred on July 29, 2011.

22. "**Committee**" means the Official Committee of Unsecured Creditors of the Debtors, appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

23. "**Confirmation**" means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

24. "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of the Bankruptcy Rules 5003 and 9021.

3

25.    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on Confirmation of this Plan, as such hearing may be continued from time to time.

26.    "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

27.    "**Convenience Claim**" means a Senior Unsecured Claim (a) that is Scheduled or Filed by the General Claims Bar Date in the amount equal to or less than $2,000, unless the holder of such Claim elects to opt out of the Convenience Class; or (b) that is Scheduled or Filed by the General Claims Bar Date in an amount in excess of $2,000 as to which the holder of such Claim elects to opt into the Convenience Class and reduce its Claim to $2,000.

28.    "**Creditor**" means any Person or Entity that is the holder of a Claim against a Debtor.

29.    "**D&O Policy**" means the policy issued to The Merit Group Inc. for the policy period from July 1, 2010 to July 1, 2011 (as currently renewed through August 31, 2011) by Federal Insurance Company, policy number 8211-8338, which includes the Director & Officer Liability Coverage Section, the Fiduciary Liability Coverage Section, and the General Terms and Conditions Section, as well as all accompanying documents, agreements, attachments, declarations, amendments, endorsements, renewals and tails relating thereto (including that certain Election of Extended Reporting Period Endorsement extending the reporting period from September 1, 2011 to September 1, 2012) and any other existing policy.

30.    "**Debtor**" means any of the Debtors, as a debtor and debtor-in-possession.

31.    "**Debtors**" mean FSG Liquidation, FSP Liquidation, MPFT Liquidation, MP Sundries Liquidation, MSupply Liquidation, MTrans Liquidation, and TMG Liquidation, each as debtors and debtors-in-possession.

32.    "**Deficiency Letter**" means the Notice of Deficiency, dated April 15, 2011, from the Internal Revenue Service to Five Star Products, Inc. & Subsidiaries asserting deficiences in corporate income taxes for tax years 2007 and 2008 in the total amount of $275,715.

33.    "**DIP Financing Order**" means the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507(I) Approving Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, and (V) Modifying the Automatic Stay, entered by the Bankruptcy Court on June 10, 2011.

34.    "**Disclosure Statement**" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to this Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified, or supplemented.

35.    "**Disposition**" means any sale, conveyance, transfer, assignment, liquidation or abandonment of any Property by the Plan Administrator.

36.    "**Disputed Claim**" means:

a.    if no Proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law: (i) a Claim that is listed on the Debtors' Schedules as other than disputed, contingent, or unliquidated, but as to which the

4

Debtors, the Plan Administrator, or any other party in interest has Filed an objection by the Claims Objection Bar Date, but only to the extent of the difference between the amount of the Claim listed in the Schedules and the amount of such Claim asserted in the objection, (ii) a Claim that is listed on the Debtors' Schedules as disputed, contingent, or unliquidated; or

b.        if a Proof of Claim or request for payment of an Administrative Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law, a Claim for which an objection has been Filed by the Debtors, the Plan Administrator or any other party in interest, as the case may be, by the Claims Objection Bar Date, if such objection has not been withdrawn or denied by a Final Order, but only to the extent of the difference between the amount of the Claim asserted in the Proof of Claim and the amount of such Claim asserted in the objection.

37.    "**Disputed Claims Reserve**" means the reserve established and maintained by the Plan Administrator for all Disputed Claims in accordance with the Plan including **Article VI** hereof.

38.    "**Distributable Proceeds**" means the proceeds of the liquidation and/or prosecution of or other recovery upon the Assets, including the proceeds of all Causes of Action.

39.    "**Distribution**" means a distribution of Cash or other property of a Debtor pursuant to this Plan.

40.    "**Effective Date**" means a Business Day, as determined by the Debtors or the Plan Administrator, that (a) is as soon as reasonably practicable after the Confirmation Date and (b) is the day on which (i) all conditions to the Effective Date, if any, have been met or waived and (ii) no stay of the Confirmation Order is in effect.

41.    "**Entity**" shall have the meaning set forth in section 101 of the Bankruptcy Code.

42.    "**Estate**" or "**Estates**" means the estate(s) created for the Debtors in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

43.    "**Excluded Assets**" shall have the meaning given to such term in the DIP Financing Order.

44.    "**Fee Claim**" means a Claim under sections 330(a), 331, 503, or 1103 of the Bankruptcy Code for compensation of a Professional or other Person or Entity for services rendered or expenses incurred in the Chapter 11 Cases from the Petition Date through the Effective Date.

45.    "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or the Claims Agent, as the case may be, in the Chapter 11 Cases.

46.    "**Final Decree**" means a final decree as described in Rule 3022 of the Bankruptcy Rules.

47.    "**Final Distribution**" shall have the meaning set forth in **Article VI(C)** of this Plan.

48.    "**Final Distribution Date**" means the date on which the Final Distribution occurs, in accordance with **Article VI(C)** of this Plan.

49.    "**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court

5

of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired, and no appeal or petition for certiorari has been timely taken, or as to which an appeal that has been taken or any petition for certiorari that has been timely filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

50.    "**Five Star Acquisition**" means the acquisition of the stock of Five Star Products, Inc. (n/k/a FSP Liquidation), pursuant to that certain Stock Purchase Agreement between The Merit Group, Inc. (n/k/a TMG Liquidation) and National Patent Development Corporation dated November 29, 2009, and all other related documents and any amendments thereto.

51.    "**Five Star Claims**" mean all potential claims of any kind, actions, avoiding powers, rights of recovery, subordination rights and other rights, remedies and actions in connection with or relating to the Five Star Acquisition, including but not limited to the following: (i) claims against National Patent Development Corporation including to avoid fraudulent transfers under Sections 544 and/or 548 of the Bankruptcy Code or otherwise thereunder; (ii) claims against TMG Liquidation's then officers and directors, including Jay Baker, Caleb C. Fort, and E.F. Wolfe, Jr., for breach of fiduciary duty, negligence, and other related claims under applicable non-bankruptcy laws; and (iii) any other claims whatsoever that may come to light (against the foregoing or others) as a result of the Committee's ongoing investigation of potential claims arising out of the Five Star Acquisition, which claims the Committee has sought derivative standing to prosecute on behalf of the estates and creditors by motion dated October 31, 2011.

52.    "**FSG Liquidation**" means FSG Liquidation Company f/k/a Five Star Group, Inc., d/b/a Lancaster/Five Star, d/b/a Rightway, a Delaware corporation.

53.    "**FSP Liquidation**" means FSP Liquidation Company f/k/a Five Star Products, Inc., a Delaware corporation, which is the parent of FSG Liquidation.

54.    "**General Claims Bar Date**" means the general claims deadline(s) by which a creditor must File a Proof of Claim as set forth in the Notice of Commencement for each of the Debtors, which is October 6, 2011 for all creditors (except a governmental unit) and November 14, 2011 for a governmental unit.

55.    "**Indemnification Obligation**" means any obligation of any of the Debtors to indemnify, reimburse, or provide contribution to any present or former officers, director, or employee, or any present or former Professionals, advisors, or representatives of the Debtors, pursuant to by-laws, articles of incorporation and/or any other organizational documents, contract, or otherwise as may be in existence immediately prior to the Petition Date.

56.    "**Interest**" means the rights of the holders of any equity security of the Debtors and the rights of any Person or Entity to purchase or demand the issuance of any equity security of the Debtors, including: (a) redemption, conversion, exchange, voting, participation, and dividend rights; (b) liquidation preferences; and (c) membership or stock options and warrants.

57.    "**Litigation Costs**" means all actual and necessary costs and expenses incurred after the Effective Date in connection with investigating, prosecuting, settling, or otherwise pursuing the Causes of Action.

58.    "**MPFT Liquidation**" means MPFT Liquidation Company, LLC f/k/a Merit Pro Finishing Tools, LLC d/b/a Merit Trade Source, a South Carolina limited liability company.

COLUMBIA 1058668v2

59. "**MP Sundries Liquidation**" means MP Sundries Liquidation Company, LLC f/k/a Merit Paint Sundries, LLC d/b/a Lancaster, a South Carolina limited liability company.

60. "**MSupply Liquidation**" means MSupply Liquidation Company, LLC f/k/a Merit Supply Company, LLC d/b/a Merit Supply, a South Carolina limited liability company.

61. "**MTrans Liquidation**" means MTrans Liquidation Company f/k/a Merit Transportation, Inc., a South Carolina corporation.

62. "**Net Distributable Proceeds**" means the Distributable Proceeds after the payment or reserve for future payment of Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Secured Claims, and Plan Expenses.

63. "**Non-Tax Priority Claims**" means any Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code (including under section 507(a)(4), (5) or (6) of the Bankruptcy Code) and that is not a Priority Tax Claim, Administrative Claim or a Secured Claim.

64. "**Notice of Commencement**" means the Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines entered by the Bankruptcy Court on May 24, 2011 on the separate dockets for each of the Debtors.

65. "**Notice of Effective Date**" means a notice advising Creditors and other parties-in-interest of the Confirmation Date, Effective Date and the deadlines to File Administrative Claims (other than Section 503(b)(9) Claims) and Claims arising from the rejection of executory contracts and unexpired leases, which shall be Filed and served within five (5) days of the Effective Date.

66. "**Notice of Proof of Claim Deadline**" means the Notice of Proof of Claim Deadline Filed with the Bankruptcy Court on August 5, 2011, served by the Debtors on known Creditors, and published by the Debtors in *The Greenville News* and the national publication *USA Today* on August 24, 2011, to give notice to all potential Creditors and parties in interest.

67. "**Operating Account**" means the account by such name established and maintained by the Plan Administrator in accordance with this Plan.

68. "**Oversight Committee**" means the entity formed pursuant to **Article IV(C)** of this Plan.

69. "**Person**" means a natural person, or any legal entity or organization including, without limitation, any corporation, partnership (general or limited), limited liability company, business trust, unincorporated organization or association, joint stock company, trust, association, governmental body (or any agency, instrumentality or political subdivision thereof), or any other form of legal entity.

70. "**Petition Date**" means May 17, 2011, the date the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

71. "**Plan**" means this amended joint chapter 11 plan of liquidation of the Debtors and the Committee and all exhibits attached hereto or referenced herein, which exhibits shall be part of this Plan as if set forth fully herein, as any of the same may be amended, modified, or supplemented.

72. "**Plan Administrator**" means the Person or Entity selected by the Committee to serve in such capacity under this Plan, including as the representative of the Estates pursuant to and as provided under the Bankruptcy Code including section 1123(b)(3), and approved by the Bankruptcy Court as set

7

forth in the Confirmation Order, who is authorized under this Plan and by the Bankruptcy Court to exercise and perform all rights, powers and duties held by the Debtors and the Estates, including, without limitation, all authority held by the Debtors and the Estates prior to and after Confirmation, and all authority granted under this Plan or the Bankruptcy Code or by order of the Bankruptcy Court.  Without implying any limitation on the foregoing rights, powers, duties and authority of the Plan Administrator, the Plan Administrator has in accordance with this Plan the right, power and duty to prosecute all Causes of Action, to file tax returns, to object to Claims, to disburse monies to Creditors holding Allowed Claims under this Plan, to liquidate remaining property of the Estates, and to administer the Estates' property, including reserves established to pay Claims.

73.    **"Plan Administrator Engagement Letter"** means the engagement agreement of the Plan Administrator, which shall be Filed with the Bankruptcy Court as a supplement to the Plan within fifteen (15) days prior to the Confirmation Hearing.

74.    "**Plan Expenses**" means the costs and expenses incurred after the Effective Date in connection with the administration of this Plan, at the Plan Administrator's direction, including fees and expenses of the Plan Administrator and any professionals retained by the Plan Administrator, as well as Litigation Costs.

75.    "**Post-Closing Agreements**" means collectively "Post-Closing Leases" and "Post-Closing Contracts," each as defined in the APA.

76.    "**Post-Confirmation Debtors**" means the Debtors in their post-Confirmation Order status.

77.    "**Priority Tax Claim**" means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

78.    "**Professional**" means any professional employed in the Chapter 11 Cases pursuant to sections 327 or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

79.    "**Proof of Claim**" means a proof of claim Filed in the Chapter 11 Cases in accordance with the Bankruptcy Code and Bankruptcy Rules and any applicable Bar Date or other order of the Bankruptcy Court, together with supporting documents.

80.    "**Property**" means all property of the Debtors' Estates of any nature whatsoever, real or personal, tangible or intangible, previously or now owned by the Debtors, or acquired by the Debtors' Estates, as defined in section 541 of the Bankruptcy Code, including all Causes of Action but excluding any and all property conveyed to the Buyer under the APA as approved by the Sale Order.

81.    "**Pro Rata**" means, when used with reference to a Distribution of the Net Distributable Proceeds to a Class of Claims, proportionately, so that with respect to a particular Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class in which such Claim is included to (ii) the amount of all Allowed Claims in that Class.

82.    "**Regions Bank**" means Regions Bank, an Alabama bank.

8

83.     "**Regions Bank Settlement Agreement**" means the Settlement Agreement dated July 29, 2011 among the Debtors, Regions and the Committee, the terms of which were approved in the Sale Order.  The Regions Bank Settlement Agreement is attached hereto as **Exhibit A,** and its terms are incorporated by reference into this Plan.

84.     "**Regions Bank Settlement Amount**" means an amount equal to the sum of (i) the $2,000,000 in purchase price that  Regions Bank agreed to allow to be paid by the Buyer to the Debtors' estates as the "Additional Claims Amount" under the APA; (ii) the "Carve-Out Amount" as defined in the Regions Bank Settlement Agreement; and (iii) $2,750,000.

85.     "**Regions Deficiency Claim**" means, on any date, the total pre-petition and post-petition claims (whether absolute or contingent, due or to become due and including all post-petition interest, fees and other charges that have accrued and may hereafter accrue with respect to any of the DIP Obligations (as defined in the DIP Financing Order)) that Regions Bank holds on such date against any or all of the Debtors, after giving effect to the Closing under the APA, the payment of the Regions Bank Settlement Amount under the Regions Bank Settlement Agreement but without giving effect to the value of any collateral security, guaranties, or other payment assurances held by Regions Bank for any of its claims (until such time as Regions Bank elects to realize upon such collateral security, guaranties or other payment assurances, in which event the proceeds of such realization shall be applied to reduce the Deficiency Claim).  In calculating the amount of the Regions Deficiency Claim, amounts withheld from payment at Closing under the APA and escrowed pursuant to the terms of the APA shall not be deemed to have been received by Regions Bank until actual release of such monies from escrow and remittance of same to Regions Bank.

86.     "**Sale Motion**" means the Amended Motion of Debtors For Entry Of An Order Approving (A) The Proposed Sale of Substantially All Assets Of the Debtors Free and Clear of All Liens, Claims, Encumbrances and Other Interests (B) Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases and (C) Extension of Time to Assume or Reject Certain Unexpired Leases and Memorandum in Support of Motion Filed in the Chapter 11 Cases, as amended or supplemented.

87.     "**Sale Order**" means the Order Authorizing and Approving (A) the Sale of Substantially all Assets of the Debtors Free and Clear of all Liens, Claims, Encumbrances, and Other Interests, (B) the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, (C) Extension of Time to Assume or Reject Certain Unexpired Leases, (D) Settlement, the Settlement Term Sheet and Disbursement of Sale Proceeds, and (E) Granting Related Relief, entered on July 25, 2011.

88.     "**Schedules**" mean the schedules of assets and liabilities and the statements of financial affairs, including the global notes thereto, Filed by any and all of the Debtors, as required by section 521 of the Bankruptcy Code and the official bankruptcy forms, as the same may have been or may be amended, modified, or supplemented.

89.     "**Section 503(b)(9) Claim**" means a Claim described under section 503(b)(9) of the Bankruptcy Code.

90.     "**Secured Claim**" means a Claim that is secured by a lien on property in which any Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

91.    "**Senior Unsecured Claim**" means a non-priority, general unsecured claim against one or more Debtors, which at the time of a Distribution, has not been disallowed or subordinated and is not a claim held by Regions Bank or a Subordinated Creditor.

92.    "**Special Notice Parties**" means (i) the United States Trustee, (ii) the Oversight Committee; (iii) Regions Bank, (iv) the parties on the Plan Administrator's shortened mailing matrix to be submitted and approved by the Bankruptcy Court in connection with confirmation of the Plan and (v) any other parties that have requested in writing a special notice from the Plan Administrator. The Special Notice Parties shall be served with all pleadings filed in the Chapter 11 Cases post-Confirmation that require Bankruptcy Court approval.

93.    "**Statutory Fees**" has the meaning set forth in **Article III(A)(1)(b)**.

94.    "**Subordinated Claim**" means any general unsecured non-priority claim of a Subordinated Creditor, each of whom has subordinated all claims that such person or entity has against any or all of the Debtors to the payment in full of all prepetition and post-petition claims of Regions Bank against any or all of the Debtors pursuant to Subordination Agreements and their respective successors and permitted assigns.

95.    "**Subordinated Creditors**" mean Stonehenge Opportunity Fund II, L.P., a Delaware limited partnership, E. Fort Wolfe, Jr., Caleb C. Fort, and Valspar Corporation.

96.    "**Subordinated Distribution**" means the aggregate amount of the Distributions which Regions Bank would have been authorized to receive and retain on account of the Regions Deficiency Claim and the claims of the Subordinated Creditors, but which Regions Bank does not receive and retain by virtue of Section 2(d) of the Regions Bank Settlement Agreement.

97.    "**Subordination Agreements**" means the intercreditor and subordination agreements between the Subordinated Creditors and Regions Bank, and "Subordination Agreement" means any one of them.

98.    "**TMG Liquidation**" means TMG Liquidation Company f/k/a The Merit Group, Inc., f/k/a Lancaster Distributing Company, f/k/a Lancaster Paint Sundries, Inc., a South Carolina corporation headquartered in Spartanburg, South Carolina, and which is the parent company of FSP Liquidation, MPFT Liquidation, MP Sundries Liquidation, MSupply Liquidation, and MTrans Liquidation.

**B.    Rules of Interpretation**

For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to any Person or Entity as a holder of a Claim includes that Person or Entity's successors, assigns, and affiliates; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any

contract, articles of incorporation, code of regulations, similar constituent documents, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules, and (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply.

## C.    **Computation of Time**

In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

**ARTICLE II**
**CLASSES OF CLAIMS AND INTERESTS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Article III, have not been classified and thus are excluded from the following Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that the remainder of the Claim or Interest qualifies within the description of such other Classes.

**THIS PLAN SEEKS SUBSTANTIVE CONSOLIDATION OF THE DEBTORS AND THE ESTATES, AS FURTHER DESCRIBED IN ARTICLE IV OF THIS PLAN.  IF SUBSTANTIVE CONSOLIDATION IS AUTHORIZED AND ORDERED BY THE BANKRUPTCY COURT, ALL ALLOWED CLAIMS AGAINST THE DEBTORS OR THEIR ESTATES SHALL BE SATISFIED FROM THE COMBINED CASH AND OTHER ASSETS OF THE DEBTORS.  SUCH SUBSTANTIVE CONSOLIDATION SHALL BE WITHOUT PREJUDICE TO ANY INSIDER/AFFILIATE CLAIMS OR ANY OTHER CLAIMS OR DEFENSES OF THE DEBTORS AND SHALL NOT BE CONSTRUED AS AN ELECTION OF REMEDIES WITH RESPECT TO SUCH CLAIMS OR ANY OTHER MATTERS.  THIS PLAN SHALL SERVE AS A MOTION SEEKING ENTRY OF AN ORDER SUBSTANTIVELY CONSOLIDATING THE DEBTORS, THE ESTATES AND CHAPTER 11 CASES, AS DESCRIBED HEREIN.**

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

Class 1.  Class 1 contains any Secured Claims against the Debtors.  To the extent any such Secured Claims exist, this Class is unimpaired and deemed to accept this Plan.  The holders of Class 1 Claims are not entitled to vote to accept or reject this Plan.

Class 2.  Class 2 contains all Non-Tax Priority Claims.  This Class is unimpaired and deemed to accept this Plan.  The holders of Class 2 Claims are not entitled to vote to accept or reject this Plan.

Class 3.  Class 3 contains all Convenience Claims.  This Class is impaired and holders of Class 3 Claims are entitled to vote to accept or reject this Plan.

Class 4.  Class 4 contains all Senior Unsecured Claims, excluding Convenience Claims.  This Class is impaired and the holders of Class 4 Claims are entitled to vote to accept or reject this Plan.

11

Class 5.  Class 5 consists of the Regions Bank Deficiency Claim and Subordinated Claims.  This Class is impaired and the holders of Class 5 Claims are entitled to vote to accept or reject this Plan.

Class 6.  Class 6 contains all Interests.  This Class is impaired and the holders of Class 6 Interests are entitled to vote to accept or reject this Plan.

## ARTICLE III
## TREATMENT OF CLAIMS AND INTERESTS

A.    **Unclassified Claims**

    1.    Administrative Claims

        a.    Administrative Claims.  Except to the extent the holder of an Allowed Administrative Claim agrees to other, lesser treatment (or is the holder of a Claim for Statutory Fees), each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Claim the full amount thereof, without interest, in Cash, as soon as practicable after the later of (i) the Effective Date, or (ii) 30 days after the date on which such Claim becomes an Allowed Claim; provided, however, with respect to any Allowed Administrative Claim held by Regions Bank, such Administrative Claim shall not be paid on the Effective Date.  As set forth in the Regions Bank Settlement Agreement at Section 2(c), and consistent with the DIP Financing Order, upon the Closing under the APA and the effectiveness of the Regions Bank Settlement Agreement, Regions Bank ceased to be entitled to receive a share of the proceeds of the Excluded Assets and the Regions Settlement Amount as a holder of a claim under section 503(b) of the Bankruptcy Code and agreed to share in such proceeds on a pro rata basis with other general, non-priority unsecured claims.

        b.    Statutory Fees.  Allowed Administrative Claims for fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 ("Statutory Fees") shall be paid in Cash as such fees are due in the ordinary course in an amount equal to the amount of such Statutory Fees.

    2.    Priority Tax Claims.  Each holder of an Allowed Priority Tax Claim will be paid in respect of such Allowed Claim (a) the full amount thereof, without postpetition interest or penalty or other charges, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) 30 days after the date on which such Claim becomes an Allowed Claim; or (b) such lesser amount or other treatment as the holder of an Allowed Priority Tax Claim and the Debtors might otherwise agree.  The Debtors and the Plan Administrator also reserve the right to make deferred cash payments to the holders of Priority Tax Claims in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms applicable thereto.  Provided, however, the Plan Administrator may prepay the balance of any Allowed Priority Tax Claim at any time without penalty or other charge.  The Confirmation Order shall constitute and be deemed an injunction by the Bankruptcy Court as of the Effective Date against any holder of a Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer, or director that otherwise would be liable to such holder for payment of a Priority Tax Claim or any amounts related thereto so long as no default has occurred with respect to payment of the Allowed amount of such Priority Tax Claim under the Plan.

B.    **Classified Claims**

    In addition to the treatment of unclassified Claims set forth above, the following sets forth the treatment of classified Allowed Claims and Interests.  The treatment of and consideration to be received

by holders of Allowed Claims and Interests pursuant to this **Article III** of this Plan shall be in full and complete satisfaction and settlement of such Claims and Interests. The Debtors' obligations in respect of Claims and Interests shall be satisfied in accordance with the terms of this Plan.

1.      Treatment of Class 1 Claim – Secured Claims (if any). Pursuant to the Regions Bank Settlement Agreement, the Regions Bank Settlement Amount was transferred to the Debtors free and clear of all of the liens and priority claims of Regions Bank, whether arising prior to or after the Petition Date, but Regions Bank retained all of its liens upon and rights with respect to all other assets of each Debtor upon which it held a lien other than Excluded Assets and the Acquired Assets (as defined in the APA). The Debtors are not aware of any remaining collateral in the Estates securing the Claim of Regions Bank, the Subordinated Creditors, or any other Creditor. To the extent any Secured Claim exists, however, each holder of an Allowed Class 1 Claim shall receive on account of its Allowed Secured Claim one of the following treatments as the Plan Administrator may determine in its sole and absolute discretion (and except to the extent that a holder of an Allowed Class 1 Claim has been paid by the Debtors prior to the Effective Date or agrees to other, lesser treatment): (i) the payment of Cash in an amount equal to such Allowed Class 1 Claim, including any interest on such Allowed Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (ii) surrender of the collateral securing such Class 1 Claim, in full and complete satisfaction of such Allowed Class 1 Claim. Such payment or surrender of collateral shall occur as soon as practicable after the later of (a) the Effective Date, or (b) 30 days after the date on which such claim becomes an Allowed Claim. The Debtors believe there will be no Allowed Class 1 Claims.

Class 1 is unimpaired, and the holders of Claims in this Class are deemed to accept this Plan and thus are not entitled to vote to accept or reject this Plan.

2.      Treatment of Class 2 Claims – Non-Tax Priority Claims. Except to the extent the holder of an Allowed Class 2 Claim agrees to other, lesser treatment, each holder of an Allowed Class 2 Claim shall be paid in respect of such Allowed Claim, the full amount thereof in Cash as soon as practicable after the later of (a) the Effective Date; or (b) 30 days after the date on which such claim becomes an Allowed Claim.

Class 2 is unimpaired, and the holders of Claims in this Class are deemed to accept this Plan and thus are not entitled to vote to accept or reject this Plan.

3.      Treatment of Class 3 Claims – Convenience Claims. Each holder of an Allowed Convenience Claim shall receive, in full satisfaction of such Claim, a Distribution equal to ten percent (10%) of the Allowed Convenience Claim in Cash as soon as practicable after the later of (a) the Effective Date; or (b) 30 days after the date on which such claim becomes an Allowed Claim.

Class 3 is impaired, and the holders of Claims in this Class are entitled to vote to accept or reject this Plan.

4.      Treatment of Class 4 Claims – Senior Unsecured Claims (Excluding Convenience Claims). Each holder of an Allowed Senior Unsecured Claim (excluding Convenience Claims) will receive in respect of such Claim its Pro Rata Distribution of the Net Distributable Proceeds, which shall be made from time to time by the Plan Administrator in its sole discretion, and in accordance with this Plan including the terms of the Regions Bank Settlement Agreement.

Class 4 is impaired, and the holders of Claims in this Class are entitled to vote to accept or reject this Plan.

13

5.    Treatment of Class 5 Claims – Regions Deficiency Claim and Subordinated Claims. Regions Bank, on account of its Allowed Regions Deficiency Claim, shall be treated in accordance with the Regions Bank Settlement Agreement, which is incorporated herein by reference.  Specifically, in accordance with Section 2(d) of the Regions Bank Settlement Agreement, after Distributions aggregating 10% of the principal amount of all Class 3 and Class 4 Claims collectively have been made, Regions Bank shall be authorized to receive (on account of the Allowed Regions Deficiency Claim and the aggregate Allowed Subordinated Claims of the Subordinated Creditors), Distributions in an amount equal to the Subordinated Distribution before any other Distributions are made on account of Class 4 Claims; and thereafter Regions Bank shall be authorized to participate in future Distributions to Claims in Class 4 on a Pro Rata basis (adding the Subordinated Claims of the Subordinated Creditors to the Regions Deficiency Claim for purposes of determining Regions Bank's Pro Rata share) based upon the relative amount of all general unsecured claims in Class 4, the Regions Deficiency Claim and the Subordinated Claims) at the time of each such Distribution.  If monies are escrowed or otherwise set aside pending resolution of any disputed Class 3 or Class 4 Claims, all amounts returned to or retained by the Plan Administrator after resolution of the dispute shall be remitted to Regions Bank to the extent that aggregate Distributions on account of Class 3 and Class 4 Claims collectively total 10% of such claims as hereinabove provided and Regions Bank has not received Distributions in an aggregate amount equal to the Subordinated Distribution.[2]  If Regions Bank is paid in full on account of its Regions Deficiency Claim then the Subordinated Creditors shall be authorized to participate in future Distributions to Claims in Class 4 on a Pro Rata basis based upon the relative amount of all Senior Unsecured Claims in Class 4 and the Subordinated Claims at the time of each such Distribution and subsequent distributions to Subordinated Creditors shall be made directly to each Subordinated Creditor.

Class 5 is impaired, and the holders of Claims in this Class are entitled to vote to accept or reject this Plan.

6.    Treatment of Class 6 – Interests.  Holders of Allowed Interests in Class 6 shall be authorized to receive a Distribution if and only if all Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Claims in Classes 1-5 have been paid in full.  If a distribution to Holders of Allowed Interests in Class 6 is authorized, each holder of an Allowed Interest shall receive its Pro Rata share of the available Distributable Proceeds after the payment of all Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Claims in Classes 1-5.

Class 6 is impaired, and the holders of Interests in this Class are entitled to vote to accept or reject this Plan.

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF PLAN**

A.    **Funding of Plan**

This Plan is a liquidating chapter 11 plan.  The funds for implementation of this Plan are comprised of the Regions Bank Settlement Amount, which was paid over to the Debtors at Closing, as well as prospective liquidation of the Assets of the Debtors and the Estates, including recoveries from the

---

[2]   By way of example, if Class 3 and Class 4 Claims are $40,000,000, and the aggregate of the Regions Deficiency Claim and the Subordinated Claims of Subordinated Creditors are 40% of the total of all general unsecured claims, then after a total of $4,000,000 of distributions is made on account of Class 3 and Class 4 Claims (or 10% of the total), Regions Bank would be entitled to receive Distributions totaling $1,600,000 before any further Distributions could be made on account of any Class 4 Claims.

14

pursuit of Causes of Action. The Liquidation Analysis attached to the Disclosure Statement provides detailed information regarding the Debtors' Property and proposed Distribution of the funds under this Plan.

## B.    The Plan Administrator and its Role and Duties

1.    Role of the Plan Administrator under Plan.  This Plan will be administered by a Plan Administrator, which will be vested with all the rights and powers of the Debtors and the Estates and all the power and authority over all Assets of the Debtors and the Estates and with the obligation to make Distributions in accordance with this Plan.  The initial Plan Administrator shall be selected by the Committee prior to the Confirmation Hearing, subject to approval of the Bankruptcy Court at the Confirmation Hearing.  If approved by the Bankruptcy Court at the Confirmation Hearing, the person or entity so designated shall become the Plan Administrator as of the Effective Date of this Plan.  The Plan Administrator shall be vested with and have all rights, powers, and duties (a) that the Debtors had immediately prior to Confirmation under sections 1106, 1107, 1108 and otherwise, including without limitation with respect to the Causes of Action (whether or not commenced as of Confirmation), (b) that would be vested in a chapter 11 trustee appointed prior to Confirmation under Bankruptcy Code section 1104, and (c) otherwise set forth in this Plan.  The Plan Administrator shall have exclusive control of the Assets, including without limitation the Causes of Action and, subject to the terms and conditions of the Plan, shall be subject to the jurisdiction of the Bankruptcy Court as further set forth in this Plan.  Subject to the provisions of this Plan, the Plan Administrator shall have authority to authorize the sale or other liquidation of all Assets.  The Plan Administrator shall be the representative of the Estates and shall have the capacity to sue and be sued, as provided under Bankruptcy Code section 323 and section 1123(b)(3) and otherwise under this Plan and the Bankruptcy Code.  The Plan Administrator shall be deemed to be the authorized representative of the Debtors and Post-Confirmation Debtors as the party-in-interest in the Chapter 11 Cases, under this Plan, and in any judicial proceeding or appeal to which the Debtors and Post-Confirmation Debtors are a party and the representative of the Estates, all consistent with, pursuant to and as authorized herein and under section 1123(b)(3)(B) of the Bankruptcy Code, and all Causes of Action, whenever arising, shall be retained by the Debtors and the Post-Confirmation Debtors and the Estates and be enforced and/or prosecuted by the Plan Administrator as the representative of the Debtors, the Post-Confirmation Debtors and the Estates as of the Effective Date, as further set forth in this Plan.

2.    Duties of the Plan Administrator.  The Plan Administrator shall: (a) collect and reduce to Cash (to the extent possible and in the best interest of the Estates) the Assets, including without limitation, pursuing and prosecuting the Causes of Action; (b) fund the administration of this Plan, including all Plan Expenses and specifically including any Litigation Costs associated with the Causes of Action; (c) make Plan Distributions as provided in this Plan; (d) close the Estates as expeditiously as is compatible with the best interests of holders of Allowed Claims; (e) perform the duties that a chapter 11 trustee would have performed under Bankruptcy Code section 1106(a); and (f) take such other action and perform all such other duties as are consistent with this Plan, the orderly administration of the Post-Confirmation Debtors and the Estates, and the interests of holders of Allowed Claims.

3.    Rights and Powers of Plan Administrator.  Subject to the rights and powers of the Oversight Committee as expressly set forth in this Plan, the Plan Administrator shall be authorized and empowered to fully act as and for the Debtors and Post-Confirmation Debtors as of the Effective Date, including without limitation, to: (a) prosecute, settle or release all Causes of Action, in accordance with the best interest of and for the benefit of the Creditors entitled to receive Distributions under this Plan; (b) liquidate the Assets, including through any pending sale motions initiated by the Debtors, but not consummated as of the Effective Date or otherwise; (c) prosecute objections to Claims; (d) dispose of any Assets in an orderly manner, as the Plan Administrator deems appropriate in his or its discretion and judgment, consistent with the terms of this Plan; (e) resolve Disputed Claims; (f) make Distributions to

15

the holders of Allowed Claims (as their respective interests may appear in accordance with this Plan) in as prompt, efficient and orderly fashion as possible in accordance with this Plan; (g) perform administrative services related to the implementation of this Plan; (h) accept custody and control of the Assets and the Estates and the Post-Confirmation Debtors as the sole representative of the Post-Confirmation Debtors and the Estates; (i) prosecute and defend all actions affecting this Plan or the Assets or the Estates or Post-Confirmation Debtors; (j) endorse the payment of notes or other obligations of any person or to make contracts with respect thereto; (k) purchase insurance with such coverage and limits as it reasonably deems necessary, including without limitation, insurance covering liabilities of the Plan Administrator incurred in connection with its service as Plan Administrator; (l) deposit any monies or securities with any one or more banks, trust companies or other banking institutions upon such terms as specified in this Plan and those that the Plan Administrator shall determine subject to the express provisions of this Plan; (m) take such other action and perform all such other duties as are consistent with this Plan, the orderly administration of the Post-Confirmation Debtors and the Estates, and the interests of holders of Allowed Claims; (n) employ attorneys and other professionals, as further set forth below, to assist in fulfilling the Plan Administrator's obligations under this Plan; (o) to take control of and liquidate the Debtors as their sole representative; (p) complete and file all tax returns as a representative of the Debtors; and (q) engage in all other acts necessary and reasonable in performing its obligations under the provisions of this Plan.

     4.   <u>Role of Oversight Committee and Bankruptcy Court Regarding Certain Powers of Plan Administrator</u>.  The Plan Administrator shall comply with the following protocols when exercising the rights and powers described below in this **Article IV(B)(4)**:

     a.   <u>Authority to Pursue or Withdraw Claim Objections, Causes of Actions and to Make other Filings</u>.  The Plan Administrator shall be authorized, in its sole discretion and without further Bankruptcy Court approval, to: (i) commence (or not commence) objections to Claims, (ii) commence (or not commence) Causes of Action, and (iii) File (or not File) other pleadings in the Bankruptcy Court, as Plan Administrator deems appropriate and in the best interest of the Estates. The Plan Administrator shall be authorized, without further Bankruptcy Court approval, after consulting with the Oversight Committee, to: (i) withdraw objections to Claims, upon a determination by the Plan Administrator that continued pursuit of the Claim Objection is not in the best interest of the Estates; and (ii) dismiss Causes of Action, upon a determination by the Plan Administrator that continued pursuit of the Cause of Action is not in the best interest of the Estates.  Notwittanding the foregoing, the Oversight Committee must authorize the Plan Administrator to commence (or, if pending on the Effective Date, continue to prosecute) any action relating to the Five Star Acquisition or the Five Star Claims.

     b.   <u>Authority to Enter into Settlements</u>.  The Plan Administrator shall be authorized, pursuant to the protocol set forth below, to (i) sell or otherwise dispose of Assets, and (ii) litigate, compromise or submit to mediation any Disputed Claims and Causes of Action of, or against, the Estates:

     (i)   <u>Plan Administrator Sole Discretion</u>.  Without consultation with the Oversight Committee or further order of the Bankruptcy Court, the Plan Administrator may, in its sole discretion, settle, resolve or otherwise dispose of: (a) Disputed Claims for which the Amount in Controversy is no greater than $50,000; and (b) Causes of Action of or against the Estates for which the Amount in Controversy is no greater than $50,000.

     (ii)   <u>Oversight Committee or Bankruptcy Court Approval</u>.  Upon obtaining either the approval of the Oversight Committee or the Bankruptcy Court, the Plan Administrator may, in its sole discretion, settle, resolve or otherwise dispose of: (a) Disputed Claims for which the Amount in Controversy is no greater than $200,000; and (b) Causes of Action of or against the Estates for which the Amount in Controversy is no greater than $200,000.

16

(iii)    Bankruptcy Court Approval.  The Plan Administrator shall be required to obtain Bankruptcy Court approval to settle, resolve or otherwise dispose of: (a) Disputed Claims for which the Amount in Controversy is greater than $200,000; and (b) Causes of Action of or against the Estates for which the Amount in Controversy is greater than $200,000.

c.    Authority to Sell or Otherwise Dispose of Assets other than Causes of Action. The Plan Administrator shall be authorized to sell or otherwise dispose of Assets other than Causes of Action, upon the consent of Regions Bank or approval of the Bankruptcy Court.

d.    Simplified Approval Procedures.    The Plan Administrator may obtain Bankruptcy Court approval for required matters under subsections (b) and (c) above by using the local passive notice procedures set forth in Local Rule 9013-4 with notice to the Special Notice Parties.  If the Plan Administrator Files and serves a disposition or settlement notice under subsections (b) and (c), and no objections are Filed with the Bankruptcy Court by the expiration of the notice period, the proposed disposition or settlement shall be approved upon entry of the proposed order submitted through the passive notice procedures in accordance with Local Rule 9013-4.  If an objection is Filed to a notice given under the subsections (b) and (c), and the Plan Administrator and objecting party are unable to resolve the dispute raised in the objection consensually, then the Bankruptcy Court shall hold a hearing on approval of the proposed disposition or settlement.

5.    Employment and Compensation of Plan Administrator.  The initial Plan Administrator shall be retained pursuant to the terms of this Plan and the Plan Administrator Engagement Letter.  The Plan Administrator (including any successor Plan Administrator) shall be entitled to compensation and reimbursement of necessary fees and expenses reasonably incurred in performing its duties as Plan Administrator as set forth in the Plan Administrator Engagement Letter.  The entry of the Confirmation Order shall constitute approval of the engagement of the Plan Administrator, and the terms thereof, and of any successor Plan Administrator(s) appointed in accordance with this Plan.

6.    Employment of Professionals by the Plan Administrator.  The Plan Administrator may employ one or more attorneys, accountants, appraisers, auctioneers, or other professionals, that do not hold or represent an interest adverse to the Estates, and are disinterested persons, to represent the Plan Administrator in carrying out its duties under this Plan without further Bankruptcy Court approval; provided, however, that if the Plan Administrator retains any professional on a contingency basis including to pursue Causes of Action, such retention must be approved by the Bankruptcy Court, on motion and notice to the Special Notice Parties.

7.    Compensation of Post-Effective Date Professionals.  No professional retained by the Plan Administrator shall be required to File a fee application in connection with services rendered after the Effective Date but shall submit to the Plan Administrator and Oversight Committee a monthly summary invoice and detailed billings detailing the services rendered and the compensation and fees and expenses incurred.  The Plan Administrator shall pay from the Assets, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, the reasonable fees and expenses of the professionals or others employed by the Plan Administrator accruing or incurred after the Effective Date in connection with the implementation and consummation of this Plan.  Absent any objections or disputes as to a professional's fees and expenses, such fees and expenses shall be paid in the ordinary course after the expiration of fifteen (15) Business Days from submission of the invoice summary and detailed billings to the Plan Administrator and Oversight Committee.  If the Plan Administrator or Oversight Committee disputes the reasonableness of any fees and expenses, the Plan Administrator or other interested parties may, after attempting in good faith to settle such dispute, submit such dispute to the Bankruptcy Court for a determination of the reasonableness of such fees and expenses.  The disputed portion of any such disputed invoice shall not be paid until the dispute is resolved or abandoned, except

17

as may otherwise be provided herein.  The undisputed portion of any such invoice shall be paid as provided above (within fifteen (15) Business Days of submission).  A report of all fees of professionals hired by the Plan Administrator will be provided to the Bankruptcy Court as set forth in **Article IV(B)(10)** below.

8. Removal or Resignation of Plan Administrator.

 a. Removal.  At any time prior to the Final Distribution under this Plan, any Creditor may File a motion with the Bankruptcy Court seeking to remove the Plan Administrator, upon a showing by that Creditor of good cause to remove the Plan Administrator.  If the Plan Administrator is removed, the Plan Administrator shall continue to serve until the earliest of (i) the time when appointment of a successor shall become effective, or (ii) such earlier date as shall be determined by the Bankruptcy Court.

 b. Resignation.  The Plan Administrator may resign from such capacity by giving written notice of its resignation to the Oversight Committee with a copy to the Special Notice Parties, provided that the Plan Administrator shall continue to serve as Plan Administrator after its resignation until the time when appointment of a successor Plan Administrator shall become effective.

9. Appointment of Successor Plan Administrator.  In the event the Plan Administrator resigns, is removed, or otherwise is incapacitated to serve as Plan Administrator prior to making the Final Distribution to Creditors, the Oversight Committee shall appoint another Plan Administrator without further order of the Bankruptcy Court.  Within 15 days following such appointment, the Plan Administrator shall File a notice of successor Plan Administrator with the Bankruptcy Court, on notice to the Special Notice Parties.  The successor Plan Administrator shall be substituted as a party in any action or proceeding arising in or related to the Chapter 11 Cases, this Plan, the Debtors, the Post-Confirmation Debtors, or the Estates, and shall have all of the rights, powers, and duties set forth or discussed in this Plan. This shall include without limitation acting as the sole representative of the Post-Confirmation Debtors and as the representative of the Post-Confirmation Debtors and the Estates under the Bankruptcy Code including section 1123(b)(3) as if appointed as the initial Plan Administrator under this Plan.  The successor Plan Administrator shall be compensated based on the procedure set forth above.

10. Reports.  The Plan Administrator shall File with the Bankruptcy Court and serve upon the Oversight Committee within 30 days after the end of each full calendar quarter for the first year subsequent to the Effective Date, and semi-annually thereafter (within 30 days after the end of such semi-annual period) until the Chapter 11 Cases is closed, a written report, including: (i) a summary of transactions consummated during the report period and the amounts thereof (including amounts collected, Dispositions, settlements of Disputed Claims, Distributions to Creditors, fees paid to the Plan Administrator, employees of the Plan Administrator and professionals of the Plan Administrator and the Oversight Committee, and other expenditures); and (ii) the status of Causes of Action and Distributable Proceeds as of the end of the report period, except to the extent that the Plan Administrator believes that such general disclosure might negatively affect such litigation or the settlement thereof.

11. Standard of Care for Plan Administrator; Exculpation.  The Plan Administrator shall perform the duties and obligations imposed on the Plan Administrator by this Plan with reasonable diligence and care under the circumstances.  The Plan Administrator shall not be personally liable to the Creditors or to Persons entitled to receive Distributions of Assets under this Plan, except for such of its own acts as shall constitute fraud, bad faith, willful misconduct, gross negligence or willful disregard of its duties.  Except as aforesaid, the Plan Administrator shall be entitled to be exonerated and indemnified from time to time from the Assets against any and all losses, claims, costs, expenses (including the cost

18

of defense), and liabilities arising out of or in connection with the Assets or the implementation of this Plan. The foregoing provisions of this paragraph shall also extend to the employees, professionals and agents of the Plan Administrator, as the case may be.

12.    <u>Reliance by Plan Administrator</u>.  The Plan Administrator may conclusively rely, and shall be fully protected personally in acting upon, any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document which it has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles and emails, to have been sent by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission or receipt.  In the absence of its fraud, bad faith, willful misconduct, gross negligence, or willful disregard of its duties, the Plan Administrator may conclusively rely as to the truth of statements and correctness of the facts and opinions expressed therein and shall be fully protected personally in acting thereon.  The Plan Administrator may consult with legal counsel and shall be fully protected in respect of any action taken or suffered by it in accordance with the opinion of legal counsel. The Plan Administrator shall have the right at any time to seek instructions from the Bankruptcy Court concerning the acquisition, management or Disposition of the Assets or concerning any other matter for which the Plan Administrator deems such instructions appropriate or desirable.

## C.    <u>Dissolution of the Committee and Formation of the Oversight Committee</u>

1.    <u>Dissolution of the Committee</u>.  On the Effective Date, the Committee shall be dissolved and the Committee's members, agents, advisors, and representatives (including its Professionals) shall be deemed relieved of all of their duties and responsibilities as members or representatives of the Committee and the foregoing shall be without any further duties, responsibilities and authority in connection with the Debtors, the Chapter 11 Cases or this Plan and its implementation.

2.    <u>Formation of the Oversight Committee</u>.  On the Effective Date, the Oversight Committee shall be formed and constituted.  The initial Oversight Committee shall consist of three (3), five (5), or seven (7) Committee members who shall be appointed by the Committee.  Membership on the Oversight Committee shall be on an institutional and not on an individual basis.  If any holder of a Claim that is a member of the Oversight Committee sells, transfers, assigns, otherwise relinquishes its Claim, or such Claim is satisfied, such holder and its assignee, designee or transferee shall be deemed to have immediately resigned from the Oversight Committee.  In the event that a member of the Oversight Committee resigns or is deemed to have resigned from its position on the Oversight Committee, the non-resigning Oversight Committee members shall have the right to designate its successor, if any.  All approvals and other actions of the Oversight Committee set forth in this Plan shall be obtained or made by a majority vote of the Oversight Committee.  If the Plan Administrator is not able to obtain Oversight Committee approval under this Plan, as an alternative to being authorized to take an action requiring Oversight Committee approval, the Plan Administrator may seek such authorization by filing a motion with the Bankruptcy Court, upon at least 10 days' prior notice to the Special Notice Parties.

3.    <u>Expense Reimbursement of Oversight Committee Members</u>.   The members of the Oversight Committee shall serve without compensation for their performance of services as members of the Oversight Committee; however, the members of the Oversight Committee shall be reimbursed by the Plan Administrator from the Assets for reasonable and necessary out of pocket expenses incurred during their performance of services as members of the Oversight Committee, without further order of the Bankruptcy Court.

4.    <u>Limited Liability of Oversight Committee; Reliance</u>.  Neither the Oversight Committee, nor any of its members or designees, nor any duly designated professional, agent or representative of the

Oversight Committee or the Plan Administrator, or their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of the Oversight Committee, nor shall any member be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Oversight Committee, other than acts or omissions resulting from fraud, bad faith, willful misconduct, gross negligence, or willful disregard of its duties.

The Oversight Committee may conclusively rely, and shall be fully protected personally in acting upon, any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document which it has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles and emails, to have been sent by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission or receipt.  In the absence of its fraud, bad faith, willful misconduct, gross negligence, or willful disregard of its duties, the Oversight Committee may conclusively rely as to the truth of statements and correctness of the facts and opinions expressed therein and shall be fully protected personally in acting thereon.  The Oversight Committee may consult with legal counsel and shall be fully protected in respect of any action taken or suffered by it in accordance with the opinion of legal counsel.

     5.    <u>Recusal of Oversight Committee Members if Potential Conflict</u>.  An Oversight Committee member shall recuse itself (or be recused) from any decisions or deliberations regarding actions taken or proposed to be taken by the Plan Administrator or Oversight Committee with respect to Claims of or Causes of Action against or materially related to such Oversight Committee member or any affiliate of the member.

**D.**    **<u>Plan Substantive Consolidation</u>**

     1.    <u>Generally</u>.  Entry of the Confirmation Order shall constitute the approval, pursuant to sections 1129 and 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation (for purposes of distribution and other Plan purposes only) of the Debtors, the Estates, and the Chapter 11 Cases, including without limitation, Plan voting, confirmation, Distribution, and implementation and administration of this Plan, including reporting or Filings in connection with the Plan.  On and after the Effective Date, (i) all assets and liabilities of the Debtors shall be treated as though they were merged, including for purposes of any reporting requirements under this Plan; (ii) all intercompany Claims between and among the Debtors shall be eliminated and no Distributions shall be made under this Plan on account of any Claim held by a Debtor against any other Debtor; (iii) all intercompany Interests between and among the Debtors shall be eliminated and no Distributions shall be made under this Plan on account of any Interest held by a Debtor in any other Debtor; (iv) all guarantees of the Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed one obligation of the Debtors; (v) each and every Claim Filed or to be Filed against any Debtor shall be deemed Filed against, and shall be one Claim against and obligation of, the Debtors; and (vi) any duplicate claims (identical in both subject matter and amount) Filed against different Debtors shall be deemed automatically expunged, so that only one claim survives against the consolidated Debtors.

     2.    <u>No Prejudicial Effects</u>.  The substantive consolidation effected pursuant to this Plan shall not be construed as an election of remedies and shall not affect or prejudice: (i) the legal and organizational structure of the Debtors (other than for purposes related to funding Distributions and other purposes under this Plan as set forth above in this section); (ii) any Claims or defenses of the Debtors existing prior to such substantive consolidation or at any time, whenever asserted, including without limitation any insider or other claims; (iii) requirements for any third party to establish mutuality in order

20

to assert a right of setoff; (iv) Distributions out of any insurance policies or proceeds of such policies; or (v) any similar or analogous rights of the Debtors or the Estates, including any which may constitute a right or asset of any Debtor or Estate. Without limiting the generality of the foregoing, all Claims held by any Debtor against any non-Debtor shall be unaffected by substantive consolidation under this Plan.

    3.    Plan as Motion; Objections; Hearing. This Plan shall serve as a motion seeking entry of an order substantively consolidating the Debtors, the Chapter 11 Cases, and the Estates, in the manner described above. Any objections to substantive consolidation under this Plan must be made in writing by a Creditor or other party-in-interest affected by this Plan by the date fixed by the Bankruptcy Court as the Plan objection deadline. In the event any such objections to substantive consolidation are timely Filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may coincide with the Confirmation Hearing or be held at any earlier time established by the Bankruptcy Court. Entry of the Confirmation Order shall constitute the approval, pursuant to sections 1129 and 105(a) of the Bankruptcy Code, of the substantive consolidation of the Debtors, effective as of the Effective Date.

## E.    Vesting of Assets and Retention of Causes of Action

    Notwithstanding Bankruptcy Code section 1141(b) or any other provision of this Plan, all Assets of the Debtors and the Estates, including without limitation the Causes of Action and other Property, shall be retained and remain property of the Estates or the Post-Confirmation Debtors, as applicable, and subject to enforcement by the Plan Administrator as provided in this Plan in accordance with section 1123(b)(3) following Confirmation of the Plan. Each of the Post-Confirmation Debtors and the Estates shall continue in existence under the direction and control of the Plan Administrator, as the authorized representative of each of the foregoing, in accordance with and as further set forth in this Plan. On and after the Effective Date, except as specifically provided otherwise in the Plan: (1) the Assets shall be free and clear of all claims, liens, charges, interests and other encumbrances, and (2) the Plan Administrator shall liquidate the Assets and otherwise deal with the Assets in accordance with the Plan free of any restrictions of the Bankruptcy Code.

## F.    Continued Existence of Debtors and Estates After the Effective Date

    1.    Post-Confirmation Debtors and Estates. From and after the Effective Date, the Post-Confirmation Debtors and the Estates shall continue in existence under the direction and control of the Plan Administrator as set forth in this Plan for the purpose of (a) winding up their affairs, (b) facilitating the liquidation, by conversion to Cash or other methods, of the Assets of the Debtors and the Estates, (c) enforcing and prosecuting Claims, interests, rights and privileges of the Debtors in conjunction with the marshaling of the Assets, (d) resolving Disputed Claims, (e) administering this Plan, and (f) filing appropriate tax returns. Each Debtor shall continue to exist as a Post-Confirmation Debtor until dissolved, administratively or otherwise, in accordance with this Plan by the Plan Administrator.

    2.    Corporate Governance after the Effective Date. This Plan and the Debtors as the Post-Confirmation Debtors will be administered by the Plan Administrator, in consultation with the Oversight Committee as specified in this Plan, and all actions taken in the names of the Debtors and Post-Confirmation Debtors and the Estates shall be taken through the Plan Administrator. On the Effective Date, automatically and without further action, (a) each existing member of the respective board of directors or other governing body of each of the Debtors and all of the officers of each of the Debtors and any managers or members with governing authority, to the fullest extent applicable, shall be terminated and relieved of any further obligations or duties to the Debtors, and (b) the Plan Administrator shall be deemed to have the sole authority to act for the Debtors, without any approval of any of the Debtors' officers and directors or members. From and after the Effective Date, all bylaws,

21

articles or certificates of incorporation and related corporate documents are hereby amended and deemed amended by this Plan to permit and authorize such sole appointment of the Plan Administrator as set forth in this paragraph.  Nothing in this Plan shall constitute a waiver of any claims the Estates, the Debtors, or the Plan Administrator have against the Debtors' officers and directors.

The Plan Administrator shall serve as the sole representative of the Post-Confirmation Debtors as set forth herein through the earlier of the date that the (x) Post-Confirmation Debtors are dissolved in accordance with this Plan, or (y) the Plan Administrator resigns, is terminated or unable to serve and is replaced with a successor in accordance with the provisions of this Plan, at which time such successor shall be deemed to be appointed the sole representative of the Post-Confirmation Debtors and shall serve in such capacity until the Debtors are dissolved in accordance with this Plan.  As of the Effective Date, any officers or directors for any of the Debtors (other than the Plan Administrator) shall be deemed to be terminated by the Bankruptcy Court pursuant to this Plan.

3.      Deemed Withdrawal of Transaction of Business; Dissolution of Debtors.  From and after the Effective Date, the Post-Confirmation Debtors shall not be required to file any document, or take any other action, to withdraw their business operations from any states in which the Debtors were previously conducting their business operations.  Upon Distribution of all Assets pursuant to this Plan and certification to that effect served on the Special Notice Parties and Filed with the Bankruptcy Court (unless a Final Decree has been previously entered in the Chapter 11 Cases), the Post-Confirmation Debtors shall be deemed dissolved for all purposes without the necessity for any further actions to be taken by or on behalf of the Post-Confirmation Debtors or payments to be made in connection therewith.  The Plan Administrator shall be excused from taking any further action to preserve the continued corporate existence of the Debtors thereafter.  Provided, however, the Plan Administrator shall have the discretion (but no obligation) to take whatever actions it deems appropriate or desirable with regard to any of the foregoing in this section, including filing for the Post-Confirmation Debtors a certificate of dissolution with the appropriate state authorities under applicable law.

The Plan Administrator shall have all the powers and responsibilities to wind up the affairs of the Debtors that devolve upon an administrator, liquidating agent or receiver under the applicable state and federal laws, in addition to all the rights, powers and responsibilities conferred by the Bankruptcy Code and this Plan; provided, however, that any action taken with respect to the dissolution or wind-up of the Debtors must be consistent with the terms of this Plan, or such action shall be void and of no force or effect.  Notwithstanding the dissolution or wind up of the Debtors, the Bankruptcy Court shall retain jurisdiction over those matters described in this Plan.

## G.      Debtors' Business Records

Before or contemporaneous with the Bankruptcy Court's issuance of a Final Decree, the Plan Administrator shall arrange and obtain any necessary approvals for subsequent storage, abandonment or other custody and control of remaining business records of the Debtors and the Post-Confirmation Debtors, unless the Bankruptcy Court orders otherwise.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A.      Rejection of Executory Contracts and Unexpired Leases

Except as otherwise specifically provided in this Plan, including the remaining subsections of **Article V** of this Plan, as of the Confirmation Date, all executory contracts and unexpired leases not

22

previously assumed or rejected by the Debtors on the Confirmation Date, shall be automatically rejected without further notice or order of the Bankruptcy Court.

**B.**     **Post-Closing Agreements**

The Post-Closing Agreements (which, unless previously addressed by order of the Bankruptcy Court, are each subject to a pending decision as to rejection or assignment and assumption to the Buyer by the Debtors or the Plan Administrator pursuant to the terms of the APA and the Sale Order) shall not be deemed rejected until the applicable deadline under the APA or Sale Order for assumption or rejection of such Post-Closing Agreement occurs, at which time any Post-Closing Agreements not then already assumed and assigned to Buyer or rejected shall be deemed rejected, with related Claims or other obligations treated as set forth in the APA and Sale Order.

**C.**     **D&O Policy**

The D&O Policy shall continue in full force and effect after the Effective Date regardless of whether it is determined to be an executory contract or not.  To the extent that the D&O Policy is determined to be an executory contract, this Plan shall constitute a motion to assume the D&O Policy and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that assumption of the D&O Policy is in the best interest of the Debtors and its Estates, and all parties in interest in the Chapter 11 Cases, and otherwise satisfies the provisions of the Bankruptcy Code.

**D.**     **Employment Related Agreements**

From and after the Closing, all remaining employee programs, including, but not limited to, any retirement plans or agreements to provide health benefits and disability plans not previously assumed under the APA or rejected before the Confirmation Hearing, shall be hereby deemed terminated in accordance with applicable law.  To the extent any of such employee programs constitute executory contracts, such contracts shall be deemed rejected in accordance with **Article V(A)** above.  The Plan Administrator shall be authorized (but not required or obligated) to take any and all actions, including the provision of any requisite notices if not previously provided, to provide notice of the termination under the Plan or previously, as applicable, of all such programs and to discharge all benefits and any other continuing obligations to participants and beneficiaries of such programs.

**E.**     **Indemnification Obligations of the Debtors**

Indemnification Obligations owed to directors, officers and employees of any of the Debtors (or their Estates) shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to section 365 of the Bankruptcy Code under the Plan; provided, however, that nothing contained in the Plan or Confirmation Order shall affect coverage under the D&O Policy, including all rights thereunder, or any indemnification obligations of third parties owed to the Debtors.

Notwithstanding any other provision, Indemnification Obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and order of the Bankruptcy Court, to the extent that such Indemnification Obligations relate to the period after the Petition Date, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

23

**F.**    **Bar Dates for Rejection Claims**

1.    <u>Contracts and Leases Rejected Prior to Confirmation Date</u>.  Each Person or Entity who is a party to an executory contract or unexpired lease rejected by the Debtors prior to the Confirmation Date, including Post-Closing Agreements rejected prior to the Confirmation Date, must comply with the applicable Bar Date, if any, established by the motion and order rejecting such executory contract or unexpired lease for Claims arising from the rejection or, if none, by the Bar Date established in **Article V(F)(2)** below under this Plan.

2.    <u>Contracts and Leases Rejected under Plan</u>.  Each other Person or Entity who is a party to an executory contract or unexpired lease rejected by the Debtors under this Plan must File a Proof of Claim for damages alleged to arise from the rejection of such executory contract or unexpired lease, or be forever barred, within 30 days after the date the Notice of Effective Date is served.

3.    <u>Post-Closing Agreements Rejected after Confirmation Date</u>.  Each Person or Entity who is a party to a Post-Closing Agreement that is rejected after the Confirmation Date must File a Proof of Claim for damages alleged to have arisen from the rejection of such executory contract or unexpired lease, or be forever barred, within 30 days after notice of rejection of the Post-Closing Agreement has been Filed and served on such party to the Post-Closing Agreement.  Any Proof of Claim required to be Filed under **Article V(F)(2)** or **(3)** of this Plan shall be Filed with the Claims Agent and served on the Plan Administrator in accordance with the notice provisions of this Plan not later than the applicable Bar Date.

**ARTICLE VI**
**PAYMENT AND DISTRIBUTIONS ON CLAIMS**

**A.**    **Manner of Payment**

Any payment in Cash to be made by the Debtors or the Plan Administrator shall be made, at the election of the Plan Administrator or the Debtors, by check drawn on a domestic bank or by wire transfer from a domestic bank.

**B.**    **Funds and Accounts for Payment of Claims and Plan Implementation**

As soon as practicable after the Effective Date, the Plan Administrator shall establish and maintain the following funds and/or accounts to implement this Plan:

1.    <u>Disputed Claims Reserve</u>.  As of and after the Effective Date, the Plan Administrator shall establish and maintain an account which shall be called the Disputed Claims Reserve, into which the Plan Administrator shall deposit potential Distributions to holders of Disputed Claims in accordance with the terms of this Plan.  Such Disputed Claims Reserve shall be maintained by the Plan Administrator until each Disputed Claim in each respective class has been allowed or disallowed by Final Order of the Bankruptcy Court.  Thereafter, any excess funds in the Disputed Claims Reserve shall be transferred to the Operating Account or other account established by the Plan Administrator to make Distributions to holders of Allowed Claims in accordance with this Plan.

2.    <u>Operating Account</u>.  As of and after the Effective Date, the Plan Administrator shall establish and maintain an account called the Operating Account.  The Plan Administrator shall pay all Plan Expenses and related costs of the Post-Confirmation Debtors and the Estates from the Operating Account.  Distributions to holders of Allowed Claims also may be made by the Plan Administrator out of the Operating Account, or a separate account may be established for this purpose in the Plan

24

Administrator's discretion.  To the extent the Plan Administrator determines that the existing funds in the Operating Account are insufficient for such purposes, the Plan Administrator may transfer additional Cash as needed to the Operating Account to fund such Plan Expenses or Distributions, as the case may be.

      3.    <u>Other Accounts</u>.  The Plan Administrator may, in its discretion and in a commercially reasonable manner, establish such other accounts as it deems necessary or advisable, including without limitation separate Distribution accounts, payroll accounts, tax escrow accounts, and any other accounts deemed necessary or desirable to implementation of this Plan.

## C.    <u>Interim and Final Distributions</u>

The Plan Administrator shall be authorized (but not required) to made interim Distributions, upon obtaining approval of the Oversight Committee or the Bankruptcy Court.  The Plan Administrator shall make a final Distribution ("Final Distribution") of all Net Distributable Proceeds to Creditors entitled to Distributions under this Plan only after (i) all Property and Assets of the Debtors, Post-Confirmation Debtors and the Estates have been converted to Cash or abandoned; (ii) all Disputed Claims have been finally resolved; (iii) the applicable 60-day time period regarding all Creditors' rights to claim unclaimed property in accordance with this Plan shall have passed; and (iv) the fees and expenses of the Plan Administrator and Oversight Committee shall have been paid in full (including any fees and expenses reasonably anticipated to be incurred after the Final Distribution in order to close or wind up the Debtors, the Estates or the Chapter 11 Cases as applicable) in accordance with this Plan.

## D.    <u>Rounding of Distributions; Minimum Distributions</u>

Notwithstanding any other provision of this Plan, the Plan Administrator shall not be required to make any Distribution of less than $25.00 to the holder of any Allowed Claim, and may round all Distributions to the nearest $1.00.  Any other provision of this Plan to the contrary notwithstanding, no payment of fractions of cents will be made if the Plan Administrator decides to pay cents rather than rounding to the nearest $1.00.  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  In addition, if the total value of the Assets in the Estates is less than $10,000 (the "Remaining De Minimis Assets"), the Plan Administrator shall not be required to make any further Distributions, and shall be authorized (but not required) to liquidate such Remaining De Minimis Assets (to the extent required) and abandon and transfer all Remaining De Minimis Assets to the Bankruptcy Court's fund for unclaimed funds or donate the Remaining De Minimis Assets to a nonprofit organization which is organized under Section 501(c)(3) of the Internal Revenue Code; <u>provided</u>, <u>however</u>, that if all or any portion of the Remaining De Minimis Assets is payable to Class 5 under the terms of this Plan, then such amount shall be distributed to Class 5.

## E.    <u>Distributions to the Last Known Address</u>

Distributions to holders of Allowed Claims will be sent to the last known address set forth on such holder's Proof of Claim, or on the Schedules, if no Proof of Claim has been Filed.  Holders of Claims may change the address to which Distributions, if any, will be sent by furnishing written notice to the Plan Administrator.  A proper notice of change of address will be effective for a Distribution if received at least 30 days in advance of such Distribution date.  If a Distribution is returned after being sent by the Plan Administrator to a holder's last known address as determined above in this paragraph and is treated as unclaimed property, the Plan Administrator shall thereafter be relieved from making subsequent Distributions to such holder, and amounts which otherwise would have been due to such

25

holder shall be deemed unclaimed property without further notice, action, or expiration of further time, and may be distributed as such by the Plan Administrator in accordance with this Plan.

## F.    Unclaimed Property

If any Distribution remains unclaimed for a period of 60 days after the distribution date (including through failure to negotiate a check for Distributions within 60 days of its date), such unclaimed property shall be forfeited by such holder (and any related checks may be stopped or cancelled) whereupon all right, title and interest in and to the unclaimed property shall escheat to the Plan Administrator for the benefit of other creditors and be held in reserve by the Plan Administrator to be distributed to other Creditors in accordance with this Plan unless another Disposition is made in accordance with this Plan.

## G.    Withholding or other Taxes

Any federal, state, or local withholding or other taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions hereunder.  All Persons or Entities holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

## H.    Setoffs

Subject to the limitations provided in section 553 of the Bankruptcy Code, the Debtors or the Plan Administrator, as applicable, may, but shall not be required to, setoff against any Claim and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Plan Administrator, as applicable, of any such claim or other claims, rights, or causes of action that the Debtors or the Plan Administrator may have against such holder.

Subject to any order of the Bankruptcy Court entered in the Chapter 11 Cases on or before November 1, 2011, any Person with an Allowed Claim (or a Disputed Claim until allowed or disallowed by Final Order of the Bankruptcy Court) shall be entitled to assert and exercise any setoff right or rights that Person may have to the extent permitted by the Bankruptcy Code.  The Debtors, the Post-Confirmation Debtors, the Estates and the Plan Administrators' right to object to any Person's purported right of setoff are expressly preserved.

Without further order of the Bankruptcy Court or the need to object to Claims on the basis of section 502(d), pursuant to section 502(d), the Plan Administrator may withhold Distributions on account of Allowed Claims pending resolution of an Avoidance Action, if: (i) an Avoidance Action is pending at the time the Claim becomes an Allowed Claim; or (ii) the Debtors or Plan Administrator puts the holder of the Allowed Claim on formal written notice of the Plan Administrator's intent to commence an Avoidance Action against the holder of the Allowed Claim.

## I.    Subordination Rights

All subordination rights, claims, and defenses of the Debtors and Plan Administrator shall remain valid, enforceable, and unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise, except as otherwise specifically provided in this Plan, including but not limited to those in the Regions Bank Settlement Agreement.

## ARTICLE VII
## BAR DATES, OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS RESERVE

### A.    Allowance of Claims

Except as expressly provided herein or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed, unless and until such Claim is deemed Allowed under the Bankruptcy Code or agreed to be Allowed by the Debtors, by the Plan Administrator in accordance with this Plan, or so ordered by Final Order of the Bankruptcy Court.  Except as expressly provided in this Plan, the Plan Administrator after Confirmation will have and retain any and all rights and defenses the Debtors had with respect to any Claims as of and after the Petition Date, including the Causes of Action referenced in this Plan and the Disclosure Statement and the Filing of any motions or other pleadings for estimation of the amount of Disputed Claims.  Subject to Article VI(H) above, all Claims of any Person or Entity that owes money to the Debtors shall be disallowed unless and until such Person or Entity pays the full amount it owes the Debtors.

### B.    Authority to Prosecute Objections

After the Effective Date, only the Plan Administrator shall have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims, including Administrative Claims (other than Fee Claims).

### C.    Claims Objection Bar Date

Except as otherwise specified in **Article VII(D)** below regarding general Administrative Claims, Fee Claims of professionals, and Section 503(b)(9) Claims, objections to Claims shall be Filed with the Bankruptcy Court and served upon the relevant Creditors by the Claims Objection Bar Date, which shall be no later than 180 days after the Effective Date or 180 days after such Claim is Filed, whichever date is later, provided, that this deadline may be extended by the Bankruptcy Court upon motion of the Plan Administrator or the Oversight Committee, all as further set forth in the definition of Claims Objection Bar Date.  Any Distributions with respect to and on account of Claims to which objections have been Filed will be made as soon as practicable after an order, judgment, decree or settlement agreement with respect to such Allowance of such Claim becomes a Final Order.

### D.    Bar Date and Objection Provisions for Administrative Claims

1.    <u>General Administrative Claims.</u>  The holder of an Administrative Claim, other than (a) a Fee Claim, (b) a liability incurred and payable in the ordinary course of business by the Debtors (and not past due), (c) an Administrative Claim that has been Allowed on or before the Effective Date, (d) Statutory Fees, or (e) a Section 503(b)(9) Claim, must File with the Bankruptcy Court and serve on the Debtors, the Plan Administrator, and the Office of the United States Trustee, a request for payment of such Administrative Claim within 30 days after the date the Notice of Effective Date is served.  Such request must include at a minimum (A) the name of the holder of the Claim, (B) the amount of the Claim, and (C) the basis of the claim.  **Failure to File and serve such request timely and properly shall result in the Administrative Claim being forever barred and discharged unless otherwise ordered by the Bankruptcy Court.**

The holders of the Allowed Administrative Claims enumerated in (a)–(e) above of this **Article VII(D)(1)** shall not be required to File a request for payment of their Administrative Claims. Holders of Allowed Administrative Claims for a liability incurred and payable in the ordinary course of business by the Debtors (and not past due) under (b) above shall be paid in the ordinary course of

27

business (to the extent not assumed under the APA), and holders of other Allowed Administrative Claim set forth in (a), (c), (d), (e) and (f) shall be paid as set forth in **Article III(A)(1)**.

Objections to general Administrative Claims must be Filed and served on the parties that were served with such Claims or requests and the requesting party by the later of (A) 60 days after the date the Notice of Effective Date is served; (B) 60 days after the Filing of the applicable request for payment of Administrative Claims; or (C) such later date as provided for by order of the Bankruptcy Court, which order may be entered without further notice or hearing. The Debtors or the Plan Administrator shall File and serve a notice of occurrence of the Effective Date in the Chapter 11 Cases.

2.     Fee Claims. Professionals and Entities asserting Fee Claims must File and serve on the United States Trustee, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 60 days after the date the Notice of Effective Date is served. **Failure to File timely and serve such application shall result in the Fee Claim being forever barred and discharged unless otherwise ordered by the Bankruptcy Court.** Objections to any Fee Claim must be Filed and served on the parties that were served with such Fee Claim within 21 days after the Fee Claim is Filed.

3.     Section 503(b)(9) Claims. On or before the General Claims Bar Date specified in the Notice of Proof of Claim Deadline, a holder of a Section 503(b)(9) Claim must File a Proof of Claim with respect to such holder's Claim, which Proof of Claim must separately specify the amount of and support for the holder's Section 503(b)(9) Claim (or reference such support if already Filed in the Chapter 11 Cases); provided, however, that a holder of a Section 503(b)(9) Claim that is allowed pursuant to a Final Order entered prior to the General Claims Bar Date is not required to File a Proof of Claim. Each Holder of a Section 503(b)(9) Claim and its Claim shall be subject to the General Claims Bar Date and Filing requirements set forth in the previous sentence but in every other respect shall be classified, treated, and paid to the extent Allowed as Administrative Claims under this Plan as set forth herein. Objections to Section 503(b)(9) Claims must be filed with the Bankruptcy Court and served upon the relevant Creditors by no later than 90 days after the Effective Date or 90 days after such Section 503(b)(9) Claim is filed, whichever date is later, provided that this deadline may be extended by the Bankruptcy Court upon motion of the Plan Administrator or the Oversight Committee; provided, however, no party shall have the right to file an objection to a Section 503(b)(9) Claim which was previously allowed by order of the Bankruptcy Court or  a stipulation with the Debtor or Plan Administrator, as applicable.

E.     **No Distributions to Holders of Disputed Claims**

Notwithstanding any other provision of this Plan, no Cash or other Property shall be distributed under this Plan on account of any Disputed Claim.

F.     **Estimation of Claims**

The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Plan Administrator previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during the litigation concerning any objection to any Claims, including without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute the Allowed amount of such

Claim for the purposes of Distribution of the Distributable Proceeds.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN

### A.    Conditions to Effective Date

The following are conditions precedent to the occurrence of the Effective Date:

1.    The Confirmation Order, in form and substance acceptable to the Debtors and the Committee, shall have been signed by the Bankruptcy Court and entered by the Clerk of the Bankruptcy Court; and

2.    The Confirmation Order shall have become a Final Order.

### B.    Effect of Non-Occurrence of Effective Date

If the Confirmation Order is vacated or revoked or the Effective Date does not occur for any other reason, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by, against, or Interests in, the Debtors or the Committee; (2) prejudice in any manner the rights of the Debtors or the Committee; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors or the Committee in any respect.

## ARTICLE IX
## EFFECTS OF CONFIRMATION

### A.    No Discharge

Under this Plan, the effects of Confirmation shall be as provided under Bankruptcy Code sections 1141(a), (b), (c), and (d)(3).  The Debtors and the Estates shall continue to exist following Confirmation and until there is a Final Distribution.  Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtors shall not be discharged by Confirmation or under this Plan.

### B.    Post-Confirmation Effect of Evidences of Claims or Interests

On the Effective Date, except as otherwise provided in this Plan, all promissory notes, share certificates, warrants, membership interests, instruments, indentures, agreements, or other documents evidencing, giving rise to, or governing any Claim or Interest in the Debtors shall represent only the right, if any, to participate in the Distributions contemplated by this Plan.

### C.    Preservation of Causes of Action

1.    Causes of Action Retained and Preserved For Enforcement.  Upon the occurrence of the Effective Date, all Causes of Action of any of the Debtors or the Estates shall be retained and preserved for enforcement by the Post-Confirmation Debtors and the Estates as applicable, with the Plan Administrator appointed and approved by the Bankruptcy Court as the authorized representative of each

29

of the Debtors and the Estates under this Plan (and with respect to any judicial proceeding or appeal to which any Debtor is a party) pursuant to the Bankruptcy Code including section 1123(b)(3)(B). The Plan Administrator shall have the power and right to commence, continue, and otherwise enforce any Causes of Action of the Debtors and/or the Estates, all of which shall be retained and preserved hereby, notwithstanding confirmation and/or consummation of this Plan. Potential Causes of Action currently being investigated by the Debtors and the Committee, which may but need not be pursued by the Debtors or the Committee prior to the Effective Date and by the Plan Administrator after the Effective Date as warranted but which shall be retained after Confirmation regardless include, without limitation, the following:

    a. Specified Causes of Action. Causes of Action, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, including, without limitation, the following: all potential Causes of Action listed or referenced in the Debtors' Schedules, which are incorporated herein by reference; the Five Star Claims; claims related to the Deficiency Letter, including indemnity claims; possible claims against vendors, landlords, sublessees, assignees, customers or suppliers for warranty, indemnity, back charge/set-off issues, overpayment or duplicate payment issues and collections/account receivables matters; deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor, landlord, sublessee, assignee, or other Person or Entity; employee, management or operational matters; claims against landlords, sublessees and assignees arising from the various leases, subleases and assignment agreements relating thereto, including, without limitation, claims for overcharges relating to taxes, common area maintenance and other similar charges; financial reporting; environmental; and product liability matters; actions against insurance carriers relating to coverage, indemnity or other matters; actions against current or former officers, directors, employees, parents, subsidiaries, affiliates, or tax or pension or other control group members; counterclaims and defenses relating to notes or other obligations; contract or tort claims which may exist or subsequently arise;

    b. Avoidance or Subordination Actions. Any and all avoidance or subordination or other actions pursuant to any applicable section of the Bankruptcy Code, including, without limitation, sections 510, 544, 545, 547, 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code, and other similar state laws such as fraudulent conveyance and preference and other creditors' rights statutes or state or federal common law, which may involve lenders or insiders of the Debtors or other third parties, arising from any transaction involving or concerning the Debtors, including the Causes of Action listed on the Non-Exclusive Schedule of Potential Chapter 5 Causes of Action against Non-Insiders, annexed hereto as **Exhibit B**, and the Non-Exclusive Schedule of Potential Chapter 5 Causes of Action against Insiders, annexed hereto as **Exhibit C**; and

    c. Any and all other Claims and Causes of Action of the Debtors. In addition, there may be numerous other Causes of Action which currently exist or may subsequently arise that are not set forth herein or in the Disclosure Statement including because the facts upon which such Causes of Action are based are not currently or fully known by the Debtors and, as a result, cannot be raised prior to Confirmation (collectively, the "Unknown Causes of Action"). The failure to list any such Unknown Cause of Action herein, in the Disclosure Statement, or in other Plan documents is not intended to limit the rights of the Plan Administrator or the Oversight Committee to pursue any Unknown Causes of Action including to the extent facts underlying such Unknown Cause of Action subsequently become known to the Debtors, the Plan Administrator, the Oversight Committee, or other parties in interest.

    2. Statement of Intent to Retain all Potential Causes of Action. Unless Causes of Action against a Person or Entity are expressly waived, relinquished, released, compromised or settled in this Plan or by any Final Order, the Debtors and Post-Confirmation Debtors and Estates, on behalf of themselves and holders of Allowed Claims and in accordance with Bankruptcy Code including section

1123(b)(3)(B), expressly reserve and shall retain for enforcement post-Confirmation and post-consummation all Causes of Action and Unknown Causes of Action, including, without limitation, the Causes of Action described herein as well as any other Causes of Action including Unknown Causes of Action, that the Debtors or the Estates had or had the power to assert immediately before Confirmation, for adjudication or later adjudication, and, therefore, no waiver or preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the Confirmation or consummation of this Plan. In addition, the Debtors and the Estates expressly reserve and retain the right to pursue or adopt or otherwise enforce (and the right of the Plan Administrator to do so) any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, including without limitation any lawsuits described in the Disclosure Statement or otherwise existing, against any Person, including without limitation the plaintiffs and co-defendants in such lawsuits. Nothing contained in this Plan shall constitute a waiver of the rights, if any, of the Debtors or Post-Confirmation Debtors or the Estates, through the Plan Administrator, to a jury trial with respect to any Cause of Action or objection to any Claim or Interest.

　　　　3.　　<u>Representatives of the Estates</u>.　In accordance with the Bankruptcy Code including section 1123(b)(3), any claims, rights, and Causes of Action that the respective Debtors, Post-Confirmation Debtors, Estates, or post-Confirmation Estates may hold or have the power to commence at any time against any Person or Entity shall be preserved and retained and enforced by the Plan Administrator, and the Plan Administrator shall have the right to continue or commence or otherwise enforce, as the authorized representative of the Debtors and the respective Estates and Post-Confirmation Debtors, any and all such claims, rights, or Causes of Action. The Plan Administrator may pursue any and all such claims, rights, or Causes of Action, as appropriate, in accordance with the best interests of the holders of Allowed Claims. Subject to the provisions of this Plan, the Plan Administrator shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Causes of Action. Entry of the Confirmation Order shall serve as express approval by the Bankruptcy Court of the appointment of the Plan Administrator under the Bankruptcy Code including section 1123(b)(3) as set forth above. Notwithstanding any other provision of this Plan, the Bankruptcy Court or District Court, as the case may be, shall retain jurisdiction over all Causes of Action both before and following Confirmation and the Effective Date of this Plan until all such Causes of Action have been finally adjudicated and all judgments arising out of such Causes of Action have been collected, settled, or discharged.

**D.**　　**<u>Limited Plan Exculpation</u>**

　　　　**<u>The Debtors, the Post-Confirmation Debtors, the Committee, the Plan Administrator, Oversight Committee, and each of their respective members, officers, directors, advisors, agents, attorneys, and employees (including Professionals) (collectively, the "Exculpated Persons") shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken by any Exculpated Person in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, Confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan (except for any obligations of the Post-Confirmation Debtors, the Estates, or the Plan Administrator arising in the ordinary course of business), or any other act taken or omitted to be taken in connection with the Chapter 11 Cases. The Exculpated Persons shall have no liability to any Debtor, holder of a Claim, holder of an Interest, other party in interest in the Chapter 11 Cases or any other Person or Entity for actions taken or not taken in the Chapter 11 Cases, or under this Plan, in connection herewith or with respect hereto, or arising out of their administration of the Debtors or the Estates after the Petition Date, this Plan or the property to be distributed under this Plan, including failure to obtain</u>**

**Confirmation of this Plan or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects such Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan or with respect to the Chapter 11 Cases.  Provided, however, that the foregoing provisions of this paragraph shall have no effect on the liability of any Exculpated Person that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence or other willful misconduct, and also shall have no effect on any liabilities arising from acts taken or omitted prior to the Petition Date.**

E.    **Injunction**

*From and after the Effective Date, all Persons and Entities are permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, Cause of Action, Interest or remedy against the Debtors or the Estates.*

As of the Effective Date, all Persons or Entities that have held, currently hold, or may hold a Claim, Interest, or other debt or liability against the Debtors are permanently enjoined from taking any of the following actions on account of any such Claim, Interest, debt, or liability: (i) commencing or continuing in any manner any action or other proceeding against the Debtors, the Plan Administrator, the Oversight Committee, the Property, or the Assets, other than to enforce any right pursuant to this Plan to a Distribution; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtors, the Plan Administrator, the Oversight Committee, the Property, or the Assets, other than as permitted pursuant to this Plan; (iii) creating, perfecting, or enforcing any lien or encumbrance against the Debtors, Plan Administrator, the Oversight Committee, the Property, or the Assets; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or Plan Administrator, the Oversight Committee, other than as permitted pursuant to this Plan; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of this Plan.

Upon Confirmation of this Plan, each holder of any Claim and all Creditors and other Persons and Entities will be deemed to have specifically consented to the injunctions set forth in this Plan.

F.    **Plan Terms Binding**

Upon the entry of the Confirmation Order, all provisions of this Plan, including all agreements, instruments and other documents Filed in connection with this Plan and executed by the Debtors or the Plan Administrator in connection with this Plan, shall be binding upon the Debtors, the Committee, the Post-Confirmation Debtors, the Estates, the Plan Administrator, the Oversight Committee, all Claim and Interest holders and all other Persons that are affected in any manner by this Plan.  All agreements, instruments and other documents Filed in connection with this Plan shall have full force and effect, and shall bind all parties thereto as of the entry of the Confirmation Order, whether or not such exhibits actually shall be executed by parties other than the Debtors or the Plan Administrator, or shall be issued, delivered or recorded on the Effective Date or thereafter.

G.      **Continuation of Pre-Confirmation Injunction or Stays**

**All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Cases pursuant to sections 105, 362, or 525 of the Bankruptcy Code or otherwise that are in effect on the Confirmation Date shall remain in full force and effect until the Final Decree.  Provided, however, that with regard to Causes of Action of any of the Debtors, the Post-Confirmation Debtors or the Estates, the scope of the injunctions and stays as provided for herein shall not preclude any party from propounding otherwise permissible discovery (written or oral) upon the Plan Administrator, the Estates, the Debtors or the Post-Confirmation Debtors.**

**ARTICLE X
RETENTION OF JURISDICTION**

A.      **Jurisdiction Retained by the Bankruptcy Court**

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, until such time as all payments and Distributions required to be made and all other obligations required to be performed under this Plan and the Plan documents have been made and performed by the Plan Administrator and the Chapter 11 Cases is closed by Final Decree, the Bankruptcy Court shall have and retain the maximum jurisdiction as is legally permissible, including, without limitation, jurisdiction over the Estates, the Debtors, the Post-Confirmation Debtors, the Property, the Plan Administrator, the Oversight Committee and the Assets (including the Causes of Action and other Property), and including, without limitation, jurisdiction for the following purposes:

1.      Claims.  To determine the allowability, classification, validity, priority of, or any dispute with respect to Claims upon motion by the Plan Administrator or any other party in interest;

2.      Injunction, etc.  To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Person or Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person or Entity;

3.      Professional Fees.  To determine, before or after the Effective Date, any and all applications for Fee Claims, as provided for in this Plan;

4.      Certain Priority Claims.  To determine any Priority Tax Claims, Non-Tax Priority Claims or any request for payment of Administrative Claims;

5.      Dispute Resolution.  To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of this Plan and the making of Distributions thereunder, including, without limitation, any dispute concerning payment of professional fees and expenses of the Plan Administrator or the Oversight Committee, any Oversight Committee Motion, or any dispute or matter raised by the Plan Administrator or other party in interest related to this Plan;

6.      Leases and Executory Contracts.  To determine the allowance of any Claims or other disputes resulting from the rejection of executory contracts and unexpired leases;

7.    Actions.  To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted prior to the closing of the Chapter 11 Cases, including the determination of all controversies and disputes arising under and in connection with the Debtors, the Property, the Assets, the Causes of Action, including the Five Star Claims, the Plan Administrator, or the Oversight Committee, or otherwise relating to the foregoing or this Plan, and including any remands;

8.    Plan Modification.  To modify this Plan under section 1127 of the Bankruptcy Code, or to remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order so as to carry out its intent and purposes and to issues any orders in connection with the foregoing;

9.    Aid Consummation.  To issue such orders in aid of consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person or Entity, to the full extent authorized by the Bankruptcy Code;

10.    Implementation of Confirmation Order.  To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

11.    General Matters.  To determine all such other matters, and for such other purposes, as may be provided in the Confirmation Order, this Plan, the Disclosure Statement, or any documents executed in connection with the foregoing, or as otherwise may be authorized or not inconsistent with the provisions of the Bankruptcy Code;

12.    Final Decree.  To enter an order and/or Final Decree closing the Chapter 11 Cases, which Final Decree shall specify the matters over which the Bankruptcy Court shall continue to retain jurisdiction after entry of the Final Decree.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

**A.    Pre-Confirmation Modification**

This Plan may be altered, amended or modified by the Debtors before the Confirmation Date as provided in section 1127 of the Bankruptcy Code.

**B.    Post-Confirmation Immaterial Modification**

The Debtors, the Plan Administrator or the Oversight Committee may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, but with notice to and the consent of each other, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in this Plan in such manner and to such extent as may be necessary to expedite consummation of this Plan.

**C.    Post-Confirmation Material Modification**

This Plan may be altered or amended after the Confirmation Date by the Debtors or Plan Administrator after consultation with the Oversight Committee in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing as provided in section 1127 of the Bankruptcy Code.

D.    **Non-Consensual Confirmation**

If any class of Claims or Interests votes to reject the Plan or is deemed to reject the Plan, the Plan shall constitute a request that the Bankruptcy Court confirm the Plan over such rejection in accordance with section 1129(b) of the Bankruptcy Code.  The Debtors and the Committee reserve the right to jointly alter, amend, modify, revoke or withdraw this Plan or the Disclosure Statement, including any exhibit or attachment, if necessary to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

E.    **Withdrawal or Revocation of Plan**

The Debtors and the Committee reserve the right to jointly revoke or withdraw this Plan prior to the Confirmation Date.  If the Debtors and the Committee revoke or withdraw this Plan, then the result shall be the same as if the Confirmation Order had not been entered.

F.    **Exemption from Transfer Taxes**

Pursuant to section 1146 of the Bankruptcy Code, the Confirmation Order, and any sale orders entered in the Chapter 11 Cases, the transfer or making or delivery of any instrument of transfer in furtherance of or in connection with this Plan including, without limitation, any transfers under this Plan or abandonment or Dispositions, subsequent transfers to Creditors or purchasers, or any assignments, documents, instruments and agreements and other conveyance documents executed and delivered by the Debtors or the Plan Administrator in connection with the sale of the Debtors' assets or the Assets to any purchaser or Creditor in furtherance of the wind-up of the Estates or otherwise, shall not be subject to any stamp or similar taxes such as real estate transfer, personal property, recording or other similar taxes.

G.    **Final Decree**

Notwithstanding any other provision of this Plan, the Final Decree shall be entered only after all conditions precedent to the Effective Date and to substantial consummation of this Plan under the Bankruptcy Code have been satisfied or waived.

H.    **Effectuating Documents, Further Transactions and Corporate Action**

The Debtors, the Committee, the Plan Administrator, the Oversight Committee, all holders of Allowed Claims receiving Distributions under this Plan, and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary to effectuate the provisions and intent of this Plan and the Plan documents.  As of or after the Effective Date (as appropriate), all matters provided for under this Plan that would otherwise require approval of the board of directors or managers or other governing body of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable general corporation law of the state in which the applicable Debtor is organized without any requirement of further action by the governing body of the applicable Debtor.

I.    **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Confirmation Order shall continue to be in effect.  The filing of this Plan, any statement or provision contained in this Plan, or any document prepared in connection with this Plan including the Disclosure Statement, or the taking of any action by the Debtors, Plan Administrator, or the Oversight Committee, as the case may be, shall not be and shall not be deemed

35

to be an admission or waiver of any rights of the Debtors, the Estates, the Committee, the Plan Administrator or the Oversight Committee with respect to the holders of Claims or Interests or otherwise.

## J. **Successors and Assigns**

The rights, benefits and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or Entity.

## K. **Governing Law**

Except to the extent that the Bankruptcy Code or other federal law are applicable, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of South Carolina.

## L. **Notices**

1.    All notices, requests or other communications, required or permitted to be made in accordance with this Plan, including any change of address of any Person or Entity for the purpose of receiving Distributions, shall be in writing and shall be delivered (i) personally, (ii) by facsimile or email (confirmed by first class mail or overnight mail), or (iii) mailed by first class mail or overnight mail.

2.    Any such notice shall be deemed to have been given when received or, if mailed by first class mail, seven days after the date of mailing, postage prepaid, or, if sent by overnight mail, the next business day after the date of mailing, or if sent by facsimile or email, upon confirmation of receipt by the recipient; provided, however, that a proper notice of change of address will be effective for a Distribution only if received at least 30 days in advance of such Distribution date.

a.    If to the Plan Administrator, at:

Clifford Zucker
J.H. Cohn LLP
333 Thornall Street, 6th Floor
Edison, NJ 08837
Fax: 732-549-7016
Email: czucker@jhcohn.com

With a copy (which copy shall not constitute notice) to:

Cole, Schotz, Meisel, Forman & Leonard, P.A.
300 East Lombard Street, Suite 2000
Baltimore, Maryland 21202
Attention:  G. David Dean, Esquire
Fax: 410-528-9402
Email: ddean@coleschotz.com

b.    If to the Debtors, at:

c/o TMG Liquidation Company
P.O. Box 170247
Spartanburg, SC 29301

COLUMBIA 1058668v2

Attention: Patrick J. Rourke
Email: oldmeritgroup@gmail.com

With a copy (which copy shall not constitute notice) to:

McNair Law Firm, P.A.
1221 Main Street, 18th Floor (29201)
Post Office Box 11390
Columbia, South Carolina 29211
Attention: Michael M. Beal
Fax: 803-753-3277
Email: mbeal@mcnair.net

c.         If to any holder of an Administrative Claim, a Priority Tax Claim or a Claim of any Class, at their last known address set forth on a Proof of Claim Filed with the Claims Agent, or on the Schedules, if no Proof of Claim has been Filed.

d.         If to any other Persons or Entities entitled to notice, at the respective addresses that such Persons or Entities entitled to notice have provided to the Plan Administrator.

3.     Any party may change the address at which it is to receive notices under this Plan by furnishing written notice pursuant to the provisions of this **Article XI(L)** to the Debtors, the Plan Administrator, and the Oversight Committee.

## M.    Conflicts

To the extent any provision of the Disclosure Statement, and any documents executed in connection therewith (or any exhibits, schedules, appendices, supplements or amendments to the foregoing) conflicts with or is in any way inconsistent with the terms of this Plan or Confirmation Order, the terms and provisions of this Plan or Confirmation Order as applicable shall govern and control.

## N.    Severability

If any provision of this Plan shall be held or deemed to be or shall, in fact, be inoperative or unenforceable as applied in any particular case and any jurisdiction or jurisdictions or in all jurisdictions, or in all cases, because it conflicts with any other provision or provisions hereof or any constitution, statute, rule or public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to any extent whatever.  The invalidity of any one or more phrases, sentences, clauses, sections or subsections contained in this Plan shall not require the re-solicitation of any acceptance or rejection of this Plan or affect the remaining portions of this Plan or any part thereto.

## O.    Counterparts

This Plan may be executed in several counterparts, each of which shall be an original and all of which shall constitute one instrument.

[CONTINUED ON FOLLOWING PAGE]

37

**TMG LIQUIDATION COMPANY**

By: _____

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL]

**FSP LIQUIDATION COMPANY**

By: _____

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL

**FSG LIQUIDATION COMPANY**

By: _____

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL]

**MPFP LIQUIDATION COMPANY, LLC**

By: _____

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL]

**MP SUNDRIES LIQUIDATION COMPANY, LLC**

By: _____

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL]

**MSUPPLY LIQUIDATION COMPANY, LLC**

By: _____

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL]

**MTRANS LIQUIDATION COMPANY**

By: _____

Name: Patrick J. Rourke
Title: President and Chief Executive Officer

[SEAL]

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____

    Name:  Bob Hunter

    Title:  Committee Chair

EXHIBIT A

Regions Bank Settlement Agreement

A-1

EXECUTION VERSION

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (the "Agreement") is entered into as of July 29, 2011, by and among **THE MERIT GROUP, INC.**, a South Carolina corporation and a debtor-in-possession in the Chapter 11 Cases (as defined below) ("Merit"), **MERIT TRANSPORTATION, INC.**, a South Carolina corporation and a debtor-in-possession in the Chapter 11 Cases ("Transportation"), **MERIT PAINT SUNDRIES, LLC**, a South Carolina limited liability company and a debtor-in-possession in the Chapter 11 Cases ("Paint"), **MERIT SUPPLY COMPANY, LLC**, a South Carolina limited liability company and a debtor-in-possession in the Chapter 11 Cases ("Supply"), **MERIT PRO FINISHING TOOLS, LLC**, a South Carolina limited liability company and a debtor-in-possession in the Chapter 11 Cases ("Pro Finishing"), **FIVE STAR PRODUCTS, INC.**, a Delaware corporation and a debtor-in-possession in the Chapter 11 Cases ("FS Products"), **FIVE STAR GROUP, INC.**, a Delaware corporation and a debtor-in-possession in the Chapter 11 Cases ("FS Group" and, together with Merit, Transportation, Paint, Supply, Pro Finishing and FS products, collectively, the "Debtors" and each individually, a "Debtor"), **THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN THE CHAPTER 11 CASES** (the "Committee"), and **REGIONS BANK**, an Alabama bank, in its capacity as pre-petition lender and post-petition lender and bank products provider to Debtors ("Regions Bank").

### Background:

The Committee filed with the United States Bankruptcy Court for the District of South Carolina (the "Court") a motion seeking standing to assert against Regions Bank, on behalf of the Debtors' respective estates, a preference claim under Section 547 of the Bankruptcy Code and surcharge claims under Section 506(c) of the Bankruptcy Code. Pursuant to the DIP Financing Order (as defined below), the Debtors waived all claims against Regions Bank other than surcharge claims under Section 506(c) of the Bankruptcy Code.

Regions Bank disputes the existence, validity, and amount of any claims that the Committee seeks, or the Debtors could seek, to assert against Regions Bank.

The Committee objected to the sale by the Debtors of substantially all of their assets pursuant to the APA (as defined below), absent a settlement of disputed claims with Regions Bank on terms satisfactory to the Committee and approved by the Court.

The Debtors, the Committee, and Regions Bank have agreed to the Settlement (as defined below) that is memorialized by this Agreement and that has been approved by the Court, as a consequence of which the Committee withdrew its objection to the sale pursuant to the APA.

### Terms of Agreement:

For and in consideration of the mutual promises, covenants, representations, warranties, and agreements contained in the Agreement, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties, intending to be legally bound, do agree as follows:

1.  **Definitions**. Capitalized terms used in this Agreement shall have the meanings set forth in the Background or in this Section 1 or, if not defined in the Background or in this Section 1, shall have the meaning ascribed to such term in the APA, unless otherwise expressly noted in this Agreement.

"APA" means that certain Asset Purchase Agreement made as of June 29, 2011 between Buyer and the Debtors, together with all exhibits and schedules thereto.

"Business Day" shall have the meaning given to such term in the DIP Loan Agreement.

"Buyer" means MG Distribution, LLC, an Illinois limited liability company and the "Buyer" under and as defined in the APA.

"Carve-Out Amount" means the Carve-Out under (and as defined in) the DIP Financing Order in the aggregate amount of $1,000,000; provided that the Carve-Out shall be increased by a sum equal to the amount of professional fees and expenses of Estate Professionals which are or will become due and payable (subject to the timely filing of any objection thereto) on or before July 29, 2011 (totaling $428,687), which remain unpaid immediately after giving effect to the Closing and in respect of which there is not sufficient cash on hand immediately prior to the Closing to pay such fees and expenses; shall be decreased by the amount of fees and expenses of Estate Professionals which are due and payable on or after August 1, 2011, and paid with funds advanced under the DIP Loan Agreement on or after August 1, 2011; and shall be payable without regard to the existence of cash on hand with any Debtor that is sufficient to pay all or any part of the accrued fees and expenses of Estate Professionals that are then due and payable; and may be used to pay any excess amounts over the "Prohibited Purpose" limits set forth in the DIP Financing Order.

"Chapter 11 Cases" means the cases under Chapter 11 of the Bankruptcy Code jointly administered under Case No. 11-03216-hb.

"Deficiency Claim" means, on any date, the total pre-petition and post-petition claims (whether absolute or contingent, due or to become due and including all post-petition interest, fees and other charges that have accrued and may hereafter accrue with respect to any of the DIP Obligations (as defined in the DIP Financing Order)) that Regions Bank holds on such date against any or all of the Debtors, after giving effect to the Closing under the APA and the payment of the Settlement Amount but without giving effect to the value of any collateral security, guaranties, or other payment assurances held by Regions Bank for any of its claims (until such time as Regions Bank elects to realize upon such collateral security, guaranties or other payment assurances, in which event the proceeds of such realization shall be applied to reduce the Deficiency Claim). In calculating the amount of the Deficiency Claim, amounts withheld from payment at Closing under the APA and escrowed pursuant to the terms of the APA shall not be deemed to have been received by Regions Bank until actual release of such monies from escrow and remittance of same to Regions Bank.

"Designated Unsecured Claim" means a non-priority, general unsecured claim against one or more Debtors, which at the time of a Distribution, has not been disallowed and is not a claim held by Regions Bank or a Subordinated Creditor.

"DIP Financing Order" means the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507(I) Approving Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, and (V) Modifying the Automatic Stay entered by the Court on June 10, 2011 (the "DIP Financing Order").

"DIP Loan Agreement" shall have the meaning given to such term in the DIP Financing Order.

"Distribution" means a distribution of cash or other property of a Debtor pursuant to a confirmed Plan or in a Chapter 7 case or cases of one or more Debtors.

"Estate Professionals" means professionals retained by the Debtors and by the Committee.

"Excluded Assets" shall have the meaning given to such term in the DIP Financing Order.

"Petition Date" means May 17, 2011.

"Plan" means a plan of reorganization or liquidation jointly proposed by the Debtors and the Committee.

"Sale Order" means the order of the Court entered on July 25, 2011, approving the Sale Motion.

"Settled Claims" means all debts, claims, counterclaims, demands, reckonings, actions, suits, causes of action, contested matters and adversary proceedings of any kind or nature, whether filed or unfiled, liquidated or unliquidated, matured or unmatured, known or unknown, suspected or unsuspected, disputed or undisputed, or at law or in equity, including, without limitation, any claim or cause of action under any applicable non-bankruptcy law or Chapter 5 of the Bankruptcy Code and any surcharge claim under Section 506(c) of the Bankruptcy Code, (i) that arise out of or relate in any way to the debtor-creditor, depository or other banking relationships between Regions Bank and the Debtors (or any of them), whether arising pursuant to a relationship that existed prior to or after the Petition Date and whether arising under the pre-petition or post-petition financing or cash management agreements between Regions Bank and the Debtors or otherwise, and (ii) that any of the Debtors, their respective Chapter 11 estates or the Committee have, ever had or claim to have against Regions Bank or any of its officers, directors, agents, affiliates, shareholders or attorneys.

"Settlement" means the settlement provided for in this Agreement and which has been approved by the Court in the Sale Order.

"Settlement Amount" means an amount equal to the sum of (i) the $2,000,000 in Purchase Price that Regions Bank agrees to allow to be paid by the Buyer to the Debtors' estates as the "Additional Claims Amount" under the APA; (ii) the Carve-Out Amount; and (iii) $2,750,000.

"Stipulations" shall have the meaning given to such term in the DIP Financing Order.

"Subordinated Creditors" means Stonehenge Opportunity Fund II, L.P., E. Fort Wolfe, Jr., Caleb C. Fort, and the Valspar Corporation, each of whom has subordinated all claims that such

person or entity has against any or all of the Debtors to the payment in full of all pre-petition and post-petition claims of Regions Bank against any or all of the Debtors pursuant to Subordination Agreements and their respective successors and permitted assigns.

"Subordinated Distribution" means the aggregate amount of the Distributions which Regions Bank would have been authorized to receive an retain on account of the Deficiency Claim and the claims of the Subordinated Creditors but which Regions Bank does not receive and retain by virtue of the subordination set forth in Section 2(d).

"Subordination Agreements" means the intercreditor and subordination agreements between the Subordinated Creditors and Regions Bank and "Subordination Agreement" means any one of them.

2.      **Settlement**. Each of the parties acknowledges and agrees that the following shall fully settle, satisfy and release all of the Settled Claims, including, without limitation, all of the DIP Lender's obligations under the DIP Financing Order and the DIP Financing Documents (as defined in the DIP Financing Order), and shall be in lieu of the Initial Plan Funding Commitment under (and as defined in) the DIP Financing Order which commitment shall terminate and be discharged by the Settlement:

(a)     Concurrently with the Closing under the APA and the disbursement of the Purchase Price proceeds thereunder, (i) the Buyer shall disburse the Additional Claims Amount directly to the Debtors and (ii) Regions Bank shall fund the balance of the Settlement Amount as a revolver loan under the DIP Loan Agreement; provided that the Carve-Out Amount that is a portion of the Settlement Amount shall be promptly funded at such time as the amount thereof is finally determined. Of the total Settlement Amount, $4,000,000 shall be deemed allocated to the settlement of all claims or causes of action (if any) against Regions Bank under Chapter 5 of the Bankruptcy Code.

(b)     All sums (net of closing costs and fees payable to Morgan Joseph TriArtisan LLC) at any time or times payable under the APA (exclusive of the Additional Claims Amount) shall be remitted directly to Regions Bank for application to the pre-petition loans or the post-petition loans owed by the Debtors to Regions Bank, as elected by Regions Bank in its discretion.

(c)     The Settlement Amount shall be free and clear of all of the liens and priority claims of Regions Bank, whether arising prior to or after the Petition Date, but Regions Bank shall retain all of its liens upon and rights with respect to all assets of each Debtor other than (i) Excluded Assets and (ii) the Acquired Assets effective upon the Closing under the APA. As provided in the DIP Financing Order, upon the Closing under the APA and the effectiveness of this Agreement, Regions Bank shall cease to be entitled to receive a share of the proceeds of the Excluded Assets as a holder of a claim under Section 503(b) of the Bankruptcy Code and shall share in such proceeds on a pro rata basis with other general, non-priority unsecured claims, as set forth in this Agreement.

(d)     (i) Regions Bank subordinates its rights with respect to any Distribution on account of its Deficiency Claim to aggregate Distributions on account of Designated Unsecured Claims of 10% of the aggregate principal amount of such Designated Unsecured Claims.

(ii) After Distributions aggregating 10% of the principal amount of all Designated Unsecured Claims have been made, Regions Bank shall be authorized to receive (on account of its Deficiency Claim and the aggregate claims of the Subordinated Creditors) Distributions in an amount equal to the Subordinated Distribution before any other Distributions are made on account of Designated Unsecured Claims; and thereafter Regions Bank shall be authorized to participate in future Distributions to general unsecured creditors on a pro rata basis (adding the claims of the Subordinated Creditors to the Deficiency Claim for purposes of determining Regions Bank's pro rata share) based upon the relative amount of all general unsecured claims (including the Designated Unsecured Claims, the Deficiency Claim and the claims of the Subordinated Creditors) at the time of each such Distribution. If under a confirmed Plan or otherwise any monies are escrowed or otherwise set aside pending resolution of any disputed Designated Unsecured Claims, all amounts returned to or retained by the Debtors or their respective estates (or a Plan fiduciary under a confirmed Plan) after resolution of the dispute shall be remitted to Regions Bank to the extent that aggregate distributions on account of Designated Unsecured Claims total 10% of such claims as hereinabove provided and Regions Bank has not received Distributions in an aggregate amount equal to the Subordinated Distribution. By way of example, if Designated Unsecured Claims are $40,000,000, and the aggregate of the Deficiency Claim and the claims of Subordinated Creditors are 40% of the total of all general unsecured claims, then after a total of $4,000,000 of distributions is made on account of Designated Unsecured Claims (or 10% of the total), Regions Bank would be entitled to receive Distributions totaling $1,600,000 before any Distributions could be made no account of any Designated Unsecured Claims.

3.     **Release of Regions Bank**.  **The Debtors and the Committee (on behalf of themselves and their respective successors and assigns) each hereby releases, acquits, and forever discharges Regions Bank and its officers, directors, shareholders, affiliates, agents and attorneys from any and all of the Settled Claims. In furtherance of the foregoing, the Debtors and the Committee each agrees that if any fact with respect to which the foregoing release is executed is found hereafter to be other than or different from a fact believed by such parties at the time of the execution of this Agreement to be true, such parties expressly accept and assume the risk of such possible difference in fact and agree that the foregoing release shall be and remain effective notwithstanding such difference in facts.**

4.     **Waiver of Rights of Surcharge**.  **The Debtors and the Committee (on behalf of themselves and their respective successors and assigns) fully and completely waive any rights of surcharge that any of the Debtors' estates in the Chapter 11 Cases (or any Plan fiduciary under a confirmed Plan) may have under Section 506(c) of the Bankruptcy Code or otherwise.**

5.     **Compromise Not an Admission**.  The parties hereto acknowledge and agree that the Settlement is in settlement of disputed claims solely in the interest of avoiding the cost, expense and uncertainty of litigation and that nothing contained in this Agreement shall be deemed to be an

admission by Regions Bank of the existence or validity of any of the Settled Claims, all of which are disputed by Regions Bank.

6.      **Plan**. The parties hereto agree that the confirmed Plan shall (a) provide for the distribution of all amounts which are due to Subordinated Creditors to Regions Bank in accordance with the applicable Subordination Agreements and (b) incorporate, and not conflict with, the provisions of this Agreement.

7.      **Withdrawal of Standing Motion**. Upon consummation of the Settlement, including Regions Bank's funding of the Settlement Amount upon Closing on the APA (with the exception of the Carve-Out Amount, as set forth above), the Committee agrees that it shall promptly (and in any event within 2 Business Days) withdraw its motion seeking standing to pursue certain claims against Regions Bank. The Committee further agrees that such withdrawal shall be with prejudice and the Stipulations of the Debtor shall be binding upon the Committee and other interested parties in the Chapter 11 Cases.

8.      **Claims of Subordinated Creditors**. The Debtors and the Committee agree that the claims of the Subordinated Creditors are valid and allowed claims and agree not to challenge such claims (including any challenge based upon alleged equitable subordination or recharacterization); provided that any party in interest otherwise having standing to do so (including, but not limited to, any Debtor or the Committee) is authorized to challenge the validity, extent or priority of any lien purporting to secure any claim of a Subordinated Creditor, the entitlement of any Subordinated Creditor to receive any interest, fees or charges (including attorneys' fees) accrued after the Petition Date, or the calculation of the amount owed to a Subordinated Creditor.

9.      **Regions Bank Proof of Claim**.

(a)      Regions Bank shall be authorized (but not obligated) to file a proof of claim with respect to the pre-petition obligations owing to it, but its failure to file a proof of claim shall not be a bar to allowance of any part of its Deficiency Claim, including, without limitation, any portion thereof consisting of pre-petition obligations of any Debtor to Regions Bank. As provided in the DIP Financing Order, Regions Bank has no obligation to file any proof of its administrative claim for DIP loans under the DIP Financing Order. With respect to the portion of the Deficiency Claim consisting of post-petition loans and other DIP Obligations owed to Regions Bank, the provisions of the DIP Financing Order shall remain in full force and effect and shall not be deemed to be modified in any respect by this Agreement except to the extent expressly otherwise provided herein.

(b)      If and to the extent that a proof of claim is not filed by a Subordinated Creditor within 10 days prior to the deadline for the filing of pre-petition unsecured claims, then Regions Bank, in its discretion, shall be authorized to file any such claim in the name of and on behalf of such Subordinated Creditor as and to the extent authorized by the Subordination Agreement between Regions Bank and such Subordinated Creditor.

10.      **Calculating the Deficiency Claim**. Regions Bank, the Debtors and the Committee agree to endeavor mutually to agree upon the amount of the Deficiency Claim (consisting of both outstanding pre-petition and post-petition loans and other obligations); provided, however, that in the

event Regions Bank, the Debtors and the Committee are unable to come to agreement as to the amount of the Deficiency Claim, the parties hereto agree that any such disagreement would be resolved by the Court.

11.    **Agreement Not to Object to Fees**. Each of the Committee and Regions Bank agrees that it shall not object to any fees of any professional person retained by the other party, to the extent incurred on or before the Closing of a sale under the APA, notwithstanding anything to the contrary contained in Paragraphs 9 or 15 of the DIP Financing Order. Without limiting the generality of the foregoing, the Carve-Out Amount and any other property of the Debtors' estates that is free and clear of the Liens of Regions Bank may be used to pay fees and expenses of professionals of the Committee.

12.    **Reservation of Rights**.

(a)    Regions Bank reserves (i) all of its liens (by whomsoever granted), rights, remedies, powers and claims under the DIP Financing Order, the Pre-Petition Loan Documents (as defined in the DIP Financing Order) and the DIP Financing Documents (as defined in the DIP Financing Order), including, without limitation, the Subordination Agreements, all guaranties and all third party pledge or security agreements, and (ii) all of its rights, remedies, powers and claims under other orders at any time entered by the Court; provided, however, that Regions Bank does not reserve liens upon any of the Acquired Assets upon a Closing of the sale under the APA. Further, nothing in this Agreement shall preclude Regions Bank from exercising any of its rights, remedies, powers or privileges under the DIP Financing Order or the DIP Financing Documents (as defined in the DIP Financing Order).

(b)    The Debtors and the Committee acknowledge and agree to the foregoing reservation of rights by Regions Bank.

13.    **Conditions Precedent**. The effectiveness of the Settlement is subject to the satisfaction of each of the following conditions precedent, in form and substance satisfactory all of the parties hereto, unless satisfaction thereof is specifically waived in writing by all of the parties hereto:

(a)    The APA, in the form heretofore filed with the Court, shall not have been amended or otherwise modified, and no rights of any Debtor thereunder shall have been waived, without the prior written consent of the Committee and Regions Bank, unless such amendment is non-material, does not reduce the cash amount or timing of payment of the Purchase Price under the APA and does not alter or reduce the aggregate amount of indebtedness of the Debtors that is assumed by the Buyer under the APA;

(b)    The Closing under the APA shall have occurred (or shall occur simultaneously with the execution of this Agreement); and

(c)    Regions Bank shall have funded the Settlement Amount (or such funding shall occur simultaneously with the execution of this Agreement).

14.     **Governing Law**. This Agreement shall be governed by the laws of the State of Georgia.

15.     **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of each of the parties hereto.

16.     **Merger**. This Agreement constitutes the entire agreement of the parties with respect to the Settled Claims, and it cannot be altered or amended in any way except by written agreement signed by all of the parties hereto. In entering into this Agreement no party is relying upon any statements, representations, inducements or agreements not expressly set forth herein. Except as expressly provided in this Agreement, all other agreements between the parties are preserved and not affected by anything contained in this Agreement.

17.     **Representations and Warranties**.

(a)     Each party to this Agreement represents that it has counseled independently with its attorneys concerning the meaning and legal effect of the terms of this Agreement. After such counseling, each party represents that it fully understands the Agreement and its terms, and, with this full understanding, voluntarily enters into this Agreement as evidenced by its signature below.

(b)     Each signatory below represents and warrants that he or she has full power and authority to sign on behalf of and legally bind to the Agreement his or her respective principal.

18.     **Counterparts; Telecopied Signatures**. This Agreement and any amendments, waivers, or consents relating hereto may be executed in any number of counterparts and by different parties hereto or thereto in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument. Any signature delivered by a party hereto or to any amendment, waiver, or consent relating hereto by facsimile transmission or by electronic email in Adobe Corporation's Portable Document Format (or PDF) shall be deemed to be an original signature hereto.

[Remainder of page left blank intentionally' signature pages follow]

19.    <u>Waiver of Jury Trial</u>.  To the fullest extent permitted by applicable law, each party hereto by execution hereof and by acceptance hereof, knowingly, voluntarily and intentionally waives any right each may have to a trial by jury in respect of any litigation based on, or arising out of, under or in connection with the Settled Claims, this Agreement, any agreement contemplated to be executed in connection with this Agreement or any course of conduct, course of dealing, statements (whether oral or written) or actions of any party with respect hereto.  This provision is a material inducement to the parties hereto to enter into and accept this Agreement.  Each of the parties agrees that the terms hereof shall supersede and replace any prior agreement related to arbitration of disputes between the parties contained in any other document or agreement heretofore executed in connection with, related to or being replaced, supplemented, extended or modified by, this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

THE MERIT GROUP, INC.
MERIT PRO FINISHING TOOLS, LLC
FIVE STAR PRODUCTS, INC.
FIVE STAR GROUP, INC.

By: _____
Name: Mitchell T. Jolley
Title: President and Chief Executive Officer

[SEAL]

MERIT PAINT SUNDRIES, LLC
MERIT TRANSPORTATION, INC.

By: _____
Name: Mitchell T. Jolley
Title: President

[SEAL]

MERIT SUPPLY COMPANY, LLC

By: _____
Name: Mitchell T. Jolley
Title: Chief Executive Officer

[SEAL]

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: *Bob Hunter*
Name: *Bob Hunter*
Title: *committee chair*

**REGIONS BANK**

By: _____
Name: Elizabeth L. Schoen
Title: Senior Vice President

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____
Name:
Title:

**REGIONS BANK**

By: _____
Name: Blizabeth L. Schoen
Title: Senior Vice President

Settlement Agreement

EXHIBIT B
Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Non-Insiders

B-1

**Non-Exclusive Schedule of Chapter 5 Causes of Action against Non-Insiders** [1]

| | Alleged Dollar Amount of Transfers |
|---|---|
| 3M AVIATION | $47,772.73 |
| 3M MST6980(WC) | 896,776.84 |
| A TRUCK EXPRESS | 12,326.70 |
| AAA COOPER | 360,723.70 |
| ACCOUNTSOURCE | 8,750.00 |
| ACCPC | 7,738.15 |
| ACTIVANT | 77,976.34 |
| ADT SECURITY SYSTEMS | 19,366.28 |
| ADVANCED PROTECTIVE PRODUCTS | 16,615.52 |
| AJ JERSEY | 25,743.16 |
| ALERT SPRINKLER | 38,004.20 |
| ALLWAY | 14,340.05 |
| AMERICAN EXPRESS | 92,840.55 |
| AMERICAN FINISHED PRODUCTS, INC. | 19,629.92 |
| AMES TRUE TEMPER | 71,433.15 |
| AMREP INC. | 65,999.04 |
| ARCTEX INTERNATIONAL, INC. | 97,529.67 |
| ARROW FASTENER CO. | 20,292.87 |
| ARROWORTHY, LLC | 75,474.46 |
| ASSOCIATED PAINT INC. | 12,572.54 |
| AT&T | 24,838.32 |
| AT&T MOBILITY | 25,474.97 |
| ATLANTIC PASTE & GLUE CO.INC. | 14,406.60 |
| AT-NET SERVICES, INC. | 27,101.91 |
| BALTIMORE TRUCK RENTAL | 49,039.86 |
| BANNER CHEMICAL CORP. | 10,134.77 |
| BEA FASTENERS U.S.A., INC. | 38,321.98 |
| BEAUMONT PRODUCTS, INC. | 14,120.42 |
| BELS-SMITH INC. | 21,773.20 |
| BEST OVERNITE EXPRESS, INC. | 35,217.26 |
| BGR | 73,920.23 |
| BOMGAR | 11,471.50 |
| BOSS MANUFACTURING CO. | 22,686.23 |
| BOTTOMLINE SALES GROUP | 12,000.00 |
| BULLET COMMUNICATIONS | 54,494.37 |
| C.H. ROBINSON COMPANY, LP | 17,625.13 |
| CABLEVISION LIGHTPATH INC. | 9,662.00 |
| CALFEE, HALTER, GRISWOLD LLP | 20,000.00 |
| CCA GLOBAL PARTNERS | 8,729.75 |
| CGM INC. | 24,872.10 |
| CHEM TECH INC. | 17,952.00 |
| CIRRO ENERGY | 6,861.19 |

| | Alleged Dollar Amount of Transfers |
|---|---|
| COFFMAN'S | 6,600.64 |
| COLEMAN CABLE, INC. #241900 | 83,505.40 |
| CON EDISON | 9,466.65 |
| CONNECTICUT CONVENTION CENTER | 7,000.00 |
| CONNECTICUT NATURAL GAS | 9,212.92 |
| COOPER HAND TOOLS | 13,463.26 |
| COOPER WIRING(EAGLE) #226000 | 30,176.95 |
| CORPORATE AIRCRAFT SERVICES, LLC | 201,155.04 [2] |
| CRAWFORD PRODUCTS CO., INC. | 200,730.89 |
| CUSTOM BUILDING PRODUCTS | 8,169.27 |
| CUSTOM PALLET & CRATING, INC. | 9,360.00 |
| DAICH COATINGS CORPORATION | 28,985.76 |
| DAP | 873,457.70 |
| DATS TRUCKING INC. | 7,243.04 |
| DDI LEASING, INC. | 44,993.69 |
| DEFT, INC. | 16,963.05 |
| DHE | 42,835.50 |
| DICKIES INDUSTRIAL WEAR | 18,686.12 |
| DIXON HUGHES PLLC | 48,400.00 |
| DRIPLESS CAULK GUN | 36,751.68 |
| DUGAN TRUCK LINES | 8,529.70 |
| DUKE ENERGY | 24,822.57 |
| DUMOND CHEMICALS INC. | 44,559.14 |
| DURA SEAL | 16,013.35 |
| E.E. ZIMMERMAN | 12,758.69 |
| ELIZABETHTOWN GAS | 15,687.30 |
| EMBEE CORPORATION | 7,469.01 |
| EMPIRE LEVEL MFG. CORP. | 8,292.05 |
| ENCORE PLASTICS INC. | 317,536.15 |
| ENVIRONMENTAL TECHNOLOGY, INC. | 12,080.17 |
| EQUIPMENT DEPOT | 21,671.21 |
| EULER AMERICAN CREDIT INDEMNITY CO | 75,388.00 |
| EXPRESS LOGISTICS, INC. | 9,764.06 |
| EXPRESS SERVICES, INC. | 361,901.65 |
| FALCON SUPPLY CO. INC. | 17,768.00 |
| FEDEX | 32,243.52 |
| FIBRE CONVERTERS | 27,165.84 |
| FIDELITY PAPER & SUPPLY CORP. | 44,984.72 |
| FIRST ALERT/BRK BRANDS, INC. | 19,622.55 |
| FIRST NATIONAL CAPITAL CORPORATION | 132,433.64 |
| FRANKLIN INTERNATIONAL | 148,743.51 |
| FREIGHTQUOTE.COM | 9,054.74 |
| GACO WESTERN INC. | 172,927.93 |
| GE LIGHTING | 12,933.28 |

| | Alleged Dollar Amount of Transfers |
|---|---|
| GEMINI COATINGS | 178,950.61 |
| GENE SCHWARTZ | 27,564.58 |
| GLOBAL EQUIPMENT COMPANY | 19,952.85 |
| GLOBAL FINANCIAL SERVICES | 7,478.58 |
| GMAC/ALLY AUTOMOTIVE FINANCING | 18,531.36 [2] |
| GREAT NECK SAW MANUFACTURES INC. | 47,904.45 |
| GREENVILLE OFFICE SUPPLY | 38,177.54 |
| GREGORY & APPEL INSURANCE | 385,382.00 |
| GUARDIAN LIFE | 26,032.34 [2] |
| HEARTLAND PAYMENT SYSTEMS | 24,318.00 |
| HESS CORPORATION | 13,406.44 |
| HI-TEC INDUSTRIES | 47,023.56 |
| HOMAX | 43,006.31 |
| HOPE AVIATION INSURANCE INC. | 24,725.00 [2] |
| HOPE COMPANY | 10,648.58 |
| HOPKINS MANUFACTURING CORP | 12,000.00 |
| HOWARD BERGER CO.INC. | 61,761.40 |
| HOWARD PRODUCTS INCORPORATED | 12,680.53 |
| HUGHES ENTERPRISES | 13,208.06 |
| HYDE MANUFACTURING | 99,486.98 |
| HYDRA | 10,184.20 |
| HYGRADE | 106,331.32 |
| IFCO SYSTEMS NA, INC. | 16,949.75 |
| INTERTAPE POLYMER CORP. | 32,761.13 |
| INTEX | 174,997.25 |
| ITW CONSUMER #206400 | 35,334.16 |
| J&H LIMITED, LLC | 23,017.50 |
| J.T. EATON & CO., INC. | 71,345.01 |
| JACO MANUFACTURING, INC. | 7,445.40 |
| JAN-PRO OF THE WESTERN CAROLINAS | 6,600.00 |
| JCP&L | 39,478.53 |
| JOHN HANCOCK LIFE | 24,422.79 [2] |
| KAMEN WIPING MATERIALS CO. | 16,944.57 |
| KEY EQUIPMENT FINANCE | 456,958.99 |
| KIMBERLY-CLARK CORPORATION | 22,808.48 |
| KIT INDUSTRIES, INC. | 6,051.20 |
| KRUGER PRODUCTS(USA) (ROG) | 12,432.00 |
| KRYLON - SHERWIN WILLIAMS CO. | 607,513.64 |
| LAND AIR EXPRESS | 82,910.17 |
| LARSEN PRODUCTS CORP. | 25,660.22 |
| LAUREY | 20,418.46 |
| LEE ELECTRIC INC. | 16,076.74 |
| LIGHTHOUSE/GE PLASTICS | 62,374.56 |
| LOUISVILLE LADDER, INC. | 7,419.00 |

|  | Alleged Dollar Amount of Transfers |
|---|---|
| MACCO | 89,274.10 |
| MARINE INDUSTRIAL | 48,120.84 |
| MARRIOTT | 13,880.71 |
| MARRIOTT HARTFORD DOWNTOWN | 39,941.49 |
| MASSMUTUAL FINANCIAL GROUP | 31,491.16 [2] |
| MASTER LOCK COMPANY | 39,612.80 |
| MASTERCHEM INDUSTRIES INC. | 472,699.97 |
| MAXTECH INTERNATIONAL INC. | 10,494.02 |
| MCCLOSKEY | 148,941.51 |
| M-D BUILDING PRODUCTS | 92,047.49 |
| METROMONT TRAVEL | 150,000.00 [2] |
| MICROFLEX | 39,828.20 |
| MIDWEST FASTENER CORP. | 142,277.08 |
| MINWAX | 1,655,413.03 |
| MODERN MASTERS | 228,726.53 |
| MURCO WALL PRODUCTS, INC. | 9,174.75 |
| NATIONAL PALLET, LLC | 8,685.00 |
| NORTON COMPANY | 201,115.22 |
| OAKLAND PACKAGING & SUPPLY | 11,905.93 |
| OHIO NATIONAL LIFE ASSURANCE CORPORATION | 134,599.02 [2] |
| OLD MASTERS | 79,019.61 |
| OLFA-NORTH AMERICA | 153,665.22 |
| PACIFIC GAS & ELECTRIC | 6,897.84 |
| PACIFIC LIFE | 15,000.00 [2] |
| PACKAGING SERVICE CO. | 691,334.18 |
| PARKER, POE, ADAMS & BERNSTEIN LLP | 20,000.00 |
| PENOFIN PERFORMANCE COATINGS INC. | 76,267.42 |
| PEQUA INDUSTRIES INC. | 7,291.80 |
| PERMATEX, INC. | 27,752.02 |
| PITNEY BOWES | 27,500.00 |
| PITT OHIO EXPRESS LLC | 100,706.12 |
| POLY-AMERICA, INC. | 806,319.52 |
| POLYNOVA INDUSTRIES LIMITED | 39,737.25 |
| PRECISION PRODUCTS INC. | 28,703.72 |
| PREVAL | 19,477.93 |
| PRIMESOURCE RECEIVABLES COMPANY, LLC | 19,764.12 |
| PRIMROSE PLASTICS | 204,193.90 |
| PrintTek, Inc. | 81,407.96 |
| PROJECT FIRE SAFETY | 7,816.62 |
| PROSOCO INC. | 10,427.54 |
| PSE&G | 42,147.92 |
| PURDY CORPORATION | 942,208.32 |
| QWEST COMMUNICATIONS | 14,919.04 |
| R & L CARRIERS INC. | 585,616.75 |

| | Alleged Dollar Amount of Transfers |
|---|---|
| R&D WEAVING, INC. | 12,527.18 |
| R&L TRUCKLOAD SERVICES, LLC | 12,414.00 |
| R.J. ACKAWAY & ASSOCIATES, INC. | 92,420.36 |
| RED DEVIL, INC. | 44,977.03 |
| REPUBLIC FASTENER PRODUCTS CORP. | 6,925.00 |
| ROMAN ADHESIVES, INC. | 146,497.88 |
| RUST OLEUM CORPORATION | 1,458,751.30 |
| S. C. JOHNSON & SON, INC. | 11,673.43 |
| SAIA MOTOR FREIGHT LINE | 110,449.60 |
| SAMAX ENTERPRISES INC. | 46,168.53 |
| SAMUEL CABOT INC. | 2,075,464.55 |
| SASHCO | 209,354.36 |
| SCANONLINE | 150,876.02 |
| SEAL-KRETE | 223,827.79 |
| SEYMOUR OF SYCAMORE | 97,003.12 |
| SFL FINANCIAL | 99,853.19 |
| SHEFFIELD BRONZE PAINT CORP | 38,962.39 |
| SHERWIN WILLIAMS / DUTCH BOY | 55,675.36 |
| SLOCUM ADHESIVES CORPORATION | 34,102.10 |
| SOUTHEASTERN FREIGHT | 234,694.92 |
| SOUTHERN PRINTING & TYPE | 8,406.96 |
| SOUTHWIRE CO. | 6,187.50 |
| SPRAYWAY INCORPORATED | 27,720.56 |
| STANLEY BLACK & DECKER | 19,131.49 |
| STEVENS AVIATION | 15,080.08 [2] |
| STRAIT-FLEX INTERNATIONAL INC. | 16,156.34 |
| SUPREME CHEMICALS | 71,975.26 |
| THE FLOOD COMPANY | 43,433.54 |
| THE GARDNER GIBSON COMPANY | 149,107.82 |
| THE SKYBRYTE CO. | 59,829.25 |
| THIS STUFF WORKS | 11,144.70 |
| THOMPSONS - SHERWIN WILLIAMS CO. | 425,432.23 |
| TLG LENOX, LLC | 25,000.00 |
| TRANSERVICE LOGISTICS, INC. | 1,416,996.90 |
| TRIMACO LLC | 262,039.56 |
| TURF TECH | 10,023.98 |
| U. S. CONTAINER CORP. | 6,934.66 |
| ULTRA HARDWARE LLC (FERUM IMPORTING) | 32,742.48 |
| UNIGROUP WORLDWIDE | 327,597.45 |
| UNITED COMB & NOVELTY | 9,327.80 |
| UNITED GILSONITE LABORATORIES | 60,322.33 |
| UNITED PARCEL SERVICE | 245,274.26 |
| UNITED STATES GYPSUM COMPANY | 561,067.01 |
| UPS FREIGHT | 116,248.34 |

| | Alleged Dollar Amount of Transfers |
|---|---|
| USF REDDAWAY | 60,321.00 |
| VALSPAR CORPORATION | 63,585.89 |
| VAL-TEST SUNDRIES | 18,032.45 |
| VANEX COLOR INC. | 7,000.28 |
| VELOCITY EXPRESS | 129,167.05 |
| VERIZON WIRELESS | 17,989.44 |
| VISTAGE WORLDWIDE, INC. | 6,675.00 |
| WARD TRUCKING | 11,669.11 |
| WB MASON CO., INC. | 6,046.71 |
| WD-40 COMPANY | 22,492.03 |
| WERNER COMPANY | 21,091.01 |
| WEST CHESTER HOLDINGS | 6,452.21 |
| WHITE LIGHTNING PRODUCTS CORP. | 131,978.85 |
| WILSON-IMPERIAL CO. | 23,972.10 |
| WM BARR | 519,323.44 |
| WOODSTREAM CORP. | 6,288.71 |
| WOOSTER | 1,127,807.13 |
| WORKTOOLS INTL. | 114,934.37 |
| WRL.COM LLC | 112,289.76 |
| XIM PRODUCTS | 24,546.41 |
| ZIPWALL LLC. | 38,288.95 |
| Total | $27,908,946.40 |

[1] Excludes potential claims related to the Five Star Acquisition.

[2] Includes alleged preference and fraudulent transfer amounts.

*Note: The information above is based on the books and records of the Debtors at the time of preparation. Inadvertent errors may exist and/or the subsequent receipt of information may result in changes in changes to this Exhibit.*

EXHIBIT C

Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Insiders

C-1

**Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Insiders** [1]

| | Alleged Dollar Amount of Transfers [2] |
|---|---|
| CALEB C. FORT | $235,610.69 |
| MERIT INVESTMENTS, LLC | 837,300.00 |
| E. FORT WOLFE, JR. | 57,248.84 |
| JAY N. BAKER | 9,545.61 |
| Total | $1,139,705.14 |

[1] *Excludes potential claims against Five Star.*

[2] *Excludes payroll.*

*Note: The information above is based on the books and records of the Debtors at the time of preparation. Inadvertent errors may exist and/or the subsequent receipt of information may result in changes in changes to this Exhibit.*

**EXHIBIT B**

**Disclosure Statement Order**

(To be filed at a later time)

49249/0001-7813086v6

COLUMBIA 1054928v3

**EXHIBIT C-1**

**Non-Exclusive Schedule of Preference Causes of Action**

COLUMBIA 1054928v3

**Non-Exclusive Schedule of Chapter 5 Causes of Action against Non-Insiders** [1]

|  | Alleged Dollar Amount of Transfers |
|---|---|
| 3M AVIATION | $47,772.73 |
| 3M MST6980(WC) | 896,776.84 |
| A TRUCK EXPRESS | 12,326.70 |
| AAA COOPER | 360,723.70 |
| ACCOUNTSOURCE | 8,750.00 |
| ACCPC | 7,738.15 |
| ACTIVANT | 77,976.34 |
| ADT SECURITY SYSTEMS | 19,366.28 |
| ADVANCED PROTECTIVE PRODUCTS | 16,615.52 |
| AJ JERSEY | 25,743.16 |
| ALERT SPRINKLER | 38,004.20 |
| ALLWAY | 14,340.05 |
| AMERICAN EXPRESS | 92,840.55 |
| AMERICAN FINISHED PRODUCTS, INC. | 19,629.92 |
| AMES TRUE TEMPER | 71,433.15 |
| AMREP INC. | 65,999.04 |
| ARCTEX INTERNATIONAL, INC. | 97,529.67 |
| ARROW FASTENER CO. | 20,292.87 |
| ARROWORTHY, LLC | 75,474.46 |
| ASSOCIATED PAINT INC. | 12,572.54 |
| AT&T | 24,838.32 |
| AT&T MOBILITY | 25,474.97 |
| ATLANTIC PASTE & GLUE CO.INC. | 14,406.60 |
| AT-NET SERVICES, INC. | 27,101.91 |
| BALTIMORE TRUCK RENTAL | 49,039.86 |
| BANNER CHEMICAL CORP. | 10,134.77 |
| BEA FASTENERS U.S.A., INC. | 38,321.98 |
| BEAUMONT PRODUCTS, INC. | 14,120.42 |
| BELS-SMITH INC. | 21,773.20 |
| BEST OVERNITE EXPRESS, INC. | 35,217.26 |
| BGR | 73,920.23 |
| BOMGAR | 11,471.50 |
| BOSS MANUFACTURING CO. | 22,686.23 |
| BOTTOMLINE SALES GROUP | 12,000.00 |
| BULLET COMMUNICATIONS | 54,494.37 |
| C.H. ROBINSON COMPANY, LP | 17,625.13 |
| CABLEVISION LIGHTPATH INC. | 9,662.00 |
| CALFEE, HALTER, GRISWOLD LLP | 20,000.00 |
| CCA GLOBAL PARTNERS | 8,729.75 |
| CGM INC. | 24,872.10 |
| CHEM TECH INC. | 17,952.00 |
| CIRRO ENERGY | 6,861.19 |

| | Alleged Dollar Amount of Transfers |
|---|---|
| COFFMAN'S | 6,600.64 |
| COLEMAN CABLE, INC. #241900 | 83,505.40 |
| CON EDISON | 9,466.65 |
| CONNECTICUT CONVENTION CENTER | 7,000.00 |
| CONNECTICUT NATURAL GAS | 9,212.92 |
| COOPER HAND TOOLS | 13,463.26 |
| COOPER WIRING(EAGLE) #226000 | 30,176.95 |
| CORPORATE AIRCRAFT SERVICES, LLC | 201,155.04 [2] |
| CRAWFORD PRODUCTS CO., INC. | 200,730.89 |
| CUSTOM BUILDING PRODUCTS | 8,169.27 |
| CUSTOM PALLET & CRATING, INC. | 9,360.00 |
| DAICH COATINGS CORPORATION | 28,985.76 |
| DAP | 873,457.70 |
| DATS TRUCKING INC. | 7,243.04 |
| DDI LEASING, INC. | 44,993.69 |
| DEFT, INC. | 16,963.05 |
| DHE | 42,835.50 |
| DICKIES INDUSTRIAL WEAR | 18,686.12 |
| DIXON HUGHES PLLC | 48,400.00 |
| DRIPLESS CAULK GUN | 36,751.68 |
| DUGAN TRUCK LINES | 8,529.70 |
| DUKE ENERGY | 24,822.57 |
| DUMOND CHEMICALS INC. | 44,559.14 |
| DURA SEAL | 16,013.35 |
| E.E. ZIMMERMAN | 12,758.69 |
| ELIZABETHTOWN GAS | 15,687.30 |
| EMBEE CORPORATION | 7,469.01 |
| EMPIRE LEVEL MFG. CORP. | 8,292.05 |
| ENCORE PLASTICS INC. | 317,536.15 |
| ENVIRONMENTAL TECHNOLOGY, INC. | 12,080.17 |
| EQUIPMENT DEPOT | 21,671.21 |
| EULER AMERICAN CREDIT INDEMNITY CO | 75,388.00 |
| EXPRESS LOGISTICS, INC. | 9,764.06 |
| EXPRESS SERVICES, INC. | 361,901.65 |
| FALCON SUPPLY CO. INC. | 17,768.00 |
| FEDEX | 32,243.52 |
| FIBRE CONVERTERS | 27,165.84 |
| FIDELITY PAPER & SUPPLY CORP. | 44,984.72 |
| FIRST ALERT/BRK BRANDS, INC. | 19,622.55 |
| FIRST NATIONAL CAPITAL CORPORATION | 132,433.64 |
| FRANKLIN INTERNATIONAL | 148,743.51 |
| FREIGHTQUOTE.COM | 9,054.74 |
| GACO WESTERN INC. | 172,927.93 |
| GE LIGHTING | 12,933.28 |

| | Alleged Dollar Amount of Transfers |
|---|---|
| GEMINI COATINGS | 178,950.61 |
| GENE SCHWARTZ | 27,564.58 |
| GLOBAL EQUIPMENT COMPANY | 19,952.85 |
| GLOBAL FINANCIAL SERVICES | 7,478.58 |
| GMAC/ALLY AUTOMOTIVE FINANCING | 18,531.36 [2] |
| GREAT NECK SAW MANUFACTURES INC. | 47,904.45 |
| GREENVILLE OFFICE SUPPLY | 38,177.54 |
| GREGORY & APPEL INSURANCE | 385,382.00 |
| GUARDIAN LIFE | 26,032.34 [2] |
| HEARTLAND PAYMENT SYSTEMS | 24,318.00 |
| HESS CORPORATION | 13,406.44 |
| HI-TEC INDUSTRIES | 47,023.56 |
| HOMAX | 43,006.31 |
| HOPE AVIATION INSURANCE INC. | 24,725.00 [2] |
| HOPE COMPANY | 10,648.58 |
| HOPKINS MANUFACTURING CORP | 12,000.00 |
| HOWARD BERGER CO.INC. | 61,761.40 |
| HOWARD PRODUCTS INCORPORATED | 12,680.53 |
| HUGHES ENTERPRISES | 13,208.06 |
| HYDE MANUFACTURING | 99,486.98 |
| HYDRA | 10,184.20 |
| HYGRADE | 106,331.32 |
| IFCO SYSTEMS NA, INC. | 16,949.75 |
| INTERTAPE POLYMER CORP. | 32,761.13 |
| INTEX | 174,997.25 |
| ITW CONSUMER #206400 | 35,334.16 |
| J&H LIMITED, LLC | 23,017.50 |
| J.T. EATON & CO., INC. | 71,345.01 |
| JACO MANUFACTURING, INC. | 7,445.40 |
| JAN-PRO OF THE WESTERN CAROLINAS | 6,600.00 |
| JCP&L | 39,478.53 |
| JOHN HANCOCK LIFE | 24,422.79 [2] |
| KAMEN WIPING MATERIALS CO. | 16,944.57 |
| KEY EQUIPMENT FINANCE | 456,958.99 |
| KIMBERLY-CLARK CORPORATION | 22,808.48 |
| KIT INDUSTRIES, INC. | 6,051.20 |
| KRUGER PRODUCTS(USA) (ROG) | 12,432.00 |
| KRYLON - SHERWIN WILLIAMS CO. | 607,513.64 |
| LAND AIR EXPRESS | 82,910.17 |
| LARSEN PRODUCTS CORP. | 25,660.22 |
| LAUREY | 20,418.46 |
| LEE ELECTRIC INC. | 16,076.74 |
| LIGHTHOUSE/GE PLASTICS | 62,374.56 |
| LOUISVILLE LADDER, INC. | 7,419.00 |

| | Alleged Dollar Amount of Transfers |
|---|---|
| MACCO | 89,274.10 |
| MARINE INDUSTRIAL | 48,120.84 |
| MARRIOTT | 13,880.71 |
| MARRIOTT HARTFORD DOWNTOWN | 39,941.49 |
| MASSMUTUAL FINANCIAL GROUP | 31,491.16 [2] |
| MASTER LOCK COMPANY | 39,612.80 |
| MASTERCHEM INDUSTRIES INC. | 472,699.97 |
| MAXTECH INTERNATIONAL INC. | 10,494.02 |
| MCCLOSKEY | 148,941.51 |
| M-D BUILDING PRODUCTS | 92,047.49 |
| METROMONT TRAVEL | 150,000.00 [2] |
| MICROFLEX | 39,828.20 |
| MIDWEST FASTENER CORP. | 142,277.08 |
| MINWAX | 1,655,413.03 |
| MODERN MASTERS | 228,726.53 |
| MURCO WALL PRODUCTS, INC. | 9,174.75 |
| NATIONAL PALLET, LLC | 8,685.00 |
| NORTON COMPANY | 201,115.22 |
| OAKLAND PACKAGING & SUPPLY | 11,905.93 |
| OHIO NATIONAL LIFE ASSURANCE CORPORATION | 134,599.02 [2] |
| OLD MASTERS | 79,019.61 |
| OLFA-NORTH AMERICA | 153,665.22 |
| PACIFIC GAS & ELECTRIC | 6,897.84 |
| PACIFIC LIFE | 15,000.00 [2] |
| PACKAGING SERVICE CO. | 691,334.18 |
| PARKER, POE, ADAMS & BERNSTEIN LLP | 20,000.00 |
| PENOFIN PERFORMANCE COATINGS INC. | 76,267.42 |
| PEQUA INDUSTRIES INC. | 7,291.80 |
| PERMATEX, INC. | 27,752.02 |
| PITNEY BOWES | 27,500.00 |
| PITT OHIO EXPRESS LLC | 100,706.12 |
| POLY-AMERICA, INC. | 806,319.52 |
| POLYNOVA INDUSTRIES LIMITED | 39,737.25 |
| PRECISION PRODUCTS INC. | 28,703.72 |
| PREVAL | 19,477.93 |
| PRIMESOURCE RECEIVABLES COMPANY, LLC | 19,764.12 |
| PRIMROSE PLASTICS | 204,193.90 |
| PrintTek, Inc. | 81,407.96 |
| PROJECT FIRE SAFETY | 7,816.62 |
| PROSOCO INC. | 10,427.54 |
| PSE&G | 42,147.92 |
| PURDY CORPORATION | 942,208.32 |
| QWEST COMMUNICATIONS | 14,919.04 |
| R & L CARRIERS INC. | 585,616.75 |

|  | Alleged Dollar Amount of Transfers |
|---|---|
| R&D WEAVING, INC. | 12,527.18 |
| R&L TRUCKLOAD SERVICES, LLC | 12,414.00 |
| R.J. ACKAWAY & ASSOCIATES, INC. | 92,420.36 |
| RED DEVIL, INC. | 44,977.03 |
| REPUBLIC FASTENER PRODUCTS CORP. | 6,925.00 |
| ROMAN ADHESIVES, INC. | 146,497.88 |
| RUST OLEUM CORPORATION | 1,458,751.30 |
| S. C. JOHNSON & SON, INC. | 11,673.43 |
| SAIA MOTOR FREIGHT LINE | 110,449.60 |
| SAMAX ENTERPRISES INC. | 46,168.53 |
| SAMUEL CABOT INC. | 2,075,464.55 |
| SASHCO | 209,354.36 |
| SCANONLINE | 150,876.02 |
| SEAL-KRETE | 223,827.79 |
| SEYMOUR OF SYCAMORE | 97,003.12 |
| SFL FINANCIAL | 99,853.19 |
| SHEFFIELD BRONZE PAINT CORP | 38,962.39 |
| SHERWIN WILLIAMS / DUTCH BOY | 55,675.36 |
| SLOCUM ADHESIVES CORPORATION | 34,102.10 |
| SOUTHEASTERN FREIGHT | 234,694.92 |
| SOUTHERN PRINTING & TYPE | 8,406.96 |
| SOUTHWIRE CO. | 6,187.50 |
| SPRAYWAY INCORPORATED | 27,720.56 |
| STANLEY BLACK & DECKER | 19,131.49 |
| STEVENS AVIATION | 15,080.08 [2] |
| STRAIT-FLEX INTERNATIONAL INC. | 16,156.34 |
| SUPREME CHEMICALS | 71,975.26 |
| THE FLOOD COMPANY | 43,433.54 |
| THE GARDNER GIBSON COMPANY | 149,107.82 |
| THE SKYBRYTE CO. | 59,829.25 |
| THIS STUFF WORKS | 11,144.70 |
| THOMPSONS - SHERWIN WILLIAMS CO. | 425,432.23 |
| TLG LENOX, LLC | 25,000.00 |
| TRANSERVICE LOGISTICS, INC. | 1,416,996.90 |
| TRIMACO LLC | 262,039.56 |
| TURF TECH | 10,023.98 |
| U. S. CONTAINER CORP. | 6,934.66 |
| ULTRA HARDWARE LLC (FERUM IMPORTING) | 32,742.48 |
| UNIGROUP WORLDWIDE | 327,597.45 |
| UNITED COMB & NOVELTY | 9,327.80 |
| UNITED GILSONITE LABORATORIES | 60,322.33 |
| UNITED PARCEL SERVICE | 245,274.26 |
| UNITED STATES GYPSUM COMPANY | 561,067.01 |
| UPS FREIGHT | 116,248.34 |

|  | Alleged Dollar Amount of Transfers |
|---|---|
| USF REDDAWAY | 60,321.00 |
| VALSPAR CORPORATION | 63,585.89 |
| VAL-TEST SUNDRIES | 18,032.45 |
| VANEX COLOR INC. | 7,000.28 |
| VELOCITY EXPRESS | 129,167.05 |
| VERIZON WIRELESS | 17,989.44 |
| VISTAGE WORLDWIDE, INC. | 6,675.00 |
| WARD TRUCKING | 11,669.11 |
| WB MASON CO., INC. | 6,046.71 |
| WD-40 COMPANY | 22,492.03 |
| WERNER COMPANY | 21,091.01 |
| WEST CHESTER HOLDINGS | 6,452.21 |
| WHITE LIGHTNING PRODUCTS CORP. | 131,978.85 |
| WILSON-IMPERIAL CO. | 23,972.10 |
| WM BARR | 519,323.44 |
| WOODSTREAM CORP. | 6,288.71 |
| WOOSTER | 1,127,807.13 |
| WORKTOOLS INTL. | 114,934.37 |
| WRL.COM LLC | 112,289.76 |
| XIM PRODUCTS | 24,546.41 |
| ZIPWALL LLC. | 38,288.95 |
| Total | $27,908,946.40 |

[1] Excludes potential claims related to the Five Star Acquisition.

[2] Includes alleged preference and fraudulent transfer amounts.

*Note: The information above is based on the books and records of the Debtors at the time of preparation. Inadvertent errors may exist and/or the subsequent receipt of information may result in changes in changes to this Exhibit.*

**EXHIBIT C-2**

**Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Insiders**

COLUMBIA 1054928v3

**Non-Exclusive Schedule of Potential Chapter 5 Causes of Action Against Insiders** [1]

|  | Alleged Dollar Amount of Transfers [2] |
|---|---|
| CALEB C. FORT | $235,610.69 |
| MERIT INVESTMENTS, LLC | 837,300.00 |
| E. FORT WOLFE, JR. | 57,248.84 |
| JAY N. BAKER | 9,545.61 |
| Total | $1,139,705.14 |

[1] *Excludes potential claims against Five Star.*

[2] *Excludes payroll.*

*Note: The information above is based on the books and records of the Debtors at the time of preparation. Inadvertent errors may exist and/or the subsequent receipt of information may result in changes in changes to this Exhibit.*

**EXHIBIT D**

**Liquidation Analysis**

D-1

**TMG Liquidation Company, et al**
**Recovery Analysis**
As of 11/1/11 - To Be Updated Prior to Confirmation

| | Ch. 11 Liquidation | Ch. 7 Liquidation |
|---|---|---|
| **Assets Available to Creditors** | | |
| Plan Funding Commitment | $      4,750,000 | $      4,750,000 |
| Litigation Recoveries [a] | TBD | TBD |
| Other [b] | - | - |
| **Total Assets Available for Distribution** | **4,750,000** | **4,750,000** |
| | | |
| **Post-Confirmation Expenses** | | |
| Professional Fees (Six Months) | 825,000 | 900,000 |
| Chapter 7 Trustee Fees [c] | - | 165,810 |
| Other Wind Down Expenses | 181,700 | 181,700 |
| **Total Post-Confirmation Expenses** | 1,006,700 | 1,247,510 |
| | | |
| Funds Available for Claimants | 3,743,300 | 3,502,490 |
| | | |
| **Administrative Claims - Unclassified** | | |
| 503(b)9 Claims | 1,572,337 | 1,572,337 |
| Professional Fees through Confirmation (Net of Carve Out) | 974,740 | 974,740 |
| Other Administrative Claims | 284,615 | 284,615 |
| Total Administrative Claims | 2,831,692 | 2,831,692 |
| *Recovery - Administrative Claims* | *100.0%* | *100.0%* |
| Remaining Funds Available | 911,608 | 670,798 |
| | | |
| **Priority Tax Claims - Unclassified** | 447,276 | 447,276 |
| *Recovery - Priority Tax Claims* | *100.0%* | *100.0%* |
| Remaining Funds Available | 464,332 | 223,522 |
| | | |
| **Class 1 - Secured Claims** | - | - |
| **Class 2 - Non-Tax Priority Claims** | | |
| Priority Employee Claims | 111,592 | 111,592 |
| Priority Claims - Transferred Employees | 40,531 | 40,531 |
| Other | 3,158 | 3,158 |
| Total Class 2 Claims | 155,281 | 155,281 |
| *Recovery - Class 2 Claims* | *100.0%* | *100.0%* |
| Remaining Funds Available | 309,051 | 68,241 |
| | | |
| **Class 3 - Convenience Class Claims [d]** | 30,000 | - |
| *Recovery (10.0%) - Class 3 Claims* | *10.0%* | *0.0%* |
| Remaining Funds Available | 279,051 | 68,241 |
| | | |
| **Class 4 - Senior Unsecured Claims** | 40,514,800 | 40,514,800 |
| *Recovery - Class 4 Claims* | *0.7%* | *0.2%* |
| Remaining Funds Available | - | - |
| | | |
| **Class 5 - Regions Deficiency Claims and Subordinated Claims** | 25,000,000 | 25,000,000 |
| *Recovery - Class 5 Claims* | *0.0%* | *0.0%* |
| | | |
| **Class 6 - All Interests** | NM | NM |
| *Recovery - Class 6 Claims* | *0.0%* | *0.0%* |

[a] *Excludes recoveries from preference actions and causes of action related to the Five Star acquisition in 2010.*

[b] *Other miscellaneous assets recovered would inure to the benefit of Regions.*

[c] *Does not include increased fees based on recoveries from preference recoveries and other causes of action. For each additional million dollars recovered the Chapter 7 Trustee Fee would increase by $30,000. For example, if recoveries from preferences and other causes of action total $10 million Chapter 7 Trustee Fees will increase $300,000 to $1.2 million.*

[d] *Assumes no members of the convenience class opt-out of that class and that no other claimants opt-in. Total pool approximates $300,000. In a Chapter 7 liquidation it is assumed that there would be no convenience class distribution.*

TBD: To Be Determined. To date approximately $190,000 in preference settlements have been agreed to, pending execution and court approval.

NM: Not Meaningful